## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF NEW JERSEY

Rebekah R. Conroy, Esq.
Fed. Bar No. RC8712
Cohn Lifland Pearlman Hermann & Knopf LLP
Park 80 Plaza West-One
Saddle Brook, NJ 07663
(201) 845-9600

**Attorneys for Louisiana Wholesale Drug Company, Inc.**

| | | |
|---|---|---|
| **LOUISIANA WHOLESALE DRUG COMPANY, INC., on behalf of itself and all others similarly situated,** | : : : : | Civil Action No. |
| **Plaintiff,** | : : | |
| **v.** | : : : | **NO.** |
| **BECTON DICKINSON & COMPANY,** | : : | |
| **Defendant.** | : : : | **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

1.      Louisiana Wholesale Drug Company, Inc. ("LWD" or "Plaintiff") brings this class action on behalf of itself and all others similarly situated, based upon personal knowledge, information and belief, and based on the investigation of its counsel. Such investigation includes, inter alia, a review of: (i) the pleadings, briefs and court orders in Retractable Technologies, Inc. v. Becton Dickinson & Company, Civil Action No., 01cv036, E.D. Tex.; (ii) various public statements and SEC filings by Becton Dickinson & Co. ("Becton" or "Defendant") and Retractable Technologies, Inc. ("Retractable"); (iii) various materials regarding Group Purchasing Organizations ("GPOs"), such as Novation, L.L.C., VHA, Inc., Premier, Inc., and MedAssets, Inc.; (iv) reports by

the United States General Accounting Office ("GAO") and other governmental entities; (v)

transcripts and printed statements of various hearings before the United States Senate Committee

on the Judiciary; and (vi) various other documents and information.

## **NATURE OF THE ACTION**

2.      Plaintiff is a pharmaceutical and medical-device wholesaler that, at all relevant times,

bought various Hypodermic Products directly from Defendant. Plaintiff brings this civil action for

equitable relief and for damages because the prices it paid for Hypodermic Products were artificially

inflated due to Becton's conduct as alleged below, which resulted in Becton's illegal acquisition

and/or maintenance of monopoly power in the Hypodermic Products market from at least January

1, 2000  (if not earlier), and continuing through the present. The Hypodermic Products market

alleged herein includes safety-engineered and conventional (non-safety) forms of :(a) needles; (b)

syringes; (c) blood collection devices and their needles; (d) dental syringes and their needles; (e)

winged IV devices and their needles; and (f) catheter devices and their needles. Absent Defendant's

anticompetitive conduct, Plaintiff and the other Class members would have paid less than they

actually did for the Hypodermic Products that they bought during the Class Period, because with

unfettered competition: (a) Becton's list prices and/or net prices it charged Class Members for

Hypodermic Products would have been lower and/or (b) Class Members would have replaced some

of their Becton Hypodermic Product purchases with less-expensive Hypodermic Products sold by

Becton's competitors. As a result, Plaintiff and the other Class members incurred overcharges on

their purchases of Hypodermic Products throughout the Class Period because of Becton's violations

of the antitrust laws.

3.      As alleged in more detail below, Defendant Becton manufactures several different

types of safety and non-safety Hypodermic Products and, at all relevant times, has exercised monopoly power over the market for Hypodermic Products in the United States. As alleged below, during the Class Period, Becton (and/or its corporate affiliates) obtained, maintained, and/or increased Becton's monopoly power regarding Hypodermic Products through an exclusionary, anticompetitive scheme which involved a series of improper unilateral and conspiratorial acts. When taken together, Becton's improper scheme worked to exclude, limit, and/or deter competition from other actual and/or potential Hypodermic Product manufacturers, including, but not limited to, Retractable. Defendant's unlawful, anti-competitive and exclusionary scheme had the purpose and effect of illegally creating and/or maintaining barriers to market entry, resulting in foreclosure and impairment of competition. But for Defendant's unlawful and anticompetitive conduct, the improperly excluded or limited competitors would have entered the market and/or expanded their market share, either of which would have caused a reduction in the prices for Hypodermic Products.

4.     Becton's improper practices included, but were not limited to, the use of exclusive dealing and/or high market-share maintenance arrangements with various types of health-care providers (such as hospitals, ambulatory care facilities, home-health care facilities, long-term care providers, physicians and clinics) that buy Hypodermic Products. As alleged below, under Becton's exclusionary contracts, the price that many health-care providers paid for Becton's Hypodermic Products was directly conditioned on the provider's agreement to maintain or improve Becton's market share by specifically agreeing to fill a very high percentage of its Hypodermic Product needs with Becton products. Typically, this meant that a health-care provider which did not fill at least 85% of its Hypodermic Product needs with Becton products would face severe price penalties, including the loss of current (and/or past) rebates on <u>all</u> of the different types of Becton Hypodermic Products

that it bought. Thus, for example, under Becton's contracts, a hospital that filled 20% of its Hypodermic Product needs with a rival's products would lose rebates on all of the Becton products that the hospital bought, merely because the hospital fell 5% below the 85% threshold. As alleged below, Becton's high-percentage-purchase requirements: (a) have had the purpose and/or effect of denying sales to, and excluding from the market, competing Hypodermic Product manufacturers that are seeking to enter or increase their position in the Hypodermic Product market; and (b) did not have the purpose or effect of creating offsetting, pro-competitive efficiencies.

5. As part of its overarching monopolization scheme, Becton also foreclosed competition in the Hypodermic Product market by engaging in various types of bundling practices. For example, Becton conditioned a health-care entity's receipt of rebates and discounts on Becton's conventional, non-safety-needles with the requirement that the entity fill a high percentage of its needs for safety-needles with Becton products. Furthermore, Becton conditioned discounts and rebates for various other, unrelated, Becton products based on the requirement that a health-care entity fill a high percentage of its Hypodermic Product needs with Becton products. Becton is a large, diversified company that sells numerous types of unrelated health-care products. Due to Becton's bundling practices, a health-care entity that failed to fulfill all, or nearly all, of its Hypodermic Product needs with Becton products would be penalized by losing current and/or past rebates not only on the Becton's Hypodermic Products, but also on various other Becton products. Because Retractable (and some of Becton's other competitors) are smaller companies which make primarily, if not only, Hypodermic Products, it was, for all practical purposes, impossible for rival Hypodermic Product manufacturers to offer sufficient rebates and discounts on their Hypodermic Products to offset the rebates and discounts that a health-care provider would lose if it bought even

4

a relatively minimal amount of Hypodermic Products from Retractable or other rivals. Indeed, it would be difficult, if not practically impossible, for Becton's rivals to give away their products even for free due to the penalties purchasers would incur for diverting sales away from Becton. In this way, Becton used its power as a seller of various types of different, unrelated products as a means to exclude competition in the market for Hypodermic Products and increase and/or maintain its monopoly power over such products. As alleged below, Becton's bundling practices: (a) had (and continues to have) the purpose and/or effect of denying sales to, and excluding from the market, competing Hypodermic Product manufacturers that sought (and are seeking) to enter or increase their position in the Hypodermic Product market; and (b) did not have the purpose or effect of creating offsetting, pro-competitive efficiencies.

6.      Becton's bundling practices, high-percentage purchase requirements, and other improper practices, made it practically impossible for many health-care providers to fill even a small percentage of their Hypodermic Product needs with products made by Becton's competitors (such as Retractable), because the health-care providers would run the risk of facing severe penalties, such as the loss of current (and possibly even past) rebates for Becton's Hypodermic Products and other unrelated Becton products. These threatened penalties constrained the ability of health care providers to purchase products made by Becton's rivals, even where a rival's products were more desirable and less expensive. These practices foreclosed and substantially limited the entry and/or growth of competitors in the Hypodermic Product market, and thus entrenched Becton's monopoly power in the market.

7.      Becton was also able to magnify, reinforce, and exacerbate the anticompetitive effects of its exclusionary contracting practices by conspiring with GPOs and other medical device

5

manufacturers to exclude or limit competition in the Hypodermic Products market. As alleged below, GPOs act as negotiating agents for tens of thousands of hospitals and other health-care providers around the country. According to varying reports and studies, between 68% to 98% of the nation's hospitals belong to at least one GPO, such as Novation, Premier or MedAssets. Under the contracts that the GPOs negotiate for their members, GPOs do not actually buy or take title to the products at issue. Rather GPOs negotiate the terms of "model" or proposed contracts, which the GPO-members can then use as a basis for contracting directly with manufacturers. Manufacturers then typically sell the products at issue to wholesalers who take title to the products, and then resell the products to GPO-members pursuant to the prices that the GPO-members negotiated with the manufacturers.

8.      While GPOs nominally act as bargaining agents for their members, the GPOs are not actually funded or paid by their members. Rather, as alleged in more detail below, GPOs are now financed by the very suppliers -- such as Becton -- that the GPOs are supposedly negotiating against at arm's length, and whose products the GPO is supposed to be independently evaluating. Because Becton sells numerous different products to GPO-member hospitals, it pays the GPOs tens of millions of dollars in fees each year. On information and belief, a substantial portion of the funds that Becton paid to the GPOs were kept as profits, and were not used to pay the GPOs' operating expenses or distributed to the GPO members. As a result, the more GPO-member hospitals spent on Becton's products during the Class Period, the more money the GPOs received from Becton, and thus the more influence Becton had over the GPOs.

9.      As alleged below, while the GPOs do not formally enter into contracts with manufacturers on behalf of the GPO-members, GPOs have the power to pressure and coerce GPO-members to enter into contracts with one manufacturer versus another. As alleged below, prior to

6

and during the Class Period, Becton conspired with the GPOs to use various procedures which would pressure and/or effectively coerce GPO members to: (a) enter into Becton's exclusionary contracts as alleged herein; and (b) not contract with rival Hypodermic Product manufacturers such as Retractable. Consequently, while various GPOs ostensibly worked on behalf of their members in negotiating contracts with Becton regarding Hypodermic Products, the true function of various GPOs was to deliver substantial market share to Becton in exchange for substantial remuneration.

10.     Becton also colluded with other medical-device manufacturers to force and/or pressure hospitals to buy Becton Hypodermic Products exclusively (or nearly so). As alleged below, Becton and several unaffiliated medical device manufacturers participated in various GPO programs in which the prices that hospitals paid for numerous unrelated products from the different manufacturers were linked to, and conditioned on, the requirement that the hospitals fill all, or nearly all, of their Hypodermic Product needs with Becton products. Pursuant to buying programs through various GPOs (such as Novation and MedAssets), Becton paid GPO-member hospitals additional rebates on Becton products if the hospitals bought over 90% or more of their needs for various unrelated products sold by <u>other</u> manufacturers in the buying program. Conversely, other manufacturers in the GPO programs would withhold rebates on their products if a GPO-member hospital in the program did not buy the required percentage of Becton's Hypodermic Products. Thus, for example, if two GPO-member hospitals bought the same amount or percentage of their different product needs from Manufacturers A, B and C, under the GPO programs these manufacturers would withhold rebates from one hospital if that hospital failed to fill 90% or more of its needs for certain Hypodermic Products with Becton products. In such a situation, the hospital would be denied the rebates from the <u>other</u> manufacturers on <u>other</u> products, even if the hospital met the percentage

7

purchase requirements for all of the other manufacturers. In other words, failure to meet one requirement on Becton's Hypodermic Products would result in vastly disproportionate penalties on a wide variety of products from different manufacturers.

11.    These GPO programs were intentional conspiracies in which: (a) different unrelated manufacturers agreed to penalize health-care entities that did not buy the requisite percentage of Becton's Hypodermic Products by withholding rebates on their various products in order to help exclude Becton's competitors and allow Becton to maintain and/or increase its Hypodermic Product monopoly power; and (b) Becton agreed to use the rebates on its different products in order to help other manufacturers increase their sales and/or exclude their respective competitors. Becton knew that: (a) it was agreeing to penalize GPO-member entities by withholding and/or withdrawing rebates on Hypodermic Products if the GPO-member's purchases of another manufacturer's products fell below a set percentage level; and (b) it had no legitimate, pro-competitive reason for giving rebates on Hypodermic Products based on the amount or percentage that a hospital bought of another manufacturer's products. Similarly, the other manufacturers in the GPO-programs knew that: (a) they were agreeing to penalize GPO-members by withholding rebates on their products if the GPO-members failed to buy a set percentage of Becton's Hypodermic Products; and (b) they had no legitimate, pro-competitive reason for linking the rebates on their products to the amount or percentage of the hospital's purchases of Becton's Hypodermic Products. Thus, the other manufacturers in the GPO bundling programs consciously agreed and conspired with Becton to help Becton exclude competitors from the Hypodermic Product market.

12.    As with Becton's exclusionary purchase and rebate requirements, and Becton's bundling of its own products, penalizing GPO-members that failed to buy all of their requirements

for multiple products from certain incumbent manufacturers had the purpose and/or effect of excluding and/or impairing competition in the Hypodermic Product market. Becton's rivals and/or potential rivals were foreclosed and/or impaired because: (a) the decision by a GPO-member to fill even a small percentage of its Hypodermic Products needs with products made by Becton's competitors would subject the GPO-member to huge penalties, including the loss of rebates not only on Becton's products, but also on products from numerous other manufacturers; and (b) it was practically impossible for Retractable and other actual or potential Hypodermic Product manufacturers to offer GPO-member hospitals sufficient discounts and rebates to offset the discounts and rebates that the hospital would lose on other manufacturers' products.

13.    The total, cumulative affect of the various acts in Becton's exclusionary scheme was that actual and potential rival manufacturers of Hypodermic Products either could not compete or could not effectively compete in the market for Hypodermic Products. This stifling of competition caused the artificial inflation of overall market prices, and thus resulted in Plaintiff and the other Class members buying Hypodermic Products at supracompetitive prices during the Class Period. Absent Defendant's conduct, during the Class Period: (a) Becton would have lowered its list prices for its Hypodermic Products and/or the prices it charged Direct Purchasers for Hypodermic Products and/or (b)  Direct Purchasers would have replaced some of their Becton Hypodermic Product purchases with less-expensive Hypodermic Products sold by Becton's competitors. As a result, Plaintiff and the other Class members incurred overcharges on their purchases of Hypodermic Products throughout the Class Period because of Becton's misconduct.

## JURISDICTION AND VENUE

14.    Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15

9

U.S.C. §§ 15(a) and 26, to recover treble damages, equitable relief, costs of suit and reasonable attorneys' fees for Defendant's violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Subject matter jurisdiction is proper pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. §1331 and 1337, because the action arises under the laws of the United States.

15.     Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c) because during the Class Period Defendant resided, transacted business, was found, or had agents in this district, and because a substantial part of events giving rise to Plaintiff's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this District.

16.     The Court has personal jurisdiction over Defendant pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.

## THE PARTIES

17.     Plaintiff Louisiana Wholesale Drug Company, Inc.("LWD") is a corporation organized under the laws of the State of Louisiana and is located at 2085 I-49 South Service Road, Sunset, Louisiana 70584. Plaintiff is a pharmaceutical and medical supply wholesaler who bought Hypodermic Products during the Class Period directly from Becton.

18.     Becton Dickinson & Company is a corporation duly formed and existing under the laws of the State of New Jersey, with its U.S. headquarters at 1 Becton Drive, Franklin Lakes, New Jersey, 07417. Becton is a manufacturer of safety and non-safety hypodermic products that regularly transacts business in this judicial district. Becton controls at least 90% of the Hypodermic Product market. According to Becton's 2003 Annual Report, Becton's US revenues from Safety-Engineered Hypodermic Products alone was approximately $680 million. On information and belief, Becton's

U.S. revenues from all categories of Hypodermic Products was over $1 billion in 2003.

## CLASS ALLEGATIONS

19.     Plaintiff brings this action as a class action pursuant to the Federal Rules of Civil

Procedure 23(a), (b)(2) and/or (b)(3), on its own behalf and as a representative of the following class

of persons and entities ("the Class"):

> All persons and entities who purchased Hypodermic Products in the United States
> directly from Becton at any time during the period January 1, 2000 through the
> present (and continuing until Becton ceases its anti-competitive conduct, and the
> effects of that conduct cease) (the "Class Period"). The Class excludes Defendant,
> Defendant's parents, subsidiaries and affiliates.

20.     Joinder of all Class members is impracticable.  While the size of the Class is not yet

known with any certainty, based on the nature of the trade and commerce involved, Plaintiff believes

that the Class numbers potentially in the hundreds, if not thousands.  Class members are

geographically dispersed throughout the United States.  The Class members are readily identifiable

from information and records in the exclusive possession of Defendant.

21.     Questions of law and fact are common to the Class, including but not limited to:

a.      whether Defendant obtained and/or maintained monopoly power in the
market for Hypodermic Products in the United States;

b.      whether Defendant obtained and/or maintained this monopoly power through
anti-competitive and/or unlawful activity;

c.      whether Defendant engaged in illegal agreements, contracts, combinations,
and/or conspiracies, the purpose and effect of which was to unreasonably
restrain competition and limit access to competing Hypodermic Products;

d.      whether Defendant's illegal contracts, combinations, and/or conspiracies have
harmed Plaintiff and the members of the Class;

e.      whether Becton's sole-source contracts with GPOs, as part of its overall
scheme to monopolize, have resulted in unreasonable restraints on trade and

11

competition;

f.   whether the unlawful conduct of Defendant caused Plaintiff and other Class members to pay more for Hypodermic Products than they otherwise would have paid;

g.   the appropriate Class-wide measure of damages; and

h.   whether Defendant's anti-competitive conduct is continuing, thus entitling the Class to structural relief to promote competition.

22.   Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and other Class members are direct purchasers of Hypodermic Products and were injured by the same wrongful conduct of Defendant. Defendant's conduct in violation of the antitrust laws, the effects of such violations, and the relief sought are all common to the Plaintiff and the Class.

23.   As a representative of the Class, Plaintiff will fairly and adequately protect the interests of all Class members, and has engaged counsel experienced and competent in antitrust and class litigation. The interests of the Plaintiff are coincident with, and not antagonistic to, the interests of the other Class members.

24.   The questions of law and fact that are common to the members of the Class predominate over any questions affecting only individual Class members. Whatever possible difficulties may exist in the management of the class action are greatly outweighed by the advantages of the class action procedure, including, but not limited to, providing Class members with a method for redress of claims that might otherwise not warrant individual litigation.

25.   Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and

without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. A class action enables injured persons or entities to obtain redress on claims that might not be practicable to pursue individually. Class treatment also eliminates the potential for inconsistent adjudications.

### BECTON'S MONOPOLY POWER

26.     The relevant geographic market is the United States.

27.     The relevant product market for analyzing the claims in this case is Hypodermic Products, which includes both safety-engineered and conventional (non-safety) products. The phrase "safety-engineered" products refers to Hypodermic Products that have been engineered to help protect health care workers from needlesticks which can result in hepatitis C, HIV infections, and/or other infections. The Hypodermic Products market includes: (a) needles; (b) syringes; (c) blood collection devices and their needles; (d) dental syringes and their needles; (e) winged IV devices and their needles; and (f) catheter devices and their needles.

28.     In the alternative, the relevant product market in this case includes, or at one time included, a sub-market of safety-engineered Hypodermic Products.

29.     Hypodermic Products are purchased not only by hospitals, but clinics, physicians' office practices, consumers and retail and mail-order pharmacies public health agencies, and pharmaceutical companies.

30.     Upon information and belief, until the end of 1999, Defendant Becton controlled approximately 70% of the market for Hypodermic Products in the United States. By the beginning of 2000, Becton's share of the Hypodermic Product market grew to 90%. Becton sold Hypodermic Products at supra-competitive prices throughout the Class Period.

## FACTUAL ALLEGATIONS

**I.**    **Background Regarding How Hospitals and Other Health-Care**
**Entities Purchase Medical Devices and Products**

31.    As a general matter, hospitals, health-care entities, and pharmacies buy Hypodermic

Products and other health-care products from Plaintiff and other wholesalers, who: (a) purchase the

products directly from the manufacturer(s); and (b) take title to the purchased Hypodermic Products.

A significant number of health-care entities buy their Hypodermic Products from wholesalers

pursuant to prices that are set out in contracts that the health-care entities entered into with

manufacturers based on model contracts negotiated by various GPOs.  The GPOs act as negotiating

agents for tens of thousands of hospitals and other health-care providers around the country.  For

example, Novation negotiates proposed or model contracts with manufacturers for approximately

2,200 health-care entities nationwide, which purchase approximately $19.6 billion worth of a variety

of products, including, but not limited to, medical supplies, surgical supplies, pharmaceuticals,

diagnostic imaging products, business products, laboratory products, dietary and food products, and

capital equipment.   Similarly, Premier (and its subsidiaries or affiliates) represents over 1,600

member hospitals in the United States on whose behalf Premier negotiates proposed or model

contracts with manufacturers. MedAssets (and its subsidiaries or affiliates) is the largest independent

GPO in the U.S., with a membership of over 22,000 health-care providers on whose behalf

MedAssets negotiates proposed or model contracts with manufacturers. Furthermore, VHA (which

owns Novation) has created a separate company called HealthCare Purchasing Partners International

("HPPI") that offers negotiated contracts to over 8,000 health care providers (including hospitals,

ambulatory care facilities, home-health care facilities, long-term care providers, physicians and

14

clinics), which have a combined annual purchasing power of approximately $20 billion per year.

32.    Varying sources estimate that between 68% to 98% of the nation's hospitals currently belong to at least one GPO.  Although at one time there were many relatively small GPOs, mergers in the mid-1990s have yielded a handful of massive, dominant GPOs.  Premier and Novation are the two largest GPOs. Together they generate $34 billion in annual sales (not including VHA's other company, HPPI, which has 8,000 members with $8 Billion in annual purchasing power). Varying estimates indicate that Novation and Premier collectively represent approximately 70-80% of the hospitals that buy through GPO negotiated contracts.  In addition, MedAssets serves more than 22,000 healthcare providers which have a total annual purchasing power approaching $10 billion.

## II.    Retractable And Other Rival Hypodermic Product Manufacturers Posed A Growing Threat To Becton's Hypodermic Product Monopoly Power

33.    In 1997, Retractable began manufacturing and marketing a much-lauded line of safety-engineered Hypodermic Products, which it sells under the brand name, VanishPoint®. Retractable's Vanishpoint products utilize a unique, patented friction ring mechanism. Retractable's VanishPoint® products are designed specifically to prevent needle stick injuries and to prevent reuse. The friction ring mechanism permits the automated retraction of the syringe needle into the barrel of the syringe, directly from the patient, after delivery of the medication is completed. The VanishPoint® blood collection tube holder utilizes the same mechanism to retract the needle after blood has been drawn from the patient. Closure of an attached end cap of the blood collection tube holder causes the needle to retract directly from the patient into the closed tube holder. The advantages of Retractable's products include protection from needle stick injuries, prevention of cross contamination through reuse, and reduction of disposal and other associated costs.

15

34.    In October 1999, Becton's best selling safety syringe, the SafetyLok, was rated "unacceptable" by the Emergency Care Research Institute ("ECRI"), one the nation's most respected testing laboratories, because it was thought to actually cause needle sticks. In contrast to Becton's poor ratings, in 1999-2000 and 2003 ECRI rated Retractable's VanishPoint syringe and blood collection tube holder with its highest possible rating. Thus, ECRI's rating indicates that Becton's safety needles were at a significant technological disadvantage to Retractable's products.

35.    By 2000 (if not before), Becton recognized that Hypodermic Products sold by competitors (including, but not limited to, Retractable's products), posed a significant competitive threat to Becton's hypodermic products. In November 6, 2000, President Clinton signed the Needlestick Safety and Prevention Act which modified the Bloodborne Pathogens Standard, 29 C.F.R.1910.1030 (the "Act"), one of the health and safety standards promulgated by the U.S. Department of Labor's Occupational Safety and Health Association (OSHA). The Act directed that employers of workers with occupational exposure to blood-borne pathogens must use effective engineering controls, including safer medical devices, in order to reduce the risk of injury from needle-sticks and other sharp medical instruments ("sharps"). The law became effective on April 12, 2001.

36.    While safety-engineered Hypodermic Products are generally more expensive than conventional, non-safety Hypodermic Products, the legislation marked the beginning of the shift in the market from conventional, "non-safety" needles toward needles and other sharps that were safety-engineered. Because of this law and other factors, safety products have become an increasingly larger segment of the Hypodermic Product market. Recognizing the increasing importance of Safety-Engineered Hypodermic Products, financial analysts who reported about

16

medical device manufacturers recognized that Retractable's VanishPoint needles could be a competitive threat to Becton. For example, on or about May 21, 2001, Evelyn Ellison Twitchell noted in a <u>Barron's</u> report regarding Becton that Abbott Laboratories (which had distributed Retractable's needles until October 2003) "could have a leg up on Becton because it's distributing a highly rated retractable needle syringe."

37.    By 2000 (if not earlier), it was foreseeable to Becton that if Retractable (and possibly other competing Hypodermic Product manufacturers), were not foreclosed or stifled from competing in the Hypodermic Product market, Retractable (and/or other manufacturers) would achieve much greater success than they actually did, given the superiority of its products, and thus would have posed a far greater competitive threat to Becton than they actually did.

38.    Moreover, it was foreseeable to Becton that if Retractable (and/or other actual or potential Hypodermic Product manufacturers) were not foreclosed or stifled from competing in the market for safety Hypodermic Products, Retractable (and/or other competitors) would sell much more of their products and gain much larger market share than they actually did, thereby enabling Retractable and these other competitiors to achieve economies of scale and/or scope. As the competitors increased their sales, and achieved economies of scale, their costs would have fallen, and thus they would have been able to provide their products at lower prices. Furthermore, the presence of unfettered competition from Retractable (and/or other competitors), which were selling superior and/or lower-priced Safety-Engineered Products, would have forced Becton to lower the prices for its inferior Safety-Engineered products in order to remain competitive. Indeed, as Retractable (and/or other competitors) increasingly reached economies-of-scale, reduced their existing prices, and captured greater amounts of Becton's sales, Becton would have experienced

17

substantial pressure to lower its prices for both its Safety-Engineered and Non-Safety Hypodermic Products or face substantial and increasing losses in sales. Thus, it was foreseeable to Becton that if it did not restrain competition from Retractable (and/or other manufacturers), these rival Hypodermic Product manufacturers: (a) would increase the availability of Safety-Engineered Hypodermic Products that were superior and/or lower-priced than Becton's Safety-Engineered Products; (b) the prices for Hypodermic Products sold by Retractable (and/or other manufacturers) would subsequently decline as these manufacturers achieved economies of scale and/or scope; and (c) Becton would be forced to lower the prices for all of its Safety-Engineered and Non-Safety Hypodermic Products.

## III.   Becton's Exclusionary Contracts With Hospitals and Other Health-Care Entities

39.    Prior to, and throughout, the Class Period, Becton used (and continues to use) various types of exclusionary contracts with hospitals and/or other health-care entities in order to impede and deter competition from Retractable and/or other actual or potential Hypodermic Product manufacturers. Under Becton's exclusionary contracts, the price that a health-care entity paid for Becton's Hypodermic Products was explicitly conditioned on the requirement that the health-care entity help maintain Becton's market share by agreeing to fill all, or nearly all, of its Hypodermic Product needs with Becton products. Under these contracts, health-care providers would forfeit substantial rebates unless they filled at least 85% of their Hypodermic Product needs with Becton products. Indeed, under Becton's contracts, if a health-care entity were to fill less than 85% of its Hypodermic Products needs with Becton products, then the health-care entity would be penalized by: (a) being required to pay higher prices for <u>all</u> the Becton Hypodermic Products that the entity bought; (c) losing post-purchase rebates for <u>all</u> the Becton Hypodermic Products it bought; and (d)

18

in some circumstances, being forced to re-pay *past* rebates that the health-care entity received in connection with its prior purchases of Becton Hypodermic Products.

40.    Becton's market-share maintenance purchase requirements: (a) have the purpose and effect of denying sales to, and/or excluding from the market, rival manufacturers that are seeking to enter or increase their sales and market share, and thereby benefit from economies of scale; and (b) do not create significant offsetting, pro-competitive manufacturing efficiencies. Under these market-share maintenance provisions, a large hospital that buys even a large volume of Becton's Hypodermic Products could be denied rebates on all of the Becton Hypodermic Products it bought if the hospital's purchases fell even one market share percentage point below the mandated commitment levels. In such a situation, the large hospital that bought Becton's Hypodermic Products would be penalized by being forced to pay a higher price (and/or returning prior rebates) even if that hospital continued to buy large volumes of Becton Hypodermic Products. Conversely, a smaller hospital would still receive substantial rebates on Becton's Hypodermic Products, even if it bought a small volume of Becton Hypodermic Products, so long as the small hospital met the contractual market-share maintenance requirements. In this hypothetical, the smaller hospital that met the percentage purchase requirements would pay a lower effective price that was denied to the larger hospital, even if the larger hospital bought a larger volume of Becton Hypodermic Products. Thus, Becton's market-share maintenance provisions cannot be justified by any claimed volume-purchase efficiencies.

41.    Becton also excluded and hindered competition by forcing purchasers to buy a high percentage of an entire bundle of multiple Becton products in order to receive favored prices or rebates on any of the products in the bundle. Becton is a large, diversified company, that sells a

19

multitude of different models and types of health-care products. Through Becton's bundling practices, a health-care entity would receive rebates for its purchases of several types of Becton health-care products only if the health-care entity satisfied Becton's market-share maintenance provisions by buying a high percentage of each of these different products, including Becton Hypodermic Products.

42.    For example, Becton bundled the rebates and discounts on its non-safety-needles with its safety-needles. Similarly, Becton bundled rebates for its Hypodermic Products with completely unrelated health-care products. By this practice, Becton used the prices for a variety of products in order to exclude competition in the market for Hypodermic Products and thus increase and/or maintain its monopoly power in that market. Because Becton's rebates were tied to meeting the market-share maintenance requirements for each and every product in Becton's bundle, health-care entities faced severe penalties on multiple products even if they used Becton products for 100% of their needs in the other product categories but chose to buy even a small percentage of a competitor's Hypodermic Products. The prospect of such stiff sanctions is a very powerful disincentive to purchase a competitor's Hypodermic Products. That threat effectively prevented hospitals from purchasing Hypodermic Products from any source other than Becton.

43.    Many, if not all, of Becton's actual or potential competitors in the Hypodermic Product market were smaller companies with a far smaller range of products, and in some instances, only a single product. As a result, in many (if not all) instances, the smaller, excluded competitors (such as Retractable) could not seek to attract Hypodermic Product sales by offering equal, offsetting discounts (or even greater discounts), because even if the excluded rival were to substantially discount its competing Hypodermic Product (or indeed give it away for free), it could not possibly

20

compensate a health-care entity for all of the discounts and rebates that the entity would lose for the entire bundle of Becton products if it shifted even a small percentage of its Hypodermic Products purchases to one of Becton's rivals. For example, according to Retractable, one Texas hospital (a Novation member) told Retractable that if the hospital bought even one box of Retractable hypodermic products, it would lose $300,000 in rebates and incentives.

44.     Becton's bundling practices, market-share maintenance requirements, and other exclusionary practices, foreclosed from, and/or impaired competitors in, the Hypodermic Product market, and entrenched Becton's monopoly power in the Hypodermic Product market.

## IV.    Becton Used the GPO Programs to Exclude And Impair Competition From Rival Hypodermic Product Manufacturers

45.     As alleged above, between 68% to 98% of the nation's hospitals belong to at least one GPO, such as Novation, Premier or MedAssets. GPOs were originally conceived as a way for hospitals to save money by allowing them to pool their purchasing power in order to negotiate lower prices from manufacturers on an array of medical products and other goods. For example, Novation maintains agreements with almost 500 supply and distribution partners, encompassing 75 percent of the products that its members purchase, including medical supplies, surgical supplies, pharmaceuticals, diagnostic imaging products, business products, laboratory products, dietary and food products, capital equipment and related services. Other GPOs, such as Premier and MedAssets also negotiate agreements for their members with hundreds of different suppliers regarding hundreds (if not thousands) of different products.

46.     Because GPOs are nominally acting as the hospitals' bargaining agents, member hospitals originally funded the GPOs, financing their costs of doing business on behalf of the

hospitals. In 1986, however, the GPOs convinced Congress that the manufacturers and/or the suppliers of the goods should be allowed to pay the GPOs costs rather than the hospitals. Prior to 1986, any payments that a manufacturer made to a GPO would be considered an illegal "kickback" in violation of the Social Security Act's "anti-kickback" provisions. In order to allow manufacturers (rather than the hospitals) to pay the GPOs, the Social Security Act "anti-kickback" provisions were amended to create an exception for amounts paid by vendors to a GPO so long as: (a) the fees were kept at 3% or less of the purchase price; and (b) the GPO fully disclosed, in writing, to each member, all fees received from each vendor with respect to purchases made by, or on behalf of, the member.

47.     Thus, GPOs are now financed by the very suppliers -- such as Becton -- that the GPOs are supposedly negotiating against at arms' length, and whose products the GPO is supposed to be independently evaluating. Because Becton sells numerous different products to GPO-member hospitals, it pays the GPOs millions of dollars in fees each year. As a result, the more GPO-member hospitals spend on Becton's products, the more money the GPOs receive from Becton, and thus the more influence Becton has over the GPOs. According to a January 2005 report prepared by the Department of Health and Human Services Office of the Inspector General, over a 4 year period, three of the largest GPOs collected approximately $1.8 billion, $500 million of which was used to pay the GPO's operating costs. Of the remaining $1.3 billion revenue in excess of operating costs (i.e. profit), $898 million was distributed to the GPO members and $415 million stayed in the GPO coffers even though the GPO's operating costs were already reimbursed. While the GPOs ostensibly appear to be administrative "middlemen" who act as negotiating conduits between manufacturers and health-care entities, the true function of many GPOs as it relates to Hypodermic Products has been to deliver substantial market share to Becton in exchange for substantial fees and forms of

22

remuneration. As set out below, prior to, and throughout, the Class Period, the GPOs undertook various actions, implemented various policies and procedures, and created various buying programs, all of which had the purpose and/or effect of helping Becton to exclude competition from rival Hypodermic Product manufacturers.

A.    **Becton Used The GPO Programs As A Vehicle To Conspire With Other Manufacturers**

48.    As alleged above, Becton used various types of bundling practices regarding its own products in order to exclude and/or limit competition in the Hypodermic Products market. The risk that a health-care entity faced of losing rebates for numerous unrelated products if the entity failed to meet the market-share maintenance requirements for Becton's Hypodermic Products was a very powerful disincentive that deterred health-care entities from buying significant amounts of Hypodermic Products from any source other than Becton. As a part of its exclusionary scheme, Becton used various GPO programs to take its bundling practices even further by conspiring with other manufacturers so that rebates on **other manufacturers'** products were conditioned on the requirement that a health-care entity fill 90% or more of its Hypodermic Products needs with Becton products. The effect was that a health-care entity that chose to buy significant amounts of Hypodermic Products from one of Becton's rivals would lose rebates on **other manufacturers'** products in other markets.

49.    For example, under the "Select" program run by MedAssets' affiliate, Health Services Corporation of America ("HSCA"), a health-care entity will only obtain rebates on numerous unrelated products made by other manufacturers, if the health-care entity fills at least 90% of its blood-collection device needs with Becton products. Blood collection devices (which are one type of Hypodermic Product) constituted a substantial portion of the safety-engineered products that

Retractable sold during the Class Period.  Thus, if a health-care entity that participated in MedAsset's Select program filled only 80% of its blood collection product needs with Becton products, and the other 20% of its blood collection product needs with products made by another manufacturer (such as Retractable), that health-care entity would be denied rebates from other manufacturers, even if the health-care entity filled 100% of its other product needs with these other manufacturers' products.

50.     Under the Select program, each of the manufacturers in the program determine whether the HSCA-members complied with the program's requirements regarding that manufacturer's products. Thus, under the Select program, HSCA-members could not receive rebates on numerous products made by other manufacturers, unless Becton determined that the health-care entity had filled at least 90% of its blood collection product needs with Becton products.  Similarly, while a health-care entity is technically able under the Select program to get a waiver or exemption from Becton so that the health-care entity could buy blood collection products from another manufacturer without jeopardizing its compliance with the program, it was up to Becton to decide when, to whom, and under what conditions it would give such waivers and exemptions.  Thus, Becton decided the circumstances that a health-care entity could buy a competitor's Hypodermic Product without losing rebates from other unrelated manufacturers.

51.     Similarly, during the Class Period, Novation ran a program entitled the "Opportunity Phase I" program, which according to VHA (Novation's parent), is a "portfolio" purchasing program that combined 13 unrelated products made by 5 different manufacturers. Under the Opportunity Phase I program, a Novation-member will not receive rebates from any of the 5 manufacturers on any of the 13 products, unless the Novation member buys at least 95% of its needs of each of the

products from the Novation-designated vendors. From at least 2000 forward, Becton's Hypodermic Products were included in the portfolio. Thus, if a health-care entity filled only 80% of its Hypodermic Product needs with Becton products, and the other 20% of its Hypodermic Product needs with products made by another manufacturer (such as Retractable), the health-care entity would lose the rebates from both Becton and the other manufacturers, even if the health-care entity bought 100% of its product needs from those other manufacturers.

52.    Novation's "Opportunity" program expressly prohibited hospitals that participated in the program from soliciting bids from competing Hypodermic Product manufacturers, examining rival products, or even entertaining rival proposals. For example, Novation's Opportunity Phase I Participation Agreement states: "Participant will not . . . participate in competitive product evaluations for OPPORTUNITY products." Novation's Supply Partner Terms of Participation for the Opportunity program states that "Health care organization agrees not to cause supply partner to incur defensive selling costs during the term of this Agreement (such as can be caused by *entertaining* proposals from other vendors or conducting product evaluations) . . ." (emphasis added). If a hospital violates these restrictions by even considering or evaluating Retractable's Hypodermic Products, the hospital would lose not only the additional rebates from Becton, but also the rebates regarding the 12 products sold by the 4 other manufacturers that participated in the Novation program.

53.    The practical effect of the foregoing restrictions was to force participating hospitals to buy 100% of their needs for the 13 products from the 5 manufacturers in the program, including Becton. This is because it is difficult (if not practically impossible) for a hospital to purchase a rival product if the hospital cannot initially consider the product in connection with a sales presentation,

25

the hospital cannot test or evaluate the rival product, and the hospital cannot even request or consider a bid or pricing proposal from the rival. Thus, even though Novation's program technically required the participating hospitals to fill only 95% of their Hypodermic Product needs with Becton products, a hospital's inability to consider Retractable's products without losing rebates on other products from other manufacturers meant that it was extremely difficult (if not practically impossible) for participating hospitals to fill less than 100% of their Hypodermic Product needs with Becton products.

54.    Finally, the threatened, punitive loss of rebates under Novation's Opportunity program was magnified by the fact that a participating hospital that failed to comply with the program's 95%-commitment requirements would lose not only rebates on the different manufacturers' products for its current and future purchases, but also would be forced to **repay** rebates on the various products that the hospital received for *past* purchases while it was in the program. Novation's Opportunity Spectrum I Portfolio Participation Agreement states that "all earned incentive payments received by the Participant will be subject to repayment if Participant fails to comply for the full [five-year] term of the OPPORTUNITY portfolio" with a 95% purchase commitment and other requirements." The effect of these program terms was that the penalties for buying Hypodermic Products from rival manufacturers substantially increased over time. Because a hospital could lose past rebates on all of the different unrelated products in Novation's program if the hospital failed to remain in compliance, the longer the hospital stays in the program (and continues to buy 90% of its product needs from the 5 participating manufacturers), the more the hospital could potentially lose from deviating from the program.

55.    The potential loss of past rebates means that when a hospital receives the extra rebates

26

under Novation's portfolio programs, the hospital is receiving additional rebates not only because of its past conduct, but also conditioned on its meeting purchasing requirements going forward. Thus, under the Novation portfolio programs, Becton and the other participating manufacturers paid rebates partly as an advanced payment in exchange for the GPO-member's commitment to limit or deny sales to the manufacturers' competitors in the future. A hospital's failure to limit its purchases of a competitor's Hypodermic Products to 10% or less would constitute a breach of the hospital's promise or commitment and require returning the prior payment it received not only to Becton, but also to each of the other unrelated manufacturers in the program.

56.    During the Class Period, Premier had similar programs that tied rebates and bundled unrelated products from different manufacturers and which prohibited participating hospitals from considering or evaluating products from unapproved manufacturers.

57.    As alleged above, the various GPO programs, in which rebates on Becton's Hypodermic Products were bundled with unrelated products from other manufacturers were intentional conspiracies in which different unrelated manufacturers agreed to use the rebates on their various products with the effect of maintaining Becton's market share, and entrenching its monopoly power by excluding competitors. Because of its daily administrative involvement with these various GPO p rograms, B ecton k new that it w as g iving G PO-member h ospitals a dditional r ebates o n Hypodermic Products based on the extent to which the GPO-member hospitals were buying other manufacturers' unrelated products in other markets. Becton had no legitimate, pro-competitive reason for linking the rebates on Hypodermic Products to the amount or percentage of the hospital's purchases of another manufacturers' unrelated products. Similarly, the other manufacturers in the GPO-programs knew that: (a) they were giving GPO-member hospitals additional rebates on their

27

products based on the percentage of Becton Hypodermic Products that the hospitals bought; and (b) they had no legitimate, pro-competitive reason for linking the rebates on their products to the amount or percentage of the hospital's purchases of Becton's Hypodermic Products. Thus, the other manufacturers in the GPO bundling programs consciously agreed and conspired with Becton to help exclude and/or impair Becton's competitors in the Hypodermic Product market.

58.     Furthermore, by offering, maintaining, and promoting the types of cross-manufacturer bundling programs alleged above, GPOs (including, but not limited to, Novation, MedAssets, Premier) which offered, maintained and promoted those programs intentionally agreed to actively aid, assist and promote the multi-manufacturer conspiracy alleged herein. Consequently, the various GPOs which offered, maintained, and promoted the types of cross-manufacturer bundling programs alleged herein were active and willing participants in the multi-manufacturer conspiracy alleged herein.

59.     As with Becton's high-percentage purchase requirements, and bundling within its own product lines, linking rebates and prices across multiple product lines by different manufacturers has had the purpose and/or effect of excluding competition in the Hypodermic Product market because: (a) GPO-member hospitals that filled even a small percentage of their Hypodermic Products needs with products made by Becton's competitors would risk losing both current and past rebates on not only Becton's products, but also products from numerous other manufacturers; and (b) it was economically difficult (if not impossible) for Retractable and other Hypodermic Product manufacturers to offer GPO-member hospitals sufficient discounts and rebates to offset the discounts and rebates that the hospital would lose on other manufacturers' products. Thus, Becton's conspiracy with the other medical-device manufacturers in the GPO programs made it very difficult (if not

28

virtually impossible) for a small competitor such as Retractable to break into the market, and generate enough sales to obtain substantial economies of scale.

**B.    Becton Entered Into Agreements With GPOs Which Prevented GPO Members From Buying Hypodermic Products Made By Rival Manufacturers**

60.    In furtherance of Becton's scheme to exclude competition from rival Hypodermic Product manufacturers, various GPOs aided Becton by taking steps, and enacting procedures, which pressured and effectively coerced GPO-members to not buy Hypodermic Products made by other manufacturers.

61.    In 1996, Premier's board of directors adopted a general policy of commitment that requires all member hospitals to sign a letter of intent to comply with any commitment contracts that Premier negotiates with suppliers.  According to Premier's 1996 Group Purchasing Policy, "once a group contract or contract category has been announced as included in Premier's Committed Program, members will not contract independently for products in areas covered by these contracts." Premier has a special compliance committee to monitor member hospital compliance with commitment contracts. If this committee determines that "the member is not in consensus with Premier's group purchasing strategy of commitment and unwilling to comply," then the committee will recommend that Premier's board impose appropriate sanctions including "financial adjustments or, if appropriate, removal from the Premier organization." The fact that Premier enforces this rule is evidenced by the fact that, according to Retractable,  Premier threatened to expel Iowa Health Systems as a stockholder member for breaching Premier's Purchasing Partners Compliance Policy. On information and belief, other GPOs have similar policies.

62.    Because of Premier's policies, Premier's member hospitals are effectively forced to

contract with only suppliers approved by Premier. Because GPOs such as Premier negotiate discounts and rebates from hundreds of suppliers regarding hundreds of different, unrelated products – such as jello, rubber gloves, pharmaceuticals, etc. – expulsion from a GPO like Premier would mean that any significant purchases from non-approved manufacturers could cause a hospital to lose current (and potentially past) discounts and/or rebates on hundreds of unrelated products from hundreds of different, unrelated manufacturers.

63.     On information and belief, in or about 1998, Premier awarded Becton a 7.5 year sole-source contract. Furthermore, on information and belief, there is evidence that in or about 1999, Becton paid Novation a $1 million payment (in addition to the 3% administrative fees that it pays Novation) for a 4-year sole-source contract under which Becton would be the only vendor approved by Novation to sell Hypodermic Products to Novation members.

64.     Because of the Premier policies alleged above, once Premier awarded Becton a sole-source contract regarding Hypodermic products, any Premier member that bought Hypodermic Products made by other, non-approved manufacturers, such as Retractable, ran the risk of being expelled from the Premier organization and losing rebates on hundreds of other products. The effect of Premier's policies coerced Premier members to: (a) enter into Becton's exclusionary contracts; and/or (b) avoid Hypodermic Products made by other, non-approved, rival manufacturers. As a result of this arrangement, Premier-member hospitals are prohibited from buying **any** competing Hypodermic Products.

65.     Similarly, while Premier-member entities are technically free to seek exemptions from Premier's sole-source contracts, upon information and belief, Premier refers waiver requests to Becton for approval. The fact that a member hospital was required to receive Becton's approval

30

for an exemption from the sole-source nature of the contract prior to purchasing off-contract indicates the exclusive nature of the agreement. Thus, Becton had substantial (if not complete) control to determine whether (and to what extent) Premier-member hospitals could buy competing products from other manufacturers without facing substantial penalties or the loss of significant rebates on Becton's products.

66.    Becton's sole-source contracts with Novation, Premier, and possibly other GPOs, worked to significantly impede and/or prevent other Hypodermic Product manufacturers from selling significant (if any) Hypodermic Products to health-care entities that used those GPOs. For example, as one of Novation's attorneys (Robert Bloch) stated in a paper submitted to the Federal Trade Commission:

> [g]iven that GPO contracts account for seventy-two percent of hospital purchases, failure to win one or more GPO contracts may result in a significant loss of business to the losing vendor depending on the percentage of the total market for the product(s) represented by the purchases of a particular GPO.

Bloch, "*An Analysis of Group Purchasing Organizations' Contracting Practices Under the Antitrust Laws: Myth and Reality*" at 15.

67.    The GPO policies alleged herein, combined with the sole-source contracts that Becton obtained from Novation and Premier (and possibly other GPOs), worked to exacerbate and add to the anti-competitive affects of Becton's other exclusionary actions described above, including but not limited to, Becton's market-share-maintenance provisions and bundling practices alleged herein.

## MARKET EFFECTS OF BECTON'S CONDUCT

68.    The total, overall affect of the various acts in Becton's anti-competitive, exclusionary scheme has been to substantially foreclose and/or impair competition from lower-priced and/or

31

superior quality Hypodermic Products. As alleged above, had Retractable (and possibly other competing Hypodermic Product manufacturers), not been foreclosed or stifled from competing in the safety Hypodermic Product market by Becton's anti-competitive conduct, Retractable (and/or other manufacturers) would have achieved much greater success than they actually did, given the superiority of its products, and thus would have posed a far greater competitive threat to Becton.

69.    Moreover, had Retractable (and/or other actual or potential Hypodermic Product manufacturers) not been foreclosed or stifled from competing in the market for Hypodermic Products by Becton's anti-competitive conduct, Retractable (and/or other competitors) would have sold much more of their products, gained much larger market share, which would have enabled them to achieve economies of scale and/or scope. As the competitors increased their sales, and achieved economies of scale, their costs would have fallen, and thus they would have been able to provide their products at lower prices.

70.    The presence of unfettered competition from Retractable (and/or other competitors), which were selling superior and/or lower-priced Safety-Engineered Products, would have forced Becton to lower the prices for its inferior Safety-Engineered products in order to remain competitive. Indeed, as Retractable (and/or other competitors) increasingly reached economies-of-scale, reduced their existing prices, and captured greater amounts of Becton's sales, Becton would have experienced substantial pressures to lower its prices or face substantial and increasing losses in sales. Thus, absent Becton's illegal conduct as alleged herein, unrestrained competition from Retractable (and/or other manufacturers): (a) would have increased the availability of Safety-Engineered Hypodermic Products that were superior and/or lower-priced than Becton's Safety-Engineered Products; (b) would have resulted in falling prices for Hypodermic Products sold by Retractable (and/or other

32

manufacturers), as these manufacturers achieved economies of scale and/or scope; and (c) would have caused Becton to lower the prices for all of its Safety-Engineered Hypodermic Products.

71.    Furthermore, absent Becton's illegal conduct, unrestrained competition from Retractable (and/or other manufacturers) would have also resulted in lower prices for conventional, non-safety needles as well. While Safety-Engineered Hypodermic Products typically have a higher price than "conventional" or non-safety Hypodermic Products, there is a relationship between the prices and volumes for the two kinds of Hypodermic Products. While Safety-Engineered Hypodermic Products have various safety and quality benefits over conventional, non-safety Hypodermic Products, Hospitals and other health-care entities are financially motivated to use a certain amount of the lower-quality, non-safety, products because those products have a lower price than Safety-Engineered products. However, as the price difference between the two sets of Hypodermic Products shrinks or narrows, the more health-care providers are willing or induced to buy the higher-quality Safety-Engineered Products. Because prices for Safety-Engineered Hypodermic Products would have been lower absent the anti-competitive conduct alleged herein, the prices for conventional, non-safety Hypodermic Products would have also fallen. This is especially the case since as Retractable (and other competitors) increased efficiencies of scale and scope these other competitors would have been able to reduce their prices for their Hypodermic Products.

72.    By unlawfully excluding and/or impairing competition, Becton's conduct has caused Plaintiff and the other Class members to pay more for Hypodermic Products than Plaintiff and the other Class members otherwise would have paid absent Becton's illegal, exclusionary conduct.

73.    Furthermore, the ultimate users and consumers of Hypodermic Products have also

33

been injured because technologically superior products were illegally excluded from the market and/or faced illegal restraints as a result of the conduct alleged above. The improper exclusion of competition from Hypodermic Product manufacturers -- and the resulting inability of these manufacturers to achieve economies which would have enabled them to increase their production – has harmed the ultimate users and consumers of Hypodermic Products because such users and consumers were improperly denied choices and options to purchase technologically superior Hypodermic Products at the lower prices that increased economies of scale would have induced.

## DAMAGES

74.    During the relevant period, Plaintiff and the other members of the Class purchased substantial amounts of Hypodermic Products directly from Defendant. As a result of Defendant's illegal conduct, members of the Class were compelled to pay, and did pay, artificially inflated prices for the Hypodermic Products they purchased. Plaintiff would have been able to, *inter alia*, purchase less-expensive Hypodermic Products had potential competitors, such as Retractable, been able to enter the market, or enter the market without Defendant's imposed restraints, and achieve economies of scale. The prices that Plaintiff and the other Class members paid for Hypodermic Products during the Class Period was substantially greater than the prices that Plaintiff and the Class members would have paid absent the illegal conduct alleged herein, because: (1) the price of Hypodermic Products was artificially inflated by Defendant's illegal conduct; and/or (2) Class members were substantially deprived of the opportunity to purchase competing Hypodermic Products, other than Becton's Hypodermic Products, and to purchase those competing products at substantially lower prices. Members of the Class, have, as a consequence, sustained substantial losses and damage to their business and property in the form of overcharges. The full amount and form and components of such

34

damages will be calculated after discovery and upon proof at trial.

## CAUSES OF ACTION

### COUNT I
### Monopolization- Sherman Act §2

75.    Plaintiff incorporates by reference paragraphs 1 through 74.

76.    Defendant willfully maintained and unlawfully exercised monopoly power in the relevant market.

77.    Defendant's conduct in maintaining and extending its monopoly power in the relevant market constitutes unlawful monopolization in violation of §2 of the Sherman Act. (15 U.S.C. §2).

78.    Defendant acted willfully to maintain and exercise monopoly power in the relevant market through exclusionary, anti-competitive conduct set forth above.

79.    There is no legitimate business justification for the actions and conduct through which Defendant maintained its monopoly in the relevant market.

80.    Defendant has effectively excluded competition from the relevant market, maintained its dominant market share in the relevant market, and profited by its anti-competitive conduct by excluding less expensive, superior competitive products, by maintaining prices at artificially high prices, and reaping the benefits of its illegal monopoly.

81.    The anticompetitive effects of Defendant's conduct far outweigh any conceivable procompetitive benefits or justifications.

82.    Plaintiff and members of the Class were injured in their business or property by Defendant's monopolization of the relevant market. Without limiting the generality of the foregoing, Plaintiff and members of the Class have been forced to pay higher prices for Hypodermic Products

35

in the relevant market than they would have paid in the absence of Defendant's unlawful conduct.

## COUNT II

### Violation of Sherman Act §2 – Conspiracy to Monopolize

83.    Plaintiff incorporates by reference paragraphs 1 through 82.

84.    Prior to, and during, the Class Period, Becton agreed, conspired and/or colluded with GPOs (such as Novation, Premier, MedAssets) and/or other medical-device manufacturers, to assist Becton in: (a) excluding competition from other Hypodermic Product manufacturers; and (b) willfully maintaining and unlawfully exercising monopoly power in the relevant market. Such conduct constitutes an illegal conspiracy to monopolize in violation of §2 of the Sherman Act (15 U.S.C. §2).

85.    As alleged above, there was no legitimate business justification for the agreement, collusion and conspiracy between Becton and various other entities to help Becton in: (a) excluding competition from other Hypodermic Product manufacturers; and (b) willfully maintaining and unlawfully exercising monopoly power in the relevant market.

86.    Defendant's collusion, agreement and conspiracy alleged herein has enabled and/or assisted Becton in: (a) effectively excluding less expensive, superior competitive products from the relevant market; (b) maintaining Becton's dominant market share and monopoly power in the relevant market; (c) maintaining prices at artificially high levels for Becton's Hypodermic Products; and/or (d) otherwise reaping the benefits of its illegal monopoly power. The anticompetitive effects of Defendant's collusive and conspiratorial conduct far outweighs any conceivable procompetitive benefits or justifications.

87.    Plaintiff and members of the Class were injured in their business or property by the

collusion and conspiracy alleged above which facilitated, enabled, assisted or furthered Becton's exclusion of competition and monopolization of the relevant market. Without limiting the generality of the foregoing, Plaintiff and members of the Class have been forced to pay higher prices for safety Hypodermic Products in the relevant market than they would have paid in the absence of Defendant's unlawful conduct.

## COUNT III

### Violation of Sherman Act §1 - Anticompetitive Conspiracy

88.    Plaintiff realleges and incorporates by reference paragraphs 1 through 87.

89.    Section 1 of the Sherman Act prohibits every unreasonable contract, combination or conspiracy in restraint of trade. 15 U.S.C. §1.

90.    Prior to, and during, the Class Period, Becton agreed, conspired and/or colluded with GPOs (such as Novation, Premier, MedAssets) and/or other medical-device manufacturers, to assist Becton in: (a) excluding competition from other Hypodermic Product manufacturers; and (b) willfully maintaining and unlawfully exercising monopoly power in the relevant market. Such conduct constitutes an illegal agreement, combination and/or conspiracy in restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

91.    As alleged above, there was no legitimate business justification for the agreement, collusion and conspiracy between Becton and various other entities that: (a) excluded competition from other Hypodermic Product manufacturers; and (b) resulted in Becton's willful maintenance and unlawful exercise of monopoly power in the relevant market.

92.    Defendant's collusion, agreement and conspiracy alleged herein has enabled and/or assisted Becton in: (a) effectively excluding less expensive, superior competitive products from the

relevant market; (b) maintaining Becton's dominant market share and monopoly power in the relevant market; (c) maintaining prices at artificially high levels for Becton's Hypodermic Products and/or (d) otherwise reaping the benefits of its illegal monopoly power. The anticompetitive effects of Defendant's collusive and conspiratorial conduct far outweighs any conceivable procompetitive benefits or justifications.

93.     Plaintiff and members of the Class were injured in their business or property by the collusion and conspiracy alleged above which facilitated, enabled, assisted or furthered Becton's exclusion of competition and monopolization of the relevant market. Without limiting the generality of the foregoing, Plaintiff and members of the Class have been forced to pay higher prices for safety Hypodermic Products in the relevant market than they would have paid in the absence of Defendant's unlawful conduct.

## COUNT IV

### Violation of Clayton Act §3 – Use of Exclusionary Contracts

94.     Plaintiff incorporates by reference paragraphs 1 through 93.

95.     Section 3 of the Clayton Act (15 U.S.C. §14) prohibits a company from making contracts "on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods. . . of a competitor or competitors," and where the effect of such contract "may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

96.     Section 3 of the Clayton Act prohibits contracts that are exclusive by their express terms or by their practical effect. Defendant's contracts with health-care entities, either expressly or by their practical effect, required healthcare entities to purchase all, or nearly all, of the their Hypodermic Products needs from Becton in order to obtain and retain various discounts and/or

rebates. Healthcare entities, did in fact, comply with the requirements of Becton's exclusionary contracts by filling all, or nearly all, their Hypodermic Products needs from Defendant in order to obtain and retain various discounts and/or rebates. Each and every contract with the market-share maintenance provisions alleged herein, between Defendant and a separate healthcare entity constituted its own contract which contained "the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods. . . of a competitor or competitors."

97.     Each and every contract between Defendant and a separate healthcare entity had the practical effect of suppressing the sale of less expensive, superior safety Hypodermic Products manufactured by rival competitors. Defendant's exclusive and de facto exclusive contracts have substantially lessened competition and/or tended to create and/or maintain a monopoly in Hypodermic Products in violation of 15 U.S.C. §14.

98.     Defendant's conduct has proximately injured Plaintiff and members of the Class who have been forced to pay higher prices for safety Hypodermic Products than they would have paid in the absence of Defendant's unlawful conduct.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself, and the Class, respectfully requests that:

(i)     The Court determine that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23, be given to the Class;

(ii)    The acts alleged herein be adjudged and decreed to be unlawful acts of monopolization in violation of Sections 1, 2, and 3 of the Sherman Act;

(iii)   Each member of the Class recover three-fold the damages determined to have been

sustained by each of them, and that judgment be entered against Defendant in favor of the Class;

(iv)    The Class recover its costs of suit, including reasonable attorneys' fees and costs as provided by law; and

(v)    The Class be granted structural, prospective relief to promote competition, and/or any other appropriate relief as may be determined to be just, equitable, and proper by this Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: March 23, 2005

Rebekah R. Conroy (RC8712)
For the Firm
COHN LIFLAND PEARLMAN
 HERMANN & KNOPF LLP
Park 80 Plaza West-One
Saddle Brook, NJ 07663


GARWIN, GERSTEIN & FISHER, L.L.P.
Bruce E. Gerstein
Noah H. Silverman
Elena Chan
1501 Broadway
New York, New York 10036
Tel.: (212) 398-0055
Fax:    (212) 764-6620

BERGER & MONTAGUE, P.C.
Daniel Berger
Eric L. Cramer
David Sorensen
1622 Locust Street

Philadelphia, PA 19103
Tel.: (215) 875-3000
Fax: (215) 875-4671

ODOM & DES ROCHES, L.L.P.
John Gregory Odom
Stuart E. Des Roches
Suite 2020, Poydras Center
650 Poydras Street
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078

PERCY, SMITH & FOOTE, L.L.P.
David P. Smith
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309
Tel: (318) 445-4480
Fax: (318) 487-1741

SCHIFFRIN & BARROWAY, LLP
Kendall S. Zylstra
Stephen P. Connolly
280 King of Prussia Road
Radnor, Pennsylvania 19087

KOZYAK TROPIN & THROCKMORTON,
 P.A.
Adam Moskowitz, Esq.
2800 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131-2335
Telephone: (305) 372-1800
Telecopier: (305) 372-3508

COHEN, MILSTEIN, HAUSFELD & TOLL,
 P.L.L.C.
Linda P. Nussbaum
150 East 52nd Street
30th Floor
New York, New York 10019-6004
Tel: (212) 838-7797
Fax: (212) 838-7745

41

LAW OFFICES OF JOSHUA P. DAVIS
Joshua P. Davis
437 Valley Street
San Francisco CA 94131

LAW OFFICE OF ALFRED G. YATES JR
PC
Alfred G. Yates
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Phone: (412) 391-5164
Fax: (412) 471-1033