## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LOUISIANA WHOLESALE DRUG COMPANY, INC., On Behalf Of Itself And All Others Similarly Situated, | Civil Action No. 05-CV-1602 (JLL) |
| Plaintiff, | |
| vs. | HEARING DATE: July 25, 2005 Oral Argument Requested |
| BECTON DICKINSON & COMPANY, | |
| Defendant. | |

## MEMORANDUM OF BECTON DICKINSON & COMPANY
## IN SUPPORT OF ITS MOTION TO DISMISS

PAUL, WEISS, RIFKIND,
 WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 373-3000

LOWENSTEIN SANDLER PC
65 Livingston Avenue
Roseland, NJ  07068
(973) 597-2500

Attorneys for Defendant

On the Brief and Of Counsel:

Theodore V. Wells, Jr.  (TW-2830)
Moses Silverman  (MS-9996)
Robert A. Atkins  (RA-9709)
Gregory B. Reilly  (GR-3657)
Deborah A. Silodor (DS-0414)

Doc #:NY6:978562.2

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ............................................................................... 1

THE COMPLAINT ............................................................................................... 3

ARGUMENT ........................................................................................................ 9

I.   The Complaint Should Be Dismissed Because Plaintiff Has
     Failed To Properly Allege A Relevant Product Market ................................... 10

II.  The Complaint Should Be Dismissed Because Plaintiff Has
     Failed To Allege The Essential Elements Of An Antitrust Claim .................. 15

III. The Clayton Act Claim Should Be Dismissed Because Plaintiff
     Has Not Alleged -- And Cannot Allege -- The Facts Necessary
     To State A Claim .......................................................................................... 22

IV.  The Complaint Should Be Dismissed To The Extent That
     Plaintiff's Claims Are Time-Barred Under The Applicable
     Statute Of Limitations ................................................................................. 23

CONCLUSION .................................................................................................... 24

# TABLE OF AUTHORITIES

## CASES

*Allen-Myland, Inc.* v. *Int'l Bus. Machs. Corp.*,
   33 F.3d 194 (3d Cir. 1994)........................................................................ 12

*Associated Gen. Contractors of Cal., Inc.* v. *Cal. State Counsel of Carpenters*,
   459 U.S. 519 (1983)........................................................................... 9, 20, 21

*Brown Shoe Co.* v. *United States*, 370 U.S. 294 (1962) ................................... 11, 12

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997) ............... 6

*Carpet Group Int'l* v. *Oriental Rug Importers Ass'n, Inc.*,
   256 F. Supp. 2d 249 (D.N.J. 2003) ............................................................ 16

*Carpet Group Int'l* v. *Oriental Rug Importers Ass'n, Inc.*,
   227 F.3d 62 (3d Cir. 2000).......................................................................... 16

*City of Pittsburgh* v. *West Penn Power Co.*, 147 F.3d 256 (3d Cir. 1998)............. 20

*Commonwealth of Pennsylvania ex rel. Zimmerman* v. *PepsiCo, Inc.*,
   836 F.2d 173 (3d Cir. 1988)........................................................................ 21

*Crossroads Cogeneration Corp.* v. *Orange & Rockland Utils., Inc.*,
   159 F.3d 129 (3d Cir. 1998)........................................................................ 12

*Fleer Corp.* v. *Topps Chewing Gum, Inc.*,
   658 F.2d 139 (3d Cir. 1981)................................................................... 15, 17

*Gabriel* v. *Gabriel Bros., Inc.*, No. 93 CIV. 0894 (PKL),
   1994 WL 369147 (S.D.N.Y. July 13, 1994) .......................................... 11, 14

*Garshman* v. *Universal Res. Holding, Inc.*, 824 F.2d 223 (3d Cir. 1987)............. 18

*Garshman* v. *Universal Res. Holding, Inc.*,
   625 F. Supp. 737 (D.N.J. 1986) ............................................................. 10, 16

*In re Iams Co. Litig.*, No. C-3-90-014,
  1992 WL 1258515 (S.D. Ohio July 23, 1992)...................................17, 22, 23

*Jefferson Parish Hosp. Dist. No. 2* v. *Hyde*, 466 U.S. 2 (1984) ............................10

*Mele* v. *Fed. Reserve Bank of N.Y.*, 359 F.3d 251 (3d Cir. 2003)...........................6

*Nami* v. *Fauver*, 82 F.3d 63 (3rd. Cir. 1996) ...........................................22

*Pao* v. *Holy Redeemer Hosp.*, 547 F. Supp. 484 (E.D. Pa. 1982)...........................10

*Queen City Pizza, Inc.* v. *Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997)...............................................2, 11, 12, 13, 15, 17

*Richter Concrete Corp.* v. *Hilltop Concrete Corp.*,
  691 F.2d 818 (6th Cir. 1982)..........................................................17

*Schuylkill Energy Res.* v. *PA Power & Light*,
  113 F.3d 405 (3d Cir. 1997)..............................................16, 17, 20

*Southern Concrete Co.* v. *United States Steel Corp.*,
  535 F.2d 313 (5th Cir. 1976)......................................................22, 23

*Steamfitters Local Union No. 420 Welfare Fund* v. *Philip Morris, Inc.*,
  171 F.3d 912 (3d Cir. 1991)..........................................................20

*Sutliff, Inc.* v. *Donovan Co.*, 727 F.2d 648 (7th Cir. 1984)...............................10, 16

*Syncsort, Inc.* v. *Sequential Software, Inc.*,
  50 F. Supp. 2d 318 (D.N.J. 1999) ..............................................1, 2, 9, 11, 12

*TV Communications Network, Inc.* v. *Turner Network Television, Inc.*,
  964 F.2d 1022 (10th Cir. 1992)......................................................12

*Tampa Elec. Co.* v. *Nashville Coal Co.*, 365 U.S. 320 (1961)..............11, 15, 17, 23

*Tanaka* v. *Univ. of S. Cal.*, 252 F.3d 1059 (9th Cir. 2001)......................................12

*Theatre Party Assocs., Inc.* v. *Shubert Org., Inc.*,
  695 F. Supp. 150 (S.D.N.Y. 1988)................................................11

*Tunis Bros. Co., Inc.* v. *Ford Motor Co.*, 952 F.2d 715 (3d Cir. 1991)................. 13

*United States* v. *E.I. duPont de Nemours & Co.*, 351 U.S. 377 (1956)................. 13

*United States* v. *Eastman Kodak Co.*, 63 F.3d 95 (2d Cir. 1995) ........................... 11

*United States* v. *Employing Plasterers Ass'n*, 347 U.S. 186 (1954) ...................... 16

*United States* v. *Grinnell Corp.*, 384 U.S. 563 (1966)........................................... 16

*Vinci* v. *Waste Mgmt., Inc.*, 80 F.3d 1372 (9th Cir. 1996)...................................... 17

## STATUTES

15 U.S.C. § 15b ...................................................................................................... 23

Needlestick Safety and Prevention Act,
    Pub. L. No. 106-430, 114 Stat. 1901 (2000)..................................................... 6

Defendant Becton Dickinson & Company ("Becton") respectfully submits this memorandum of law in support of its motion, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Complaint.

## PRELIMINARY STATEMENT

The Complaint should be dismissed because it fails to allege the most basic element of an antitrust claim: the existence of a relevant product market. Plaintiff Louisiana Wholesale Drug Company, a distributor of pharmaceutical products, accuses Becton, a manufacturer of medical devices, of unlawful monopolization and exclusive dealing. But plaintiff never identifies the products it buys, never alleges the particular product markets in which it does business, and never specifies which anticompetitive conduct occurred in which product market.

Instead, the Complaint compiles a list of more than twelve different medical devices -- from catheters to dental syringes, from blood collection needles to winged IV devices, and more -- and claims they are all part of a single, gigantic market called the "Hypodermic Products" market. That is like claiming there is a single "Electronic Products" market for DVD players, alarm clocks, microwaves and digital cameras. That will not suffice to state an antitrust claim in this or any other Circuit. A complaint must define a relevant market of "reasonably interchangeable" products. *Syncsort, Inc.* v. *Sequential Software, Inc.,* 50 F. Supp.

2d 318, 331-33 (D.N.J. 1999) (citing *Queen City Pizza, Inc.* v. *Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)).

This Complaint illustrates perfectly the wisdom of that rule: there is no way to know from the pleading what Becton allegedly did with respect to which products, which competitors were allegedly excluded from which markets, or in which markets plaintiff does business. Whether plaintiff even has standing to sue is impossible to tell because the Complaint never alleges what product plaintiff bought and what specifically happened in *that* product market. This, we suspect, is not an accident. Plaintiff has omitted the necessary facts and blurred the details under a meaningless market definition because it cannot allege that it purchased most of these medical products, that Becton has monopoly power in all the relevant product markets, or that competitors are excluded from all those various markets.

Since the Complaint fails to allege a plausible market definition, it does not adequately allege any of the other essential elements of an antitrust claim: monopoly power, concerted action, anticompetitive effects, antitrust injury or even standing. Plaintiff is caught between the Third Circuit's pleading requirements and the facts. It cannot allege the facts, because it does not have the facts, to proceed with an action involving twelve or more different product markets. The Complaint should be dismissed.

# THE COMPLAINT

The Complaint in this case is based on the pleading of another litigant in another case.  Plaintiff says so in the very first paragraph of its Complaint, referring specifically to the antitrust case brought against Becton by one of its competitors, Retractable Technologies, Inc. ("RTI").  (Cplt. ¶ 1.)  Just like the complaint in that case, this Complaint recounts how Becton, a manufacturer of many different medical devices, allegedly foreclosed RTI, a rival manufacturer, from selling its products to hospitals, doctors and other healthcare providers. (Cplt. ¶¶ 31-67.)  Despite its length, the Complaint says next to nothing about the plaintiff in this case.

## The Alleged Anticompetitive Behavior

Plaintiff asserts four causes of action against Becton:  (Count I) unlawful monopolization in violation of § 2 of the Sherman Act, (Count II) conspiracy to monopolize in violation of § 2 of the Sherman Act, (Count III) anticompetitive conspiracy in violation of § 1 of the Sherman Act, and (Count IV) use of exclusionary contracts in violation of § 3 of the Clayton Act.  (Cplt. ¶¶ 75-98.)

All of these claims arise from actions allegedly taken by Becton to exclude RTI (and some other unnamed companies) from competing fairly in what plaintiff has named the "Hypodermic Products" market.  (Cplt. ¶ 27.)  The Complaint focuses on Becton's contracts with Group Purchasing Organizations ("GPO's").

GPO's are the "negotiating agents" for hospitals and other healthcare providers that were formed "to negotiate lower prices" for medical products. (Cplt. ¶¶ 31, 45.) The Complaint charges, *inter alia*, that by offering price "discounts" and "rebates," Becton obtained exclusionary contracts that stifled competition from RTI and unspecified others. (Cplt. ¶¶ 42-43, 48-59.) The foreclosure of RTI, allegedly caused by Becton's price reductions, somehow resulted in "inflated" prices for customers. (Cplt. ¶ 2.)

Yet, for all these recycled allegations about RTI, the Complaint alleges precious little about the plaintiff who brought this action. That Louisiana Wholesale Drug Company is a "pharmaceutical and medical-device wholesaler," and bought something at some point from Becton, is all that is alleged. (Cplt. ¶ 2.) Virtually nothing is alleged about what plaintiff does, what specific medical products it bought from Becton, what prices it paid for those products, how it distributes or resells those products, what prices it charges its own customers, or how it was actually harmed by Becton's allegedly anticompetitive behavior.

**The Alleged Relevant Product Market**

The absence of any specific factual allegations about what happened to this plaintiff is made all the more conspicuous by plaintiff's failure to properly allege a relevant product market. The pleading does not disclose what particular medical products plaintiff did, or did not, buy from Becton. That is because the Complaint

lumps together an assortment of very different medical devices into a single

category that plaintiff labels "Hypodermic Products," as described in paragraph 27:

> "The relevant product market for analyzing the claims in this case is
> Hypodermic Products, which includes both safety-engineered and
> conventional (non-safety) products . . . . The Hypodermic Products
> market includes: (a) needles; (b) syringes; (c) blood collection devices
> and their needles; (d) dental syringes and their needles; (e) winged IV
> devices and their needles; and (f) catheter devices and their needles."

By its own terms, this so-called "Hypodermic Products" market includes at

least twelve different products:  six different medical device groups, in both

"safety" and "conventional" designs.  Becton alone manufactures nearly 400

different catalogue items in these various device categories.[1]

These various medical devices are not all the same product, and they do not

comprise a single product market.  Indeed, the complaint in the RTI case -- which

plaintiff otherwise borrowed without change -- alleged that the same list of medical

products encompasses "several discrete relevant markets."  (RTI's Third Amended

---

[1] Though the Court need not address this to resolve this motion, it should know
that the Complaint fails to distinguish between the market for insulin syringes and
needles -- *i.e.*, those used by self-injecting diabetics -- and the market for
hypodermic syringes and needles used by healthcare providers.  Insulin products
are designed differently, are used by a different class of customers, and are
generally sold through different distribution channels.  They are in separate
relevant markets (both safety and conventional) from the other syringes and
needles.  Thus, there are at least fourteen different markets implicated here.

Complaint ¶ 22) (emphasis added).[2]  Plaintiff copied RTI's market definition

verbatim, except it deleted that all-important phrase:

> "'Hypodermic Products' include <u>several discrete relevant markets,</u> composed of [1] needles and [2] syringes, [3] blood collection devices and their needles, [4] dental syringes and their needles, [5] winged IV devices and their needles; and [6] catheter devices and their needles."

While RTI used the same title to describe all the products ("Hypodermic

Products"), it made clear that there are actually a number of different product

markets.  RTI also alleged that each of the six different product categories must

further be "divided into discrete sub-markets" because, *inter alia*, there are "safety

and nonsafety" versions of these different devices.  (RTI Complaint ¶ 23.)  As RTI

alleged, "safety and nonsafety products" are defined in federal legislation that

requires healthcare providers to use safety devices to the virtual exclusion of

conventional devices.  (*Id.* ¶ 23; *see* Cplt. ¶ 35.)  *See* Needlestick Safety and

Prevention Act, Pub. L. No. 106-430, 114 Stat. 1901 (2000).  Thus, as a matter of

federal law, safety and conventional devices are not interchangeable.[3]

---

[2] RTI's Third Amended Complaint ("RTI Complaint") is Exhibit 1 to the accompanying Declaration of Robert Atkins.  On a motion to dismiss, the Court may consider documents specifically referenced and explicitly relied on in the pleading.  *Mele* v. *Fed. Reserve Bank of N.Y.*, 359 F.3d 251, 255 n.5 (3d Cir. 2003) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).

[3] Plaintiff itself alleges an "alternative" market definition in paragraph 28, which seems to acknowledge, at a minimum, that safety and conventional products constitute two, separate product markets: "In the alternative, the relevant product market in this case includes, or at one time included, a sub-market of safety-engineered Hypodermic Products." (Cplt. ¶ 28.)

It is more than a bit instructive that RTI, a company that actually designs and manufactures some of these medical products, alleged that there are at least twelve separate product markets and sub-markets.  Plaintiff here has alleged no facts to support homogenizing these various different products and treating them as one.  It cannot allege such facts.  They don't exist.

**The Different Medical Products Involved**

The medical devices listed by plaintiff are designed and manufactured in very different ways, using different technologies and manufacturing facilities, in order to perform different clinical functions in the treatment and diagnosis of patients.  Here are just a few of the products involved:



| Conventional Syringe & Needle | Safety Blood Collection Device | Safety Winged IV | Conventional Catheter |

Hypodermic syringes and needles are used for giving hypodermic injections -- injections beneath the skin. (*See* The American Heritage Dictionary of the English Language 669 (3rd ed. 2000)). That is what "hypodermic" means: of or pertaining to the layer just beneath the epidermis or skin. (*Id.)*. Catheters are "intravenous" or "IV" devices -- slender flexible tubes that are inserted into veins or other vessels for the sustained infusion of fluids. (*See id.* at 222, 713). And, as the appellation makes plain, "blood collection devices" are still another category of medical devices, designed for withdrawing blood from veins. Blood collection devices are not designed for, and cannot be used for, giving injections.

These and the other product categories listed by plaintiff -- dental syringes and winged IV devices -- are not substitutes for each other. A doctor trying to use an intravenous catheter to give a hypodermic injection would do nothing but hurt the patient.

Plaintiff's entire Complaint hinges on its vague and overbroad market definition. All the allegations are about the supposed "Hypodermic Products" market. There are no facts alleged -- *e.g.*, no anticompetitive conduct, no exercise of monopoly power, no antitrust injury -- with specific respect to the safety syringe market, or the conventional catheter market, or the dental syringe market, or any other actual market. While plaintiff claims that it "bought various Hypodermic Products" from Becton, it does not specify which of the "various" products it

purchased.  (Cplt. ¶ 2.)  Likewise, plaintiff's lengthy narrative about how Becton's

dealings with the GPO's supposedly inhibited competition, refers only to the

meaningless "Hypodermic Products" market.  (Cplt. ¶¶ 31-67.)  So too, with

respect to the alleged effect of these supposed practices on the marketplace -- all of

the allegations are made about the "Hypodermic Products" market.  (Cplt.

¶¶ 68-73.)  Nothing specific about any legally cognizable product market is alleged

anywhere in the Complaint.

## ARGUMENT

The Supreme Court has instructed the district courts that "factual specificity

in antitrust complaints is required."  *Syncsort, Inc.* v. *Sequential Software, Inc.*, 50

F. Supp. 2d 318, 328 (D.N.J. 1999) (citing *Associated Gen. Contractors of Cal.,*

*Inc.* v. *Cal. State Counsel of Carpenters*, 459 U.S. 519, 528 n.17 (1983)).  In an

antitrust case of this magnitude, "a district court must retain the power to insist

upon some specificity in pleading before allowing a potentially massive factual

controversy to proceed."  *Associated Gen. Contractors*, 459 U.S. at 528, n.17.

This Court has held that "facts must be pleaded with reasonable particularity,

however, in order to permit an inference that a Federal antitrust claim is

cognizable."  *Syncsort*, 50 F. Supp. 2d at 328.

Conscious of the staggering and often unnecessary cost and distraction

generated by antitrust lawsuits like this, courts have demanded that plaintiffs meet

their burden of pleading all of the elements and sufficient facts before embarking

on full-blown litigation:

> It is simply not fair to the defendants, and it would be an onerous
> imposition on the judicial process, to permit litigation to go forward
> on the basis of such conclusory and speculative allegations.

*Pao* v. *Holy Redeemer Hosp.*, 547 F. Supp. 484, 491 (E.D. Pa. 1982). This Court

expressed the same concern in *Garshman* v. *Universal Res. Holding, Inc.*, 625 F.

Supp. 737, 741 (D.N.J. 1986):

> Recently, however, courts have focused on "the heavy costs of
> modern federal litigation, especially antitrust litigation, and the
> mounting caseload pressures on the federal courts," and made clear
> that some minimal and reasonable particularity in pleading is required
> to sustain a claim of violation of the Sherman Act. (quoting *Sutliff,
> Inc.* v. *Donovan Co.*, 727 F.2d 648, 654 (7th Cir. 1984)).

As demonstrated below, the Complaint should be dismissed because plaintiff

has failed to allege with any particularity or factual specificity the relevant product

markets and what, in fact, happened to plaintiff in those particular markets.

## I.

### THE COMPLAINT SHOULD BE DISMISSED
### BECAUSE PLAINTIFF HAS FAILED TO PROPERLY
### ALLEGE A RELEVANT PRODUCT MARKET

As a prerequisite to an antitrust claim, the plaintiff must allege a relevant

market in which the anticompetitive effects of the challenged conduct can be

assessed. *See Jefferson Parish Hosp. Dist. No. 2* v. *Hyde*, 466 U.S. 2, 29 (1984).

Whether brought as monopolization claims under Section 2 of the Sherman Act, or

exclusionary conduct claims under Section 1 of the Sherman Act and Section 3 of the Clayton Act, no antitrust claim can proceed without an adequate allegation of a relevant market. *Queen City Pizza, Inc.* v. *Domino's Pizza, Inc.*, 124 F.3d 430, 433 (3d Cir. 1997); *see Tampa Elec. Co.* v. *Nashville Coal Co.*, 365 U.S. 320, 327-28 (1961). "Without a definition of the relevant market, there is no way to measure a company's ability to act as a monopolist." *United States* v. *Eastman Kodak Co.*, 63 F.3d 95, 104 (2d Cir. 1995). To even determine "whether there exists a viable claim of monopolization," the court is required to inquire into the relevant product market. *Syncsort, Inc.* v. *Sequential Software, Inc.*, 50 F. Supp. 2d 318, 327 (D.N.J. 1999)

The plaintiff "bears the burden of defining the relevant market" in the pleading. *Id.* at 331. A relevant market is comprised of a market for the specific product at issue, the market for "reasonably interchangeable products," and a geographic market in which the sellers compete. *See Brown Shoe Co.* v. *United States*, 370 U.S. 294, 324-25 (1962). An "implausible" market definition will not be sustained. *E.&G. Gabriel* v. *Gabriel Bros., Inc.*, No. 93 CIV. 0894 (PKL), 1994 WL 369147, at *2-3 (S.D.N.Y. July 13, 1994). "[F]ederal courts 'have not hesitated to reject market allegations that make no economic sense under any set of facts.'" *Id.* (quoting *Theatre Party Assocs., Inc.* v. *Shubert Org., Inc.,* 695 F. Supp. 150, 154 (S.D.N.Y. 1988)).

Thus, this is much more than a pleading technicality. To avoid dismissal, an antitrust plaintiff "must plead facts sufficient to demonstrate a viable relevant market." *Syncsort*, 50 F. Supp. 2d at 327. The Third Circuit has held: "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand . . . the relevant market is legally insufficient." *Queen City Pizza,* 124 F.3d at 436. In *Queen City Pizza*, the court affirmed the district court's dismissal -- at the pleading stage -- of all the monopolization claims (under § 2 of the Sherman Act) and the exclusive dealing claims (under § 1 of the Sherman Act) "because the plaintiffs failed to allege a valid relevant market." *Id*. at 433. [4]

Specifically, it is plaintiff's burden to define a plausible relevant market based on the Supreme Court's guidance in *Brown Shoe*: "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *See Queen City Pizza*, 124 F.3d at 436 (citing *Brown Shoe*, 370 U.S. at 325). Reasonable interchangeability means "that one product is roughly equivalent to another for the use to which it is put." *Allen-Myland, Inc.* v. *Int'l Bus. Machs. Corp.*, 33 F.3d 194, 206 (3d Cir. 1994). Product interchangeability is assessed by

---

[4] *See also Crossroads Cogeneration Corp*. v. *Orange & Rockland Utils., Inc.*, 159 F.3d 129, 141 (3d Cir. 1998); *Tanaka* v. *Univ. of S. Cal.*, 252 F.3d 1059, 1065 (9th Cir. 2001); *TV Communications Network, Inc.* v. *Turner Network Television, Inc.*, 964 F.2d 1022, 1028 (10th Cir. 1992).

such factors as "price, use and quality," and by analyzing the "cross-elasticity of demand" -- *i.e.*, whether the rise in the price of one product would tend to increase demand for another like product. *Tunis Bros. Co., Inc.* v. *Ford Motor Co.*, 952 F.2d 715, 722 (3d Cir. 1991). As the Supreme Court has characterized it, product substitutability is the touchstone of a valid market definition. *United States* v. *E.I. duPont de Nemours & Co.*, 351 U.S. 377, 394 (1956). A relevant market is thus comprised of "commodities reasonably interchangeable by consumers for the same purposes." *Id.* at 395.

The Complaint here should be dismissed because plaintiff has not even tried to satisfy its burden under *Queen City*. Plaintiff has not alleged the supposed "Hypodermic Products" market "with reference to the rule of reasonable interchangeability and cross-elasticity of demand." *Queen City Pizza*, 124 F.3d at 436. That is plain from the face of the pleading. The Complaint nowhere alleges product interchangeability or substitutability. It does not use those words, or any functional equivalent.

In short, plaintiff does not allege, as it must to state a claim, that all the various products within its alleged "Hypodermic Products" market can be interchanged, used to perform the same clinical functions, or substituted for each other in medical practice. In fact, there are no factual allegations at all about the use of, or demand for, any of the multitude of products identified in the Complaint.

This pleading defect is not, we respectfully submit, an oversight.  It simply would not be possible, consistent with plaintiff's obligations under Rule 11, for plaintiff to make the necessary allegations.  A blood collection needle cannot be used to insert an IV catheter.  A catheter cannot be used like a dental syringe to give an injection in the mouth.  A dental syringe cannot be used to perform a needle biopsy.  A hypodermic needle cannot be used to infuse a patient with intravenous nutrients.  These rudimentary medical facts are why RTI in its complaint alleged, quite correctly, that there are at least twelve "discrete relevant markets."  (RTI Complaint ¶ 22.)

Plaintiff cannot meet its obligation to plead a viable relevant market by fabricating some overbroad and patently unrealistic "market."  In *E.&G. Gabriel* v. *Gabriel Bros., Inc.*, No. 93 CIV. 0894 (PKL), 1994 WL 369147 (S.D.N.Y. July 13, 1994), the court granted a motion to dismiss the plaintiff's Sherman Act claims because (1) the failure to define a relevant market "by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal," and (2) the court found "plaintiff's alleged market to be implausible."  *Id*. at *3.  There, the proposed relevant market ("name-branded deep discounted merchandise") was "economically nonsensical" because it included so many varied products that are "obviously not reasonable substitutes" (like hammers and pajamas) and "are not used for similar purposes."  *Id*.  Though perhaps not quite as extreme as that case,

the implicit allegation here, that IV catheters, dental syringes, blood collection devices and hypodermic needles can each be substituted for the others and used for the same clinical purpose, is medically non-sensical.

The Complaint should be dismissed.

## II.

### THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS FAILED TO ALLEGE THE ESSENTIAL ELEMENTS OF AN ANTITRUST CLAIM

Given plaintiff's failure to properly allege any relevant product market, none of plaintiff's antitrust counts state a viable cause of action. That is true not merely because the existence of a relevant market is one of the essential elements of the monopolization and conspiracy counts under the Sherman and Clayton Acts.[5] It goes further than that. The allegations of Becton's supposedly anticompetitive conduct relate solely to the non-existent and non-sensical "Hypodermic Products" market. No facts are alleged about Becton's conduct in any particular product market, or about the nature of competition in any particular product market, or about plaintiff's purported injury in any particular product market. Accordingly, plaintiff has not adequately alleged any of the essential elements of an antitrust claim.

---

[5] *See Tampa Elec. Co.* v. *Nashville Coal Co.*, 365 U.S. 320, 327-28 (1961); *Queen City Pizza, Inc.* v. *Domino's Pizza, Inc.*, 124 F.3d 430, 442 (3d Cir. 1997); *Fleer Corp.* v. *Topps Chewing Gum, Inc.*, 658 F.2d 139, 147 (3d Cir. 1981);

In order to survive a Rule 12(b)(6) motion, claims under the Sherman

Antitrust Act must include allegations covering all the elements that comprise the

theory. *United States* v. *Employing Plasterers Ass'n*, 347 U.S. 186, 189 (1954).

Moreover, "reasonable particularity in pleading is required to sustain a claim of

violation of the Sherman Act." *Garshman* v. *Universal Res. Holding, Inc.*, 625 F.

Supp. 737, 741 (D.N.J. 1986) (citing *Sutliff, Inc.* v. *Donovan Co.*, 727 F.2d 648,

654 (7th Cir. 1984)).

The elements of plaintiff's claims are these:

To state an adequate claim of monopolization under Section 2 of the

Sherman Act, plaintiff must allege defendant's (1) possession of monopoly power

in the relevant geographic and product market, and (2) willful acquisition or

maintenance of that power as distinguished from a justifiable business decision.

*Id.*, 625 F. Supp. at 744 (citing *United States* v. *Grinnell Corp.*, 384 U.S. 563, 570-

71 (1966)).  In addition, plaintiff must allege facts sufficient to establish "antitrust

injury." *Schuylkill Energy Res.* v. *PA Power & Light*, 113 F.3d 405, 413 (3d Cir.

1997).  Generally, that means the plaintiff must be a participant in the relevant

market -- *i.e.*, a competitor or a consumer. *Carpet Group Int'l* v. *Oriental Rug*

*Importers Ass'n, Inc.*, 227 F.3d 62, 77 (3d Cir. 2000) (noting that antitrust injury

---

*Carpet Group Int'l* v. *Oriental Rug Importers Ass'n, Inc.*, 256 F. Supp. 2d 249, 283
(D.N.J. 2003).

may also "inhere where the harm is 'inextricably intertwined' with the defendant's wrongdoing").  As the Third Circuit explained:

> "The requirement that the alleged injury be related to anti-competitive behavior requires, as a corollary, that the injured party be a participant in the same market as the alleged malefactors."

*Schuylkill Energy Res.*, 113 F.3d at 415 (quoting *Vinci* v. *Waste Mgmt., Inc.*, 80 F.3d 1372, 1376 (9th Cir. 1996)).[6]  The elements of a Sherman Act Section 1 violation are:  "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action."  *Queen City Pizza*, 124 F.3d at 442.[7]

Plaintiff has not alleged with any factual particularity any of these rudimentary elements -- monopoly power, concerted action, anticompetitive effects or antitrust injury -- with respect to any viable product market.

---

[6] Where a conspiracy to monopolize is alleged, as in Count II here, plaintiff also must "prove both an existence of conspiracy and specific intent to monopolize." *Richter Concrete Corp.* v. *Hilltop Concrete Corp.*, 691 F.2d 818, 827 (6th Cir. 1982) (citing *Fleer Corp.*, 658 F.2d at 153).

[7] In order to establish an "exclusionary contract" claim under Section 3 of the Clayton Act, a plaintiff must prove:  "(1) as a condition of sale or price, the buyer is precluded from dealing in the goods of any of the sellers' competitors (the "exclusionary condition"); and (2) the probable effect of the exclusionary condition is to substantially lessen competition or tend to create a monopoly" in a relevant market. *In re Iams Co. Litig.*, No. C-3-90-014, 1992 WL 1258515, at *5 (S.D. Ohio July 23, 1992); *See Tampa Elec. Co.*, 365 U.S. at 327-28.

(1)   <u>Regarding Monopoly Power</u>.  The allegation that Becton has monopoly power in the "Hypodermic Products" market is meaningless.  (Cplt. ¶ 27-30.)  There is no such market.  Moreover, plaintiff cannot mean by using this vague market definition that Becton has illegally monopolized all of the twelve or more product markets:  among many other reasons, Becton does not even make dental syringes and, therefore, has zero market share.  Since plaintiff has failed to allege particularized facts showing that Becton has monopoly power (or intended to obtain such power) in a specific relevant market, it has failed to state a claim under Section 2 of the Sherman Act.

(2)   <u>Regarding Concerted Action</u>.  The allegation that Becton's dealings with the GPO's are some kind of conspiracy to exclude competition in the "Hypodermic Products" market (Cplt. ¶¶ 90-92) is not sufficient to state a claim because the Complaint fails to identify which contracts, with which GPOs, had which anticompetitive effect, in which product markets.  *See*, *e.g.*, *Garshman* v. *Universal Res. Holding, Inc.*, 824 F.2d 223, 230 (3d Cir. 1987).  If plaintiff is alleging that every one of Becton's contracts, with every GPO, covers every product in every market, there is no basis for that.  Having reviewed the pleadings and briefs in the RTI case (as alleged in paragraph 1 of the Complaint), plaintiff knows that is not true.

(3)   <u>Regarding Anticompetitive Effects</u>.  The Complaint contains no particularized allegations about competition in any specific relevant market. Worse still, the Complaint never alleges what competitors (or would-be competitors) participated in, and were supposedly excluded from, which markets. If plaintiff means to allege that RTI was excluded from all of the twelve-plus product markets, that is undeniably false.  As RTI's own pleading establishes, RTI makes only safety devices.  (RTI Complaint ¶ 18.)  RTI sells safety syringes and safety blood collection devices -- *i.e.*, only two of the products.  Plaintiff itself alleges that RTI makes "safety-engineered" products (Cplt. ¶ 33), not conventional products.  Plaintiff has failed to allege with any factual specificity the identity of any actual or potential competitor that Becton excluded from any of the six or more conventional product markets.

(4)   <u>Regarding Antitrust Injury</u>.  The Complaint may be the most deficient when it comes to plaintiff's alleged injury.  Plaintiff claims that it "incurred overcharges" for some unspecified products.  (Cplt. ¶ 2.)  What were those products?  In what markets is plaintiff a consumer?  The Complaint has no answer. Plaintiff does not allege what products it buys from Becton, or anyone else. Plaintiff certainly does not allege that it buys all of the twelve plus products -- and we do not believe plaintiff could make that allegation and still comply with Rule 11.  Since a plaintiff ordinarily must be a participant in the relevant market to

suffer antitrust injury, *Schuylkill Energy Res.*, 113 F.3d at 415, plaintiff cannot state a claim without alleging the specific market in which it buys or distributes products.

(5)   <u>Regarding Plaintiff's Standing</u>.  Given its failure to allege the required factual particularity about the products and the markets, plaintiff has not even established its own standing to sue.  To bring a private antitrust action, the would-be plaintiff must allege "a causal connection between the [antitrust] violation alleged and the injury."  *City of Pittsburgh* v. *West Penn Power Co.*, 147 F.3d 256, 265 (3d Cir. 1998).  An injury that is not connected to the anticompetitive conduct, or is "too remotely connected in the causal chain from any wrongdoing," will not convey standing.  *Steamfitters Local Union No. 420 Welfare Fund* v. *Philip Morris, Inc.*, 171 F.3d 912, 928 (3d Cir. 1991).  As the Supreme Court held, the question of standing "requires us to evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them."  *Assoc. Gen. Contractors of Cal., Inc.* v. *Cal. State Council of Carpenters*, 459 U.S. 519, 535 (1983).  Here, the Complaint does not contain the specific factual allegations that the Court needs to assess plaintiff's standing. Assuming, for example, that the Complaint had specifically alleged that Becton violated the antitrust laws in the conventional catheter market, plaintiff has not alleged the facts that would give it standing to complain -- *e.g.*, that it actually buys

conventional catheters, that the conduct alleged actually affected the price of conventional catheters, or that plaintiff actually was injured by that conduct. Furthermore, if plaintiff contends that Becton's conduct in one product market (*e.g.*, conventional catheters) gives plaintiff standing to complain that it was harmed in an entirely different market (*e.g.*, insulin needles), that kind of disconnected and attenuated claim is far too speculative to establish standing. *See id.* at 534-35.[8]

In sum, the Complaint is more a mystery than a pleading. Is plaintiff claiming that it was overcharged for products Becton does not even make, like dental syringes? Is plaintiff claiming that Becton excluded competition in a market for products plaintiff does not even buy, like safety blood collection needles? Is plaintiff claiming that Becton monopolized a market in which its supposed competitor RTI does not even compete, like conventional catheters? Is plaintiff claiming that it was hurt by prices for insulin syringes, which have nothing in the world to do with the GPO contracts for winged IV devices?

---

[8] In the same way, the Complaint contains nothing more than vague speculation that, had Becton acted differently, plaintiff would have paid less for some unspecified "Hypodermic Products" because RTI and some unnamed "potential competitors" *would* have entered the "market," *would* have launched some unidentified products, *would* have sold those products to plaintiff, *would* have achieved economies of scale, and *would* have reduced their prices. (*See* Cplt. ¶¶ 38, 68-72). Plaintiff's allegations are simply too speculative to sustain an antitrust claim, and illustrate what the Third Circuit has termed "fanciful claims." *Commonwealth of Pennsylvania ex rel. Zimmerman* v. *PepsiCo, Inc.*, 836 F.2d 173, 182 (3d Cir. 1988).

The answers cannot be found in the Complaint.  The essential building blocks for a cognizable antitrust claim are missing.

Whether by plaintiff's design or default, the Complaint does not meet the most basic requirements of a pleading:  to put the defendant on adequate notice of the facts alleged against it, such that it may defend itself; and to put the court in a position to assess the legal sufficiency of those allegations.  *See Nami* v. *Fauver*, 82 F.3d 63, 65 (3rd. Cir. 1996).  Since the Complaint does not satisfy that threshold pleading standard, it should be dismissed.

## III.

### THE CLAYTON ACT CLAIM SHOULD BE DISMISSED BECAUSE PLAINTIFF HAS NOT ALLEGED – AND CANNOT ALLEGE -- THE FACTS NECESSARY TO STATE A CLAIM

In addition to the reasons above, plaintiff's purported "exclusionary contract" claim under Section 3 of the Clayton Act (Count IV) should be dismissed because plaintiff has no standing.

Plaintiff alleges that, in violation of Section 3 of the Clayton Act, Becton entered into "exclusive and de facto exclusive contracts" with healthcare entities that lessened competition.  (Cplt. ¶ 97.)  However, only competitors and "restricted purchasers" -- purchasers who are parties to the allegedly restrictive contract -- can sue for damages under Section 3 of the Clayton Act.  *In re Iams Co. Litig.*, No. C-3-90-014, 1992 WL 1258515, at *5 (S.D. Ohio July 23, 1992); *see Southern*

*Concrete Co.* v. *United States Steel Corp.*, 535 F.2d 313, 318 (5th Cir. 1976).  A

plaintiff must plead and prove, *inter alia*, that as a condition of sale, the purchaser

is precluded from dealing with the sellers' competitors.  *See Tampa Elec. Co.* v.

*Nashville Coal Co.*, 365 U.S. 320, 327-28 (1961).  For there to be an actionable

claim, the plaintiff purchaser must be a party to the contract imposing that

"exclusionary condition."  *In re Iams*, 1992 WL 1258515, at *5.

Here, plaintiff has not alleged that it is a party to any contract with Becton,

exclusionary or otherwise, prohibiting it from buying products from Becton's

competitors.  In fact, plaintiff alleges that the supposedly "exclusive" contracts

were between Becton and "healthcare entities"  (Cplt. ¶¶ 96-97) -- *i.e.*, not with

plaintiff.  Consequently, the Complaint fails to state a claim under the Clayton Act

and Count IV should be dismissed.

## IV.

### THE COMPLAINT SHOULD BE DISMISSED TO THE EXTENT THAT PLAINTIFF'S CLAIMS ARE TIME-BARRED UNDER THE APPLICABLE STATUTE OF LIMITATIONS

Even if plaintiff had stated a valid cause of action, the Complaint fails to

comply with the statute of limitations.  The Complaint claims damages for a period

beginning on January 1, 2000.  (Cplt. ¶¶ 2, 19, 74.)  However, the statute of

limitations under the Sherman Act and Clayton Act is four years from the date the

cause of action accrued.  *See* 15 U.S.C. § 15b.  This action commenced on

March 23, 2005.  Plaintiff has pleaded no basis for an exception to the statute and plaintiff's claims, to the extent they accrue prior to March 23, 2001, must be dismissed.

### CONCLUSION

For the reasons set forth above, Becton respectfully submits that its motion to dismiss should be granted in all respects.  Further, given plaintiff's position, or lack thereof, in the relevant markets, it cannot assert a cognizable claim under the Sherman or Clayton Acts.  Therefore, amendment of the Complaint would be futile, and the Complaint should be dismissed with prejudice.

Respectfully submitted,

LOWENSTEIN SANDLER PC

By: _____
    Gregory B. Reilly  (GR-3657)
    Deborah A. Silodor (DS-0414)
65 Livingston Avenue
Roseland, NJ 07068
Telephone: (973) 597-2500

- and –

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
    Theodore V. Wells, Jr.  (TW-2830)
    Moses Silverman  (MS-9996)

Robert A. Atkins  (RA-9709)
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone: (212) 373-3000


Attorneys for Defendant
 Becton Dickinson & Company