Peter S. Pearlman, Esq.
Fed. Bar No. PP8416
Cohn Lifland Pearlman Herrmann & Knopf LLP
Park 80 Plaza West-One
Saddle Brook, NJ 07663
(201) 845-9600

**Attorneys for Louisiana Wholesale Drug Company, Inc., Rochester Drug
Co-Operative, Inc. and J M Smith Corporation d/b/a Smith Drug Company**

**UNITED STATES DISTRICT COURT
 FOR THE DISTRICT OF   NEW JERSEY**

|  |  |  |
|---|---|---|
| **LOUISIANA WHOLESALE DRUG COMPANY, INC., ROCHESTER DRUG CO-OPERATIVE, INC. and JM SMITH CORPORATION d/b/a Smith Drug Company, on behalf of themselves and all others similarly situated,** | : : : : : : : : | Civil Action No.  05-1602 (JLL) |
| **Plaintiffs,** | : | **JURY TRIAL DEMANDED** |
| v. | : : | |
| **BECTON DICKINSON & COMPANY,** | : : | **Electronically Filed** |
| **Defendant.** | : : | |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT[1]

1.       Louisiana Wholesale Drug Company, Inc. ("LWD"), Rochester Drug Co-Operative,

Inc. ("RDC"), and J M Smith Corporation d/b/a Smith Drug Company ("Smith Drug") (collectively,

---

[1] This complaint is filed as an amended complaint for Louisiana Wholesale Drug
Company, Inc.. This complaint is the first pleading for Rochester Drug Co-Operative, Inc. and J
M Smith Corporation d/b/a Smith Drug Company.

"Plaintiffs") bring this class action on behalf of themselves and all others similarly situated, and aver as follows:

## NATURE OF THE ACTION

2.      Plaintiffs are pharmaceutical and medical device wholesalers that, at all relevant times, bought various hypodermic products (defined below) directly from defendant Becton Dickinson & Company ("Becton" or "Defendant"). Plaintiffs bring this civil action for equitable relief and for damages because the prices that they and other members of the Class (defined below) paid for the hypodermic products enumerated below were artificially inflated due to Becton's conduct.

3.      As alleged below, Becton illegally acquired and maintained monopoly power over various hypodermic products and markets for those products from at least January 1, 2000 (if not earlier) through the present. The hypodermic products at issue here include four relevant product markets: (a) disposable syringes and associated needles; (b) blood collection devices ("BCDs") and associated needles; (c) winged IV catheter devices and their needles; and (d) IV catheter devices and their needles.   Plaintiffs also allege, in the alternative, that during at least some part of the Class Period alleged herein winged IV catheter devices and their needles were in the same relevant market as IV catheter devices and their needles. Products in each of these markets are collectively referred to below as the "Relevant Hypodermic Products" or simply "Hypodermic Products."   During the Class Period, each of these products was sold in both safety and "conventional" (non-safety) forms. As alleged in more detail below, safety versions of the various Hypodermic Products are designed to prevent accidental needlesticks to hospital personnel using the devices.

2

4.      Absent Becton's anti-competitive conduct, Plaintiffs and the other Class members would have paid less for each of the Relevant Hypodermic Products purchased during the Class Period (defined below).   Prices for these products would have been lower with unfettered competition because absent the exclusionary conduct: (a) Becton's prices to members of the Class for the Relevant Hypodermic Products would have been lower; and, (b) members of the Class would have replaced some of their Relevant Hypodermic Product purchases from Becton with less-expensive Relevant Hypodermic Products sold by Becton's competitors.  As a result of Becton's unlawful conduct, Plaintiffs and the other Class members paid overcharges on their purchases of the Relevant Hypodermic Products throughout the Class Period.

5.      As alleged in more detail below, Becton manufactures various safety and non-safety Hypodermic Products and, at all relevant times, has exercised monopoly power over Hypodermic Products, and specifically over the relevant markets for safety and non-safety forms of: (a) disposable syringes and associated needles; (b) blood collection devices ("BCDs") and associated needles; and (c) winged IV catheter devices and their needles; and (d) IV catheter devices and their needles.

6.      Since the late 1980s (if not earlier), Defendant Becton has used (and continues to use) various anti-competitive and illegal practices to achieve and maintain its dominant market position by suppressing and foreclosing competition, even from superior products sold by other manufacturers (such as Retractable Technologies, Inc.), or cheaper products sold by competitors, such as Terumo Medical Corporation. This conduct has enabled Becton to charge prices for the Relevant Hypodermic Products substantially above competitive levels.

7.      Becton's anti-competitive practices include: imposing on hospitals or other health-care entities market share purchase requirements; bundling its goods for exclusionary purposes;

3

conspiring with Group Purchasing Organizations ("GPOs") to impose exclusionary contracts; and conspiring with other established manufacturers to impose rebate penalties on purchasers relating to a bundle of products.

8.    Becton's imposition of high and/or dominant market share purchase requirements effectively made Becton's rebates and/or discounts contingent on a hospital buying nearly all of a particular line of products from Becton. Thus, for example, a hospital that missed meeting an 85% market share purchase requirement with Becton BCD products by only one or two percentage points would be penalized by losing, *inter alia*, various rebates on *all* of the Becton BCDs that the hospital bought. Given Becton's dominant market share for these products, this would be an extremely steep and disproportionate penalty which made it economically impractical (if not impossible) for a hospital to use more than *de minimus* amounts of a competitor's Relevant Hypodermic Products. As alleged in more detail below, Becton's market-share purchase requirements rewarded and/or penalized hospitals based not on the volume of Hypodermic Products that hospitals bought from Becton but the extent to which they denied sales to Becton's competitors. As a result, Becton's market-share purchase requirements: (a) had the purpose and effect of denying sales to, and/or excluding from the market, Becton's competitors; and (b) were not structured to create significant offsetting, pro-competitive manufacturing efficiencies.

9.    Becton also bundles or ties its rebates for various unrelated products by requiring hospitals to fill a high percentage of one line of products as a condition to receive rebates on that **and** other Becton products. For example, a hospital that missed meeting the 85% Becton market share maintenance requirement for Blood Collection Devices by only one or two percentage points would forfeit various rebates not only on the Becton Blood Collection Devices that the hospital bought, but

4

also on: (a) other Becton Hypodermic Products, such as IV catheters or winged IV devices; and (b) even on various Becton's non-Hypodermic Products that the hospital bought and continued to buy. Given Becton's dominance in the markets for many of these other bundled products, the threatened penalty made it economically impractical (if not impossible) for a hospital to use more than a small amount of a competitor's Relevant Hypodermic Products.

10.   To implement and enforce many of Becton's exclusionary contracts and policies, Becton conspired with GPOs, which negotiate contracts on behalf of large groups of hospitals and similar entities.  This conduct has yielded exclusionary contracts that prevent GPO members (e.g. hospitals) from purchasing, or even testing, the products of Becton's competitors.

11.   Further, Becton conspired with other established medical device manufacturers to force hospitals and other health-care entities to fill a dominant percentage of their Hypodermic Products need with Becton's products. As alleged below, Becton and other manufacturers used various GPO programs as vehicles to assist each other to exclude their respective competitors. Under these programs, several manufacturers refused to give a hospital rebates on various different, unrelated products unless the hospital filled 95% of certain Hypodermic Product needs with Becton's products. A hospital's potential loss of rebates on a wide variety of products made by different manufacturers was as a strong penalty that made it economically impractical (if not impossible) for a hospital to use a more than a small or trivial amount of the Relevant Hypodermic Products from Becton's competitors. By tying rebates on their products to the percentage of Becton products that a hospital used these other manufacturers helped Becton to economically coerce hospitals to not buy from Becton's competitors.  Becton reciprocated by imposing similar conditions on rebates for its products, thereby: (a) significantly penalizing hospitals that failed to use the products made by the

5

other conspiring manufacturers; and (b) helping the other conspiring manufacturers to deny sales to, and exclude competition from, their rivals.

12.     The cumulative effect of these practices has been to foreclose competing manufacturers of the Relevant Hypodermic Products (even those competitors with superior and/or less expensive products) from a substantial portion of the respective markets, and to prevent them from (a) gaining market share, (b) achieving economies of scale and scope, and (c) driving down prices in the markets for Hypodermic Products. As a result, Plaintiffs and the others members of the Class that Plaintiffs seek to represent, have paid supra-competitive prices for the Hypodermic Products at issue in this complaint.

## JURISDICTION AND VENUE

13.     Plaintiffs bring this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to recover treble damages, equitable relief, costs of suit and reasonable attorneys' fees for Becton's violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§1-2. Subject matter jurisdiction is proper pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. §§1331 and 1337, because the action arises under the laws of the United States.

14.     Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c) because during the Class Period Becton resided, transacted business, was found, or had agents in this district, and because a substantial part of events giving rise to Plaintiffs' claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this district.

15.     The Court has personal jurisdiction over Becton pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.

6

## THE PARTIES

16.     Plaintiff Louisiana Wholesale Drug Company, Inc. ("LWD") is a corporation organized under the laws of the State of Louisiana and is located at 2085 I-49 South Service Road, Sunset, Louisiana 70584. At all relevant times, LWD purchased safety and non-safety disposable syringes and their associated needles directly from Becton and was injured thereby.

17.     Plaintiff Rochester Drug Co-Operative, Inc. ("RDC") is a pharmaceutical and medical device wholesaler located at 50 Jet View Drive, Rochester, New York. At all relevant times, RDC purchased safety and non-safety disposable syringes and their associated needles directly from Becton and was injured thereby.

18.     Plaintiff Smith Drug is a pharmaceutical and medical device wholesaler located at 101 W. St. Johns Street, Suite 305, Spartanburg, SC 29306. Smith Drug is a South Carolina Corporation. At all relevant times, J M Smith Corporation purchased safety and non-safety disposable syringes and their associated needles directly from Becton and was injured thereby.

19.     Becton Dickinson & Company is a corporation duly formed and existing under the laws of the State of New Jersey, with its U.S. headquarters at 1 Becton Drive, Franklin Lakes, New Jersey 07417. Becton is a manufacturer of various safety and non-safety Hypodermic Products, including: (a) disposable syringes and associated needles; (b) blood collection devices ("BCDs") and associated needles; (c) winged IV devices and their needles; and (d) IV catheter devices and their needles. Becton regularly transacts business in this judicial district.

7

20.     On information and belief, Becton has had a high and/or dominant market share of

each of the following markets: (a) disposable syringes and associated needles; (b) blood collection

devices and associated needles; (c) winged IV devices and their needles; and (d) IV catheter devices

and their needles. If each of these product markets is divided into "safety" and "non-safety"

submarkets, Becton has also had high and/or dominant market shares in each of these respective sub-

markets. According to Becton's 2003 Annual Report, Becton's U.S. revenues from all of its safety-

engineered hypodermic products were approximately $680 million. On information and belief,

Becton's U.S. revenues from all  types of Hypodermic Products were over $1 billion in 2003.

## CLASS ALLEGATIONS

21.     Plaintiffs bring this action as a class action pursuant to the Federal Rules of Civil

Procedure 23(a), (b)(2) and (b)(3), on their own behalf and as representatives of the following class

of persons and entities ("the Class"):

> All persons and entities who purchased Relevant Hypodermic Products in the United
> States directly from Becton at any time during the period March 23, 2001 through the
> present (the "Class Period"). The Class excludes Becton, Becton's parents,
> subsidiaries and affiliates.

22.     Alternatively, Plaintiffs bring this action as a class action pursuant to the Federal

Rules of Civil Procedure 23(a), (b)(2) and (b)(3), on their own behalf and as representatives of the

following class:

> All persons and entities who purchased disposable syringes and associated needles,
> of the safety and/or non-safety varieties, in the United States directly from Becton at
> any time during the period March 23, 2001 through the present (the "Class Period").
> The Class excludes Becton, Becton's parents, subsidiaries and affiliates.

8

23.     Joinder of all Class members is impracticable.[2]  While the size of the Class is not yet

known with certainty, based on the nature of the trade and commerce involved, Plaintiffs reasonably

believe that the Class numbers potentially in the hundreds, if not thousands.  Class members are

geographically dispersed throughout the United States.  The Class members are readily identifiable

from information and records in Becton's exclusive possession.

24.     Questions of law and fact are common to the Class, including but not limited to:

a.     whether Defendant obtained and maintained monopoly power in the markets
       for the Relevant Hypodermic Products in the United States;

b.     whether Defendant obtained and/or maintained monopoly power in the
       relevant markets through anti-competitive and unlawful activity;

c.     whether Defendant engaged in agreements, contracts, combinations, and
       conspiracies, which had the purpose and/or effect of unreasonably restraining
       competition and limiting purchaser access to competing Relevant
       Hypodermic Products;

d.     whether Defendant's unreasonably anti-competitive contracts, combinations,
       and conspiracies have caused Plaintiffs and the other members of the Class
       to suffer antitrust injury in the nature of overcharges;

e.     whether Becton's sole-source contracts with GPOs, as part of its overall
       scheme to monopolize, have resulted in unreasonable restraints on trade and
       competition;

f.     whether Becton's unlawful conduct caused Plaintiffs and other Class
       members to pay more for the Relevant Hypodermic Products than they
       otherwise would have paid;

g.     the appropriate Class-wide measure of damages; and

h.     whether Becton's anti-competitive conduct is continuing, thus entitling the
       Class to injunctive relief to promote unrestrained trade and free and fair
       competition.

---

[2]All allegations herein with regard to the Class apply equally to the two alternative Class
definitions alleged herein.

25.     Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and other Class members are direct purchasers of the Relevant Hypodermic Products and were overcharged and thus injured by the same wrongful conduct of Defendant. Defendant's violation of the antitrust laws, the effects of such violations, and the relief sought are all issues or questions that are common to Plaintiffs and the other Class members.

26.     As representatives of the Class, Plaintiffs will fairly and adequately protect the interests of all Class members, and has engaged counsel experienced and competent in antitrust and class litigation. The interests of the Plaintiffs are coincident with, and not antagonistic to, the interests of the other Class members.

27.     The questions of law and fact that are common to the members of the Class predominate over any questions affecting only individual Class members. Whatever possible difficulties may exist in the management of the class action are greatly outweighed by the advantages of the class action procedure. Those advantages include, but are not limited to, providing Class members with a method for redress of claims that might otherwise not warrant individual litigation.

28.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. A class action enables injured persons or entities to obtain redress on claims that might not be practicable to pursue individually. Class treatment also eliminates the potential for inconsistent adjudications.

## BECTON'S MONOPOLY POWER

10

29. The relevant geographic market for all of the commerce at issue in this case is the United States.

30. The relevant products for this case are all Hypodermic Products, which can be broken down into following four relevant markets pertinent to this case: (a) disposable syringes and associated needles; (b) blood collection devices ("BCDs") and associated needles; and (c) winged IV devices and their needles; and (d) IV catheter devices and their needles. Products in each of these markets will be collectively referred to below as the "Relevant Hypodermic Products" or simply "Hypodermic Products."

31. Plaintiffs also allege, in the alternative, that during at least some part of the Class Period alleged herein winged IV devices and their needles were in the same relevant market as IV catheter devices and their needles.

32. All of the relevant Hypodermic Products come in safety and non-safety forms. Safety and non-safety forms of the same type of Hypodermic Product are partial substitutes. For example, a safety form of a blood collection device can accomplish the same function as a non-safety form of that product. Thus, the safety and non-safety forms of a products are, to some extent, substitutable for and in competition with each other. However, safety syringes, BCDs, winged IV devices and IV catheter devices have important advantages that the non-safety versions of those products do not, because the safety forms of those products are much less likely to stick hospital personnel and spread disease. Thus, when the safety and non-safety forms of the same Hypodermic Product are sold at the same price, buyers are not indifferent between the two versions of the product. Consequently, Becton and other manufacturers are able to charge a higher price for safety-forms of the various

11

Hypodermic Products. Thus, for each of the Hypodermic Products at issue, safety and non-safety devices are in separate product sub-markets for all or part of the Class Period.

33.     While the safety and non-safety forms of any particular Hypodermic Product were in separate sub-markets for all or part of the Class Period, given that the higher-priced, safety forms of a Hypodermic Product can perform the same function as a less-expensive non-safety forms of the product, if the price on the safety-form of a product drops enough, buyers will shift their purchases from the conventional forms of the product to the safety-form of the product. Thus, competition regarding the safety form of a Hypodermic Product can affect not only the price for the safety form of the product, but also the price for the less-expensive, conventional (non-safety) form of the product. If competition drives down prices for the higher-priced safety-form of a product, sellers of the conventional form of the product will have to lower their prices on that product or risk losing sales as consumers shift their purchases from the conventional to the safety-form of the product. Thus, even taking a static view, a firm (such as Becton) which had monopoly power over the sub-markets for the conventional, non-safety forms of the Relevant Hypodermic Products would clearly benefit by excluding, hampering, or delaying competition from manufacturers such as Retractable, Terumo and others that sold safety-versions of those same products. Thus, as alleged below, since unfettered competition from Retractable, Terumo and/or other excluded competitors would have driven down the prices for safety-forms of the Relevant Hypodermic Products, Becton would have been forced to lower the prices it charged for conventional versions of those products, or risk the possibility that consumers would shift their purchases from Becton's conventional product to a competitor's safety-form of the product. This price effect is even stronger if one considers the

12

dynamic effects of exclusionary conduct over time. The clear market trend is toward greater needle safety, in part, because of increasing regulation.

34. The Relevant Hypodermic Products are utilized not only by hospitals, but also by clinics, physicians' office practices, consumers and retail and mail-order pharmacies, public health agencies, and pharmaceutical companies.

35. As late as 2003, Defendant had a dominant market share of each of the Relevant Hypodermic Product markets and sub-markets at issue. It controlled 70% or greater of the markets for disposable syringes and associated needles and BCDs, of both the safety and non-safety type. Becton also controlled 50-70% or greater of the market for safety and non-safety winged IV devices and IV catheter devices. Becton had monopoly power over and sold all of the Relevant Hypodermic Products at supra-competitive prices throughout the Class Period.

## FACTUAL ALLEGATIONS

### I. Background: How Hospitals and Other Health-Care Entities Purchase Medical Devices and Products

36. As a general matter, at all relevant times, hospitals, health-care entities, pharmacies, and other various entities procured the Relevant Hypodermic Products from wholesalers; wholesalers, such as Plaintiffs, purchase the medical devices directly from the manufacturer(s) and take title to the Relevant Hypodermic Products. A significant number of health-care entities buy their Relevant Hypodermic Products from wholesalers pursuant to prices that are set out in contracts that the health-care entities entered into with manufacturers based on so-called model or form contracts negotiated by GPOs.

13

37.     The GPOs act as negotiating agents for tens of thousands of hospitals and other health-care providers. For example, Novation, one of the largest GPOs, negotiates form or model contracts with manufacturers for approximately 2,200 health-care entities nationwide. Novation's members collectively purchase approximately $19.6 billion worth of a variety of products, including, but not limited to, medical supplies, surgical supplies, pharmaceuticals, diagnostic imaging products, business products, laboratory products, dietary and food products, and capital equipment. Similarly, Premier (and its subsidiaries or affiliates) negotiates proposed or model contracts with manufacturers for over 1,600 member hospitals in the United States. MedAssets (and its subsidiaries or affiliates) is the largest independent GPO in the U.S. MedAssets negotiates model contracts with manufacturers on behalf of its membership of over 22,000 health-care providers. Furthermore, VHA (which owns Novation) has created a separate company called HealthCare Purchasing Partners International ("HPPI") that offers negotiated contracts to over 8,000 health care providers (including hospitals, ambulatory care facilities, home health-care facilities, long-term care providers, physicians and clinics), which have combined annual purchasing power of approximately $20 billion per year.

38.     It is variously estimated that between 68% to 98% of the nation's hospitals currently belong to at least one GPO. Although at one time there were many relatively small GPOs, mergers in the mid-1990s have yielded a handful of massive, dominant GPOs. Premier and Novation are the two largest GPOs. Together they contract for $34 billion in annual sales (not including VHA's other company, HPPI, which has 8,000 members with $8 billion in annual purchasing power). Varying estimates indicate that Novation and Premier collectively represent approximately 70-80% of the hospitals that buy through GPO negotiated contracts. In addition, MedAssets serves more than 22,000 healthcare providers which have a total annual purchasing power approaching $10 billion.

14

II.    **Rival Manufacturers of Relevant Hypodermic Products Posed
       Growing Threats To Becton's Ability to Maintain or
       Expand Its Monopoly Power in the Relevant Hypodermic Product Markets**

39.    Since the early to mid 1980s, Becton has faced a number of threats to its monopoly

power in the Relevant Hypodermic Product Markets from rival competitors.    As set out below,

Becton has repeatedly been able to eliminate or impede competition from these various rivals

through the various types of improper conduct alleged herein.  Furthermore, by erecting artificial

barriers to entry through the exclusionary conduct alleged herein, Becton discouraged  potential

rivals from even attempting to invest the resources necessary to challenge Becton's dominance in

each of the Relevant Product Markets and sub-markets.

40.    For example, in the 1970s, Becton started facing competition from Terumo, a

Japanese company, which manufacturers disposable medical products. Terumo manufactures both

conventional and safety forms of all the Relevant Hypodermic Products in this action -- *i.e.*

conventional and safety forms of: (a) disposable syringes and associated needles; (b) blood collection

devices and associated needles; and (c) winged IV devices and their needles; and (d) IV catheter

devices and their needles.

41.    In the late 1970s, Terumo started selling in the United States needles that were less-

expensive than  Becton's needles. Becton responded to this competitive threat by, inter alia, using

various types of pricing and rebating practices to prevent Terumo from gaining significant market

share in the U.S. market for conventional needles. By 1981 the competitive threat from Terumo was

at least initially contained.

42.    In the mid 1980s, Terumo decided to increase its position in the United States markets

for the Relevant Hypodermic Products. By 1988 Terumo had gained approximately 12% of the U.S.

15

market for various Hypodermic Products and announced plans to further increase its market share. Specifically, Terumo was expanding its U.S. manufacturing facilities to meet the demand for its Relevant Hypodermic Products and stated that it planned to increase its annual U.S. sales five fold (from 10 billion Yen to 50 billion Yen). Terumo's strategy for gaining market share was to offer wholesalers and GPOs hypodermic products at prices that ranged from approximately 20% to 40% below Becton's then-current prices.

43. Because of Terumo's aggressive discounting strategy, Becton reported in a August 11, 1989 company Report that Becton was experiencing heavy price competition from Terumo in its core U.S. hypodermic and insulin syringe business. Similarly a 1989 News & Observer article reported that Becton was preparing for a battle with Terumo for domination of hypodermic syringe and other markets.

44. In response to the growing threat from Terumo, Becton undertook in 1988 and 1989 an "aggressive" program called "Block Terumo", which involved the use of various pricing and rebating tactics alleged herein as well as the use of long-term, exclusive contracts with purchasers. As a January 1990 Becton report states:

> In fiscal 1989, management embarked upon an aggressive strategy to prevent the Japanese firm of Terumo from gaining a foothold in the domestic market for needles and syringes, a business that accounts for an estimated $150 million in revenues for Becton Dickinson.

45. In the three years from 1988 to 1991, Terumo's market share in the United States for the Relevant Hypodermic Products went from approximately 12% to approximately 1%. In or about 1992, Terumo announced that it would no longer focus on selling hypodermic products to hospitals in the United States.

16

46.     According to various sources, it was Becton's use of the various pricing strategies

and long-term exclusive contracting practices that significantly blocked competition from Terumo

in the early 1990s. For example, a January 1990 Becton report states that its "enhanced incentive

plan" enabled Becton to limit Terumo's market share to only 1%. As alleged below, but for Becton's

continuing improper conduct, Terumo would have been able to enter, and/or expand its presence in,

the U.S. markets and sub-markets for the each of the Relevant Hypodermic Products prior to and

during the Class Period. But for Becton's improper conduct prior to, and during the Class Period:

(a) Plaintiffs and the other Class members would have substituted a certain portion of their purchases

of Becton's Relevant Hypodermic Products with Terumo's less-expensive versions of the Relevant

Hypodermic Products; and (b) the competition from Terumo would have forced Becton to lower its

prices for the relevant Hypodermic Products.

47.     In addition to Terumo, Becton continued during the 1990s to face threats from other

rival manufacturers. For example, in 1997, Retractable began manufacturing and marketing a much-

lauded line of safety-engineered Hypodermic Products, which it sells under the brand name,

VanishPoint®.  Retractable currently sells safety forms of: (a) disposable syringes and associated

needles; (b) blood collection devices ("BCDs") and associated needles. According to Retractable,

VanishPoint® products were designed specifically to prevent needle stick injuries and to prevent

reuse. The friction ring mechanism permits the automated retraction of the syringe needle into the

barrel of the syringe directly from the patient after delivery of the medication is completed. The

VanishPoint® blood collection tube holder utilizes the same mechanism to retract the needle after

blood has been drawn from the patient. Closure of an attached end cap of the blood collection tube

holder causes the needle to retract directly from the patient into the closed tube holder. According

17

to Retractable, the advantages of Retractable's products include protection from needle stick injuries, prevention of cross contamination through reuse, and reduction of disposal and other associated costs.

48.     In October 1999, Becton's best-selling safety syringe, the SafetyLok, was rated "unacceptable" by the Emergency Care Research Institute ("ECRI"), one of the nation's most respected testing laboratories, because it was thought to actually cause needle sticks. In contrast to Becton's poor ratings, in 1999-2000 and 2003 ECRI rated Retractable's VanishPoint syringe and blood collection tube holder with ECRI's highest possible rating. Thus, Becton's safety needles were viewed as technologically inferior to Retractable's comparable products.

49.     By 2000 (if not before), it was foreseeable to Becton that it would be facing a growing threat from competitors that sold superior and/or cheaper safety-forms of various hypodermic products. In the years prior to 2000, the possibility of Federal legislation encouraging the use of safety-engineered forms of Hypodermic Products was widely-known and discussed within the Hypodermic Product industry.

50.     On November 6, 2000, President Clinton signed the Needlestick Safety and Prevention Act which modified the Bloodborne Pathogens Standard, 29 C.F.R.1910.1030 (the "Act"), one of the health and safety standards promulgated by the U.S. Department of Labor's Occupational Safety and Health Association ("OSHA"). The Act directed that employers of workers with occupational exposure to blood-borne pathogens must use effective engineering controls, including safer medical devices, in order to reduce the risk of injury from needle- sticks and other sharp medical instruments ("sharps"). The requirement that hospitals and health-care entities begin

18

switching to safety-engineered products (which had been the subject of industry-wide discussion for several years prior to November 2000), became effective on April 12, 2001.

51.     While safety-engineered Hypodermic Products are generally more expensive than conventional, non-safety Hypodermic Products, the legislation fostered a shift from conventional, non-safety Hypodermic Products to the safety-forms of those products. Because of this law and other factors, safety products have become an increasingly larger segment of the Hypodermic Product market. Indeed, in April 2003 Becton completely abandoned making and selling conventional (non-safety) types of various Hypodermic Products because it recognized that the demand had substantially shifted to safety-engineered products. According to Becton, by April 2003, U.S. hospitals had shifted over 80% of their Hypodermic Products usage from conventional (non-safety) designs to safety-engineered designs for various Hypodermic products, such as IV catheters, "needleless" IV connectors, blood drawing needles, winged needle sets, and lancet devices. Because this transition from conventional to safety-engineered products was foreseeable, it was foreseeable to Becton that it was seriously threatened by competitors that had a price or technological advantage in the safety-engineered part of the Hypodermic Product market.

52.     Recognizing the increasing importance of Safety Engineered Hypodermic Products, financial analysts who reported about medical device manufacturers recognized that Retractable's VanishPoint needles could be a competitive threat to Becton. For example, on or about May 21, 2001, *Barron's* reported that Abbott Laboratories (which, at the time, had distributed Retractable's needles) "could have a leg up on Becton because it's distributing a highly rated retractable needle syringe."

19

53.     By 2000 (if not earlier), it was foreseeable to Becton that if it did not take steps to stifle or foreclose the growth of competitors selling safety-forms of the various relevant Hypodermic Products, those competitors would pose a significant competitive threat to Becton. The threat from Retractable, Terumo and/or other actual or potential Hypodermic Product manufacturers would be an ever-increasing one because as Retractable, Terumo and other competitors sold more of their products and gained an increasingly larger market share, these other competitors would achieve economies of scale and scope. As a result, these competitors would see their variable costs fall, and thus they would have been able to provide their products at lower prices. If Becton's competitors were able to establish themselves as significant sellers of safety forms of the Relevant Hypodermic Products, then as consumers shifted to safety-forms of the hypodermic products the consumers would, at least in part, be shifting from Becton's conventional hypodermic products to the safety-forms of those products sold by Becton's competitors. Price competition between Becton and its competitors for safety forms of the Relevant Hypodermic Products would intensify as output increased. Furthermore, Becton would be forced to the lower the price on those units of the conventional Hypodermic Products that Becton continued to sell, because as Becton's competitors grew, achieved efficiencies of scale, and reduced their prices for the safety-forms of the relevant Hypodermic Products, Becton would experience substantial pressure to lower its prices for both its Safety Engineered and Non-Safety Hypodermic Products. Thus, if Becton's competitors were able to establish and increase their sales of the safety versions of the relevant Hypodermic Products, Becton would lose significant revenues because: (a) as consumers shifted to safety versions of the Hypodermic Products they would be diverting sales from Becton to Becton's competitors; (b) even on the conventional product sales that Becton retained it would have to reduce prices; and (c) price

20

competition would reduce the revenues Becton would garner from that fraction of sales that it retained of safety versions of Hypodermic Products.

54.    Thus, it was foreseeable to Becton that if it did not restrain or impede competition from Terumo, Retractable and other manufacturers: (a) these rival manufacturers of the Relevant Hypodermic Products would increase the supply of Safety Engineered Hypodermic Products that were superior and/or had lower prices than Becton's Safety Engineered Hypodermic Products; (b) the prices for Hypodermic Products sold by Terumo, Retractable (and other manufacturers) would subsequently decline as these manufacturers achieved economies of scale and scope and as price competition intensified; (c) Becton would be forced to lower the prices for all of its Safety Engineered and Non-Safety Hypodermic Products, due to increased supply, price competition with rival manufacturers, the increased threat of the entry of new, potential rivals, and the pressure price competition for Safety Engineered Hypodermic Products would exert on Becton's Non-Safety Hypodermic Products. Furthermore it was foreseeable to Becton that, absent the barriers to entry created by its efforts to restrain competition, still more potential new competition would have been attracted to the market by Becton's supracompetitve pricing, which would have forced Becton to lower its prices for both safety and conventional forms of the Relevant Hypodermic Products.

**III.    Becton's Exclusionary Contracts With Hospitals and Other Health-Care Entities**

55.    Prior to, and throughout, the Class Period, Becton used (and continues to use) various types of exclusionary contracts with hospitals and other health-care entities in order to frustrate, impair, and substantially foreclose competition from Retractable and other actual or potential manufacturers of Relevant Hypodermic Products. Under Becton's exclusionary contracts the prices that health-care entities pay for Becton's Relevant Hypodermic Products are explicitly conditioned

21

on health-care entities' maintaining Becton's market share by agreeing to fill all, or nearly all, of their relevant Hypodermic Product needs with Becton products, to the exclusion of rival products. Under these contracts, for instance, health-care providers must, as a Becton-imposed penalty, forfeit substantial rebates unless they fill at least 85% of their relevant Hypodermic Product needs with Becton products. Indeed, under Becton's contracts, if a health-care entity were to fill even one or two percentage points less than 85% of its Relevant Hypodermic Products needs with Becton products (*i.e.*, by turning to rival products), then the health-care entity would be penalized by: (a) being required to pay higher prices for all or most of the Becton Relevant Hypodermic Products that the entity bought; (b) losing post-purchase rebates for all or most of the Becton Relevant Hypodermic Products it bought; and (c) in some circumstances, being forced to re-pay *past* rebates that the health-care entity received in connection with its prior purchases of Becton Relevant Hypodermic Products.

56.    Becton's market-share maintenance purchase requirements have had the purpose and effect of denying sales to, or excluding from the market potential and/or existing rival manufacturers and preventing rivals from achieving economies of scale. Becton's contracts do not create significant offsetting, pro-competitive efficiencies because the rebates and pricing terms are not structured based upon the amount of volume that a hospital uses of Becton's products, but rather the extent to which a hospital excludes Becton's competitors. Under these market-share maintenance provisions, for example, a hospital that buys even a large volume of Becton's syringes could be denied rebates on *all* of the Becton syringes that its buys if the hospital's total purchases fall even one market share percentage point below the mandated commitment levels. In such a situation, the hospital would be penalized through higher prices (or even the necessity of returning prior rebates) even if that hospital

22

continued to buy large volumes of Becton's syringes. Yet, another hospital would still receive substantial rebates on Becton's syringes, even if it bought a small volume of Becton's syringes, so long as that hospital met the contractual market-share maintenance requirements.   In this hypothetical, the latter hospital that met the market share purchase requirements would pay a lower effective price that was denied to the former hospital, even if the former hospital bought a larger volume of Becton's syringes. Thus, Becton's rebate penalty strategy was not based on the volume that health-care entities bought of Becton's product, but rather on the extent to which health-care entities denied sales to Becton's competitors.

57.     Becton also excluded and hindered competition by bundling or conditioning the favored prices or rebates for several different products upon a hospital's commitment to use Becton's products for most, if not all, of the hospital's needs in each of the various product categories. Becton is a large, diversified company, that sells a multitude of different models and types of healthcare products. Through Becton's bundling practices, a healthcare entity would receive rebates for its purchases of several types of Becton healthcare products, but only if the healthcare entity satisfied Becton's market-share maintenance provisions by buying a dominant percentage of each of the different products in Becton's bundle, including Becton Relevant Hypodermic Products.

58.     For example, Becton bundled the rebates and discounts on its non-safety-needles with rebates and discounts on its safety-needles. Thus, Becton was able to leverage its monopoly power in the non-safety Relevant Hypodermic Products sub-markets to impede and substantially foreclose competition in the safety-engineered Relevant Hypodermic Product sub-markets.

59.     Similarly, Becton bundled rebates for its Relevant Hypodermic Products with completely unrelated healthcare products. Because all of Becton's rebates were tied to meeting the

23

market-share maintenance requirements for each and every product in Becton's bundle, healthcare entities faced severe penalties even if they used Becton products for 100% of their needs in numerous product categories, but chose to buy even a relatively small percentage of only one or more of a competitor's Relevant Hypodermic Products. The prospect of such stiff sanctions is a very powerful disincentive, which made it economically impractical or impossible for a hospital to use significant amounts of a competitor's Relevant Hypodermic Products. Becton's threats to impose such powerful economic penalties on purchasers effectively prevented hospitals from purchasing Relevant Hypodermic Products from any source other than Becton. Thus, Becton's bundling practices excluded competition in the markets for the Relevant Hypodermic Products, thereby raising rivals' costs of achieving sales, and thus increased and maintained its monopoly power in those markets.

60.     Many, if not all, of Becton's actual or potential competitors in the relevant Hypodermic Product markets were companies with a far smaller range of products, and in some instances, only a single product. As a result, in many (if not all) instances, the excluded competitors (such as Retractable) could not seek to build share in the relevant Hypodermic Product markets by offering equal, offsetting discounts (much less higher discounts), because even if the excluded rival were to substantially discount its competing Relevant Hypodermic Products (or indeed give them away for free), it could not compensate a healthcare entity for all of the discounts and rebates that the entity would lose for the entire bundle of Becton products if the entity shifted even a small percentage of its Relevant Hypodermic Products purchases to one of Becton's rivals.

61.     For example, according to Retractable, one Texas hospital (a Novation member) told Retractable that if the hospital bought even one box of Retractable's needles, the hospital would lose

24

$300,000 in rebates and incentives. In addition, Becton's practices deterred or impeded other competitors (such as Terumo) from entering, and/or expanding their presence, in the U.S. market and sub-markets for each of the Relevant Hypodermic Products. Thus, Becton's practices excluded or inhibited other competitors from the market who were selling Relevant Hypodermic Products, even at lower prices.

62. Becton's bundling practices, market-share maintenance requirements, and other exclusionary practices, substantially foreclosed competitors from, and impaired competitors in, the Relevant Hypodermic Product markets, and maintained Becton's monopoly power in the Relevant Hypodermic Product markets.

## IV. Becton Used the GPO Programs to Exclude And Impair Competition From Rival Manufacturers of Relevant Hypodermic Products

63. As alleged above, between 68% and 98% of the nation's hospitals belong to at least one GPO, such as Novation, Premier or MedAssets. GPOs were originally conceived as a way for hospitals to save money by pooling purchasing power to negotiate lower prices on an array of medical products and other goods. For example, Novation maintains agreements with almost 500 supply and distribution partners, encompassing 75 percent of the products that its members purchase, including medical supplies, surgical supplies, pharmaceuticals, diagnostic imaging products, business products, laboratory products, dietary and food products, capital equipment and related services. Other GPOs, such as Premier and MedAssets also negotiate agreements for their members with hundreds of different suppliers regarding hundreds (if not thousands) of different products.

64. Because GPOs are nominally acting as the hospitals' bargaining agents, member hospitals originally funded the GPOs.

25

65.     In 1986, however, the GPOs convinced Congress that the manufacturers and the suppliers of the goods should be allowed to pay the GPOs' costs rather than the hospitals.  Prior to 1986, any payments that a manufacturer made to a GPO would be considered an illegal "kickback" in violation of the Social Security Act's "anti-kickback" provisions.  In order to allow manufacturers (rather than the hospitals) to pay the GPOs, Congress amended the Social Security Act's "anti-kickback" provisions to create an exception for amounts paid by vendors to a GPO so long as: (a) the fees were kept at 3% or lower of the purchase price; and (b) the GPO fully disclosed, in writing, to each member, all fees received from each vendor with respect to purchases made by, or on behalf of, the member.

66.     Thus, GPOs are now financed by the very suppliers -- including Becton -- that the GPOs are supposedly negotiating against at arms-length, and whose products the GPOs are supposed to be independently evaluating.

67.     Because Becton sells many different products to the GPO-member hospitals, the GPOs can potentially receive up to 3% of the price of those sales in administrative fees – often millions of dollars.  However, Becton decides for itself what percentage (up to the 3% cap) to pay the GPOs.  This places Becton in the position to reward a GPO which enacts and enforces policies favoring Becton.

68.     Thus, a GPO's willingness or failure to favor Becton over Becton's competitors on one type of product can potentially impact the amount of money the GPO receives in fees on dozens of different Becton products.

69.     Because smaller rivals such as Retractable cannot offer the GPOs sufficient fees to offset what the GPOs will lose from alienating Becton, such rivals are at a significant disadvantage.

26

70.    The cycle feeds itself: the more GPO-member hospitals spend on Becton's products, the more money the GPOs receive from Becton, and thus the more influence Becton has over the GPOs.

71.    According to a January 2005 report prepared by the Department of Health and Human Services Office of the Inspector General, over a four-year period three of the largest GPOs collected approximately $1.8 billion, $500 million of which was used to pay the GPOs' operating costs. Of the remaining $1.3 billion revenue in excess of operating costs (i.e. profit) , $898 million was distributed to the GPO members and $415 million stayed in the GPO coffers even though the GPOs' operating costs had already been reimbursed. While the GPOs ostensibly appear to be administrative "middlemen" who act as negotiating conduits between manufacturers and healthcare entities, the true function of many GPOs as it relates to the Relevant Hypodermic Products has been to deliver substantial market share to Becton in exchange for substantial fees and other forms of remuneration. As set out below, prior to, and throughout, the Class Period, the GPOs undertook various actions, implemented various policies and procedures, and created various buying programs, all of which had the purpose and effect of helping Becton to exclude competition from rival manufacturers of Relevant Hypodermic Products.

72.    In addition to millions of dollars in cash payments, Becton's payment of GPO administrative fees has also taken the form of equity positions. For example, according to a February 1997 article states that:

> In another twist, Premier is seeking and receiving administrative fees in the form of equity positions, taking risk-sharing to another level. A recent deal with Becton Dickinson & Co. calls for Premier to receive a portion of administrative fees in the form of warrants to buy Becton Dickinson stock. If Becton Dickinson's fortunes rise, buoyed in part by Premier purchases, so will the value of the stock held by Premier.

27

Thus, as the February 1997 article indicates, Premier and any other GPOs that received Becton stock or warrants had a powerful incentive to favor all of Becton's products (including Becton's Relevant Hypodermic Products) over those of Becton's competitors because if Becton's sales increased, buoyed in part by the GPOs purchases, so would the value of the GPO's stock and warrants.

**A.    Becton Used The GPO Programs As A Vehicle To Conspire With Other Manufacturers**

73.    As alleged above, Becton bundled or linked the rebates and discounts on several different types of Becton products to exclude and limit competition in the relevant Hypodermic Product markets. Due to these practices, healthcare entities operated under the very real threat of losing substantial rebates on several different Becton products simply for failing to meet the market-share maintenance requirements on Becton's Relevant Hypodermic Products. This circumstance operated as a very powerful disincentive, deterring healthcare entities from using significant amounts of Relevant Hypodermic Products from any source other than Becton. As a part of its exclusionary scheme, Becton also used various GPO programs to conspire with other manufacturers so that a GPO-member hospital received various rebates on **other manufacturers'** products only if the hospital used Becton products for 90% or more of various Hypodermic Product needs. A healthcare entity that chose to buy significant amounts of various Hypodermic Products made by one of Becton's rivals would risk losing substantial rebates not merely on Becton's products but also on **other manufacturers'** unrelated products in other markets.

74.    For example, under the "Select" program run by MedAssets' affiliate, Health Services Corporation of America ("HSCA"), a healthcare entity only obtains rebates on numerous products made by multiple manufacturers, if the healthcare entity fills at least 90% of its blood-collection device needs through Becton. Thus, if a health-care entity that participated in MedAsset's Select

28

program filled only 80% of its blood collection product needs with Becton products, and filled the other 20% of its blood collection product needs with products made by another manufacturer (such as Retractable or Terumo), that health-care entity would be denied rebates on unrelated products made by **other manufacturers**, even if the health-care entity had filled 100% of its other product needs with these other manufacturers' products.

75.     Under the "Select program," each of the manufacturers in the program determine whether the HSCA-members complied with the program's requirements regarding that manufacturer's products. Thus, under the Select program, HSCA-members could not receive rebates on numerous products made by other manufacturers, unless Becton determined that the health-care entity had filled at least 90% of its blood collection product needs with Becton products. Similarly, under the Select program, while a health-care entity is technically able to get a waiver or exemption from Becton to buy blood collection products from another manufacturer without jeopardizing its compliance with the program, it was up to Becton to decide when, to whom, and under what conditions it would give such waivers and exemptions. Thus, Becton decided the circumstances that a health-care entity could buy a competitor's Relevant Hypodermic Products without losing rebates from other unrelated manufacturers.

76.     Similarly, during the Class Period, Novation ran a program entitled the "Opportunity Phase I" program which according to VHA (Novation's parent), is a "portfolio" purchasing program that combined 13 unrelated products made by five different manufacturers. Since at least 1995 forward, Becton's blood collection products were included in this portfolio. The Opportunity Phase I program was created in 1995 by $60 Million in contributions from Becton and the four other manufacturers in the program. As part of its operation, Becton and the other manufacturers in the

29

program paid Novation a fee equal to 7% of the sales revenue they received from hospitals that participate in the Opportunity program (in addition to the 3% administrative fees that manufacturers pay Novation). Under the Opportunity Phase I program, a Novation member cannot receive rebates from any of the five manufacturers on any of the 13 products unless the Novation member buys at least 95% of its needs of each of the products from the Novation-designated vendors. Thus, if a health-care entity used Becton products for only 80% of its blood-collection-device needs , and filled the other 20% of its blood-collection-device needs with products made by another manufacturer (such as from Retractable or Terumo), the health-care entity would lose the rebates from both Becton and the other manufacturers, even if the health-care entity had bought 100% of its other product-line needs from those other manufacturers.

77.     Novation's "Opportunity" program expressly prohibited hospitals participating in the program from soliciting bids from competing blood collection device manufacturers, examining rival products, or even entertaining rival proposals. For example, Novation's Opportunity Phase I Participation Agreement states: "Participant will not . . . participate in competitive product evaluations for OPPORTUNITY products." Novation's Supply Partner Terms of Participation for the Opportunity program states that the "Health care organization agrees not to cause supply partner to incur defensive selling costs during the term of this Agreement (such as can be caused by *entertaining* proposals from other vendors or conducting product evaluations)." (emphasis added). If, for instance, a hospital were to violate these restrictions by even considering or evaluating blood collection devices from Retractable or other competitors, the hospital would not only lose the additional rebates from Becton but it would also lose the rebates on 12 products sold by the four other manufacturers that participated in the Novation program.

30

78.     The foregoing restrictions effectively forced participating hospitals to buy 100% of their needs for the 13 products from the five manufacturers in the program, including Becton.  It is extremely difficult (if not practically impossible) for a hospital to purchase a rival product if the hospital cannot: initially consider the product in connection with a sales presentation, test or evaluate the rival product, or even request or consider a bid or pricing proposal from the rival.  Thus, even though Novation's program technically required the participating hospitals to fill "only" 95% of their relevant Hypodermic Product needs with Becton products, a hospital's inability to consider Retractable's products without losing rebates on other products from other manufacturers meant that it was extremely difficult (if not practically impossible) for participating hospitals to fill less than 100% of their relevant Hypodermic Product needs through Becton.

79.     Finally, the effect of the threatened punitive loss of rebates under Novation's Opportunity program was magnified because a participating hospital that failed to comply with the program's 95%-commitment requirements would lose not only rebates on the different manufacturers' products for its current and future purchases but also would be forced to **repay** rebates on the various products that the hospital received for *past* purchases while it was in the program.  Novation's Opportunity Spectrum I Portfolio Participation Agreement states that "all earned incentive payments received by the Participant will be subject to repayment if Participant fails to comply for the full [five-year] term of the OPPORTUNITY portfolio" with a 95% purchase commitment and other requirements."  The effect of these program terms was that the penalties for buying Relevant Hypodermic Products from rival manufacturers substantially increased over time.  Because a hospital could lose past rebates on all of the different unrelated products in Novation's program if the hospital failed to remain in compliance, the longer the hospital stays in the program

31

(and continues to buy 95% of its product needs from the five participating manufacturers), the more the hospital could potentially lose from deviating even slightly from the program.

80.    The potential loss of past rebates means that when a hospital receives the extra rebates under Novation's portfolio programs, the hospital is receiving additional rebates not only because of its past conduct but also to lock in purchasing requirements going forward. Thus, under the Novation portfolio programs, Becton and the other participating manufacturers paid rebates partly as an advance payment in exchange for the GPO-members' commitment to limit or deny sales to the competitors in the future. A hospital's failure to limit its purchases of a competitor's Relevant Hypodermic Products to 5% or less would constitute a breach of the hospital's promise or commitment and require returning the payment it already received for past purchases, not only to Becton but also to each of the other unrelated manufacturers in the program.

81.    On information and belief, during the Class Period, other GPOs had similar programs that conditioned the rebates that a hospital received regarding unrelated products from several different manufacturers based on whether the hospital satisfied market-share percentage requirements regarding Becton Hypodermic Products.

82.    As alleged above, the various GPO programs, in which rebates on Becton's Relevant Hypodermic Products were bundled with unrelated products from other manufacturers constituted a multi-manufacturer conspiracy which helped to entrench Becton's monopoly power by excluding competitors. Because of its daily administrative involvement with these various GPO programs, Becton knew that it was giving GPO-member hospitals additional rebates on various Hypodermic Products based on the extent to which the GPO-member hospitals were buying other manufacturers' unrelated products in other markets. Becton had no legitimate, pro-competitive reason for linking

32

the rebates on Relevant Hypodermic Products to the amount or percentage of the hospital's

purchases of other manufacturers' unrelated products. The other manufacturers in the GPO bundling

programs consciously agreed and conspired with Becton to: (a) press hospitals to fill 90% or more

of their Relevant Hypodermic Product needs from Becton; and (b) help Becton exclude and impair

competitors in the relevant Hypodermic Product markets.

83.     Furthermore, by offering, maintaining and promoting the types of cross-manufacturer

bundling programs alleged above, GPOs (including, but not limited to, Novation and MedAssets),

which offered, maintained and promoted those programs intentionally agreed to actively aid, assist

and promote the multi-manufacturer conspiracy alleged herein. As alleged above, Becton and the

other manufacturers in the Opportunity Program paid Novation a fee equal to 7% of the revenues that

the manufacturers received from hospitals that participated in the Opportunity program (in addition

to the 3% administrative fees that the manufacturers paid Novation). Because of its apparent desire

to receive such additional fees, Novation undertook various efforts to help the manufacturers

promote the Opportunity Program to Novation's hospital members. For example, Novation actively

induced hospitals to participate in the Opportunity program by agreeing to waive members' $20,000

annual dues for as long as the members complied with the program's high-percentage purchase

requirements. News articles indicate that Novation waived its $20,000 annual fees because it

recognized that: (a) an additional $20,000 rebate coming from Novation would be an added

inducement to encourage GPO-members to participate in the Opportunity program; and (b) Novation

would gain more from the additional 7% payments and increased 3% fees resulting from higher sales

than it would from the annual $20,000 membership fees.

33

84.     The waiver of Novation's $20,000 membership fee was not only an inducement to hospitals to participate in the Opportunity program but also an additional barrier to entry that Retractable and other Becton rivals were forced to overcome to sell their competing Relevant Hypodermic Products.  As alleged above, the multi-manufacturer bundling programs excluded competition because to induce a hospital to deviate or leave the Opportunity program, it was necessary for Retractable to compensate the hospital for all of the various rebates that the hospital would lose from the various manufacturers in the program.  Toward that same end, hospitals that deviated or failed to comply with the Opportunity program would be required to pay the $20,000 Novation membership fee that would otherwise be waived.  Therefore, the $20,000 fee-waiver effectively became: (a) an additional rebate from Novation to the hospitals that Retractable and other excluded Relevant Hypodermic Product manufacturers had to offset to attract sales, and (b) a significant economic disincentive which effectively coerced hospitals to not violate the progam's terms by buying a significant amount of Relevant Hypodermic Products from Becton's competitors.

85.     Consequently, the various GPOs which offered, maintained and promoted the types of cross-manufacturer bundling programs alleged herein were active and willing participants in the multi-manufacturer conspiracy alleged herein.

86.     As with Becton's dominant-percentage purchase requirements, and bundling within its own product lines, linking rebates and prices across multiple product lines by different manufacturers has had the purpose and effect of excluding competition in the relevant Hypodermic Product markets because: (a) GPO-member hospitals that filled even a small percentage of certain Hypodermic Products needs with products made by Becton's competitors would risk losing both current and past rebates  not only on Becton's products but also on products from numerous other

34

manufacturers; and (b) it was economically difficult (if not impossible) for Retractable, Terumo and other Hypodermic Product manufacturers to offer GPO-member hospitals sufficient discounts and rebates to offset the bundled discounts and rebates that the hospital would lose on other manufacturers' products.

87.    On information and belief, blood collection devices constituted a substantial portion of the Hypodermic Products that Retractable sold during the Class Period. The purpose and/or effect of Becton's conspiracy with the GPOs and other manufacturers was not simply to impede Retractable and other rival manufacturers from selling only blood collection devices, but from achieving sufficient sales and revenues that would enable Retractable and others to expand their operations, improve their efficiencies of scale, reduce their prices for BCDs as well as syringes and needles, and broaden the scope of the Hypodermic Products that these manufacturers sold. Thus, the purpose and/or effect of excluding Retractable and others competitors from selling BCDs was to generally impede rivals from establishing themselves and/or increasing their presence in any of the different Hypodermic Product markets. By using the MedAssets and Novation programs to impede Retractable's blood collection product sales, Becton (and its co-conspirators) were able to hamper and impede the ability of Retractable (and other rival competitors) to: (a) achieve economies of scale regarding all of the Relevant Hypodermic Products that Retractable sells; and (b) broaden the scope of the Hypodermic Products it sells. Thus, Becton's conspiracy with the other medical-device manufacturers in the GPO programs helped to substantially foreclose Becton's competitors from the market because the GPO programs made it very difficult (if not virtually impossible) for a small competitor such as Retractable to break into, or expand their presence, in the U.S. markets

35

and sub-markets for the Relevant Hypodermic Products, thereby generating enough sales to obtain substantial economies of scale and challenge Becton's dominance.

**B.**    **Becton Entered Into Agreements With GPOs To Prevent GPO Members From Buying Relevant Hypodermic Products Made By Rival Manufacturers**

88.    In furtherance of Becton's scheme to exclude competition from rival Relevant Hypodermic Product manufacturers, various GPOs aided Becton by taking steps, and enacting procedures, which pressured and effectively coerced GPO-members to not buy Relevant Hypodermic Products made by other manufacturers.

89.    In 1996, Premier's Board of Directors adopted a general policy that requires all member hospitals to sign a letter of intent to comply with any commitment contracts that Premier negotiates with suppliers. According to Premier's 1996 Group Purchasing Policy, "once a group contract or contract category has been announced as included in Premier's Committed Program, members will not contract independently for products in areas covered by these contracts." Premier has a special compliance committee to monitor member hospital compliance with commitment contracts. If this committee determines that "the member is not in consensus with Premier's group purchasing strategy of commitment and unwilling to comply," then the committee will recommend that Premier's Board impose appropriate sanctions including "financial adjustments or, if appropriate, removal from the Premier organization." According to Retractable, Premier threatened to expel Iowa Health Systems as a stockholder member for breaching Premier's Purchasing Partners Compliance Policy.   On information and belief, other GPOs have similar policies.

90.    Because of Premier's policies, Premier's member hospitals are effectively forced to contract only with suppliers approved by Premier. Because GPOs such as Premier negotiate

discounts and rebates from hundreds of suppliers regarding hundreds of different, unrelated products – such as jell-O, rubber gloves, pharmaceuticals, etc. – expulsion from a GPO like Premier would mean that any significant purchases of one type of product from non-approved manufacturers could cause a hospital to lose current (and potentially past) discounts and rebates on hundreds of unrelated products from hundreds of different, unrelated manufacturers.

91.     As alleged above, in 1997 Premier signed a contract with Becton under which some of Premier's administrative fees were paid in the form of Becton stock warrants. Premier's stock interest in Becton gave Premier a powerful incentive to favor Becton's Hypodermic Products over those of Becton's competitors in order to increase the value of Premier's Becton stock holdings. On information and belief, the next year (1998), Premier awarded Becton a 7.5 year sole-source contract.

92.     Furthermore, on information and belief, there is evidence that in or about 1999, Becton provided Novation a $1 million payment (in addition to the 3% administrative fees that it pays Novation) for a 4-year sole-source contract under which Becton would be the only vendor approved by Novation to sell Relevant Hypodermic Products to Novation members.

93.     Because of the Premier policies alleged above, once Premier awarded Becton a sole-source contract regarding Relevant Hypodermic Products, any Premier member that bought relevant Hypodermic Products made by other, non-approved manufacturers, such as Retractable, ran the risk of being expelled from the Premier organization and losing rebates on hundreds of other products. The effect of Premier's policies coerced Premier members to: (a) enter into Becton's exclusionary contracts; and (b) avoid relevant Hypodermic Products made by other, non-approved, rival manufacturers. As a result of this arrangement, Premier-member hospitals are prohibited from buying any competing relevant Hypodermic Products.

37

94.     Similarly, while Premier-member entities are technically free to seek exemptions from Premier's sole-source contracts, upon information and belief, Premier refers waiver requests to Becton for approval.   Thus, Becton had substantial (if not complete) control to determine whether (and to what extent) Premier-member hospitals could buy competing products from other manufacturers without facing substantial penalties or the loss of significant rebates on Becton's products.

95.     Becton's sole-source contracts with Novation, Premier, and possibly other GPOs, worked to significantly impede and prevent other relevant Hypodermic Product manufacturers from selling significant (if any) relevant Hypodermic Products to health-care entities that used those GPOs.   For example, as one of Novation's attorneys (Robert Bloch) stated in a paper submitted to the Federal Trade Commission:

> [g]iven that GPO contracts account for seventy-two percent of hospital purchases, failure to win one or more GPO contracts may result in a significant loss of business to the losing vendor depending on the percentage of the total market for the product(s) represented by the purchases of a particular GPO.

Bloch, "*An Analysis of Group Purchasing Organizations' Contracting Practices Under the Antitrust Laws: Myth and Reality*" at 15.

96.     The GPO policies alleged above, combined with the sole-source contracts that Becton obtained from Novation and Premier (and possibly other GPOs), exacerbated  the anti-competitive effects of Becton's other exclusionary actions described above, including but not limited to, Becton's market-share maintenance provisions and bundling practices.

38

## MARKET EFFECTS OF BECTON'S CONDUCT

97.     The overall effect of the various acts in Becton's anti-competitive, exclusionary scheme has been to substantially foreclose and impair competition (and the threat of such competition) from lower-priced and/or superior quality relevant Hypodermic Products. As alleged above, had Becton not improperly foreclosed or stifled Terumo, Retractable and other actual or potential competitors from competing in markets for the Relevant Hypodermic Product, Terumo, Retractable and other potential rival manufacturers would have achieved much greater sales than they actually did (or threatened to do), given the superiority of its products and/or the cheaper prices that they charged (or could have charged upon entry), and would have posed a far greater competitive threat to Becton. Additionally, absent Becton's exclusionary conduct, barriers to entry to each of the Relevant Hypodermic Product Markets would have been lower, which: (a) would have made it easier for existing or new competitors to enter or expand their positions in the markets for the Relevant Hypodermic Products and (b) would have caused existing or potential competitors to be attracted to the Relevant Hypodermic Product markets because of the supra-competitive prices that Becton was charging. As a result, absent Becton's misconduct and the resulting barriers to entry, Becton would have rationally perceived that there was a greater threat of potential competitive entry in each of the relevant markets and sub-markets if Becton did not reduce its supra-competitive prices.

98.     Moreover, had Terumo, Retractable and other actual or potential relevant Hypodermic Product manufacturers not been substantially foreclosed or stifled by Becton's anti-competitive conduct from competing in the markets for each of the Relevant Hypodermic Products, Terumo, Retractable and the other actual or potential competitors would have sold much more of their products and gained much larger market share, enabling them to achieve economies of scale and

39

scope. As these competitors increased their sales and achieved economies of scale, their costs would have fallen, and thus they would have been able to provide their products at even lower prices, further pressuring Becton to lower its prices in response. Furthermore, given the relationship between pricing for safety and non-safety products, unfettered actual or threatened competition from Terumo, Retractable and/or other actual or potential manufacturers of safety engineered Hypodermic Products, would have forced Becton to lower its prices (and/or not raise its prices as much as it actually did) for non-safety engineered products. Moreover, the mere increased threat of competitive entry into each of the Relevant Hypodermic Product Markets would have forced Becton to discipline (*i.e.*, lower) its prices.

99. The presence of unfettered competition from Terumo, Retractable and/or other actual or potential competitors, which were selling superior and/or lower-priced Safety Engineered Products, and/or the mere increased threat of additional competition that would have resulted from the elimination of Becton's artificial barriers to entry in each of the relevant markets and sub-markets at issue, would have forced Becton to lower the prices for its inferior Safety-Engineered products in order to remain competitive and/or to counter a perceived threat of additional entry.

100. For example, when Terumo started selling its Hypodermic Products at prices that were 20-40% below Becton's prices, it placed significant pricing pressure on Becton. Had Becton not used the various practices alleged herein to exclude or deter competition from Terumo, the price competition from Terumo and other actual or potential competitors would have continued to push down prices and/or limited the rate or amount that Becton could increase its prices.

101. Furthermore, as competitors, such as Retractable, increasingly reached economies of scale, reduced their existing prices, and captured greater amounts of Becton's sales, Becton would

40

have experienced substantial pressures to lower its prices or face substantial and increasing losses in sales. Thus, absent Becton's illegal conduct as alleged herein, unrestrained competition from Terumo, Retractable (and other manufacturers): (a) would have increased the availability of Safety-Engineered forms of the Relevant Hypodermic Products that were superior and/or lower-priced than Becton's Safety-Engineered products; (b) would have resulted in falling prices for all of the Relevant Hypodermic Products, as Retractable (and other manufacturers) achieved or increased economies of scale and scope; and (c) would have caused Becton to lower the prices for all of its Safety-Engineered versions of the Relevant Hypodermic Products.

102.    Furthermore, absent Becton's illegal conduct, unrestrained competition from Terumo, Retractable and other actual or potential rival manufacturers would have also resulted in lower prices for conventional, non-safety versions of the Relevant Hypodermic Products. While safety-engineered relevant Hypodermic Products typically have a higher price than "conventional" or non-safety relevant Hypodermic Products, there is a relationship between the prices and volumes for the two kinds of relevant Hypodermic Products. While safety-engineered relevant Hypodermic Products have various safety and quality benefits over conventional, non-safety relevant Hypodermic Products, hospitals and other healthcare entities have incentives to use a certain amount of the lower-quality, non-safety products because those products are priced lower than safety-engineered products. However, as the price difference between the two sets of relevant Hypodermic Products shrinks or narrows, the more health-care providers are willing or induced to buy the higher-quality Safety Engineered Products. Because prices for Safety Engineered relevant Hypodermic Products would have been lower absent the anti-competitive conduct alleged herein, Becton would have been forced to lower the prices for its conventional, non-safety relevant Hypodermic Products so that health-care

41

entities would not shift their purchases from Becton's conventional Hypdermic Products to competitively priced safety-forms of the Hypodermic Products sold by Becton's rivals. As Terumo, Retractable and other competitors increased their efficiencies and achieved economies of scale and scope, they would have been able to reduce their prices for their relevant Hypodermic Products.

103.    By unlawfully excluding and impairing competition, Becton's conduct has caused Plaintiffs and the other Class members to pay more for relevant Hypodermic Products than they otherwise would have paid absent Becton's illegal, exclusionary conduct.

104.    Furthermore, the ultimate users and consumers of relevant Hypodermic Products have been injured because technologically superior products were illegally excluded from the market and faced illegal restraints.  The improper exclusion of competition from relevant Hypodermic Product manufacturers -- and the resulting inability of these manufacturers to achieve economies of scale which would have enabled them to increase their production – has harmed the ultimate users and consumers of relevant Hypodermic Products because such users and consumers were improperly denied options to purchase technologically superior relevant Hypodermic Products at the lower prices that increased economies of scale would have yielded.

## DAMAGES

105.    During the relevant period, Plaintiffs and the other members of the Class purchased substantial amounts of relevant Hypodermic Products directly from Becton. As a result of Becton's alleged illegal conduct, members of the Class were compelled to pay, and did pay, artificially inflated prices for the relevant Hypodermic Products they purchased.  Plaintiffs would have been able to, *inter alia*, purchase less-expensive relevant Hypodermic Products had potential competitors (such as Retractable or Terumo) been able to enter the market  (or merely increased the perceived threat

42

of entry to Becton) – without Becton's imposed restraints – and achieve economies of scale.  The prices that Plaintiffs and the other Class members paid for relevant Hypodermic Products during the Class Period were substantially greater than the prices that Plaintiffs and the Class members would have paid absent the illegal conduct alleged herein because: (1) the prices of all relevant Hypodermic Products were artificially inflated by Becton's illegal conduct; and (2) Class members were deprived of the opportunity to purchase competing relevant Hypodermic Products, other than Becton's relevant Hypodermic Products, and to purchase those competing products at substantially lower prices.  Members of the Class have, as a consequence, sustained substantial losses and damage to their business and property in the form of overcharges.  The full amount and form and components of such damages will be calculated after discovery and upon proof at trial.

## CAUSES OF ACTION

### COUNT I
### Monopolization- Sherman Act §2

106.    Plaintiffs incorporate by reference all of the foregoing allegations as though fully set forth at length.

107.    Becton willfully maintained and unlawfully exercised monopoly power in the relevant market.

108.    Becton's conduct in maintaining and extending its monopoly power in the relevant markets constitutes unlawful monopolization in violation of §2 of the Sherman Act. (15 U.S.C. §2).

109.    Becton acted willfully to maintain and exercise monopoly power in the relevant market through exclusionary, anti-competitive conduct set forth above, including, but not limited

43

to, the leveraging of its dominant market share in one or more relevant Hypodermic Product (or other) markets (through, *inter alia,* bundling the availability of rebates on its various Hypodermic Products and other products) to maintain, enhance, or obtain monopoly power in other relevant Hypodermic Product (or other) markets.

110.    There is no legitimate business justification for the actions and conduct through which Becton maintained its monopoly in the relevant market.

111.    Becton has effectively excluded competition from the relevant markets, maintained its dominant market share in the relevant markets, and profited by its anti-competitive conduct by excluding less expensive, superior competitive products, by maintaining prices at artificially high prices, and reaping the benefits of its illegal obtained monopoly power.

112.    The anti-competitive effects of Becton's conduct far outweigh any conceivable procompetitive benefits or justifications.

113.    Plaintiffs and members of the Class were injured in their business or property by Defendant's monopolization of the relevant markets.   Without limiting the generality of the foregoing, Plaintiffs and the other members of the Class have been forced to pay higher prices for relevant Hypodermic Products in the relevant markets than they would have paid in the absence of Defendant's unlawful conduct.

### COUNT II

### Violation of Sherman Act §2 – Conspiracy to Monopolize

114.    Plaintiffs incorporate by reference all of the foregoing allegations as though fully set forth at length.

44

115.    Prior to, and during, the Class Period, Becton agreed, conspired and colluded with GPOs (such as Novation, Premier, MedAssets) and other medical-device manufacturers to assist Becton in: (a) excluding competition from other relevant Hypodermic Product manufacturers; and (b) willfully maintaining and unlawfully exercising monopoly power in the relevant markets. Such conduct constitutes an illegal conspiracy to monopolize in violation of §2 of the Sherman Act (15 U.S.C. §2).

116.    As alleged above, there was no legitimate business justification for the agreement, collusion and conspiracy between Becton and various other entities to help Becton in: (a) excluding competition from other relevant Hypodermic Product manufacturers; and (b) willfully maintaining and unlawfully exercising monopoly power in the relevant markets.

117.    Defendant's collusion, agreement and conspiracy alleged herein has enabled and assisted Becton in: (a) substantially foreclosing and effectively excluding less expensive, superior competitive products from the relevant markets; (b) maintaining Becton's dominant market share and monopoly power in the relevant markets; (c) maintaining prices at artificially high levels for Becton's relevant Hypodermic Products; and (d) otherwise reaping the benefits of its illegal monopoly power. The anti-competitive effects of Becton's collusive and conspiratorial conduct far outweighs any conceivable procompetitive benefits or justifications.

118.    Plaintiffs and members of the Class were injured in their business or property by the collusion and conspiracy alleged above which facilitated, enabled, assisted or furthered Becton's exclusion of competition and monopolization of the relevant markets. Without limiting the generality of the foregoing, Plaintiffs and members of the Class have been forced to pay higher prices

45

for Safety Engineered relevant Hypodermic Products than they would have paid in the absence of Becton's unlawful conduct.

## COUNT III
### Violation of Sherman Act §1 - Anti-Competitive Conspiracy

119.    Plaintiffs incorporate by reference all of the foregoing allegations as though fully set forth at length.

120.    Section 1 of the Sherman Act prohibits every unreasonable contract, combination or conspiracy in restraint of trade. 15 U.S.C. §1.

121.    Prior to, and during, the Class Period, Becton agreed, conspired and colluded with GPOs (such as Novation, Premier, MedAssets) and other medical-device manufacturers, to assist Becton in: (a) excluding competition from other relevant Hypodermic Product manufacturers; and (b) willfully maintaining and unlawfully exercising monopoly power in the relevant markets. Such conduct constitutes an illegal agreement, combination and conspiracy in restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. §1).

122.    As alleged above, there was no legitimate business justification for the agreement, collusion and conspiracy between Becton and various other entities that: (a) substantially foreclosed and excluded competition from other relevant Hypodermic Product manufacturers; and (b) resulted in Becton's willful maintenance and unlawful exercise of monopoly power in the relevant markets.

123.    Defendant's collusion, agreement and conspiracy alleged herein has enabled and assisted Becton in: (a) effectively excluding less expensive, superior competitive products from the relevant markets; (b) maintaining Becton's dominant market share and monopoly power in the relevant markets; (c) maintaining prices at artificially high levels for Becton's relevant Hypodermic

46

Products; and (d) otherwise reaping the benefits of its illegal monopoly power. The anti-competitive effects of Defendant's collusive and conspiratorial conduct far outweighs any conceivable procompetitive benefits or justifications.

124. Plaintiffs and members of the Class were injured in their business or property by the collusion and conspiracy alleged above which facilitated, enabled, assisted or furthered Becton's substantial foreclosure and exclusion of competition and monopolization of the relevant markets. Without limiting the generality of the foregoing, Plaintiffs and the other members of the Class have been forced to pay higher prices for safety relevant Hypodermic Products than they would have paid in the absence of Defendant's unlawful conduct.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, respectfully request that:

(i) The Court determine that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23, be given to the Class;

(ii) The acts alleged herein be adjudged and decreed to be unlawful acts in violation of Sections 1 and 2 of the Sherman Act;

(iii) Each member of the Class recover three-fold the damages determined to have been sustained by each of them, and that judgment be entered against Defendant in favor of the Class;

(iv) The Class recover its costs of suit, including reasonable attorneys' fees and costs as provided by law; and

(v) The Class be granted structural, prospective relief to promote competition, and any other appropriate relief as may be determined to be just, equitable, and proper by this Court.

47

## JURY DEMAND

Plaintiffs hereby demands a trial by jury on all issues so triable.

Dated: June 15, 2005

s/ Peter S. Pearlman
Peter S. Pearlman
COHN LIFLAND PEARLMAN HERRMANN
 & KNOPF LLP
Park 80 Plaza West-0ne
Saddle Brook, NJ 07663
(201) 845-9600

GARWIN, GERSTEIN & FISHER, L.L.P.
Bruce E. Gerstein
Noah H. Silverman
Elena Chan
1501 Broadway, Suite 1416
New York, New York 10036
Tel.:   (212) 398-0055
Fax:   (212) 764-6620

BERGER & MONTAGUE, P.C.
Daniel Berger
David Sorensen
Eric L. Cramer
1622 Locust Street
Philadelphia, PA 19103
Tel.: (215) 875-3000
Fax: (215) 875-4671

ODOM & DES ROCHES, L.L.P.
John Gregory Odom
Stuart E. Des Roches
Suite 2020, Poydras Center
650 Poydras Street
New Orleans, LA 70130
Tel: (504) 522-0077
Fax: (504) 522-0078

PERCY, SMITH & FOOTE, L.L.P.
David P. Smith
720 Murray Street
P.O. Box 1632

48

Alexandria, LA 71309
Tel: (318) 445-4480
Fax: (318) 487-1741

SCHIFFRIN & BARROWAY, LLP
Kendall S. Zylstra
Stephen P. Connolly
280 King of Prussia Road
Radnor, Pennsylvania 19087

KOZYAK TROPIN & THROCKMORTON, P.A.
Adam Moskowitz
2800 Wachovia Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131-2335
Telephone: (305) 372-1800
Telecopier: (305) 372-3508

COHEN, MILSTEIN, HAUSFELD
   & TOLL, P.L.L.C.
Linda P. Nussbaum
Sean McElligott
150 East 52nd Street
30th Floor
New York, New York 10019-6004
Tel: (212) 838-7797
Fax: (212) 838-7745

LAW OFFICES OF JOSHUA P. DAVIS
Joshua P. Davis
437 Valley Street
San Francisco, CA 94131

LAW OFFICE OF ALFRED G. YATES JR   PC
Alfred G. Yates
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Phone: (412) 391-5164
Fax: (412) 471-1033