<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE HYPODERMIC PRODUCTS ANTITRUST LITIGATION | MDL No.: 1730 <br> Master Docket No.: 05-CV-1602 (JLL/CCC) |
| This Document Relates To: <br> *Louisiana Wholesale Drug Co., Inc. v. Becton Dickinson & Co.*, Civil Action No.: 05-CV-1602; *Dik Drug Co. v. Becton Dickinson & Co.*, Civil Action No.: 05-CV-4465, *American Sales Co., Inc. v. Becton Dickinson & Co.*, Civil Action No.: 06-CV-1204, *Park Surgical Co. Inc. v. Becton Dickinson & Co.*, Civil Action No.: 06-CV-1205, and *SAJ Distributors, Inc. v. Becton Dickinson & Co.*, Civil Action No.: 05-CV-5891. | **OPINION** |

**LINARES**, District Judge.

This matter comes before the Court on the motion of Defendant, Becton Dickinson &

Company, to dismiss Plaintiffs'[1] Second Consolidated Amended Class Action Complaint,[2]

---

[1] For purposes of the instant motion, Plaintiffs include Louisiana Wholesale Drug Company, Inc., Rochester Drug Co-Operative, Inc., JM Smith d/b/a Smith Drug Company, Dik Drug Company, American Sales Company, Inc., Park Surgical Co. Inc. and SAJ Distributors, Inc. (hereinafter collectively "Plaintiffs").

[2] The operative complaint is the Second Consolidated Amended Class Action Complaint, filed on May 10, 2006, hereinafter referred to as "Complaint." In the instant Opinion, the Court addresses <u>only</u> Defendant's motion to dismiss the Complaint filed by Louisiana Wholesale Drug Company, Inc., Rochester Drug Co-Operative, Inc., JM Smith d/b/a Smith Drug Company, Dik Drug Company, American Sales Company, Inc., Park Surgical Co. Inc. and SAJ Distributors, Inc. Defendant has filed separate motions to dismiss the complaints of other parties to this multidistrict litigation, which have been decided by the Court by way of separate opinions.

pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons set forth in this Opinion,

Defendant's motion is DENIED.[3]

## BACKGROUND[4]

This matter arises from actions brought by healthcare providers and distributors in the

pharmaceutical and medical device industry, against Defendant, a medical device manufacturer,

which allegedly controls a dominant share of the relevant market for the hypodermic products at

issue in this case.  The Judicial Panel on Multidistrict Litigation has transferred several related

actions to this Court for consolidated pretrial proceedings, pursuant to 28 U.S.C. § 1407.[5]

I.   **Historical Facts**

Plaintiffs are wholesalers in the pharmaceutical and medical device industry.  (Compl., ¶

2).  During the relevant time period – January 1, 2000 through the present – Plaintiffs purchased

various hypodermic products directly from Defendant.  (Id., ¶¶ 2,3).  Defendant Becton, a New

Jersey corporation, is a manufacturer of safety and non-safety Hypodermic Products, including:

(1) disposable syringes and associated needles, (2) blood collection devices and associated

_____

[3] The Court decides this matter without oral argument. Fed. R. Civ. P. 78.  Jurisdiction is premised on 28 U.S.C. §§ 1331, 1337 and 15 U.S.C. § 15(a).

[4] For purposes of the instant motion to dismiss, the Court accepts Plaintiffs' factual allegations as true, and relies only on the Complaint. See, e.g., Lum v. Bank of Am., 361 F.3d 217, 222 n.3 (3d Cir. 2004) ("In deciding motions to dismiss pursuant to Rule 12(b)(6), courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim.").

[5] Defendant has also moved to dismiss (1) the Class Action Amended Complaint filed by Medstar Health, Inc., Medstar-Georgetown Medical Center, Inc., Washington Hospital Center Corporation and National Rehabilitation Hospital, Inc., and (2) the Consolidated Class Action Complaint filed by Jabo's Pharmacy, Inc. and Drug Mart Tallman, Inc.  As previously indicated, the foregoing motions will not be addressed herein.

needles, (3) winged IV devices and their needles, and (4) IV catheter devices and their needles. (Id., ¶ 23). Said products are referred to collectively in the Complaint as the "Relevant Hypodermic Products." (Id., ¶ 34).

By way of background, the Complaint explains that hospitals and other health-care entities obtain the foregoing Hypodermic Products from wholesalers, such as Plaintiffs, who, in turn, purchase the medical devices directly from the manufacture. (Id., ¶ 40). In particular, a "significant number of health-care entities buy their Relevant Hypodermic Products from wholesalers pursuant to prices that are set out in contracts that the health-care entities entered into with manufacturers based on so-called model or form contracts negotiated by [Group Purchasing Organizations] (hereinafter "GPOs")." (Id.). Thus, the GPOs essentially act as negotiating agents for hospitals and other health-care providers. (Id., ¶ 41).

Beginning in the early 1980s, rival manufacturers began posing a threat to Becton's dominance in the Relevant Hypodermic Products markets. (Id., ¶ 43). As a result, Becton began engaging in certain improper and exclusionary conduct, which served to impede competition from current rivals – such as Terumo and Retractable – and to discourage competition from potential rivals. (Id., ¶¶ 43-58).

## II.    Becton's Alleged Anti-Competitive Conduct

The Complaint alleges that "Becton illegally acquired and maintained monopoly power over various hypodermic products and markets for those products from at least January 1, 2000 (if not earlier) through the present." (Compl., ¶ 3). In particular, the hypodermic products at issue are comprised of four relevant markets: (1) disposable syringes and associated needles; (2) blood collection devices and associated needles, (3) winged IV catheter devices and their

needles, and (4) IV catheter devices and their needles.  (Id.).[6]  During the relevant time period,

Plaintiffs also indicate that each of the foregoing products was sold in both safety and

conventional (i.e., non-safety) forms.  (Id.).  Thus, each of the four markets is comprised of two

sub-markets, including a safety and non-safety version of each product.  (Id., ¶¶ 24, 36).  Since

2003, Becton has had a dominant market share of each of the Relevant Hypodermic Product

markets and sub-markets. (Id., ¶ 39).

Within the relevant markets – and since the 1980s – Becton has engaged in several forms

of anti-competitive practices, including: (1) imposing market share purchase requirements on

hospitals or other healthcare entities, (2) bundling its goods for exclusionary purposes, (3)

conspiring with GPOs for the purpose of imposing exclusionary contracts, and (4) conspiring

with other manufacturers to "impose rebate penalties on purchasers relating to a bundle of

products."  (Id., ¶ 7).

### A.    Market Share Purchase Requirements

In essence, Becton's imposition of certain market share purchase requirements made

Becton's rebates contingent upon a hospital buying nearly all of a particular line of products from

Becton. (Id., ¶ 8).  For example, "a hospital that missed meeting an 85% market share purchase

requirement with Becton BCD[7] products by only one or two percentage points would be

penalized by losing . . . various rebates on all of the Becton BCDs that the hospital had bought."

(Id.).  Such health-care entities could also be penalized by being forced to re-pay past rebates

_____

[6] In the alternative, the Complaint alleges that "during at least some part of the Class
Period alleged herein winged IV catheter devices and their needles were in the same relevant
market as IV catheter devices and their needles."  (Id.).

[7] "BCD" refers to blood collection devices.

which the health-care entity had received in connection with prior purchases.  (Id., ¶ 59).

As a result of such market-share purchase requirements, Becton excluded and/or denied sales to certain competitors, and did not promote "pro-competitive manufacturing efficiencies" because the rebates and other pricing terms utilized by Becton were not structured upon the volume of Becton products used by the health-care entities.  (Id., ¶¶ 8, 60).  Rather, Becton's rebates and pricing terms were structured based on the extent to which a health-care entity denied sales to Becton's competitors.  (Id.).

**B.   Bundling**

The Complaint also alleges that Becton bundled or tied certain rebates for unrelated products by "requiring hospitals to fill a high percentage of one line of products as a condition to receive rebates on that **and** other Becton products." (Id., ¶ 9) (emphasis in original).  Because of Becton's dominance in the markets of the bundled products, the threatened penalty of not reaching the Becton market share maintenance requirement made it impractical for hospitals to use "more than a small amount of a competitor's Relevant Hypodermic Products." (Id.).

In particular, Plaintiffs allege that Becton bundled rebates and discounts on its non-safety needles with rebates and discounts on its safety needs, thus leveraging its monopoly power in the non-safety sub-market to impede competition in the safety sub-market. (Id., ¶ 63).  Becton likewise bundled rebates from the Relevant Hypodermic Products with unrelated healthcare products, thus causing healthcare entities to face penalties for using even a small percentage of a competitor's Relevant Hypodermic Products. (Id.).  "For example, according to Retractable, one Texas hospital . . . told Retractable that if the hospital bought even one box of Retractable's needles, the hospital would lose $300,000 in rebates and incentives." (Id., ¶ 65).

### C.  <u>Conspiracy with GPOs</u>

The Complaint alleges that anywhere between 68% to 98% of hospitals in this country currently belong to at least one GPO, such as Novation, Premier or MedAssets. (<u>Id.</u>, ¶¶ 42, 67). Although GPOs had previously been funded by member hospitals, since 1986, manufacturers, such as Becton, began paying the GPOs' costs, rather than the hospitals. (<u>Id.</u>, ¶¶ 68, 69).  As a result, "GPOs are now financed by the very suppliers – including Becton – that the GPOs are supposedly negotiating against at arms-length, and whose products the GPOs are supposed to be independently evaluating." (<u>Id.</u>, ¶70).

Thus, according to the Complaint, in order to implement its exclusionary contracts and policies, Becton conspired with GPOs by rewarding GPOs with high administrative fees, and equity positions. (<u>Id.</u>, ¶¶ 71, 76).  For example, one such GPO, Premier, adopted a policy whereby all member hospitals were required to sign a letter of intent forcing them to comply with any commitment contracts which Premier had negotiated with suppliers. (<u>Id.</u>, ¶ 93).  Members who failed to comply – and instead contracted independently for products covered by Premier's commitment contracts – could be subjected to sanctions and/or removal from the Premier organization. (<u>Id.</u>).  Because Premier had signed a contract with Becton under which Becton agreed to pay Premier's administrative fees with Becton stock warrants, Premier had an incentive to promote Becton's Hypodermic Products over those of its competitors. (<u>Id.</u>, ¶¶ 95, 99).  This, in turn, resulted in a self-perpetuating cycle: "the more GPO-member hospitals spend on Becton's products, the more money the GPOs receive from Becton, and thus the more influence Becton has over the GPOs." (<u>Id.</u>, ¶ 74).  The foregoing GPO policies, combined with the sole-source contracts between Becton and certain GPOs – including Novation and Premier – had the effect

of coercing GPO members into entering exclusionary contracts with Becton, thereby avoiding relevant Hypodermic Products made by other "non-approved" rival manufacturers. (Id., ¶¶ 97-100).

### D.    Conspiracy with Other Manufacturers

Finally, Plaintiffs also allege that Becton conspired with other medical device manufacturers in order to "force hospitals and other health-care entitles to fill a dominant percentage of their Hypodermic Products need with Becton's products." (Id., ¶ 11).  In particular, several manufacturers refused to provide rebates to hospitals regarding unrelated products "unless the hospital filled 95% of certain Hypodermic Products needs with Becton's products." (Id.).

For example, MedAssets – one of the foregoing GPOs – has a program called "Select" under which a healthcare entity can only obtain rebates on certain products made by various manufacturers if the healthcare entity fills at least 90% of its blood-collection device needs through Becton. (Id., ¶ 78).  Similarly, Novation – another GPO – has a program called "Opportunity Phase I" whereby "a Novation member cannot receive rebates from any of the five manufacturers on any of the 13 products unless the Novation member buys at least 95% of its needs of each of the products from the Novation-designated vendor." (Id., ¶ 80).

Thus, the Complaint alleges that not only did Becton conspire with certain other manufacturers in creating the multi-manufacturer conspiracy, but also that the GPOs – including but not limited to Novation and MedAssets – intentionally engaged in actively aiding, assisting and promoting same. (Id., ¶¶ 86, 87).  For example, Novation induced hospitals into participating in the "Opportunity Phase I" program by agreeing to waive the $20,000 annual dues "for as long

as the members complied with the program's high-percentage purchase requirements." (<u>Id.</u>, ¶ 87).

The Complaint further explains that the purpose and/or effect of the foregoing conspiracy between Becton, other manufacturers and GPOs was to "generally impede rivals from establishing themselves and/or increasing their presence in any of the different Hypodermic Product markets." (<u>Id.</u>, ¶ 91).

## III.   Market Effects of Becton's Alleged Anti-Competitive Conduct

As a result of Becton's exclusionary conduct, actual and/or potential competitors – such as Terumo and Retractable – were foreclosed and/or stifled from competing in markets for the Relevant Hypodermic Products. (<u>Id.</u>, ¶ 101).  Had Becton not engaged in such conduct, actual and/or potential competitors would have sold more of their related products, thereby gaining a larger market share, and "enabling them to achieve economies of scale and scope." (<u>Id.</u>, ¶ 102). Accordingly, "as these competitors increased their sales and achieved economics of scale, their costs would have fallen, and thus they would have been able to provide their products at even lower prices, further pressuring Becton to lower its prices in response." (<u>Id.</u>).  In addition to its financial implications, Becton's exclusionary conduct has also had the effect of injuring consumers to the extent that technologically superior products were excluded from the market as a direct result of same. (<u>Id.</u>, ¶ 108).

## IV.   The Second Consolidated Amended Complaint

In light of the foregoing, Plaintiffs brought this action, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to recover treble damages, equitable relief, and reasonable attorneys' fees for Defendant's alleged violation of Sections 1 and 2 of the Sherman

Act, 15 U.S.C. §§ 1-2.  Plaintiffs filed the instant class action complaint on May 10, 2006,

pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), on their behalf, and as

representatives of the following class:

> All persons and entities who purchased Relevant Hypodermic
> Products in the United States directly from Becton at any time
> during the period March 23, 2001 through the present (the "Class
> Period").  The Class excludes Becton, Becton's parents,
> subsidiaries and affiliates.

(Id., ¶ 25).  Count One of the Complaint alleges monopolization in violation of Section 2 of the

Sherman Act.  Count Two of the Complaint alleges conspiracy to monopolize, in violation of

Section 2 of the Sherman Act, and Count Three alleges anti-competitive conspiracy, in violation

of Section 1 of the Sherman Act.

Defendant Becton now moves to dismiss the Complaint pursuant to Federal Rule of Civil

Procedure 12(b)(6).

## **LEGAL STANDARD**

The applicable inquiry under Federal Rule of Civil Procedure 12(b)(6) is well-settled.

Courts must accept all well-pleaded allegations in the complaint as true and draw all reasonable

inferences in favor of the non-moving party.[8]  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974),

abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982); Allegheny Gen. Hosp.

v. Philip Morris, Inc., 228 F.3d 429, 434-35 (3d Cir. 2000).   However, courts are not required to

credit bald assertions or legal conclusions improperly alleged in the complaint.  See In re

Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429 (3d Cir.1997). Similarly, legal

---

[8] In doing so, a court may look only to the facts alleged in the complaint and any
accompanying attachments, and may not look at the record.  See Jordan v. Fox, Rothschild,
O'Brien & Frankel, 20 F.3d 1251, 1261 (3d Cir. 1994).

conclusions draped in the guise of factual allegations may not benefit from the presumption of truthfulness. See In re Nice Sys., Ltd. Sec. Litig., 135 F. Supp.2d 551, 565 (D.N.J. 2001).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.  Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1959 (2007).[9]  Ultimately, however, the question is not whether plaintiffs will prevail at trial, but whether they should be given an opportunity to offer evidence in support of their claims.  Scheuer, 416 U.S. at 236.

Additionally, the Third Circuit has explained that antitrust complaints, in particular, should be liberally construed. Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 179 (3d Cir. 1988).  Although there is no heightened pleading standard in antitrust cases,[10] antitrust complaints are not exempt from the Federal Rules of Civil Procedure.  See, e.g., Zimmerman, 836 F.2d at 179-80.  In this vein, the Third Circuit has indicated that the pleading standard for "Section 1 claims is the short and concise statement

[9] In so holding, the United States Supreme Court rejected the language previously used by the Court in Conley v. Gibson, providing that "[i]n appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. 41, 45-46 (1957).  See Bell Atl. Corp., 127 S.Ct. at 1964, 1974 (holding that the Conley "no set of facts" language "has earned its retirement" and "is best forgotten.").

[10] See, e.g., In re K-Dur Antitrust Litig., 338 F. Supp. 2d 517 (D.N.J. 2004); In re Mercedes-Benz Anti-Trust Litig., 157 F.Supp.2d 355, 359 (D.N.J. 2001).

standard of Rule 8(a)."[11] Lum v. Bank of Am., 361 F.3d 217, 228 (3d Cir. 2004) (distinguishing

the "short and concise statement" standard of Rule 8(a), generally applicable to antitrust claims,

from the heightened "particularity" standard of Rule 9(b), applicable to antitrust claims sounding

in fraud).  In assessing the Rule 8(a) pleading standard in the context of antitrust cases, the

United States Supreme Court has recently explained that "[w]hile a complaint attacked by a Rule

12(b)(6) motion to dismiss does not need detailed factual allegations," it must plead "enough

facts to state a claim to relief that is plausible on its face. Bell Atl. Corp., 127 S.Ct. at 1964,

1974.[12]  With this framework in mind, the Court turns now to the issues raised by Defendant in

support of the instant motion.  _____

## DISCUSSION

Becton argues that the Complaint should be dismissed for failure to state claims upon

which relief can be granted based on the following assertions: (1) Plaintiffs lack standing to

pursue certain claims; (2) Plaintiffs have not adequately alleged the essential elements or

necessary facts of any of its antitrust claims; and (3) the anti-competitive claim is not

independent or distinguishable from the conspiracy to monopolize claim.

## I.    Standing to Pursue Claims

Defendant argues that certain of Plaintiffs' claims should be dismissed because Plaintiffs

lack standing to pursue same. (Def. Br. at 19).  In particular, Defendant alleges that "[f]or three

---

[11] Federal Rule of Civil Procedure 8(a) provides that "[a] pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."

[12] See also Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 528 n. 17 (1983) (stating that "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.").

of the product markets – safety blood collection devices, safety IV catheters and safety winged IV catheters – there is no plaintiff to allege a claim.  None of the plaintiffs claim to buy those products." (Id.).  Moreover, Defendant argues that Plaintiffs cannot acquire the requisite standing by bringing this case as a class action. (Id. at 20).

In response, Plaintiffs argue that they "have alleged that they paid more for Relevant Hypodermic Products that they bought directly from Becton as a result of Becton's exclusionary acts in violation of Sections 1 and 2 of the Sherman Act.  It is well settled that a direct purchaser who pays an overcharge due to an antitrust violation suffers quintessential antitrust injury." (Pl. Opp'n Br. at 26).  In particular, Plaintiffs claim that standing should not be evaluated on a product by product basis.  (Id. at 31).  To the extent that it should be, Plaintiffs argue that the Complaint alleges only four relevant product markets. (Id., n. 11).  Finally, Plaintiffs state that "the Court need not, and should not, determine the products comprising any relevant product market, or the number of any such markets, on this motion." (Id. at 32, n. 11).

The Complaint states that there are four relevant markets at issue in this case, including:

> (a) disposable syringes and associated needles;
> (b) blood collection devices ("BCDs") and associated needles;
> (c) winged IV devices and their needles; and
> (d) IV catheter devices and their needles.

(Compl., ¶ 34).  Each of these markets is collectively referred to as the "Relevant Hypodermic Products."  The Complaint goes on to state that "[a]ll of the relevant Hypodermic Products come in safety and non-safety forms. . .  Thus, for each of the Hypodermic Products at issue, safety and non-safety devices are in separate sub-markets for all or part of the Class Period." (Id., ¶ 36).[13]

---

[13] The parties are in disagreement as to the number of product markets at issue.  Plaintiffs argue that there are four, whereas, Defendant argues that there are eight, since the safety and

Though a court must take as true all the facts alleged, it may not "assume that the [plaintiff] can prove [any] facts that it has not alleged." <u>Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters</u>, 459 U.S. 519, 526 (1983). Notably, Defendant claims that the Complaint fails to allege that any of the named Plaintiffs have purchased Becton's (1) safety blood collection devices, (2) safety IV catheters, or (3) safety winged IV catheters. (Def. Reply Br. at 8).[14]

The Third Circuit has explained that:

> Under the rule of <u>Brunswick Corp v. Pueblo Bowl-O-Mat, Inc.</u>, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), a plaintiff must demonstrate that it has suffered antitrust injury in order to sue under the antitrust laws. <u>Brunswick</u> holds that to establish antitrust injury, plaintiffs must prove (1) "injury of the type the antitrust laws were intended to prevent," and (2) injury that "flows from that which makes the defendants' acts unlawful".

---

conventional version of each of the four Relevant Hypodermic Products constitute separate markets.

The Court recognizes that the United States Supreme Court has explained that submarkets "constitute product markets for antitrust purposes." <u>Brown Shoe Co. v. United States</u>, 370 U.S. 294, 325 (1962) (citation omitted). Nevertheless, for the reasons set forth herein, the Court need not reach the issue of whether Plaintiffs' claims are based on four or eight relevant product markets. <u>See, e.g.</u>, <u>Fineman v. Armstrong World Indus., Inc.</u>, 980 F.2d 171, 199 (3d Cir. 1992) ("the determination of a relevant product market or submarket ("market") is a highly factual one best allocated to the trier of fact.").

[14] The Court has reviewed the portions of the Complaint referred to by Defendant (Def. Br. at 8-9), and agrees that Plaintiffs do not expressly allege that they purchase (1) safety blood collection devices, (2) safety IV catheters, or (3) safety winged IV catheters. Plaintiffs do not refute this; rather, Plaintiffs argue that the Complaint alleges that the safety and conventional versions of each relevant product, constitute one product market, and that Plaintiffs <u>have</u> alleged antitrust injury in each of the four relevant product markets. <u>See</u> Compl., ¶¶ 16-22. For the reasons set forth herein, the Court will nevertheless allow Plaintiffs' claims to proceed as to the foregoing markets.

Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 978 F.2d 1318, 1327-28 (3d Cir. 1992) (internal

citations omitted).  In essence, Defendant's argument is based on Plaintiffs' alleged inability to

fulfill the second factor set forth by the Court in Brunswick.[15]  In particular, Defendant argues

that Plaintiffs lack standing to assert claims based on the three foregoing markets, as Plaintiffs

have failed to allege any injury that flows from Defendant's allegedly unlawful conduct in such

markets.

        In support of this argument, Defendant cites to a line of cases indicating that a plaintiff

suffers no "antitrust injury" in a market in which it is neither a consumer nor a competitor.  See,

e.g., Assoc. Gen. Contractors of Cal., Inc., 459 U.S. at 539, 545-46 (affirming district court's

dismissal of a union's antitrust claim, finding that the union had suffered no antitrust injury

where "the Union was neither a consumer nor a competitor in the market in which trade was

restrained," and explaining that "the chain of causation between the Union's injury and the

alleged restraint in the market for construction subcontracts contains several somewhat vaguely

defined links."); Schuykill Energy Res., Inc. v. Pa. Power & Light, 113 F.3d 405, 415 (3d Cir.

1997) (citing to Ninth Circuit decision for the proposition that "[a] plaintiff who is neither a

competitor nor a consumer in the relevant market does not suffer antitrust injury."); Gregory

Mktg. Corp. v. Wakefern Food Corp., 787 F.2d 92, 95-96 (3d Cir. 1986) ("Gregory is neither a

consumer nor a competitor in the apple juice market, and thus is not 'within the area of the

economy . . . endangered by [the] breakdown of competitive conditions. . . .'") (quoting Blue

---

        [15] Defendant does not argue that the injuries alleged by Plaintiffs are not of the type the
antitrust laws were intended to prevent. Therefore, the Court will limit its analysis to the second
factor set forth by the Court in Brunswick, namely whether Plaintiffs have adequately plead an
injury that "flows from that which makes the defendants' acts unlawful." Int'l Raw Materials,
Ltd., 978 F.2d at 1328.

Shield of Va. v. McCready, 457 U.S. 465, 481 (1982)).

However, the United States Supreme Court has recognized that an antitrust injury can be suffered by a plaintiff, even if the plaintiff "was not a competitor of the conspirators, [where] the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." Blue Shield of Va. v. McCready, 457 U.S. 465, 484 (1982)).  The Court went on to explain that "[i]n light of the conspiracy here alleged we think that McCready's injury 'flows from that which makes defendants' acts unlawful' within the meaning of Brunswick, and falls squarely within the area of congressional concern." Id.

The Third Circuit has likewise found that a terminal operator plaintiff lacked standing to assert antitrust injury in the soda ash market – in which it was neither a consumer nor a competitor – because the plaintiff had "made no showing of a connection between the alleged international soda ash conspiracy and the level of competition within the terminalling market." Int'l Raw Materials, Ltd., 978 F.2d at 1327-29.  There, the Court explained "[b]ecause IRM is neither a competitor nor a consumer in the relevant market, it must allege a significant causal connection between the alleged soda ash conspiracy and the alleged anticompetitive effects in the terminalling market such that the harm to the terminalling market can be said to be 'inextricably intertwined' with the alleged soda ash cartel." Id. at 1328 (quoting McCready, 457 U.S. at 484). See also Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp., 995 F.2d 425, 429 (3d Cir. 1993) ("The second [Brunswick] requirement is generally met if the plaintiff is a 'competitor [ ]or a consumer in the relevant market.' Alternatively, this requirement is fulfilled if there exists a 'significant causal connection' such that the harm to the plaintiff can be said to be 'inextricably intertwined' with the antitrust conspiracy.") (quoting McCready, 457 U.S. at 484).

Here, the Complaint alleges, in relevant part, as follows:

> Safety and non-safety forms of the same type of Hypodermic
> Product are partial substitutes.  For example, a safety form of a
> blood collection device can accomplish the same function as a non-
> safety form of that product.  Thus, the safety and non-safety forms
> of a products are, to some extent, substitutable for and in
> competition with each other. . . . While the safety and non-safety
> forms of any particular Hypodermic Product were in separate sub-
> markets for all or part of the Class Period, given the higher-priced,
> safety forms of a Hypodermic Product can perform the same
> function as a less-expensive non-safety forms of the product, if the
> price on the safety-form of a product drops enough, buyers will
> shift their purchases from the conventional forms of the  product to
> the safety-form of the product.  Thus, competition regarding the
> safety form of a Hypodermic Product can affect not only the price
> for the safety form of the product, but also the price for the less-
> expensive, conventional (non-safety) form of the product.

(Compl., ¶¶ 36, 37).  Even if the Court were to assume, arguendo, that Plaintiffs' claims arise out

of eight distinct product markets, and that Plaintiffs are not consumers or competitors in three of

the eight product markets[16] – a finding which this Court does not make – in light of the foregoing

allegations, which the Court accepts as true for purposes of the instant motion, the Court

concludes that Plaintiffs have raised "a right to relief above the speculative level . . . ."  Bell Atl.

Corp., 127 S.Ct. at 1959.

For instance, the Complaint specifically alleges that "[i]f competition drives down prices

for the higher-priced safety-form of a product, sellers of the conventional form of the product

will have to lower their prices on that product or risk losing sales as consumers shift their

purchases from the conventional to the safety-form of the product." (Id., ¶ 37).  Even if the Court

---

[16] The three product markets in which Defendant claims that Plaintiffs lack standing to
assert antitrust claims are: (1) safety blood collection devices, (2) safety IV catheters, and (3)
safety winged IV catheters.

ultimately finds that there are eight distinct product markets, if Plaintiffs can show that

Defendant has unlawfully precluded competition in the markets of  safety blood collection

devices, safety IV catheters, and/or safety winged IV catheters, Plaintiffs may demonstrate that

their injuries in the markets of the conventional version of said products actually flow from

Defendant's actions in the markets of the safety version of said products.[17]  As a result, to the

extent that Defendant moves to dismiss the Complaint on the basis that Plaintiffs lack standing to

assert antitrust claims in three of the eight product markets (allegedly) at issue solely because

they were neither consumers nor competitors in said markets, Defendant's motion is denied.[18]

## II.      Elements of the Claims

Defendant moves to dismiss Counts One, Two and Three on the basis that Plaintiffs have

not alleged with "factual particularity" the essential elements of its § 1 and § 2 claims. (Def. Br.

at 14).  In particular, Defendant argues that Plaintiffs (1) fail to demonstrate a viable relevant

---

[17] Nevertheless, the Court recognizes that prudential concerns also underlie antitrust standing requirements. See, e.g., Int'l Raw Materials, Ltd., 978 F.2d at 1329 ("Because IRM is neither a producer nor a consumer of soda ash, it is not the plaintiff best situated to challenge ANSAC's allegedly unlawful conduct in the soda ash market.").  Defendant has not raised such concerns, nor does the Court find it appropriate to address same at this stage of the litigation.

[18] Defendant also urges the Court to strike "Plaintiffs' allegations about their proposed class of purchasers of 'Relevant Hypodermic Products' . . . leaving only their alternative proposed class of syringe and needle purchasers." (Def. Br. at 23).  The crux of Defendant's argument is that "Plaintiffs should not be permitted to use an overly broad class definition as camouflage for their lack of standing." (Id. at 24).  The Court has considered Defendant's request and finds the request to be premature at this stage of the litigation. See, e.g., Strzakowlski v. Gen. Motors Corp., No. 04-4740, 2005 WL 2001912, at *26 (D.N.J. Aug. 16, 2005) (denying motion to dismiss class allegations, and noting that "courts permit class action allegations to be stricken prior to discovery, such as on a Rule 12(b)(6) motion.  However, such a dismissal should be ordered only 'in those rare cases where the complaint itself demonstrates that the requirements for maintaining a class action cannot be met.'") (internal citations omitted).

market, (2) fail to identify the specifics of which of Becton's contracts are allegedly

"exclusionary," (3) fail to provide "particularized allegations about competition in any specific

market," and (4) fail to allege adequate "antitrust injury" in those markets in which they do not

allege to be purchasers.[19]  Because Defendant has presented the Court with such global pleading

arguments, which allegedly relate to Counts One, Two <u>and</u> Three, it is not entirely clear to the

Court which arguments relate to which claims, and therefore, the specific basis on which

Defendant believes that Plaintiffs have failed to plead particular elements of either the § 1 or § 2

claims.  (Def. Br. at 14-18).  As a result, the Court will begin its analysis by assessing whether

the Complaint alleges the requisite elements of both claims,[20] respectively, and will then turn to

Defendant's general pleading arguments, keeping in mind that antitrust complaints are liberally

construed in this Circuit.  <u>See</u> <u>PepsiCo, Inc.</u>, 836 F.2d at 179.

### A.      Unlawful Monopolization – Section 2 of the Sherman Act

Section 2 of the Sherman Act provides that:

> Every person who shall monopolize, or attempt to monopolize, or
> combine or conspire with any other person or persons, to
> monopolize any part of the trade or commerce among the several
> States, or with foreign nations, shall be deemed guilty of a felony,
> and, on conviction thereof, shall be punished by fine not exceeding
> $100,000,000 if a corporation or, if any other person, $1,000,000,
> or by imprisonment not exceeding 10 years, or by both said
> punishments, in the discretion of the court.

---

[19] Despite Defendant's combination of its legal arguments in support of its motion to dismiss Plaintiffs' § 2 claims, with its arguments supporting dismissal of Plaintiffs' § 1 claim, the Court determines that the less confusing and more prudent approach is to treat and evaluate both claims independently.

[20] In doing so, the Court is cognizant of the fact that "a formulaic recitation of a cause of action's elements" alone will not sustain Plaintiffs' obligation to provide the grounds of their entitlement to relief. <u>Bell Atl. Corp.</u>, 127 S.Ct. at 1959.

15 U.S.C. § 2.  Thus, § 2 of the Sherman Act proscribes (1) actual monopolization, (2) attempted

monopolization, and (3) conspiracies to monopolize.  See, e.g., McPherson's. Ltd. v. Never Dull,

Inc., No. 90-2070, 1990 WL 238812, at * 5 (Dec. 26, 1990).  Count One of the Complaint alleges

actual monopolization under § 2, and Count Two alleges a conspiracy to monopolize, also under

§ 2 of the Sherman Act.

The Third Circuit has indicated that a § 2 violation generally consists of two elements:

"(1) possession of monopoly power [in the relevant product market] and (2) '. . . maintenance of

that power as distinguished from growth or development as a consequence of a superior product,

business acumen, or historic accident.'" United States v. Dentsply Int'l, 399 F.3d 181, 186 (3d

Cir. 2005) (citing Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 480

(1992)).

Therefore, the Complaint must first allege that Becton possesses monopoly power in a

particular product market.  In fact, the Complaint states that "Becton illegally acquired and

maintained monopoly power over various hypodermic products and markets for those products

from at least January 1, 2000 (if not earlier) through the present." (Compl., ¶ 3).  The Complaint

goes on to identify the specific hypodermic product markets over which Becton possessed a

monopoly: (1) disposable syringes and associated needles; (2) blood collection devices and

associated needles, (3) winged IV catheter devices and their needles, and (4) IV catheter devices

and their needles.  (Id.).  See generally Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737,

749 (3d Cir. 1996) (explaining that plaintiffs bear the burden in  "establishing the relevant market

for purposes of providing its actual monopoly claim") (citation omitted).

The Complaint must also allege that Becton has maintained such a monopoly by unlawful

means.  "Unlawful maintenance of a monopoly is demonstrated by proof that a defendant has

engaged in anti-competitive conduct that reasonably appears to be a significant contribution to

maintaining monopoly power." Dentsply Int'l, 399 F.3d at 187 (citation omitted).  The

Complaint alleges that "[s]ince the late 1980s (if not earlier), Defendant Becton has used (and

continues to use) various anti-competitive and illegal practices to achieve and maintain its

dominant market position by suppressing and foreclosing competition, even from superior

products sold by other manufacturers (such as Retractable Technologies, Inc.), or cheaper

products sold by competitors, such as Terumo Medical Corporation." (Compl., ¶ 6).  The

Complaint goes on to provide examples of Becton's alleged anti-competitive conduct, including

(1) imposing market share purchase requirements on hospitals or other healthcare entities, (2)

bundling its goods for exclusionary purposes, (3) conspiring with GPOs for the purpose of

imposing exclusionary contracts, and (4) conspiring with other manufacturers to "impose rebate

penalties on purchasers relating to a bundle of products." (Compl., ¶ 7).[21]

　　　　Moreover, a plaintiff must allege facts establishing an "antitrust injury." See Schuykill

Energy Res., Inc. v. Pa. Power & Light, 113 F.3d 405, 413, 417 (3d Cir. 1997) (recognizing that

the existence of antitrust injury is not typically resolved through motions to dismiss).  Here, the

Complaint alleges that "[b]y unlawfully excluding and impairing competition, Becton's conduct

has caused Plaintiffs and the other Class members to pay more for relevant Hypodermic Products

---

　　　　[21] See, e.g., SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056, 1065 (3d Cir. 1978)
(finding that "the act of willful acquisition and maintenance of monopoly power was brought
about by linking products on which Lilly faced no competition Keflin and Keflex with a
competitive product, Kefzol. The result was to sell all three products on a non-competitive basis
in what would have otherwise been a competitive market for Ancef and Kefzol. The effect of the
Revised CSP was to force SmithKline to pay rebates on one product, Ancef, equal to rebates paid
by Lilly based on volume sales of three products.").

than they otherwise would have paid absent Becton's illegal, exclusionary conduct." (Compl., ¶

107). See supra Discussion Part I.

### B.   Anti-Competitive Conspiracy – Section 1 of the Sherman Act

Section 1 of the Sherman Act provides that:

> Every contract, combination in the form of trust or otherwise, or
> conspiracy, in restraint of trade or commerce among the several
> States, or with foreign nations, is declared to be illegal. Every
> person who shall make any contract or engage in any combination
> or conspiracy hereby declared to be illegal shall be deemed guilty
> of a felony, and, on conviction thereof, shall be punished by fine
> not exceeding $100,000,000 if a corporation, or, if any other
> person, $1,000,000, or by imprisonment not exceeding 10 years, or
> by both said punishments, in the discretion of the court.

15 U.S.C. § 1.

The Third Circuit has explained that there are four essential elements of a § 1 violation:

> (1) concerted action by the defendants; (2) that produced
> anti-competitive effects within the relevant product and geographic
> markets; (3) that the concerted action was illegal; and (4) that the
> plaintiff was injured as a proximate result of the concerted action.

Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 442 (3d Cir. 1997).  Moreover,

"[b]ecause § 1 of the Sherman Act 'does not prohibit [all] unreasonable restraints of trade . . . but

only restraints effected by a contract, combination, or conspiracy,' '[t]he crucial question' is

whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an

agreement, tacit or express.'" Bell Atl. Corp., 127 S.Ct. at 1964.  As a result, "stating such a

claim requires a complaint with enough factual matter (taken as true) to suggest that an

agreement was made." Id. at 1965.

Here, the Complaint alleges that Becton conspired with certain GPOs and other medical

device manufacturers to impose Becton's exclusionary practices, such as linking rebates on

Relevant Hypodermic Products to the amount of a hospital's purchases of other manufacturers' unrelated products (Compl., ¶¶ 7, 10-11, 86).  For example, Becton conspired with GPOs, including but not limited to Premier, by rewarding Premier with high administrative fees, and equity positions. (Id., ¶¶ 71, 76).  In turn, Premier, adopted a policy whereby all member hospitals were required to sign a letter of intent forcing them to comply with any commitment contracts which Premier had negotiated with suppliers. (Id., ¶ 93).  Members who failed to comply – and instead contracted independently for products covered by Premier's commitment contracts – could be subjected to sanctions and/or removal from the Premier organization. (Id.).

Additionally, MedAssets – one of the foregoing GPOs – has a program called "Select" under which a healthcare entity can only obtain rebates on certain products made by various manufacturers if the healthcare entity fills at least 90% of its blood-collection device needs through Becton. (Id., ¶ 78).  Similarly, Novation – another GPO – has a program called "Opportunity Phase I" whereby "a Novation member cannot receive rebates from any of the five manufacturers on any of the 13 products unless the Novation member buys at least 95% of its needs of each of the products from the Novation-designated vendor." (Id., ¶ 80).[22]

Such agreements between Defendant and certain GPOs and/or manufacturers, it is

_____

[22] Given the foregoing allegations, the Court finds "plausible grounds to infer an agreement" between Defendant and certain GPOs and/or manufactures. Bell Atl. Corp., 127 S.Ct. at 1965. See generally Elder-Beerman Stores Corp. v. Federated Dept. Stores, Inc., 459 F.2d 138, 146 (6th Cir. 1972) ("The granting of exclusive selling rights or acceptance of such exclusive selling rights, acts which are not prohibited by law unless there is a resulting foreclosure of market alternatives cannot, without proof of such foreclosure, form the basis for a jury verdict that the defendants had entered into a conspiracy to restrain trade.").

alleged, had the cumulative effect of foreclosing "competing manufacturers of the Relevant Hypodermic Products (even those competitors with superior and/or less expensive products) from a substantial portion of the respective markets." (Compl., ¶ 12).  Moreover, the Complaint states that "Becton had no legitimate, pro-competitive reason for linking the rebates on Relevant Hypodermic Products to the amount or percentage of the hospital's purchases of other manufacturers' unrelated products." (Compl., ¶ 86).  Finally, the Complaint states that "linking rebates and prices across multiple product lines by different manufacturers has had the purpose and effect of excluding competition in the relevant Hypodermic Product markets," (Compl., ¶ 90) and that such conduct "has caused Plaintiffs and the other Class members to pay more for relevant Hypodermic Products than they otherwise would have paid absent Becton's illegal, exclusionary conduct." (Compl., ¶ 107).

### C.    Becton's Pleading Arguments

Defendant argues that Plaintiffs (1) fail to demonstrate a viable relevant market, (2) fail to identify the specifics of which of Becton's contracts are allegedly "exclusionary," (3) fail to provide "particularized allegations about competition in any specific market," and (4) fail to allege adequate "antitrust injury" in those markets in which they do not allege to be purchasers. For the reasons that follow, the Court finds Defendant's pleading arguments to be unpersuasive.

### Relevant Market

The Complaint alleges that "Becton illegally acquired and maintained monopoly power over various hypodermic products and markets for those products from at least January 1, 2000 (if not earlier) through the present." (Compl., ¶ 3).  In particular, the Complaint alleges that Becton maintained such monopoly power over four relevant product markets: (1) disposable

syringes and associated needles; (2) blood collection devices and associated needles, (3) winged

IV catheter devices and their needles, and (4) IV catheter devices and their needles.  (Id.).

Defendant cites to <u>Syncsort Inc. v. Innovative Routines Int'l Inc.</u>, 2005 WL 1076043, at *2

(D.N.J. May 6, 2005) for the proposition that Plaintiffs have failed to plead facts sufficient to

demonstrate a viable relevant market in which Defendant allegedly maintained a monopoly. (Def.

Br. at 15).  In particular, Defendant argues that "plaintiffs pay lip service to this pleading

requirement by nominally defining eight separate product markets, but then defeat that purpose

by failing to allege what particular conduct took place with respect to what particular products in

which particular markets." (Id.).

      Defendant fails, however, to provide the Court with any legal authority indicating that an

antitrust plaintiff is required to plead a relevant market with such specificity.  <u>See, e.g.</u>, <u>Bell Atl.</u>

<u>Corp.</u>, 127 S.Ct. at 1964, 1974 (explaining that a complaint "does not need detailed factual

allegations;" rather, it must plead "enough facts to state a claim to relief that is plausible on its

face.").  In particular, Defendant fails to provide the Court with any binding legal authority

indicating that the pleading of a plausible relevant market must include  "what particular conduct

took place with respect to what particular products in which particular markets." (Def. Br. at 15).

The Court, therefore, has been given no reason to believe that the relevant markets, as plead in

the Complaint, are anything but plausible.  Moreover, the court in <u>Syncsort</u> – the case largely

relied upon by Defendant in this regard – specifically stated that "Plaintiff does not, however,

advance any legal support for the proposition that defendant must plead facts regarding the nature

of the market and the products at issue to satisfy the requirements for pleading a relevant market

definition." <u>Syncsort, Inc.</u>, 2005 WL 1076043, at * 3.

**"Exclusionary" Conduct**[23]

Defendant argues that "[t]here are lots of pages and lots of paragraphs in the Second

Amended Complaint, but almost no specific allegations about what specific contracts, with what

specific parties, cover what specific products." (Def. Br. at 14; Def. Reply Br. at 2).  With respect

to the "exclusive" contracts alleged, Defendant argues that "Plaintiffs, do not, however, identify

which of Becton's contracts are allegedly 'exclusionary,' which of Becton's myriad customers

are parties to these contracts, or in which product market these contracts exist." (Def. Br. at 16).[24]

Again, Defendant fails, however, to provide the Court with any legal authority indicating that an

antitrust plaintiff is required to plead with such specificity.  The Supreme Court has reiterated

that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the

---

[23] The Court will not consider Defendant's argument that "plaintiffs here have not alleged
that Becton's supposed exclusive dealings arrangements or bundled discounts foreclose a
substantial share of the relevant market," as it was raised for the first time in Defendant's reply
brief. (Def. Reply Br. at 5).  A moving party may not raise new issues in a reply brief that it
should have raised in its initial brief, particularly since Plaintiffs were not given an opportunity to
respond to same. See, e.g., Bayer AG v. Schein Pharm., 129 F. Supp. 2d 705, 716 (D.N.J. 2001),
aff'd 301 F.3d 1306 (3d Cir. 2002) (striking section of reply brief which raised new issues
because opposing party "has no opportunity to respond to newly minted arguments contained in
reply briefs.").  Even if the Court were so inclined as to consider same, any such argument would
be futile, as the Complaint specifically alleges that "[t]he cumulative effect of these practices has
been to foreclose competing manufacturers of the Relevant Hypodermic Products (even those
competitors with superior and/or less expensive products) from a substantial portion of the
respective markets, and to prevent them from (a) gaining market share, (b) achieving economies
of scale and scope, and (c) driving down prices in the markets for Hypodermic Products."
(Compl., ¶ 12).

[24] Defendant asserts a similar argument in its letter to the Court dated June 5, 2007, which
the Court has reviewed and considered, as it summarized (and attached) the Supreme Court's
recent decision in Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955 (2007).  Therein, Defendant cites
to Bell Atl. Corp. for the proposition that "[a]s the Supreme Court found in Twombly, 'the
Complaint here furnishes no clue as to which' of the parties 'supposedly agreed, or when and
where the illicit agreement took place.' (Def. June 5 Letter at 2).

claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atl. Corp., 127 S.Ct. at 1964 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).[25]  The Court recognizes, however, that the Third Circuit has applied a heightened pleading standard in antitrust cases sounding in fraud. See, e.g., Lum, 361 F.3d at 228 (distinguishing the "short and concise statement" standard of Rule 8(a), generally applicable to antitrust claims, from the heightened "particularity" standard of Rule 9(b), applicable to antitrust claims sounding in fraud).  However, Defendant does not suggest that the antitrust claims alleged in the Complaint sound in fraud.[26]  Therefore, the Court sees no reason why it should apply the more rigorous pleading standard contemplated by Defendant to the case at hand.[27]

The Complaint alleges that Becton maintained its monopoly over the relevant product markets by engaging in the following anti-competitive conduct: (1) imposing minimum market share purchase requirements (Compl., ¶¶ 7-8, 59-60), (2) bundling rebates or discounts (Id., ¶¶ 7-9, 61-65), (3) conspiring with certain GPOs to implement and enforce the foregoing contracts and policies (Id., ¶¶ 7, 10), and (4) conspiring with other manufacturers to impose reciprocal rebate penalties and minimum market share purchase requirements "to assist each other to

---

[25] While the Supreme Court indicated that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions," for the reasons stated herein, the Court finds that Plaintiffs have met this burden.

[26] See also In re Ins. Brokerage Antitrust Litig., No. 04-5184, 2007 WL 1100449, at *8 (D.N.J. April 5, 2007) (utilizing heightened pleading standard of Federal Rule of Civil Procedure 9(b) where the plaintiffs' antitrust conspiracy claims were predicated on fraud).

[27] Defendant reasserts this argument repeatedly throughout its papers.  For purposes of efficiency, the Court will not revisit this issue herein.

exclude their respective competitors" (Id., ¶¶ 7, 11).

For instance, the Complaint alleges that Becton conspired with GPOs – such as Novation and Premier – by rewarding them with high administrative fees, and equity positions, in return for the promotion of Becton's Hypodermic Products over those of its competitors.  (Id., ¶¶ 95, 99).  As a result, members of such GPO members  were essentially coerced into entering into sole-source contracts with Becton, thereby precluding them from purchasing relevant Hypodermic Products made by other "non-approved" rival manufacturers. (Id., ¶¶ 97, 99).

The Complaint also provides that Becton conspired with other manufacturers to impose reciprocal rebate penalties and minimum market share purchase requirements.  For example, the Complaint alleges that MedAssets – a GPO – has a program called "Select" under which a healthcare entity can only obtain rebates on certain products made by various manufacturers if the healthcare entity fills at least 90% of its blood-collection device needs through Becton. (Id., ¶ 78).   The Complaint also alleges that Novation – another GPO – had a similar program called "Opportunity Phase I" whereby "a Novation member cannot receive rebates from any of the five manufacturers on any of the 13 products unless the Novation member buys at least 95% of its needs of each of the products from the Novation-designated vendor." (Id., ¶ 80).

The Court finds such allegations of anti-competitive conduct set forth in the Complaint to be in sharp contrast with the allegations found to be insufficient in Bell Atl. Corp., 127 S.Ct. at 1962-63.[28]  In particular, the complaint at issue in Bell Atl. Corp. sought to demonstrate anti-

---

[28] In Bell Atl. Corp., the plaintiffs alleged that the Incumbent Local Exchange Carriers "have entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another." Id. at 1963.

competitive agreements based on parallel conduct through <u>inference</u>.  <u>Id.</u> at 1962.  To the

contrary, the instant Complaint sets forth allegations of specific anti-competitive agreements –

between Becton and certain GPOs, and between Becton and certain manufacturers – which the

Court deems as providing Defendant with adequate notice of the particular grounds upon which

Plaintiffs' claims rest, particularly given the fact that Plaintiffs have not yet had the benefit of

discovery.[29]  <u>See, e.g.</u>, <u>Hosp. Bldg. Co. v. Trs. of Rex Hosp.</u>, 425 U.S. 738, 746-747 (1976)

(explaining that "in antitrust cases, where 'the proof is largely in the hands of the alleged

conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be

granted very sparingly") (quotation omitted).  Defendant has cited to no legal authority

suggesting otherwise.[30]

---

[29] The Court recognizes that "[t]he allegation of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the Sherman Act." <u>Garshman v. Universal Res. Holding Inc.</u>, 824 F.2d 223, 230-31 (3d Cir. 1987).  Nevertheless, the Court does not find that the deficiencies alleged by Defendant in this case rise to the level of those contemplated by the Third Circuit in <u>Garshman</u>, where the complaint, itself, failed to allege <u>any</u> "adverse effect on competition in any relevant market." <u>Id.</u> at 231.

[30] Defendant relies on <u>McPherson's Ltd. v. Never Dull, Inc.</u>, 1990 WL 238812, at *3-4 (D.N.J. Dec. 26, 1990), and <u>JM Computer Servs., Inc. v. Schlumberger Techs., Inc.</u>, 1996 WL 241607, at *4 (N.D. Cal. May 3, 1996), for the proposition that "Plaintiffs should allege, at a minimum, which contracts it believes are suspect and with whom those agreements were made." (Def. Br. at 16).  The Court has reviewed the <u>McPherson's Ltd.</u> and <u>Schlumberger</u> decisions – neither of which is binding on this Court – and finds that neither case suggests that the pleadings in this matter are deficient. <u>See, e.g.</u>, <u>McPherson's Ltd. v. Never Dull, Inc.</u>, 1990 WL 238812, at *3-4 (D.N.J. Dec. 26, 1990) (granting defendant's motion to dismiss antitrust claims where the complaint provided "<u>no factual support</u> for its assertion that the plaintiffs have violated the Sherman Act; it merely cites the present lawsuit by plaintiffs as an example of this alleged misconduct.") (emphasis added); <u>JM Computer Servs., Inc. v. Schlumberger Techs., Inc.</u>, 1996 WL 241607, at *4 (N.D. Cal. May 3, 1996) (granting defendant's motion to dismiss a § 2 claim where Plaintiff (1) failed to "identify the specific products or services in product markets for which Plaintiff claims there is no price elasticity," (2) failed to "identify an agreement with a specific person or entity," and (3) "does not identify the parts, services, or contracts involved in

To the extent that Defendant invites the Court to decipher whether certain exclusionary practices alleged in the Complaint are "nothing more than price discounts" (Def. Reply Br. at 3), the Court determines that given the nature of the allegations contained in the Complaint, any such legal determination is improper at this stage of the litigation.[31]

### Anti-Competitive Effects

The Complaint goes on to allege that, as a result of Becton's exclusionary conduct, actual and/or potential competitors – such as Terumo and Retractable – were foreclosed and/or stifled from competing in markets for the Relevant Hypodermic Products. (Compl., ¶ 101). Had Becton not engaged in such conduct, actual and/or potential competitors – such as Terumo and Retractable – would have sold more of their related products, thereby gaining a larger market share. (Id., ¶ 102). Accordingly, "as these competitors increased their sales and achieved economics of scale, their costs would have fallen, and thus they would have been able to provide their products at even lower prices, further pressuring Becton to lower its prices in response." (Id.).

Defendant argues that the Complaint "contains almost no particularized allegations about competition in any specific market . . . . Nor does it allege specifically how competition was hurt in the conventional winged IV catheter market. Nor does it allege what specific competitors (or

_____

the alleged exclusive dealing").

[31] Moreover, Defendant's reliance on Broadcom Corp. v. Qualcomm Inc., No. 05-3350, 2006 WL 2528545 (D.N.J. Aug. 31, 2006), which is not binding on this Court and distinguishable from the instant case on a number of levels, is misplaced. See Broadcom Corp., 2006 WL 2528545, at *7-9 (dismissing antitrust claims where defendant had a "legal monopoly over the technology claimed in its patents," and expressing concern "that reviewing and supervising the terms upon which Qualcomm licenses its patents, and offers to sell its UMTS chipsets may be beyond the effective control of the Court under the antitrust laws.").

would-be competitors) participated in, and were supposedly excluded from, which of the eight specific product markets." (Def. Br. at 17-18).[32]

Once again, however, Defendant has failed to provide the Court with any legal authority indicating that the anti-competitive effects of Defendant's alleged exclusionary practices must be plead with such specificity, particularly before a plaintiff has had the ability to conduct relevant discovery.  In fact, Defendant cites to no legal authority, whatsoever, in support of this argument. See Def. Br. at 17-18, section (3).

## Antitrust Injury

The gravamen of Defendant's argument that Plaintiffs have failed to plead antitrust injury is that Plaintiffs lack standing to assert claims in relevant product markets in which they were not consumers. (Def. Br. at 18).   Defendant does not challenge the nature of the injuries alleged by Plaintiffs. See, e.g., Int'l Raw Materials, Ltd., 978 F.2d at 1328.  Having already determined that dismissal on such a basis is inappropriate, see supra Discussion Part I, and having been provided with no alterative basis for a finding that Plaintiffs have otherwise inadequately plead an "antitrust injury," the Court need not revisit this issue. See, e.g., Brader v. Allegheny Gen. Hosp., 64 F.3d 869, 876 (3d Cir. 1995) (explaining that "the existence of an 'antitrust injury' is not typically resolved through motions to dismiss.").

---

[32] The Court disagrees with Defendant's contention that the Complaint fails to specify which competitors were allegedly excluded from the relevant product markets.  See Compl., ¶ 101 (stating that "had Becton not improperly foreclosed or stifled Terumo, Retractable and other actual or potential competitors from competing in markets for the Relevant Hypodermic Product, Terumo, Retractable and other potential rival manufacturers would have achieved much greater sales than they actually did (or threatened to do) given the superiority of its products and/or the cheaper prices that they charged (or could have charged upon entry), and would have posed a far greater competitive threat to Becton.").

Page 30 of  33

In light of the foregoing, to the extent that Defendant moves to dismiss the Complaint on the basis that Plaintiffs have failed to allege "with factual particularity" the essential elements of each of its claims, Defendant's motion is denied.

### III.    Anti-Competitive Conspiracy / Conspiracy to Monopolize

Defendant argues that the anti-competitive conspiracy claim must be dismissed because "it is redundant of their conspiracy to monopolize claim under Section 2." (Def. Br. at 24).  In particular, Defendant points out that the conduct alleged by Plaintiffs in support of its anti-competitive conspiracy claim is the same exact conduct alleged in support of its conspiracy to monopolize claim. (Id. at 26).  In response, Plaintiffs make two arguments: (1) they have properly alleged two overlapping conspiracies; and (2) redundant and/or contradictory claims are permitted at this stage of the litigation under the Federal Rule of Civil Procedure 8(e)(2). (Pl. Opp'n Br. at 35-38).  In particular, Plaintiffs explain that "[w]hen a defendant denies it possess monopoly/market power, plaintiffs are virtually required to plead conspiracies under both Sections 1 and 2, until discovery reveals whether the conspiracy is one merely to restrain trade, or one to monopolize a market." (Pl. Opp'n Br. at 38).  Based on the reasons set forth below, the Court finds Plaintiffs' argument in this regard to be persuasive.

The United States Supreme Court has indicated that conspiracy claims brought under Sections 1 and 2 of the Sherman Act "require proof of conspiracies which are reciprocally distinguishable from and independent of one other although the objects of the conspiracies may partially overlap." Am. Tobacco Co. v. United States, 328 U.S. 781, 788 (1946).  The Supreme Court explained the following:

> We have here separate statutory offenses, one a conspiracy in restraint of trade that may stop short of monopoly, and the other a

> conspiracy to monopolize that may not be content with restraint
> short of monopoly. One is made criminal by § 1 and the other by §
> 2 of the Sherman Act.

Id.

Similarly, the Second Circuit has analyzed the relationship between both conspiracy claims in H.I. Hayden Co. of New York, Inc. v. Siemens Med. Sys., Inc., 879 F.2d 1005, 1019 (2d Cir. 1989).  There, despite finding that plaintiffs failed to offer sufficient evidence in support of its Section 2 conspiracy claim to withstand summary judgment, the Second Circuit determined that plaintiffs' conspiracy allegations were "reciprocally distinguishable" to the extent that the Section 1 claim was directed at the elimination of a specific competitor, whereas the Section 2 claim was directed to attaining a monopoly over sale of the relevant equipment to dentists in the United States. Id.

Defendant cites to no legal authority for the proposition that a Section 1 claim must be dismissed at the outset of a litigation where Plaintiffs assert an overlapping Section 2 claim. Furthermore, the cases cited to by Defendant were decided by the respective courts on other grounds, such as plaintiff's failure to offer sufficient allegations and/or evidence in support of its Section 2 claim.  See, e.g., Regency Oldsmobile v. Gen. Motors Corp., 723 F.Supp. 250, 269-70 (D.N.J. 1989) (granting summary judgment as to Section 2 claim after finding that "plaintiff has not proffered adequate evidence to support an inference of a conspiracy to monopolize."); Desai v. Impacta, S.A., No. 89-4817, 1990 WL 132709, at * 12 (D.N.J. Sept. 7, 1990) (dismissing Section 2 claim after finding that "plaintiffs have not proffered sufficient allegations or offered adequate evidence to support an inference of a conspiracy to monopolize.").  To the contrary, Becton moves solely on the basis that Plaintiffs' Section 1 claim is redundant of their Section 2

claim. (Def. Br. at 24).

Having considered the parties' arguments, the Court determines that, based upon the allegations set forth in the Complaint, it would be premature to dismiss either claim on the basis that it is redundant at this time.[33]  See, e.g., Scheuer, 416 U.S. at 236. ("The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.").  Although Plaintiffs may ultimately fail in providing "proof of conspiracies which are reciprocally distinguishable from and independent of each other," the Court will allow both claims to proceed so that Plaintiffs may have the benefit of discovery in demonstrating to the Court the specific nature of the alleged conspiracy (or conspiracies) at issue. Am. Tobacco Co., 328 U.S. at 788.  Defendant's motion to dismiss the Third Count of the Complaint on the basis that it is redundant is, therefore, denied.

## CONCLUSION

For the reasons stated herein, the Court denies Defendant's motion to dismiss the Second Consolidated Amended Class Action Complaint.  An appropriate Order accompanies this Opinion.


DATE: June 29, 2007

/s/ Jose L. Linares
JOSE L. LINARES,
UNITED STATES DISTRICT JUDGE

---

[33] Therefore, the Court need not address the applicability of Federal Rule of Civil Procedure 8(e).  See Pl. Opp'n Br. at 38.