<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE HYPODERMIC PRODUCTS ANTITRUST LITIGATION | MDL No.: 1730<br>Master Docket No.: 05-CV-1602 (JLL/CCC) |
| This Document Relates To:<br>*Medstar Health, Inc. Medstar-Georgetown Medical Center, Inc., Washington Hospital Center Corp. and National Rehabilitation Hospital, Inc. v. Becton Dickinson & Co.,*<br>Civil Action No.: 06-CV-3258. | **OPINION** |

**LINARES**, District Judge.

This matter comes before the Court on the motion of Defendant, Becton Dickinson & Company, to dismiss Plaintiffs'[1] Class Action Amended Complaint,[2] pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth in this Opinion, Defendant's motion is DENIED.[3]

---

[1] For purposes of the instant motion, Plaintiffs include Medstar Health, Inc., Medstar-Georgetown Medical Center, Inc., Washington Hospital Center Corporation and National Rehabilitation Hospital, Inc. (hereinafter collectively "Plaintiffs").

[2] The operative complaint is the Class Action Amended Complaint filed on July 28, 2006, hereinafter referred to as "Complaint." In the instant Opinion, the Court addresses <u>only</u> Defendant's motion to dismiss the Complaint filed by Medstar Health, Inc., Medstar-Georgetown Medical Center, Inc., Washington Hospital Center Corporation and National Rehabilitation Hospital, Inc. Defendant has filed separate motions to dismiss the complaints of other parties to this multidistrict litigation, which have been decided by the Court by way of separate opinions.

[3] The Court decides this matter without oral argument. Fed. R. Civ. P. 78. Jurisdiction is premised on 28 U.S.C. §§ 1331 and 1337.

## BACKGROUND[4]

This matter arises from actions brought by healthcare providers and distributors in the pharmaceutical and medical device industry, against Defendant, a medical device manufacturer, which allegedly controls a dominant share of the relevant market for the hypodermic products at issue in this case.  The Judicial Panel on Multidistrict Litigation transferred this case to this Court for consolidated pretrial proceedings, pursuant to 28 U.S.C. § 1407.[5]

### I.      Historical Facts

Plaintiffs, a Maryland non-profit healthcare corporation, and its Washington, D.C. subsidiaries, operate a community-based network of hospitals which purchased various disposable hypodermic products manufactured by Becton for use in its hospitals, doctor's offices, surgery centers, nursing homes and other healthcare settings. (Compl., ¶¶ 1, 13).  Becton, a New Jersey corporation, was founded in 1897, and by the 1950s, had become the leading hypodermic

---

[4] For purposes of the instant motion to dismiss, the Court accepts Plaintiffs' factual allegations as true, and relies only on the Complaint. See, e.g., Lum v. Bank of Am., 361 F.3d 217, 222 n.3 (3d Cir. 2004) ("In deciding motions to dismiss pursuant to Rule 12(b)(6), courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim."). Defendant attaches certain documents to its motion to dismiss, including a copy of the Supplier Agreement between Becton Dickinson & Company and Novation, L.L.C., dated October 12, 1999, and urges the Court to consider same on the basis that said documents are "integral" to the Complaint. (Def. Br. at 9, n. 4; Silodor Decl., Ex. 2).  While Plaintiffs do not appear to oppose the Court's consideration of such documents (Pl. Opp'n Br. at 17-18), the Court determines that it is unnecessary to consider same for purposes of the instant motion to dismiss.

[5] Defendant has also moved to dismiss (1) the Second Consolidated Amended Class Action Complaint filed by Louisiana Wholesale Drug Company, Inc., Rochester Drug Co-Operative, Inc., JM Smith d/b/a Smith Drug Company, Dik Drug Company, American Sales Company, Inc., Park Surgical Co. Inc. and SAJ Distributors, Inc., and (2) the Consolidated Class Action Complaint filed by Jabo's Pharmacy, Inc. and Drug Mart Tallman, Inc.  As previously indicated, the foregoing motions will not be addressed herein.

syringe manufacturer in the United States. (Id., ¶ 47).  The disposable hypodermic products at issue include relevant markets for: (1) disposable syringes and associated needles, (2) disposable blood collection tubes, (3) disposable blood collection tube holders, and (4) intravenous ("IV") catheter devices and their associated needles. (Id., ¶ 2).  Said products are referred to collectively in the Complaint as "Disposable Hypodermic Products." (Id.).  Disposable Hypodermic Products are each sold in both a safety and non-safety form to hospitals and/or other healthcare providers. (Id., ¶¶ 27, 38, 49).  The relevant geographic market for each of the Disposable Hypodermic Products is the entire United States. (Id., ¶¶  30, 35, 40, 45).

By way of background, the Complaint explains that hospitals and other healthcare providers purchased Disposable Hypodermic Products from Defendant through certain authorized distributors "who do not independently set prices for those products." (Id., ¶ 50).  In particular, the Complaint explains that a hospital negotiates a price for Disposable Hypodermic Products with Defendant, either directly or through a Group Purchasing Organization (hereinafter "GPO").  (Id., ¶¶ 51, 57).  The authorized dealer then takes possession of Defendant's products and holds them in inventory until the hospital needs said products, at which time the authorized dealer delivers same. (Id.).  The hospital then pays the authorized dealer the price it had negotiated with Becton, as well as a delivery or administrative fee. (Id.).  The authorized dealer then pays Defendant the amount it collected from the hospital, which was "the amount already agreed to between Becton and the [healthcare provider] under applicable GPO agreements or otherwise directly with Becton." (Id.).

The Complaint goes on to allege that "as a result of this purchasing process, there is effectively only one sale: the [healthcare provider] purchases Becton Disposable Hypodermic

Products at prices negotiated with Becton and then receives these Products from authorized

distributors." (Id.).   Because authorized distributors have no control over the pricing of Becton's

products, they, therefore, act solely as a distribution agent, "temporarily holding inventory and

then delivering the product purchased" by the hospital. (Id., ¶ 52).  Thus, the only price which the

authorized distributors negotiate with Becton and/or the healthcare provider is the amount of the

delivery and/or administrative fee associated with same. (Id.).  "The fixed percentage the

authorized distributor charges for distribution services is the same no matter the price the Class

Member negotiates and then pays Becton, and the price a Class Member pays for Becton

Disposable Hypodermic Products will be the same from all authorized distributors." (Id.).  The

Complaint also explains that upon information and belief, Becton sells a portion of its

Disposable Hypodermic Products to wholesalers, who then resell these products to indirect class

members. (Id., ¶ 56).

## II.     Becton's Alleged Anti-Competitive Conduct

Beginning in the early 1980s, rival manufacturers began posing a threat to Becton's

dominance in the Disposable Hypodermic Products markets. (Id., ¶ 48).  As a result, Becton

began engaging in certain anti-competitive and illegal practices, which served to foreclose

competition in the relevant markets by suppressing competition from current competitors and/or

product innovators, such as Terumo and Retractable (Id., ¶ 6).

The specific anti-competitive practices set forth in the Complaint include: (1) Becton's

imposition of market share purchase requirements on healthcare providers, (2) Becton's bundling

of its goods for exclusionary and predatory purposes, (3) Becton's exclusionary contracts with

certain GPOs, and (4) Becton's bundling of its goods with the goods of other manufacturers for

exclusionary purposes. (Id., ¶ 4).  Such practices were specifically designed to "eliminate or lessen competition and unlawfully acquire and maintain monopoly and/or market power" in the four relevant markets mentioned above, namely: (1) disposable syringes and their associated needles, (2) blood collection tubes, (3) blood collection tube holders, and (4) IV catheters and their associated needles. (Id., ¶ 25).  Erecting such artificial barriers in the form of anti-competitive conduct has "discouraged potential rivals from even attempting to invest the resources necessary to challenge Becton's dominance in the markets for Disposable Hypodermic Products." (Id., ¶ 48).  Moreover, the Complaint alleges that there are no pro-competitive efficiencies created through such predatory and exclusionary conduct. (Id., ¶ 71).

### A.     Market Share Purchase Requirements and Bundling

The Complaint also alleges that Becton uses exclusionary contracts in order to "bundle together for sale different types of products to protect and exploit its market power." (Id., ¶ 65). For example, Becton responded to bid requests from GPOs, by offering proposals to sell its Disposable Hypodermic Products along with unrelated products, thereby providing substantial financial incentives to hospitals which agreed to purchase all of the products included in the bundle. (Id.).

Becton offered one such purchasing program to MedStar, whereby in order "to receive the purported benefit offered under the bundle, purchasers had to agree to fill at least 95% of their Disposable Hypodermic Product needs from Becton." (Id., ¶ 66).  On the other hand, health care providers who purchased less than Becton's suggested "compliance" levels of their Disposable Hypodermic Products needs from Becton were penalized by (1) having to pay higher prices for Disposable Hypodermic Products, (2) losing certain post-purchase rebates, and (3)

having to re-pay past rebates received by Becton.  (Id.).

     Becton has also offered certain healthcare providers with "conversion" bonuses and rebates, which served as an additional incentive to accept the bundle of Becton products. (Id., ¶ 67). One such conversion program offered healthcare providers with one month's worth of Disposable Hypodermic Products as an inducement to choose Becton as their "primary" Disposable Hypodermic Product supplier.  (Id.).  Under this program, healthcare providers became eligible for certain "premium" discounts on Becton products only if they agreed to use a "minimum of three of four Becton Dickinson safety product categories that include needles and syringes, IV catheters, surgical blades and blood collection." (Id.).  Because many of Becton's competitors in the Disposable Hypodermic Product markets are smaller companies which sell much fewer products, "these competitors cannot profitably match Becton's structured offers across product lines (because the combined discounts on all of the products in Becton's bundle is in many cases greater than the entire price of a single product made by another manufacturer)." (Id., ¶ 68).  As a result of such "deliberately designed" programs, a substantial portion of the Disposable Hypodermic Product markets has been foreclosed. (Id.).

**B.**    **Exclusionary Contracts**

     The Complaint explains that anywhere between 68% to 98% of hospitals in this country currently belong to at least one GPO,  which serves as a negotiating agent for healthcare providers.  (Id., ¶ 57).  GPOs were originally designed as a way for hospitals to save money by pooling their purchasing power in order to negotiate lower prices for medical products and/or goods. (Id., ¶ 58).  Prior to 1986, any payments made by manufacturers to a GPO were considered an illegal "kickback," which violated the Social Security Act's "anti-kickback"

provisions. (Id.).  However, Congress amended the Social Security Act's "anti-kickback"

provisions in 1986 to create certain limited exceptions for amounts paid by vendors to a GPO.

(Id.).  Thus, according to the Complaint, in order to influence GPOs, such as Premier, Becton has

rewarded them not only with substantial cash payments, but also with high administrative fees,

and equity positions. (Id., ¶ 59).

      Becton also secured "commitment contracts" with certain GPOs – including Novation

and Premier – which essentially required that they deal exclusively with Becton for all their

Hypodermic Product needs. (Id., ¶¶ 60, 62). For example, in 1998, one such GPO, Premier,

awarded Becton with a 7.5 year "sole-source" contract. (Id., ¶ 60).  Similarly, in 1999, Becton

awarded another GPO, Novation, with a $1 million payment – in addition to certain

administrative fees – for a 4-year "sole-source" contract, whereby "Becton would be the only

vendor approved by Novation to sell Disposable Hypodermic Products to Novation members."

(Id.).  Such commitment or "sole-source" contracts were implemented to prevent healthcare

providers from buying Disposable Hypodermic Products made by other manufacturers.  (Id., ¶

61).  In fact, "[i]f a Class member desired to purchase Disposable Hypodermic Products from a

manufacturer that was not the chosen sole-source contractor for the GPO, the Class member

risked losing numerous financial incentives." (Id.).

      Finally, Plaintiffs allege that Becton used exclusionary practices to unfairly and

unlawfully limit competition from competing manufacturers of Disposable Hypodermic

Products. (Id., ¶ 72).   For example, the Complaint alleges that in response to a growing threat to

its monopoly power in the Disposable Hypodermic Product markets by a Japanese corporation by

the name of Terumo, Becton engaged in a program called "Block Terumo" in the late 1980s,

"which entailed the use of an aggressive strategy that included the bundled pricing and contracting strategies described above and other similar exclusionary and predatory tactics." (Id., ¶ 73). Similar strategies were utilized by Becton to limit competition from another competitor – Retractable Technologies – in the late 1990s. (Id., ¶ 75).

## III.    Market Effects of Becton's Alleged Anti-Competitive Conduct

The Complaint alleges that the combined market effect of the foregoing anti-competitive actions have resulted in foreclosed competition and, thus, higher prices for all purchasers of Becton's Disposable Hypodermic Products. (Id., ¶ 70). Thus, according to the Complaint, Becton's customers have paid more than they would have paid in the absence of such unlawful conduct, "contrary to Becton's representations that hospitals and other customers who purchased Becton's bundle would receive a financial benefit." (Id., ¶¶ 70, 78). Thus, not only were healthcare providers deprived of the opportunity to purchase competing Disposable Hypodermic Products, but they were also forced to pay Becton artificially inflated prices for same. (Id., ¶ 78).

## IV.    The Class Action Amended Complaint

In light of the foregoing, Plaintiffs brought this action, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to recover treble damages, equitable relief, and reasonable attorneys' fees for Defendant's alleged violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, as well as Section 3 of the Clayton Act, 15 U.S.C. § 14. Plaintiffs filed the instant class action complaint on July 28, 2006, pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), on their behalf, and as representatives of the following class (hereinafter referred to as the "Class"):

> All hospitals and healthcare providers in the United States who purchased Disposable Hypodermic Products manufactured by Becton through Becton's authorized distributors, at any time during the period 1988 through the present (the "Class Period"). The Class excludes Becton, Becton's parents, subsidiaries and affiliates, as well as all Becton's authorized distributors [sic].

(Compl., ¶ 16). In the alternative, or in addition, Plaintiffs seek to bring this action on their own behalf and as representatives of the following class of persons and entities (hereinafter referred to as the "Indirect Class"):

> All hospitals and healthcare providers in Alabama, Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin (the "Class Jurisdictions"), who purchased Disposable Hypodermic Products manufactured by Becton through a distributor or wholesaler at any time during the period 1988 through the present (the "Class Period"). The Class excludes Becton, Becton's parents, subsidiaries and affiliates, and all distributors or wholesalers.

(Id., ¶ 17). Plaintiffs present a third alternative class (hereinafter referred to as the "D.C. Indirect Class"):

> All hospitals and healthcare providers in the District of Columbia who purchased Disposable Hypodermic Products manufactured by Becton through a distributor or wholesaler at any time during the period 1988 through the present (the "Class Period"). The Class excludes Becton, Becton's parents, subsidiaries and affiliates, and all distributors or wholesalers.

(Id., ¶ 18).

Count One of the Complaint alleges unreasonable restraint of trade, in violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act. Count Two of the Complaint alleges monopoly maintenance, in violation of Section 2 of the Sherman Act, and Count Three

alleges attempted monopolization also in violation of Section 2 of the Sherman Act.  Count Four

alleges state antitrust law violations, brought only by the Indirect Class.  Count Five alleges

violation of the District of Columbia's Antitrust Law, brought only by the D.C. Indirect Class,

and Count Six of the Complaint alleges unjust enrichment.

Defendant Becton now moves to dismiss the Complaint pursuant to Federal Rule of Civil

Procedure 12(b)(6).

## **LEGAL STANDARD**

The applicable inquiry under Federal Rule of Civil Procedure 12(b)(6) is well-settled.

Courts must accept all well-pleaded allegations in the complaint as true and draw all reasonable

inferences in favor of the non-moving party.[6]  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974),

abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982); Allegheny Gen. Hosp.

v. Philip Morris, Inc., 228 F.3d 429, 434-35 (3d Cir. 2000).   However, courts are not required to

credit bald assertions or legal conclusions improperly alleged in the complaint.  See In re

Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429 (3d Cir. 1997). Similarly, legal

conclusions draped in the guise of factual allegations may not benefit from the presumption of

truthfulness. See In re Nice Sys., Ltd. Sec. Litig., 135 F. Supp.2d 551, 565 (D.N.J. 2001).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'

requires more than labels and conclusions, and a formulaic recitation of a cause of action's

elements will not do.  Factual allegations must be enough to raise a right to relief above the

_____

[6] In doing so, a court may look only to the facts alleged in the complaint and any
accompanying attachments, and may not look at the record.  See Jordan v. Fox, Rothschild,
O'Brien & Frankel, 20 F.3d 1251, 1261 (3d Cir. 1994).

speculative level on the assumption that all of the complaint's allegations are true." Bell Atl.

Corp. v. Twombly, 127 S.Ct. 1955, 1959 (2007).[7]  Ultimately, however, the question is not

whether plaintiffs will prevail at trial, but whether they should be given an opportunity to offer

evidence in support of their claims.  Scheuer, 416 U.S. at 236.

Additionally, the Third Circuit has explained that antitrust complaints, in particular,

should be liberally construed. Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc., 836

F.2d 173, 179 (3d Cir. 1988).  Although there is no heightened pleading standard

in antitrust cases,[8] antitrust complaints are not exempt from the Federal Rules of Civil Procedure.

See, e.g., Zimmerman, 836 F.2d at 179-80.  In this vein, the Third Circuit has indicated that the

pleading standard for "Section 1 claims is the short and concise statement standard of Rule

8(a)."[9] Lum v. Bank of Am., 361 F.3d 217, 228 (3d Cir. 2004) (distinguishing the "short and

concise statement" standard of Rule 8(a), generally applicable to antitrust claims, from the

heightened "particularity" standard of Rule 9(b), applicable to antitrust claims sounding in fraud).

In assessing the Rule 8(a) pleading standard in the context of antitrust cases, the United States

_____

[7] In so holding, the United States Supreme Court rejected the language previously used by
the Court in Conley v. Gibson, providing that "[i]n appraising the sufficiency of the complaint
we follow, of course, the accepted rule that a complaint should not be dismissed for failure to
state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support
of his claim which would entitle him to relief." 355 U.S. 41, 45-46 (1957).  See Bell Atl. Corp.,
127 S.Ct. at 1964, 1974 (holding that the Conley "no set of facts" language "has earned its
retirement" and "is best forgotten.").

[8]  See, e.g., In re K-Dur Antitrust Litig., 338 F. Supp. 2d 517 (D.N.J. 2004); In re
Mercedes-Benz Anti-Trust Litig., 157 F.Supp.2d 355, 359 (D.N.J. 2001).

[9] Federal Rule of Civil Procedure 8(a) provides that "[a] pleading which sets forth a claim
for relief . . . shall contain . . . a short and plain statement of the claim showing that the pleader is
entitled to relief."

Supreme Court has explained that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," it must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp., 127 S.Ct. at 1964, 1974.[10]  With this framework in mind, the Court turns now to the issues raised by Defendant in support of the instant motion.

## DISCUSSION

Becton argues that the Complaint should be dismissed for failure to state claims upon which relief can be granted based on the following: (1) Plaintiffs have not adequately alleged the essential elements or necessary facts of any of its antitrust claims, (2) Plaintiffs have not adequately alleged the essential elements of any state-law antitrust claims, (3) Plaintiffs lack standing to assert certain claims, and (4) certain state claims fail as a matter of law.

**I.      Federal Antitrust Claims**

    **A.      Elements of Claims**

Defendant argues that Plaintiffs (1) have failed to allege any of the required elements of an antitrust claim – such as relevant market, anti-competitive effects, antitrust injury, and standing – and (2) have failed to specify any unlawful "exclusive dealing" or "exclusionary conduct." Because Defendant has presented the Court with such global pleading arguments, which allegedly relate to Counts One, Two and Three, it is not entirely clear to the Court which arguments relate to which claims, and therefore, the specific basis on which Defendant believes that Plaintiffs have failed to plead particular elements of any claim.  As a result, the Court will

---

[10] See also Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 528 n. 17 (1983) (stating that "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.").

begin its analysis by assessing, generally, whether the Complaint alleges the requisite elements of

the federal antitrust claims,[11] and will then turn to Defendant's broader pleading arguments,

keeping in mind that antitrust complaints are liberally construed in this Circuit.  See PepsiCo,

Inc., 836 F.2d at 179.

### Count One

Count One of the Complaint alleges unreasonable restraint of trade, in violation of

Section 1 of the Sherman Act and Section 3 of the Clayton Act.  Section 1 of the Sherman Act

provides that:

> Every contract, combination in the form of trust or otherwise, or
> conspiracy, in restraint of trade or commerce among the several
> States, or with foreign nations, is declared to be illegal. Every
> person who shall make any contract or engage in any combination
> or conspiracy hereby declared to be illegal shall be deemed guilty
> of a felony, and, on conviction thereof, shall be punished by fine
> not exceeding $100,000,000 if a corporation, or, if any other
> person, $1,000,000, or by imprisonment not exceeding 10 years, or
> by both said punishments, in the discretion of the court.

15 U.S.C. § 1.

The Third Circuit has explained that there are four essential elements of a § 1 violation:

> (1) concerted action by the defendants; (2) that produced
> anti-competitive effects within the relevant product and geographic
> markets; (3) that the concerted action was illegal; and (4) that the
> plaintiff was injured as a proximate result of the concerted action.

Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 442 (3d Cir. 1997). Moreover,

"[b]ecause § 1 of the Sherman Act 'does not prohibit [all] unreasonable restraints of trade . . . but

---

[11]  In doing so, the Court is cognizant of the fact that "a formulaic recitation of a cause of
action's elements" alone will not sustain Plaintiffs' obligation to provide the grounds of their
entitlement to relief. Bell Atl. Corp., 127 S.Ct. at 1959.

only restraints effected by a contract, combination, or conspiracy,' '[t]he crucial question' is

whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an

agreement, tacit or express.'" Bell Atl. Corp., 127 S.Ct. at 1964.  As a result, "stating such a

claim requires a complaint with enough factual matter (taken as true) to suggest that an

agreement was made." Id. at 1965.

> Section 3 of the Clayton Act, in turn, provides that:

>> It shall be unlawful for any person engaged in commerce, in the
>> course of such commerce, to lease or make a sale or contract for
>> sale of goods . . . or fix a price charged therefor, or discount from,
>> or rebate upon, such price, on the condition, agreement, or
>> understanding that the lessee or purchaser thereof shall not use or
>> deal in the goods . . . of a competitor or competitors of the lessor or
>> seller, where the effect of such lease, sale, or contract for sale or
>> such condition, agreement, or understanding may be to
>> substantially lessen competition or tend to create a monopoly in
>> any line of commerce.

15 U.S.C. § 14. See Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468,

473 n. 2 (3d Cir. 1992) (explaining that Section 3 of the Clayton Act was technically written to

"cover exclusive dealing contracts (contracts requiring the purchaser not to deal in the goods of a

competitor of the seller) but Congress also intended to cover tying arrangements.").

Recovery under Section 3 of the Clayton Act generally requires: (1) an "exclusive

dealing" arrangement, and (2) "the probable effect of the exclusion must be to substantially

lessen competition in the market." Barr Labs., Inc. v. Abbott Labs., No. 87-4764, 1989 WL

60320, *4 (D.N.J. June 1, 1989) (citing Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320,

327 (1961)).

Here, the Complaint alleges that Becton entered into arrangements with GPOs, such as

Premier, whereby it would pay the GPOs "millions of dollars in cash payments," as well as "equity positions," with the expectation said GPOs would "favor Becton's products, regardless of price, over those of Becton's competitors." (Compl., ¶ 59). The Complaint cites to an article from February 1997, which states that as a result of a recent deal between Becton and Premier, whereby Premier would "receive a portion of administrative fees in the form of warrants to buy Becton stock. If Becton Dickinson's fortunes rise, buoyed in part by Premier purchases, so will the value of the stock held by Premier." (Id.).

The Complaint also alleges that Becton entered into agreements with GPOs, certain hospitals and other customers which included "bundled financial incentives" and "exclusive dealing commitments." (Compl., ¶ 82). For example, during 1999, it is alleged that Becton provided Novation, another GPO, with a $1 million payment, on top of the 3% administrative fees, in exchange for a four-year "sole-source contract under which Becton would be the only vendor approved by Novation to sell Disposable Hypodermic Products to Novation members." (Id., ¶ 60).[12] The Complaint further alleges that the object of such an arrangement was to prevent Class members from purchasing Disposable Hypodermic Products made by other manufacturers, because "[i]f a Class member desired to purchase Disposable Hypodermic Products from a manufacturer that was not the chosen sole-source contractor for the GPO, the Class member risked losing numerous financial incentives." (Id., ¶ 61). Accordingly, such arrangements served

---

[12]   Given the foregoing allegations, the Court finds "plausible grounds to infer an agreement" between Defendant and certain GPOs and/or manufactures. Bell Atl. Corp., 127 S.Ct. at 1965. See generally Elder-Beerman Stores Corp. v. Federated Dept. Stores, Inc., 459 F.2d 138, 146 (6th Cir. 1972) ("The granting of exclusive selling rights or acceptance of such exclusive selling rights, acts which are not prohibited by law unless there is a resulting foreclosure of market alternatives cannot, without proof of such foreclosure, form the basis for a jury verdict that the defendants had entered into a conspiracy to restrain trade.").

to significantly "impede and prevent competing Disposable Hypodermic Product manufacturers from selling significant (if any) Disposable Hypodermic Products to healthcare providers that used those GPOs." (Id., ¶ 62).

Moreover, a plaintiff must allege facts establishing an "antitrust injury." See Schuykill Energy Res., Inc. v. Pa. Power & Light, 113 F.3d 405, 413, 417 (3d Cir. 1997) (recognizing that the existence of antitrust injury is not typically resolved through motions to dismiss).  In this regard, the Complaint alleges that Plaintiffs were injured by Becton's exclusionary practices, including its "sole-source" arrangements with certain GPOs, to the extent that they were forced to pay higher prices for Disposable Hypodermic Products than they would have paid in the absence of such practices and/or arrangements.  (Compl., ¶¶ 63, 85, 93, 99).

## Count Two

Count Two of the Complaint alleges monopoly maintenance in violation of Section 2 of the Sherman Act.  Section 2 of the Sherman Act provides that:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 2.

The Third Circuit has indicated that a § 2 violation generally consists of two elements: "(1) possession of monopoly power [in the relevant product market] and (2) '. . . maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" United States v. Dentsply Int'l, 399 F.3d 181, 186 (3d

Cir. 2005) (citing <u>Eastman Kodak Co. v. Image Technical Servs., Inc.</u>, 504 U.S. 451, 480 (1992)).  The Complaint alleges that Becton possesses monopoly power in the Disposable Syringe and Blood Collection Tube and Blood Collection Tube Holder markets, in the United States. (Compl., ¶ 87).  The Complaint also alleges that in order to maintain such monopoly power, "Becton has willfully and unlawfully used exclusionary and predatory conduct, including but not limited to, bundled pricing with the intent to foreclose competition, and exclusionary agreements." (<u>Id.</u>, ¶ 89).  The Complaint likewise alleges that Becton's monopoly power in the Disposable Syringe, Blood Collection Tube and Blood Collection Tube Holder markets is not the result of "superior product offerings, good faith business acumen, or historical accident." (<u>Id.</u>, ¶¶ 91, 92).  Rather, it is the result of certain "deliberately designed" programs and/or arrangements with GPOs and healthcare providers, including but not limited to, commitment contracts, bundling contracts, and conversion bonuses. (<u>Id.</u>, ¶¶ 59, 60, 66-69).[13]

### Count Three

Count Three of the Complaint alleges attempted monopolization, in violation of Section 2 of the Sherman Act.  "To state a claim for attempted monopolization, a plaintiff must allege '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" <u>Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.</u>, 113 F.3d 405, 413 (3d Cir. 1997) (citation omitted).

---

[13] <u>See, e.g.</u>, <u>SmithKline Corp. v. Eli Lilly & Co.</u>, 575 F.2d 1056, 1065 (3d Cir. 1978) (finding that "the act of willful acquisition and maintenance of monopoly power was brought about by linking products on which Lilly faced no competition Keflin and Keflex with a competitive product, Kefzol. The result was to sell all three products on a non-competitive basis in what would have otherwise been a competitive market for Ancef and Kefzol. The effect of the Revised CSP was to force SmithKline to pay rebates on one product, Ancef, equal to rebates paid by Lilly based on volume sales of three products.").

The Complaint alleges that, "to the extent that Becton does not possess monopoly power in the

Disposable Syringe, Blood Collection Tube and/or Blood Collection Tube Holder markets in the

United States, it has unlawfully attempted to monopolize the markets for Disposable Syringes,

Blood Collection Tubes and/or Blood Collection Tubes." (Compl., ¶ 95).  In particular, the

Complaint alleges that Becton engaged in exclusionary and predatory conduct, including bundled

pricing and exclusionary agreements, with the "specific intent" of achieving its goal of obtaining

a monopoly in the foregoing markets.  (Id., ¶¶ 96, 97).  For example, the Complaint explains that

Becton engaged in a program called "Block Terumo," as a result of "the growing threat" posed

by the price reductions of a competitor, Terumo. (Id., ¶ 73).  The Complaint goes on to allege

that, as a result of the implementation of the "exclusionary and predatory sales tactics" (i.e., the

"Block Terumo" program) "Terumo's market share in the United States for the Disposable

Hypodermic Products went from approximately 12% to approximately 1%." (Id.).  By 1992,

"Terumo announced that it would no longer focus on selling hypodermic products to hospitals in

the United States," thus indicating that "there is a dangerous probability that if left unchecked,

Becton will achieve its goals of obtaining monopoly power in said markets. (Id., ¶¶ 73, 98).[14]

    **B.**    **Generally**

**Relevant Market**

    Turning now to Defendant's arguments, Defendant claims that Plaintiffs have failed to set

---

[14] See generally Schuylkill Energy Res., Inc., 113 F.3d at 415 ("Thus, SER must allege that PP & L unlawfully acquired monopoly power or had a dangerous probability of unlawfully achieving monopoly power in its service area. To do this, SER must allege that PP & L in some way acted to exclude SER as a competitor in the delivery of electricity to customers in PP & L's service area.").

forth the requisite relevant market.  In particular, Defendant claims that (1) Plaintiffs improperly combine "safety and conventional products without any allegations of the reasonable interchangeability and cross-elasticity of demand," and (2) Plaintiffs' definition of the "IV" catheter market," which includes winged IV catheters does not allege whether these products "can be interchanged, used to perform the same clinical functions or substituted for each other in medical practice."  (Def.  Br. at 24).

The Third Circuit has explained that Plaintiffs have the burden of defining the relevant market, and that the "outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997) (internal citations omitted).  In Queen City Pizza, the Court went on to explain that:

> Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted.

Id.

The Complaint alleges four relevant product markets: (1) disposable syringes and associated needles, (2) disposable blood collection tubes, (3) disposable blood collection tube holders, and (4) intravenous catheter devices and their associated needles. (Compl., ¶ 2).  The Complaint likewise alleges that there is no product "that can reasonably be substituted for" any of the products comprising the relevant product markets. (Id., ¶¶ 29, 34, 39, 44).  Defendant is correct in noting that the Complaint alleges that each of the four products at issue come in safety

and non-safety forms. (Id., ¶¶ 27, 38, 49).  To the extent that Defendant urges the Court to conclude, based on the foregoing allegations, (1) that the two versions of each product, therefore, comprise separate product markets, and (2) that "folding these two separate markets into one general market creates an implausible product market,"[15] the Court determines that any such determination would be improper at this juncture.[16]  See, e.g., Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 199 (3d Cir. 1992) ("the determination of a relevant product market or submarket ("market") is a highly factual one best allocated to the trier of fact."); Weiss v. York Hosp., 745 F.2d 786, 825 (3d Cir. 1984) ("Market definition is a question of fact.").

Defendant also makes the cursory argument that Plaintiffs' definition of the "IV catheter market," which includes winged IV catheters does not allege whether these products "can be interchanged, used to perform the same clinical functions or substituted for each other in medical practice," without citing to the relevant portion of the Complaint which allegedly defines the "IV catheter market" as such. (Def. Br. at 24)  Although the Complaint does allege that Becton manufactures IV Catheters "including Winged IV Catheters," the Complaint does not expressly allege that the "Winged IV Catheters" necessarily fall within the relevant product market of "IV

---

[15] In particular, Defendant argues that "as a matter of law, safety and conventional devices are not interchangeable and cannot be part of the same relevant market." Even if Defendant is ultimately correct, the Court declines to engage in any such analysis at this time. See, e.g., Ansell, Inc. v. Schmid Labs, Inc., 757 F. Supp. 467 (D.N.J. 1991) (defining relevant product market after multi-day hearing, including expert testimony).

[16] Moreover, Defendant's reliance on  E. & G. Gabriel v. Gabriel Bros., Inc., – a case which is not binding on this Court and distinguishable on a number of levels – is misplaced.  No. 93-0894, 1994 WL 369147, at *3 (S.D.N.Y. July 13, 1994) (finding plaintiff's proposed market, comprised of "products as varied as household hardwares and children's sleepwear," to be implausible, and reasoning that "[h]ammers are obviously not reasonable substitutes for children's pajamas, they are not used for similar purposes, nor will the price of hammers affect the price of pajamas.").

Catheters and their Associated Needles." (Compl., ¶¶ 43, 44).  Moreover, the Complaint <u>does</u>

allege that "[a] relevant product market exists for the sale of IV Catheters and their associated

needles and the market segments thereunder," and that "<u>no product</u> . . . <u>can be substituted for IV</u>

<u>Catheters and their associated needles to fill this medical need.</u>"  (<u>Id.</u>, ¶ 44) (emphasis added).

### **Anti-Competitive Effects**

Defendant also argues that the Complaint "contains no particularized allegations about

competition in any specific market. . . Medstar never specifies what specific products were

supposedly bundled and to whom the proposals were made." (Def. Br. at 25).  Additionally,

Defendant argues that the Complaint "is silent about the competitive dynamics or prices in any

specific product market.  Nor does the . . . Complaint allege what specific competitors (or would-

be competitors) participated in, and were supposedly excluded from, which of the specific

product markets."  However, Defendant cites to no legal authority indicating that such

particularized allegations are a pleading requirement.[17]  To the contrary, the Supreme Court has

---

[17] Throughout its papers, Defendant relies on a number of cases, which are <u>not</u> binding on this Court, for the proposition that Plaintiffs' have failed to plead with the requisite "particularity" or "specificity."  The Court has reviewed these decisions and finds that such cases do not warrant dismissal of Plaintiffs' claims on such a basis at this time. <u>See, e.g.</u>, <u>Broadcom Corp. v. Qualcomm Inc.</u>, No. 05-3350, 2006 WL 2528545, at *7-9 (D.N.J. Aug. 31, 2006) (dismissing antitrust claims where defendant had a "legal monopoly over the technology claimed in its patents," and expressing concern "that reviewing and supervising the terms upon which Qualcomm licenses its patents, and offers to sell its UMTS chipsets may be beyond the effective control of the Court under the antitrust laws."); <u>Glaberson v. Comcast Corp.</u>, No. 03-6604, 2006 WL 2559479, at *15 (D.N.J. Aug. 31, 2006) (denying motion to dismiss and finding that "Comcast has not demonstrated that Plaintiffs cannot prove any set of facts, consistent with the Third Amended Complaint, which would entitle them to relief."); <u>JM Computer Servs., Inc. v. Schlumberger Techs., Inc.</u>, 1996 WL 241607, at *4 (N.D. Cal. May 3, 1996) (granting defendant's motion to dismiss a § 2 claim where plaintiff (1) failed to "identify the specific products or services in product markets for which Plaintiff claims there is no price elasticity," (2) failed to "identify an agreement with a specific person or entity," and (3) "does not identify the parts, services, or contracts involved in the alleged exclusive dealing").

reiterated that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" <u>Bell Atl. Corp.</u>, 127 S.Ct. at 1964 (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)).[18]   The Court recognizes that the Third Circuit has applied a heightened pleading standard in antitrust cases sounding in fraud. <u>See, e.g.</u>, <u>Lum</u>, 361 F.3d at 228 (distinguishing the "short and concise statement" standard of Rule 8(a), generally applicable to antitrust claims, from the heightened "particularity" standard of Rule 9(b), applicable to antitrust claims sounding in fraud).  However, Defendant does not suggest that the antitrust claims alleged in the Complaint sound in fraud.[19]  Therefore, the Court sees no reason why it should apply the more rigorous pleading standard contemplated by Defendant to the case at hand.[20]

––––––––––––––––––––

Defendant also relies heavily on the Third Circuit's decision in <u>Garshman v. Universal Res. Holding Inc.</u>, 824 F.2d 223, 230-31 (3d Cir. 1987).  The Court has reviewed the <u>Garshman</u> decision and finds that the deficiencies alleged by Defendant in this case do not rise to the level of those contemplated by the Third Circuit in <u>Garshman</u>, where the complaint, itself, failed to allege <u>any</u> "adverse effect on competition in any relevant market." <u>Id.</u> at 230-31 (stating that "[t]he allegation of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the Sherman Act.").

[18] While the Supreme Court indicated that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions," for the reasons stated herein, the Court finds that Plaintiffs have met this burden. <u>Bell Atl. Corp.</u>, 127 S.Ct. at 1959.

[19] <u>See also</u> <u>In re Ins. Brokerage Antitrust Litig.</u>, No. 04-5184, 2007 WL 1100449, at *8 (D.N.J. April 5, 2007) (utilizing heightened pleading standard of Federal Rule of Civil Procedure 9(b) where the plaintiffs' antitrust conspiracy claims were predicated on fraud).

[20] Defendant reasserts this argument repeatedly throughout its papers.  For purposes of efficiency, the Court will not revisit this issue herein.

In any event, the Complaint does provide certain examples of the types of exclusionary practices utilized by Becton, and the purported effects of same.  For example, the Complaint alleges that from 1998 through 1999, Becton engaged in securing commitment or "sole-source" contracts with certain GPOs, including Premier and Novation, which required that they deal exclusively with Becton for any hypodermic product needs, in return for a substantial monetary payment. (Id., ¶60).  The Complaint also alleges that pursuant to Becton's purchasing programs, unrelated products from different product lines were "bundled" together for sale to hospitals and other healthcare providers – including Medstar – whereby in order "to receive the purported benefit offered under the bundle, purchasers had to agree to fill at least 95% of their Disposable Hypodermic Product needs from Becton." (Id., ¶¶ 66, 68).  As an additional incentive, Plaintiffs also allege that Becton offered "conversion" programs.  The Complaint goes on to list two examples of such programs, one of which provided a particular Class member with the ability to purchase Becton products at a premium discount only if it agreed to utilize a "minimum of three of four Becton Dickinson safety product categories that include needles and syringes, IV catheters, surgical blades and blood collection." (Id., ¶ 67).

In addressing the anti-competitive effects of such programs, the Complaint explains the following:

> Many of Becton's competitors in the Disposable Hypodermic
> Product markets are smaller, specialized companies that sell fewer
> products, and in some instances only a single product.  As a result,
> these competitors cannot profitably match Becton's structured
> offers across product lines (because the combined discounts on all
> of the products in Becton's bundle is in many cases greater than the
> entire price of a single product made by another manufacturer).  In
> certain cases, even if the competitor offered substantial discounts
> on Disposable Hypodermic Products (or indeed gave them away
> for free), it could not 'replace' all the discounts and rebates that the

buyer would 'lose' as a penalty for rejecting Becton's bundle.

(Id., ¶ 68).  For instance, the Complaint alleges that beginning in the 1970s, one particular

competitor, Terumo, "which manufactures certain disposable medical products, including

disposable syringes and associated needles" – one of the relevant product markets at issue –

began gaining approximately 12% of the United States market for various hypodermic products.

(Compl., ¶ 72).  However, by 1992 – as a direct result of certain exclusionary initiatives

undertaken by Becton – Terumo's market share dropped to approximately 1%, and it ultimately

ceased focusing on selling any hypodermic products to hospitals in the United States.  (Id., ¶ 73).

This, the Complaint alleges, demonstrates that Becton's actions effectively foreclosed

competition in the relevant product markets, forcing Plaintiffs to pay higher prices for Disposable

Hypodermic Products than they would have paid in the absence of Becton's exclusionary

practices. (Id., ¶¶ 68, 69, 70).

    The Court finds such allegations of anti-competitive conduct set forth in the Complaint to

be in sharp contrast with the allegations found to be insufficient in Bell Atl. Corp., 127 S.Ct. at

1962-63.[21]  In particular, the complaint at issue in Bell Atl. Corp. sought to demonstrate anti-

competitive agreements based on parallel conduct through inference.  Id. at 1962.  To the

contrary, the instant Complaint sets forth allegations of specific anti-competitive agreements –

between Becton and certain GPOs, and between Becton and certain manufacturers – which the

Court deems as providing Defendant with adequate notice of the particular grounds upon which

_____

    [21] In Bell Atl. Corp., the plaintiffs alleged that the Incumbent Local Exchange Carriers
"have entered into a contract, combination or conspiracy to prevent competitive entry in their
respective local telephone and/or high speed internet services markets and have agreed not to
compete with one another and otherwise allocated customers and markets to one another." Id. at
1963.

Plaintiffs' claims rest, particularly given the fact that Plaintiffs have not yet had the benefit of discovery.[22] See, e.g., Hosp. Bldg. Co. v. Trs. of Rex Hosp., 425 U.S. 738, 746-747 (1976) (explaining that "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly") (quotation omitted).

## Antitrust Injury

Defendant argues that Plaintiffs cannot state a claim because the "vague" allegations of antitrust injury set forth in the Complaint lack the requisite specificity. (Def. Br. at 25-26). Defendant also argues that "[s]ince a plaintiff ordinarily must be a participant in the relevant market to suffer antitrust injury, MedStar cannot state a claim without alleging the specific market in which it buys or sells products." (Id. at 26).

In support of its argument that the allegations of antitrust injury contained in the Complaint are overly "vague," Defendant presents the following hypothetical questions for the Court's consideration – "did MedStar pay overcharges for Becton's products? If so, what were those products?" (Def. Br. at 26). Even assuming, arguendo, that the Complaint does not specifically answer those questions, once again, Defendant cites to no legal authority indicating that antitrust injury must be plead with such specificity, or that the antitrust injury alleged by Plaintiffs is somehow implausible. (Def. Br. at 25-26). The Complaint alleges that "[b]y

---

[22] The Court recognizes that "[t]he allegation of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the Sherman Act." Garshman v. Universal Res. Holding Inc., 824 F.2d 223, 230-31 (3d Cir. 1987). Nevertheless, the Court does not find that the deficiencies alleged by Defendant in this case rise to the level of those contemplated by the Third Circuit in Garshman, where the complaint, itself, failed to allege any "adverse effect on competition in any relevant market." Id. at 231.

unlawfully excluding and impairing competition [in the four relevant product markets], Becton's conduct has caused Plaintiffs and the other Class members to pay more for Disposable Hypodermic Products than they otherwise would have paid absent Becton's illegal, exclusionary conduct." (Compl., ¶ 63). Defendant has given the Court no specific basis on which to find such a pleading of antitrust injury to be insufficient.[23]

In the alternative, Defendant cites to Schuykill Energy Res., Inc. v. Pa. Power & Light, 113 F.3d 405, 415 (3d Cir. 1997), for the proposition that "[a] plaintiff who is neither a competitor nor a consumer in the relevant market does not suffer antitrust injury." (Def. Br. at 26). To the extent that Defendant moves to dismiss the Complaint on such a basis, any such request is denied. The United States Supreme Court has recognized that an antitrust injury can be suffered by a plaintiff, even if the plaintiff "was not a competitor of the conspirators, [where] the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." Blue Shield of Va. v. McCready, 457 U.S. 465, 484 (1982)). There, the Court went on to explain that "[i]n light of the conspiracy here alleged we think that McCready's injury 'flows from that which makes defendants' acts unlawful' within the meaning of Brunswick, and falls squarely within the area of congressional concern." Id.

The Third Circuit has likewise found that a terminal operator plaintiff lacked standing to

---

[23] See generally Harrison Aire, Inc. v. Aerostar Intern., Inc., 423 F.3d 374, 385 (3d Cir. 2005) ("Here, Harrison Aire is a consumer of balloon fabric, and it claims antitrust injury in the form of business losses caused by high fabric prices, which in turn allegedly were caused by Raven/Aerostar's exclusionary conduct in the relevant fabric market. This type of injury-prohibitively high consumer prices resulting from allegedly monopolistic behavior-is the type the antitrust laws are designed to redress.").

assert antitrust injury in the soda ash market – in which it was neither a consumer nor a competitor – because the plaintiff had "made no showing of a connection between the alleged international soda ash conspiracy and the level of competition within the terminalling market." Int'l Raw Materials, Ltd., 978 F.2d at 1327-29.  There, the Court explained "[b]ecause IRM is neither a competitor nor a consumer in the relevant market, it must allege a significant causal connection between the alleged soda ash conspiracy and the alleged anticompetitive effects in the terminalling market such that the harm to the terminalling market can be said to be 'inextricably intertwined' with the alleged soda ash cartel." Id. at 1327 (quoting McCready, 457 U.S. at 484). See also Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp., 995 F.2d 425, 429 (3d Cir. 1993) ("The second [Brunswick] requirement is generally met if the plaintiff is a 'competitor [ ]or a consumer in the relevant market.' Alternatively, this requirement is fulfilled if there exists a 'significant causal connection' such that the harm to the plaintiff can be said to be 'inextricably intertwined' with the antitrust conspiracy.") (quoting McCready, 457 U.S. at 484).  Thus, neither the Supreme Court nor the Third Circuit has foreclosed a finding of antitrust injury simply because the plaintiff was not a participant in the relevant market.[24]  As a result, to the extent that Defendant moves to dismiss the Complaint on the basis that Plaintiffs cannot suffer antitrust injury in a relevant market in which it is not a participant, Defendant's motion is denied.[25]

---

[24] Because Defendant does not argue that Plaintiffs' alleged injuries are not "inextricably intertwined" with Defendant's alleged actions in the relevant markets, the Court need not consider same.

[25] Defendant also makes the related argument that Plaintiffs lack antitrust standing generally because they have "not alleged the facts that would give it standing to complain – e.g., that it actually buys those products from Becton, that it did so pursuant to an 'exclusive' contract, that the contract prevented MedStar from buying such products from Becton's rivals, and that such conduct actually affected the price of such products." (Def. Br. at 27) (emphasis in original).

## Standing

Defendant makes the argument that Plaintiffs lack standing under Section 3 of the

Clayton Act because "MedStar has not alleged specific facts showing any contracts that it is a

party to that are exclusive.  That pleading defect is particularly fatal to MedStar's exclusive

dealing claim under Section 3 of the Clayton Act.  Only competitors and 'restricted purchasers' –

purchasers who are parties to the allegedly restrictive contract – can sue for damages under

Section 3 of Clayton Act." (Def. Br. at 28).

Pursuant to this Court's March 23, 2007 Order, all parties were advised that the issue of

Clayton Act standing would by addressed by way of a separate motion.  See CM/ECF Docket

Entry Nos. 144, 146.  As a result, the Court will not address the issues raised regarding same

herein.[26]

## Exclusive Dealing Allegations

Defendant makes the global argument that "[w]hether fashioned as unlawful 'exclusive

dealing' under Section 1 of the Sherman Act and Section 3 of the Clayton Act (Count I), or as a

form of monopolization under Section 2 of the Sherman Act (Counts II and III), MedStar has

_____

To the extent that the Court should construe such an argument as based on the theory that
Plaintiffs cannot suffer antitrust injury in a relevant market in which it is not a participant, such
an argument is, therefore, rejected.

[26] To the extent that Defendant argues that Plaintiffs lack antitrust standing generally
based on the theory that Plaintiffs have not alleged that they are direct purchasers of the
Disposable Hypodermic Products at issue, the Court will, therefore, defer its consideration of this
argument. See Def. Br. at 27 (arguing that Plaintiffs lack antitrust standing because Plaintiffs
have "not alleged the facts that would give it standing to complain – e.g., that it actually buys
those products from Becton, that it did so pursuant to an 'exclusive' contract, that the contract
prevented MedStar from buying such products from Becton's rivals, and that such conduct
actually affected the price of such products.") (emphasis in original).

failed to plead the facts necessary to state any viable claim: that there are exclusive agreements and that those agreements resulted in the foreclosure of competition in a substantial portion of the market." (Def Br. at 14).  The crux of Defendant's argument is that, despite the fact that the Complaint contains the jargon of exclusive dealing, it contains "no specific facts to support MedStar's conclusion that some unidentified and unexplained contracts 'were designed to prevent' hospitals from buying from other manufacturers." (Id. at 16).

The Complaint alleges that "Becton used 'commitment contracts' . . . [which] essentially required GPO members to deal exclusively with Becton for its Hypodermic Product needs." (Compl., ¶ 60).  The Complaint goes on to provide two examples of such "commitment contracts," (1) "in or around 1998 Premier awarded Becton a 7.5 year sole-source contract," and (2) "[i]n or around 1999, Becton provided another GPO, Novation, a $1 million payment (in addition to the 3% administrative fees that it pays Novation) for a 4-year sole-source contract under which Becton would be the only vendor approved by Novation to sell Disposable Hypodermic Products to Novation members." (Id.).  Moreover, the Complaint alleges that "[i]f a Class member desired to purchase Disposable Hypodermic Products from a manufacturer that was not the chosen sole-source contractor for the GPO, the Class member risked losing numerous financial incentives," as a result, a "substantial portion of the markets for Disposable Hypodermic Products have been foreclosed." (Id., ¶¶ 61, 69).

In light of the foregoing allegations, the Court finds that Defendant's argument that "MedStar has not pled any particular facts to establish either the existence of exclusive dealing arrangements or the substantial foreclosure of competition by those contracts" to be

unpersuasive.[27]  See, e.g., Bell Atl. Corp., 127 S.Ct. at 1965 ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.").

## II.    Indirect Purchaser Claims

### _____A.    Generally

In the alternative, Plaintiffs assert indirect purchaser claims under the laws of the District of Columbia and twenty-five other jurisdictions.  Defendant moves to dismiss such "indirect" purchaser claims on the same basis on which it argues that Plaintiffs' federal antitrust claims are deficient.  As discussed above, Plaintiffs' claims will not be dismissed on these grounds.

Defendant also claims that "[t]here is an additional, and independent, reason for dismissing plaintiffs' 'indirect' purchaser claims under state law: the Complaint fails to allege what portion, if any, of Becton's alleged 'overcharge' was passed on to them." (Def. Br. at 30).[28] In particular, Defendant argues that, as indirect purchasers, Plaintiffs must prove that Becton charged monopoly prices and that Becton's "overcharge" was passed on to Plaintiffs.

---

[27] Furthermore, Defendant cites to no legal authority indicating that such allegations have been insufficiently plead.  In fact, the majority of the cases relied upon by Defendant in this regard are either not binding on this Court, or were not decided at the motion to dismiss level, therefore providing little or no guidance to the Court as to whether Plaintiffs' exclusive dealing allegations were properly or improperly pled.  See, e.g., Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328 (1990); Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320 (1961); LePage's Inc. v. 3M, 324 F.3d 141 (3d Cir. 2003).

[28] Defendant incorporates by reference its arguments at pages 22-23 and 36-38 of its Memorandum in Support of its Motion to Dismiss the Consolidated Complaint of Jabo's Pharmacy and Drug Mart Tallman, attached as Exhibit 4 to the Silodor Declaration. See Silodor Decl., Ex. 4 at 22-23.

As a preliminary matter, the Court notes that Defendant cites to no legal authority indicating that Plaintiffs must plead the <u>amount</u> of "overcharge" which was passed on to them. Furthermore, although Defendant claims that "an indirect purchaser must allege and prove: (1) that a 'direct' purchaser (<u>e.g.</u>, a wholesaler) was overcharged by Becton, (2) that the direct purchaser then passed on the overcharge, or some portion of it, to the 'indirect' purchaser, and (3) that the indirect purchaser did not turn around and pass on all of the overcharge to its customers,"[29] the cases relied upon by Defendant in support of same – which are not binding on this Court, and none of which were decided at the motion to dismiss stage – do not dictate that the foregoing factors are a pleading requirement.[30]  Therefore, the Court concludes that Defendant has not met its burden in demonstrating that Plaintiffs' indirect purchaser claims should be dismissed on such a basis at this time.

### B.    Unjust Enrichment Claims

Plaintiffs assert claims for unjust enrichment under the laws of the District of Columbia and twenty-five other jurisdictions. (Compl. at 28).  Generally, "in order to state a claim for

---

[29] <u>See</u> Silidor Decl., Ex. 4 at 23.

[30] <u>See</u> <u>In re Methionine Antitrust Litig.</u>, 204 F.R.D. 161, 164 (N.D. Cal. 2001); <u>A&M Supply Co. v. Microsoft Corp.</u>, 654 N.W. 2d 572, 575 (Mich. Ct. App. 2002); <u>Melnick v. Microsoft Corp.</u>, No. 99-709, 2001 WL 1012261, at *6 (Me. Super. Ct. Aug. 24, 2001).

Moreover, to the extent that Defendant cites to <u>Illinois Brick Co. v. Illinois</u>, 431 U.S. 720 (1977), for the proposition that "[a]n indirect purchaser plaintiff must prove that Becton charged monopoly prices and that all or some of Becton's 'overcharge' was passed through the distribution chain from the first purchaser to the indirect purchaser plaintiff," (Silidor Decl., Ex. 4 at 23) Defendant fails to indicate how Plaintiffs' ultimate burden of proof is relevant at this stage of the litigation. <u>See, e.g.</u>, <u>Scheuer</u>, 416 U.S. at 236 (explaining that, in conducting a 12(b)(6) analysis, the question is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be given an opportunity to offer evidence in support of their claims).

unjust enrichment, a plaintiff must allege (1) at plaintiff's expense, (2) defendant received

benefit, (3) under circumstances that would make it unjust for defendant to retain benefit without

paying for it." In re K-Dur Antitrust Litig., 338 F. Supp. 2d at 544 (citing Restatement of

Restitution § 1 (1937)).  Here, the Complaint alleges that "[a]s a result of Becton's

anticompetitive scheme alleged herein, Plaintiffs and the Class members paid too much for

Becton Disposable Hypodermic Products.  The payment of these 'overcharges' represents an

unjust benefit Plaintiffs and Class members conferred upon Becton.  Becton was unjustly

enriched by these illegal overcharges and equity requires disgorgement to prevent Becton from

benefitting from its illegal acts." (Compl., ¶ 116).

_____Defendant moves to dismiss Plaintiffs' claims for unjust enrichment on the basis that

such claims are redundant to the extent that they are "based on the same alleged facts and same

alleged damages as their antitrust claims: that they 'paid too much' for Becton products and that

the 'overcharge' was an 'unjust benefit' plaintiffs conferred on Becton." (Def. Br. at 30).[31]  While

Defendant may ultimately be correct, Plaintiffs are permitted to plead alternative theories of

recovery. See, e.g., In re K-Dur Antitrust Litig., 338 F. Supp. 2d at 544 (denying motion to

dismiss claims of unjust enrichment on the basis that equitable remedies such as unjust

enrichment should not be granted where there exists an adequate remedy at law, and noting that

plaintiffs "are clearly permitted to plead alternative theories of recovery."); United States v.

Kensington Hosp., 760 F. Supp. 1120, 1135 (E.D. Pa. 1991) (recognizing that under

Pennsylvania law an underlying contract precludes a claim of unjust enrichment, but allowing

_____

[31] Defendant's brief incorporates by reference pages 36-38 of its motion to dismiss the
Consolidated Complaint of Jabo's Pharmacy, Inc. and Drug Mart Tallman, Inc. attached as
Exhibit 4 to the Silodor Declaration. See Silodor Decl., Ex. 4 at 36-38.

both claims to proceed, and explaining that the "Federal rules allow pleading in the alternative.").

Therefore, the Court finds that it would be premature to dismiss Plaintiffs' unjust enrichment

claims on such a basis at this stage of the litigation.

_____ To the extent that Defendant moves to dismiss Plaintiffs' claims of unjust enrichment on

the basis that certain individual states impose additional requirements, such as privity and

exhaustion of remedies, the Court likewise determines that it is premature to consider these

requirements on a state by state basis, at this time.[32]   Because neither the "Indirect Class," nor the

---

[32] In Section V of its motion to dismiss  the Consolidated Complaint of Jabo's Pharmacy, Inc. and Drug Mart Tallman, Inc., Defendant makes the argument that certain state law claims should be dismissed because the named plaintiffs lack standing to bring claims in those states in which the named plaintiffs do not engage in business.  See Silodor Decl., Ex. 4 at 24.  The Court notes that this argument is not  raised in connection with the instant motion to dismiss, nor is it expressly incorporated by reference.  See Def. Br. at 30.  However, page 38 of the motion to dismiss the Consolidated Complaint of Jabo's Pharmacy, Inc. and Drug Mart Tallman, Inc. – which Defendant does incorporate by reference – then refers the Court to Section V of same.  See Silodor Decl., Ex. 4 at 38, 24.  Defendant's maneuvering in this regard is both confusing and frustrating to the Court, and should be avoided in all future filings.  Moreover, as a result of such maneuvering, it is unclear to the Court whether Defendant intends to incorporate this argument into its motion to dismiss the instant Complaint.

L. Civ. R. 7.2(b) imposes a 40 page limit when using a 14-point Times New Roman font, as was done in this case.  Moreover, L. Civ. R. 7.2(b) specifically provides that "[b]riefs of greater length will only be accepted if special permission of the Judge or Magistrate Judge is obtained prior to submission of the brief."  Defendant's brief totals 30 pages.  Defendant also incorporates by reference pages 22-23, 36-38, and 27-36 of its motion to dismiss the Consolidated Complaint of Jabo's Pharmacy, Inc. and Drug Mart Tallman, Inc. See Def. Br. at 30.  This puts Defendant's brief at 5 pages over the 40 page limit.  While the Court has considered the arguments contained therein, as a courtesy to Defendant, to the extent that Defendant also seeks to indirectly incorporate by reference the arguments raised in Section V of its motion to dismiss the Consolidated Complaint of Jabo's Pharmacy, Inc. and Drug Mart Tallman, Inc., the arguments contained therein will not be considered by the Court.  Defendant does not indicate that it sought, or was given, permission, to file an over-length brief in this instance.

Even if the Court were to consider same, the Court would decline to entertain such an argument prior to addressing the issue of class certification. See Ortiz v. Fibreboard Corp., 527

"D.C. Indirect Class" has yet to be certified, the Court will not predict which state law(s) would be applicable in the event that said Classes are certified, "particularly given the fact that the anticipated complexity of a choice-of-law analysis may itself be a factor in determining the certifiability of the class." In re K-Dur Antitrust Litig., 338 F. Supp. 2d at 541.  Therefore, Defendant's motion to dismiss Plaintiffs' unjust enrichment claims is denied, without prejudice.

### C.    State Antitrust Claims

Finally, Defendant argues that certain state antitrust claims asserted by Plaintiffs are deficient for various reasons, including, but not limited to (1) Plaintiffs' inability to pursue claims under state antitrust laws which regulate only intrastate commerce, and (2) Plaintiffs' inability to meet particular pleading and/or procedural requirements set forth by certain states. (Def. Br. at 30).[33]  For the same reasons why the Court deems it inappropriate to determine under

---

U.S. 815, 816 (1999) ("[w]hile an Article III court ordinarily must be sure of its own jurisdiction before getting to the merits, a Rule 23 question should be treated first because class certification issues are 'logically antecedent' to Article III concerns . . . .") (citation omitted).  The state antitrust claims alleged in Count IV of the Complaint are brought "only by the Indirect Class." See Compl. at 25. (emphasis added).  Should the Court decide not to certify the Indirect Class, then Defendant's concerns regarding claims "brought only by the Indirect Class" may be moot. See, e.g., In re K-Dur Antitrust Litig., 338 F. Supp. 2d at 544 (declining to address defendant's argument that plaintiffs lack Article III standing to assert claims in jurisdictions in which plaintiffs do not allege to have been purchasers prior to determining class certification); Clark v. McDonald's Corp., 213 F.R.D. 198, 205 (2003) (declining to address defendant's argument that plaintiff has no standing to assert claims on behalf of class members regarding restaurants in states that plaintiff, himself, has not visited, and reasoning that such an issue "would not arise but for Clark's capacity as a putative class representative."); In re Buspirone Patent Litig., 185 F. Supp. 2d 363, 377 (S.D.N.Y. 2002) (deferring on issue of Article III standing on a motion to dismiss, and explaining that "it is appropriate to decide class certification before resolving alleged Article III challenges of the present kind.").

[33] Defendant's brief incorporates by reference pages 27-36 of its motion to dismiss the Consolidated Complaint of Jabo's Pharmacy, Inc. and Drug Mart Tallman, Inc. attached as Exhibit 4 to the Silodor Declaration. See Silodor Decl., Ex. 4 at 27-36.

which state laws Plaintiffs have viable unjust enrichment claims, the Court likewise determines

that it would be inefficient to assess (1) which state antitrust laws would be applicable, and (2)

the viability of Plaintiffs' state antitrust claims under such laws, <u>prior</u> to a determination on the

issue of class certification.[34]   Accordingly, to the extent that Defendant moves to dismiss

Plaintiffs' state antitrust claims on such a basis, Defendant's motion is denied, without prejudice.

<u>**CONCLUSION**</u>

For the reasons stated herein, the Court denies Defendant's motion to dismiss the Class

Action Amended Complaint.  An appropriate Order accompanies this Opinion.


/s/ Jose L. Linares
DATE: June 29, 2007                              JOSE L. LINARES,
                                                 UNITED STATES DISTRICT JUDGE

---

[34] <u>See, e.g.</u>, <u>In re K-Dur Antitrust Litig.</u>, 338 F. Supp. 2d at 542 (declining to address
similar arguments regarding the deficiency of plaintiffs' state antitrust claims, and explaining that
it would be "inefficient to determine under which state laws the Indirect Purchasers have viable
claims before first deciding the class certification and choice of law issues.").