# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re HYPODERMIC PRODUCTS ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO: ALL ACTIONS | Master Docket No. 05-CV-1602 (JLL)<br>MDL No. 1730<br><br>Hon. Jose L. Linares, U.S.D.J.<br>Hon. Claire C. Cecchi, U.S.M.J.<br><br>ORAL ARGUMENT REQUESTED |

## TO BE FILED UNDER SEAL

## DEFENDANT BD'S MEMORANDUM OF LAW IN SUPPORT OF THE MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT WITH THE DIRECT PURCHASER PLAINTIFFS

On the Brief and Of Counsel:

    Theodore V. Wells, Jr.
    Moses Silverman
    Robert A. Atkins
    Jacqueline P. Rubin
    Steven C. Herzog

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000

LOWENSTEIN SANDLER PC
65 Livingston Avenue
Roseland, NJ 07068
(973) 597-2500

Attorneys for Defendant
Becton, Dickinson and Company

# TABLE OF CONTENTS

<u>Page</u>

PRELIMINARY STATEMENT ................................................................... 1

THE PLEADINGS AND PROCEDURAL HISTORY ................................... 4

A.    The Competing Complaints Against BD ...................................... 4

B.    The Standing Dispute Between the Plaintiff Groups ..................... 7

C.    The Proposed Settlement With the Distributor Plaintiffs .............. 8

THE RELEVANT AND UNDISPUTED FACTS ......................................... 9

A.    The Undisputed Facts About the Distributor Plaintiffs ................. 9

B.    The Undisputed Facts About the Healthcare Plaintiffs ................ 10

C.    The Facts Are The Same Under GPO Contracts ......................... 11

ARGUMENT ..................................................................................... 14

A.    The Direct Purchaser Rule ..................................................... 14

B.    The Distributor Plaintiffs Are The Direct Purchasers ................. 21

C.    The Healthcare Plaintiffs Are Not Direct Purchasers ................. 24

CONCLUSION ................................................................................... 26

i

**Table of Authorities**

## CASES

*California* v. *ARC Am. Corp.*,
    490 U.S. 93 (1989)...................................................................................... 14

*Delaware Valley Surgical Supply Inc.* v. *Johnson & Johnson*,
    523 F.3d 1116 (9th Cir. 2008) ......................................................... passim

*Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.*,
    392 U.S. 481 (1968)...........................................................................2, 14, 15

*Howard Hess Dental Labs. Inc.* v. *Dentsply Int'l, Inc.*,
    424 F.3d 363 (3d Cir. 2005) ................................................................20, 22

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2008) ........................................................................ 14

*Illinois Brick Co.* v. *Illinois*,
    431 U.S. 720 (1977)............................................................................. passim

*Kansas* v. *UtiliCorp United, Inc.*,
    497 U.S. 199 (1990)............................................................................. passim

*Kloth* v. *Microsoft Corp.*,
    444 F.3d 312 (4th Cir. 2006) ..................................................................... 20

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
    998 F.2d 1144 (3d Cir. 1993) ..................................................................... 16

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
    226 F.R.D. 492 (M.D. Pa. 2005) ............................................................... 16

*St. Francis Medical Center* v. *C.R. Bard, Inc.*,
    __ F. Supp. 2d __, 2009 WL 3088814 (E.D. Mo. Sept. 28, 2009).........22, 23

*Stepan Co.* v. *Callahan Co.*,
    568 F. Supp. 2d 546 (D.N.J. 2008) ........................................................... 16

## OTHER AUTHORITIES

Federal Rule of Civil Procedure 23(e) ................................................................ 25

Defendant Becton, Dickinson and Company ("BD") respectfully submits this memorandum of law in support of the motion for preliminary approval of settlement made by Plaintiffs Louisiana Wholesale Drug Co., Inc., Rochester Drug Co-Operative, Inc., JM Smith Corporation d/b/a Smith Drug Company, Dik Drug Company, and Park Surgical Co., Inc. (collectively, the "Distributor Plaintiffs" or the "Direct Purchaser Plaintiffs"). Specifically, BD requests that pursuant to Paragraph 2 of the Settlement Agreement dated April 27, 2009, the Court find that the Distributor Plaintiffs have "direct purchaser" standing under Section 4 of the Clayton Act.

## PRELIMINARY STATEMENT

The Settlement Agreement between BD and the Distributor Plaintiffs requires, as a condition of approval, that the Court determine which of the two competing plaintiffs groups has standing to sue BD for damages under the federal antitrust laws. Under a trilogy of Supreme Court cases and forty years of unbroken precedent in the lower courts, only "direct purchasers" of BD products have such standing. In this case, there is a feud about which plaintiffs are the direct purchasers: the "Distributor Plaintiffs" (who buy medical products directly from BD) or the "Healthcare Plaintiffs" (who buy those products from distributors). Both groups claim to have direct purchaser standing. Only one group can be right.

After several years of discovery -- including discovery about the purchasing, pricing and distribution of BD products -- BD reached a settlement with the Distributor Plaintiffs. The settlement is contingent upon the Court finding that the Distributor Plaintiffs, and not the Healthcare Plaintiffs, are the ones with

standing to bring damages claims pursuant to Section 4 of the Clayton Act. In light of the undisputed facts in the discovery record, and a recent Ninth Circuit decision exactly on point, *Delaware Valley Surgical Supply Inc.* v. *Johnson & Johnson*, 523 F.3d 1116 (9th Cir. 2008), BD concluded that the law favors a finding that the Distributor Plaintiffs have direct purchaser standing.

The facts relevant to determining the identity of the direct purchasers are no longer in dispute. It is the Distributor Plaintiffs who order products from BD, are invoiced by BD, pay BD for those products, take delivery of those products, and then store those products in their own inventory for sale to hospitals, doctors and pharmacies. The Healthcare Plaintiffs do none of that. Rather, they order and buy BD products from distributors. In the terminology of the Supreme Court, the Distributor Plaintiffs are the "immediate buyers" and, thus, the "direct purchasers." The Healthcare Plaintiffs are "indirect purchasers," with damages available only under state (not federal) law.

This bright line rule was established and twice reaffirmed by the Supreme Court for the purpose of promoting the private enforcement of the Sherman and Clayton Acts. *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.*, 392 U.S. 481 (1968); *Illinois Brick Co.* v. *Illinois,* 431 U.S. 720 (1977); *Kansas* v. *UtiliCorp United, Inc.,* 497 U.S. 199 (1990). Products are often sold and re-sold multiple times before reaching their end-user, and the Court knew full well that an unlawfully fixed or inflated price can be passed-on from customer to customer and ultimately absorbed (in whole or in part) by the end-user. The Court feared, however, that tracing the product (and the price) all the way through the

2

downstream supply chain in order to locate the "real" injured party could become a daunting and perhaps impossible exercise, and thus a deterrent to potential antitrust plaintiffs. *See Illinois Brick*, 431 U.S. at 732, 740. In its most recent case, *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199 (1990), the Court held that it would create no new exceptions to this rule because the factual inquiries such exceptions would engender are complex, and the resulting chaos would hinder antitrust enforcement. 497 U.S. at 216-17. "The possibility of allowing an exception, even in rather meritorious circumstances, would undermine the rule." *Id.* at 216.

Nonetheless, some of the Healthcare Plaintiffs in this case argue that while they buy BD products from distributors, they are really the direct purchasers. Their argument is that the prices the distributors pay to buy products from BD are established in contracts between BD and hospitals or their Group Purchasing Organizations ("GPOs"). The Healthcare Plaintiffs argue that since they (or their GPO agents) negotiate with BD the price BD charges the distributors, who then resell the products to them at a mark-up, they are the "real" direct purchasers from BD, not the distributors.

This exact same argument about GPO contracts was rejected by the Ninth Circuit in *Delaware Valley Surgical Supply Inc.* v. *Johnson & Johnson*, 523 F.3d 1116 (9th Cir. 2008). Distributors who order and buy medical products from the manufacturer -- even where the price paid by the distributors was previously negotiated by a hospital or GPO -- have direct purchaser standing, and the hospitals who buy from those distributors do not. *Id.* at 1122.

3

Consistent with the well-established paradigm of "direct purchasers" (distributors) and "indirect purchasers" (downstream customers), the Court should find that the Distributor Plaintiffs are the parties with standing to seek damages from BD under the federal antitrust laws, and make each of the findings required by Paragraph 2 of the Settlement Agreement.

## THE PLEADINGS AND PROCEDURAL HISTORY

### A.    The Competing Complaints Against BD

BD is a leading manufacturer of syringes, blood collection products, IV catheters and other medical devices.  BD is headquartered in Franklin Lakes, New Jersey.  There are at least eight different product categories involved in this case, which plaintiffs refer to collectively as "Hypodermic Products."[1]

Most of BD's products are sold by BD to distributors or wholesalers who later resell the products to end-users like hospitals, nursing homes, labs, clinics, and doctors offices.  BD also makes products, such as insulin syringes for diabetes care, that are sold by BD to distributors and wholesalers, which are later resold to pharmacies, who in turn resell the products to individual customers.

A significant portion of BD's sales to distributors are made at prices established in contracts negotiated between BD and hospitals or GPOs.  GPOs are membership organizations formed by hospitals and other healthcare providers to negotiate distributor-price agreements with device manufacturers, pharmaceutical

---

[1]    The product markets plaintiffs allege are:  conventional and safety versions of hypodermic needles and syringes, IV catheters, winged IV catheters, and blood collection needles, tubes, and tube holders.

companies and other medical suppliers. (LWD Cplt. ¶ 41; Jabo Cplt. ¶ 56; MedStar Cplt. ¶ 57.)[2] All of the plaintiffs claim that BD's contracts with GPOs are anti-competitive because they allegedly limit the ability of rival manufacturers to sell their products to GPO members. (LWD Cplt. ¶¶ 7-10; Jabo Cplt. ¶ 4; MedStar Cplt. ¶ 4.)[3] As a result, plaintiffs allege, BD's prices are inflated and they pay "overcharges" for BD's products. (LWD Cplt. ¶ 12; Jabo Cplt. ¶ 5; MedStar Cplt. ¶ 5.) BD denies those allegations because its contracts with GPOs do not exclude any of its competitors from the market -- indeed, most of BD's rivals have their

---

[2]  All exhibits are to the accompanying Declaration of Steven C. Herzog. This brief references depositions of representatives from the parties: George Goldman for Defendant BD ("Goldman Dep." (Ex. A)); Gayle White for Distributor Plaintiff Louisiana Wholesale Drug Co., Inc. ("White Dep." (Ex. B)); Edward Kirker for Distributor Plaintiff Rochester Drug Co-Operative, Inc., ("Kirker Dep." (Ex. C)); William Brice for Distributor Plaintiff Smith Drug Co. ("Brice Dep." (Ex. D)); Gary Prester for Distributor Plaintiff Dik Drug Co. ("Prester Dep." (Ex. E)); James Dube for Distributor Plaintiff Park Surgical Co., Inc. ("Dube Dep." (Ex. F)); and Erin Germann for Healthcare Plaintiff MedStar Health Inc. ("Germann Dep." (Ex. G)). This brief also references the deposition of Edward Ram, the representative of Cardinal Health, Inc., MedStar Health Inc.'s primary distributor ("Ram Dep." (Ex. H)).

[3]  The Distributor Plaintiffs consolidated their actions into a single Second Consolidated Amended Class Action Complaint ("LWD Cplt.") (Docket #77), which we refer to as the "Distributor Plaintiff Actions" in this memorandum. The Healthcare Plaintiffs are MedStar Health, Inc., et al. (collectively "MedStar"), Jabo's Pharmacy, Inc. ("Jabo's"), Drug Mart Tallman, Inc. ("Drug Mart"), and The Hebrew Home for the Aged at Riverdale ("Hebrew Home"). Jabo's and Drug Mart filed jointly the Consolidated Class Action Complaint ("Jabo Cplt." (Docket #78)); MedStar filed the MedStar Class Action Amended Complaint ("MedStar Cplt." (Docket #90)); and Hebrew Home filed a "Class Action Complaint." (Ex. I.)  All of these actions have been consolidated. (See Order dated December 9, 2008 (Docket #299).)

own GPO contracts -- and because those contracts were awarded after a competitive bidding process that resulted in lower prices for BD products.

In total, 11 plaintiffs have filed 9 separate actions alleging antitrust violations against BD, all of which have been consolidated and are now before this Court. The plaintiffs have divided into two consolidated groups:

- <u>The Distributor Plaintiffs</u>. The first group consists primarily of distributors and wholesalers of medical supplies that buy products directly from BD and then distribute those products to hospitals, doctors, pharmacies and other end-users. There are seven (7) named Distributor Plaintiffs. The Distributor Plaintiffs assert antitrust claims as "direct purchasers" for alleged violations of Sections 1 and 2 of the Sherman Act. (LWD Cplt. ¶¶ 110-128.) [4]

- <u>The Healthcare Plaintiffs</u>. The second group of plaintiffs consists of healthcare providers, such as hospitals, nursing homes and pharmacies, that buy BD products from distributors. There are four (4) named Healthcare Plaintiffs, including MedStar, the owner of Georgetown Medical Center in Washington, D.C., and The Hebrew Home for the Aged at Riverdale.

All four of the Healthcare Plaintiffs assert antitrust and related claims as "indirect purchasers" under the laws of twenty-five states and the District of Columbia. (Jabo Cplt. ¶¶ 99-113; MedStar Cplt. ¶¶ 100-117; Ex. I ¶¶ 98-108.) However, MedStar and Hebrew Home also purport to assert claims as "direct

---

[4] The Distributor Plaintiffs purport to represent all "direct purchasers" of the relevant BD products, which includes some hospitals and other healthcare providers who buy directly from BD rather than from distributors.

6

purchasers" for alleged violations of Sections 1 and 2 of the Sherman Act, as well as Section 3 of the Clayton Act. (MedStar Cplt. ¶¶ 80-99; Ex. I ¶¶ 78-97.)

Therein lies the clash between the competing class action complaints: for the very same products BD sold to a distributor (e.g., Cardinal Health), and were later sold by that distributor to a hospital (e.g., MedStar), the distributor and the hospital are both alleged to be "direct purchasers" and entitled to treble antitrust damages pursuant to Section 4 of the Clayton Act. That cannot be.

**B.    The Standing Dispute Between the Plaintiff Groups**

Even though they principally buy BD products from distributors -- i.e., not directly from BD -- MedStar and Hebrew Home claim to have federal "direct purchaser" standing for all their purchases because they buy pursuant to GPO contracts. (MedStar Cplt. ¶¶ 80-99, Hebrew Home Cplt. ¶¶ 78-97.)

On April 25, 2007, the Distributor Plaintiffs and MedStar each filed competing motions for partial summary judgment seeking a ruling as to which of them has direct purchaser standing. (Memorandum of Law in Support of MedStar's Motion for Partial Summary Judgment dated April 25, 2007 (Ex. K); Memorandum of Law in Support of Direct Purchaser Class Plaintiffs' Motion for Partial Summary Judgment dated April 25, 2007 (Ex. L).) In response, MedStar and BD argued that the Court should permit discovery regarding the purchasing and distribution of BD products, including the prices and practices under the GPO contracts. On October 16, 2007, the Court issued a Case Management Order holding in abeyance "[f]urther briefing on all plaintiffs' pending motions for partial

summary judgment" (CMO #22 ¶ 3 (Docket #207)), and permitting the parties to conduct discovery on the issue of standing.

That discovery is now complete, and the standing issue and partial summary judgment motions are ready to be resolved in connection with the proposed settlement between BD and the Distributor Plaintiffs. On October 8, 2009, Magistrate Judge Cecchi entered a scheduling order for the simultaneous briefing of the preliminary approval and partial summary judgment motions. (Order dated October 8, 2009 (Docket #324).)

### C.   The Proposed Settlement With the Distributor Plaintiffs

On April 27, 2009, following a mediation over the course of several months, BD and the Distributor Plaintiffs entered into a Settlement Agreement. (Settlement Agreement dated April 27, 2009 (Ex. M).)

The settlement is conditioned upon, *inter alia*, the Court making three findings with respect to standing:  (i) that each of the named Distributor Plaintiffs (identified in the Settlement Agreement as the "Direct Purchaser Plaintiffs") has direct purchaser standing to assert damages claims against BD under Section 4 of the Clayton Act; (ii) that MedStar and Hebrew Home do not have direct purchaser standing with respect to purchases they made from or through distributors; and (iii) only those purchasers of BD products who purchased products from BD and were invoiced by BD (*i.e.*, members of the proposed settlement class) have direct purchaser standing.  (Ex. M, ¶ 2.)

## THE RELEVANT AND UNDISPUTED FACTS

In support of their motions for partial summary judgment and for preliminary approval of the settlement, the Distributor Plaintiffs have set forth the factual record, and submitted relevant excerpts of depositions and relevant documents. Here, we itemize and discuss the uncontested facts in the record that, we respectfully submit, compel each of the three standing findings required by Paragraph 2 of the Settlement Agreement.

### A.   The Undisputed Facts About the Distributor Plaintiffs

With respect to the relevant products that the Distributor Plaintiffs purchased from BD, including those products they may have later sold to GPO-member hospitals like MedStar, these dispositive facts are undisputed:

1.   The Distributor Plaintiffs submitted orders to BD.[5]

2.   The Distributor Plaintiffs were invoiced by BD for the purchase of the products.[6]

3.   The Distributor Plaintiffs paid BD for the products.[7]

4.   The Distributor Plaintiffs took delivery of the products from BD.[8]

---

[5]

[6]

**Redacted**

[7]

9

5.    The Distributor Plaintiffs stored the BD products in their own inventory.[9]

Once they took delivery of the BD products, the Distributor Plaintiffs assumed the risk of ownership for the products they purchased from BD, including the risk of loss in the event the products were damaged or stolen while in their inventory and possession.[10]  The Distributor Plaintiffs purchased insurance to mitigate that risk of loss.[11]

## B.    The Undisputed Facts About the Healthcare Plaintiffs

With respect to the sale of BD products by distributors to their downstream customers, including GPO-member hospitals like MedStar as well as the other Healthcare Plaintiffs, these dispositive facts are undisputed:

1.    Distributors negotiated with their hospital and other customers the terms of sale for the purchase of BD products.[12]

---

8

9

10                                **Redacted**

11

12

10

2.    Distributors determined what price they charged their hospital and other customers for BD products.[13]

3.    Distributors received orders from and invoiced their hospital and other customers.[14]

4.    Distributors delivered BD products to their hospitals and other customers.[15]

5.    Distributors were paid by their hospital and other customers for their purchases of BD products from the distributors.[16]

## C.    <u>The Facts Are The Same Under GPO Contracts</u>

The GPO contracts relied on by MedStar and Hebrew Home to support their assertion of direct purchaser standing do not change any of these decisive facts. Distributors still purchase from, are invoiced by, and pay BD. The GPO-member hospitals still purchase from, are invoiced by, and pay their distributors. The only difference when a GPO contract is involved, is that the price

---

[13]

[14]

**Redacted**

[15]

[16]

11

the distributors pay BD is negotiated with BD by a GPO on behalf of its member hospitals.[17]

GPO contracts work like this. GPOs are bargaining agents for their hospital and other members. They negotiate distributor-price agreements with medical suppliers like BD. These GPO contracts do not set the prices at which hospitals order products from BD or pay BD for products. Rather, GPO contracts contain discounted prices that BD agrees to charge distributors who resell BD products to GPO-member hospitals. The GPO-member hospitals separately and independently negotiate with distributors the price at which the distributors will sell them BD products -- which typically is comprised of the distributor's acquisition cost (the price it paid BD) and a mark-up, fee or other charge.[18].

BD informs distributors of changes in prices available under a contract, or additions to a contract, through "dealer notifications."[19] Absent a GPO contract or other distributor-price agreement, BD generally charges distributors its listed dealer price.[20]

---

[17]

[18]                                     **Redacted**

[19]

[20] GPO contracts are referred to as "net dealer acquisition" contracts. BD sometimes uses other types of contracts to set the prices it charges distributors. "Maryland Plan" contracts are negotiated between BD and a distributor and set a price to the distributor for products it sells to a specific customer. "Z" contracts are contracts between BD and an end-user that set forth the maximum price for the final sale between the distributor and an end-user. BD also has

By getting BD to agree on the prices BD will charge the distributors, the hospitals (via their GPOs) can manage the prices they negotiate and ultimately agree to pay their distributors for BD products.  In that sense, a hospital can be described as a purchaser from BD -- but according to the antitrust law, it is no more than an "indirect" purchaser because the immediate buyer is still the distributor.

The commercial and legal bottom line is the same whether there is a GPO contract or not:  distributors are "direct purchasers" because they order from BD, buy from BD, are invoiced by BD, and pay BD.  And GPO-member hospitals like MedStar are "indirect purchasers" because they order from distributors, buy from distributors, are invoiced by distributors, and pay distributors.[21]

---

direct contracts with some individual hospitals and large hospital systems (called integrated delivery networks ("IDNs")).  The direct shipping agreements between IDNs and BD are called "direct product distribution agreements."

[21]

**Redacted**

13

## ARGUMENT

### THE MOTION FOR PRELIMINARY APPROVAL OF THE SETTLEMENT SHOULD BE GRANTED BECAUSE THE DISTRIBUTOR PLAINTIFFS HAVE DIRECT PURCHASER STANDING

The Settlement Agreement with the Distributor Plaintiffs recognizes that the standing dispute must be resolved in their favor as a condition of the proposed settlement. The undisputed facts in the discovery record, as applied to the case law on point, enable the Court to do that now. Each of the three standing findings required by Paragraph 2 of the Settlement Agreement is supported by more than a preponderance of the evidence. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008).

### A.   The Direct Purchaser Rule

The Supreme Court has held, over and over again, that only the "direct purchaser" of goods or services is entitled to seek treble damages for alleged violations of the federal antitrust laws. *Kansas* v. *UtiliCorp United, Inc.*, 497 U.S. 199, 204 (1990); *Illinois Brick Co.* v. *Illinois,* 431 U.S. 720, 730-31 (1977); *Hanover Shoe, Inc.* v. *United Shoe Machinery Corp.*, 392 U.S. 481, 494 (1968). The "indirect purchasers" -- *i.e.*, those downstream customers who buy goods or services from direct purchasers -- do not have standing to seek damages under federal antitrust law, and may pursue damages only under state "indirect purchaser" statutes. *See California* v. *ARC Am. Corp.*, 490 U.S. 93, 103 (1989).[22]

---

[22] There are two narrow and almost never used exceptions to the "direct purchaser rule." The first, the "pre-existing cost-plus contract" exception, applies only where the direct purchaser is insulated from any decrease in its sales as a result

The "direct purchaser rule" is the result of three Supreme Court decisions setting forth and describing who can and who cannot seek treble damages pursuant to Section 4 of the Clayton Act. The Court's holdings and reasoning in those cases are, we submit, dispositive of the standing issue now before the Court. That the Ninth Circuit last year rejected the very same GPO theory advanced here by the Healthcare Plaintiffs leaves little room for argument. *Delaware Valley Surgical Supply Inc.* v. *Johnson & Johnson*, 523 F.3d 1116 (9th Cir. 2008).

In *Hanover Shoe*, a company that leased shoe-making machines was accused by a shoe manufacturer of monopolizing the market in violation of Section 2 of the Sherman Act. The defendant machine-maker argued that the plaintiff manufacturer could not show any antitrust injury because, although the defendant had overcharged the plaintiff for manufacturing equipment, the plaintiff passed-on the overcharge to its downstream customers by raising prices on its finished shoes. *Hanover Shoe*, 392 U.S. at 488-89.

The Court rejected this "passing-on" defense. It found that "if buyers [like the plaintiff] are subjected to the passing-on defense . . . [the] ultimate customers . . . would have only a tiny stake in a lawsuit and little interest in

---

of passing on an overcharge, because it has pre-existing, fixed quantity, cost-plus contracts with its customers. *Illinois Brick*, 431 U.S. at 736. The second potential exception is where a direct purchaser is owned or controlled by an indirect purchaser. *Id.* at 736 n.16. Neither is applicable on the facts here, and we understand the Healthcare Plaintiffs to have disclaimed reliance on either of these exceptions. (*See* Hearing Transcript of October 3, 2007, at 29:7-11, 32:12-15 (Docket #205).)

15

attempting a class action.  In consequence, those who violate the antitrust laws by price fixing or monopolizing would retain the fruits of their illegality because no one was available who would bring suit against them." *Id.* at 494.  The Court stressed that it is imperative to promote private enforcement of federal antitrust laws through "[t]reble-damage actions, the importance of which the Court has many times emphasized." *Id.*

  The rule established by *Hanover Shoe* is so clear as a matter of law, and so firm as a matter of public policy, that antitrust defendants are not even allowed to argue (or present facts to show) that a direct purchaser who passes-on 100% of the price has no injury or damages.  *See In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1167 n. 20 (3d Cir. 1993); *Delaware Valley Surgical Supply Inc.* v. *Johnson & Johnson*, 523 F.3d 1116, 1123-24 (9th Cir. 2008); *In re Pressure Sensitive Labelstock Antitrust Litig.*, 226 F.R.D. 492, 497-98 (M.D. Pa. 2005).  Even though the immediate buyer (like a distributor) might pass-on most or all of the purchase price of the product to its downstream customer (like a hospital), and thereby actually pass-on any overcharge damages, the Supreme Court has ruled that granting exclusive standing to the "direct purchaser" is the best antitrust enforcement mechanism.  *See Hanover Shoe*, 392 U.S. at 494 (1968); *Illinois Brick*, 431 U.S. at 746; *UtiliCorp*, 497 U.S. at 214; *see also Delaware Valley*, 523 F.3d at 1120; *Stepan Co.* v. *Callahan Co.*, 568 F. Supp. 2d 546, 552 (D.N.J. 2008).

  In *Illinois Brick*, the Court "once again confront[ed] the question whether the overcharged direct purchaser should be deemed for purposes of § 4 to

16

have suffered the full injury from the overcharge." 431 U.S. at 726. This time, the Court faced the question not from the viewpoint of a defendant trying to assert a pass-on defense, but from the perspective of a downstream customer (like MedStar) who claimed to be the victim of a passed-on overcharge.

The defendants in *Illinois Brick* were manufacturers of concrete blocks. They were accused of price fixing in violation of Section 1 of the Sherman Act. *Illinois Brick*, 431 U.S. at 726-27. The defendant manufacturers sold concrete blocks to subcontractors working on public construction projects. The plaintiffs were the State of Illinois and 700 municipal governments or agencies. They argued that since the construction subcontractors and contractors passed-on a portion of the inflated cost of the concrete blocks to them, they had a legally cognizable antitrust injury.

The Court rejected that argument, holding that "indirect purchasers" like the plaintiffs in *Illinois Brick* cannot use a pass-on theory "offensively" and, therefore, cannot seek damages under the federal antitrust law. The Court gave three reasons:

First, allowing offensive use of the pass-on theory, while preventing defensive use, would expose antitrust defendants to impermissible multiple liability. Defendants could be held liable for the full value of the overcharge (trebled) in an action by the direct purchaser, and then held liable in subsequent actions by downstream indirect purchasers for the portion of the same overcharge (trebled again). "[O]verlapping recoveries are certain to result . . . unless the indirect purchaser is unable to establish any pass-on whatsoever." *Id.* at 730-31.

17

Second, the "burdens that [pass-on litigation] would impose on the effective enforcement of antitrust laws" apply equally to offensive and defensive use of the pass-on theory. *Id.* at 741. "However 'long and complicated' the proceedings would be when defendants sought to prove pass-on, they would be equally so when the same evidence was introduced by plaintiffs." *Id.* at 732. As the Court explained, "the attempt to trace the complex economic adjustments to a change in the cost of a particular factor of production would greatly complicate and reduce the effectiveness of already protracted treble-damages proceedings," burdening the judicial system and stifling efficient enforcement of antitrust laws. *Id.*

Third, private enforcement of the antitrust laws would be better served by a rule entitling direct purchasers, and only the direct purchasers, to recover the full amount of the unlawful overcharge. *Id.* at 745-46. "[A]llowing indirect purchasers to recover using pass-on theories . . . would transform treble-damages actions into massive multiparty litigations involving many levels of distribution and including large classes of ultimate consumers remote from the defendant." *Id.* at 740. The Court acknowledged that the direct purchaser rule would bar injured indirect purchasers from recovering damages under federal law. *Id.* at 746. However, the Court concluded that the goals of the antitrust laws -- compensation of victims, disgorgement of illegally obtained profits, and deterrence of illegal conduct -- were best accomplished by sparing direct purchaser plaintiffs "the burden of litigating the intricacies of pass-on [and permitting them] to recover the full amount of the overcharge." *Id.* at 745-46.

18

The final Supreme Court case on direct purchaser standing is *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199 (1990). The Court was faced with a federal antitrust claim brought by indirect purchasers claiming that 100% of the defendant's illegal overcharge had been passed-on to them. The plaintiffs were consumers of natural gas. They purchased the gas from utility companies. The utilities, in turn, had been overcharged by the defendant natural gas suppliers. Pursuant to regulation, the utilities passed-on the entire cost of the gas to the consumers. *Id.* at 205. The plaintiff-consumers argued that the Court should permit them to sue the natural gas suppliers by crafting an exception for indirect purchasers who can prove that the overcharge to the intermediary (the utility) was passed-on in its entirety. *Id.* at 208.

The Court rejected the invitation, affirming summary judgment in favor of the defendant gas suppliers. The direct purchaser rule, the Court held, serves to avoid the complexity of apportioning damages between direct and indirect purchasers. *Id.* at 208-213. The Court recognized that "[t]he rationales underlying *Hanover Shoe* and *Illinois Brick* will not apply with equal force in all cases." *Id.* at 216. Even so, the Court would not create a carve-out for 100% pass-on cases. Indirect purchasers would still have to prove, "among other things, that the direct purchaser could not have raised its rates prior to the overcharge." *Id.* at 209. The proposed exception would not eliminate the possibility of litigation concerning whether the entire overcharge was passed-on. Moreover, "[t]he possibility of allowing an exception, even in rather meritorious circumstances,

19

would undermine the rule." *Id.* at 216.  The Court explained:

> [T]he process of classifying various market situations
> according to the amount of pass-on likely to be involved
> and its susceptibility of proof in a judicial forum would
> entail the very problems that the *Hanover Shoe* rule was
> meant to avoid. The litigation over where the line should
> be drawn in a particular class of cases would inject the
> same "massive evidence and complicated theories" into
> treble-damages proceedings, albeit at a somewhat higher
> level of generality.

*Id.* at 216-17 (quoting *Illinois Brick*, 431 U.S. at 744-745).  The Court concluded,

"In sum, even assuming that any economic assumptions underlying the *Illinois*

*Brick* rule might be disproved in a specific case, we think it an unwarranted and

counterproductive exercise to litigate a series of exceptions.  Having stated the rule

in *Hanover Shoe*, and adhered to it in *Illinois Brick*, we stand by our interpretation

of § 4." *Id.* at 217.

The Courts of Appeals, including the Third Circuit, have adhered

strictly to these Supreme Court rulings.  In *Howard Hess Dental Labs. Inc.* v.

*Dentsply Int'l, Inc.*, 424 F.3d 363 (3d Cir. 2005), the Third Circuit found that "only

direct purchasers from antitrust violators may recover damages in antitrust suits,"

even in "the absence of a particular *Illinois Brick* concern."  424 F.3d at 369, 371.

The Court affirmed the district court's ruling that the plaintiff dental labs could not

bring a federal antitrust claim against a manufacturer where a distributor had acted

as a middleman.  *See also, e.g., Kloth* v. *Microsoft Corp.*, 444 F.3d 312, 320-21

(4th Cir. 2006) ("[It is] apparent that the plaintiffs were indirect purchasers because

they did not buy products directly from Microsoft."); *Delaware Valley*, 523 F.3d at

1122 (direct purchaser rule barred hospitals from asserting federal antitrust claims against medical manufacturer where hospital purchased products from a distributor, not the manufacturer).

**B.    The Distributor Plaintiffs Are The Direct Purchasers**

The Supreme Court in *UtiliCorp* held that the natural gas customers in that case were "indirect purchasers" because they were not "the immediate buyers from the alleged antitrust violators. They bought their gas from utilities, not from the suppliers said to have conspired to fix the price of the gas." 497 U.S. at 207. The "direct purchaser" is the "immediate buyer" of the product from the alleged antitrust violator. Therefore, as the Ninth Circuit stated in rejecting the argument that GPO contracts give downstream hospitals direct purchaser standing, the Supreme Court "closed the door on the theory that an end user who buys from an independent distributor, rather than the manufacturer, should have standing." *Delaware Valley Surgical Supply Inc.* v. *Johnson & Johnson*, 523 F.3d 1116, 1123 (9th Cir. 2008).

Here, there is no dispute that the "immediate buyers" of the products from BD are the Distributor Plaintiffs. The Distributor Plaintiffs order products from BD. BD invoices the Distributor Plaintiffs for those products. BD delivers those products to the Distributor Plaintiffs. The Distributor Plaintiffs pay BD for the products. (*See supra*, pages 9-10.)[23]

---

[23]   The same is true for those hospitals and other healthcare products that purchase directly from BD and not from distributors. Like the Distributor Plaintiffs, they have direct purchaser standing for their purchases made directly from BD and invoiced by BD.

The Healthcare Plaintiffs, including MedStar and Hebrew Home, buy BD products from distributors. The Healthcare Plaintiffs place orders for BD products with distributors (not BD); the distributors (not BD) deliver BD products to the Healthcare Plaintiffs; the distributors (not BD) invoice the Healthcare Plaintiffs; and the Healthcare Plaintiffs pay the distributors (not BD). (*See supra*, pages 10-11.)

Applying the trio of Supreme Court cases, several courts have held specifically that healthcare providers who purchase products through distributors are not direct purchasers. *See, e.g., Delaware Valley*, 523 F.3d at 1122-23; *Howard Hess*, 424 F.3d at 371; *St. Francis Medical Center* v. *C.R. Bard, Inc.*, ___ F. Supp. 2d __, 2009 WL 3088814 (E.D. Mo. Sept. 28, 2009). As far as we know, no court has ever found that a party who purchases products through a distributor, after the distributor purchased those products from a manufacturer, is a "direct purchaser."

In *Delaware Valley*, 523 F.3d 1116, the Ninth Circuit addressed the very issue raised here. Both hospitals and distributors sued a defendant manufacturer, Johnson & Johnson, alleging violations of the federal antitrust laws. Like BD, Johnson & Johnson had sold its products directly to distributors at prices set forth in GPO contracts. The hospitals then purchased the products at issue from the distributors.

Following "the clear rule set forth in *Illinois Brick*," the Ninth Circuit held that the distributors are the direct purchasers, despite the fact that the price at which the distributors bought from Johnson & Johnson had been negotiated by

22

GPOs acting on behalf of the hospitals. *Id.* at 1122. Likewise, the hospitals did not become direct purchasers by virtue of the fact that the price they paid to the distributors included the price the distributor had paid to Johnson & Johnson. *Id.* at 1122-23. "Although the price that [the hospital] pays [the distributor] is set, in part, by an agreement negotiated by a GPO on behalf of [the hospital], the hospital contracted separately with [the distributor] for the actual sale and delivery of products." *Id.* at 1122. The same is true here.

The Ninth Circuit declined to analyze the transaction any further, noting that "Supreme Court jurisprudence has been neither vague nor ambiguous in establishing the direct purchaser rule." *Id.* Citing *UtiliCorp*, the Court emphasized that "[t]he Supreme Court intended to make a bright line rule for identifying the proper plaintiff when an antitrust violation occurs in a multi-tiered distribution system. . . . The Court has explicitly rejected attempts to create exceptions to that rule, even when the considerations in a particular market may undermine some of the reasoning used by the *Illinois Brick* Court." *Id.*

In *St. Francis Medical Center* v. *C.R. Bard, Inc.,* __ F. Supp. 2d __, 2009 WL 3088814 (E.D. Mo. Sept. 28, 2009), the first case to follow *Delaware Valley,* a district court in another circuit faced a nearly identical suit brought by a hospital against a medical supply manufacturer. The hospital, St. Francis, was a member of a GPO that negotiated with the defendant manufacturer, Bard, to set the prices at which Bard sold products to distributors. Bard sold its products to distributors, who in turn sold them to member hospitals at the GPO contract price plus a distributor's mark-up that was separately negotiated between the hospitals

23

and the distributors. The hospitals paid the distributors for the products, and the distributors shipped the products and invoiced the hospitals. *Id.* at *7. The court held that the hospital plaintiffs did not have direct purchaser standing. *Id.* at *27.

Therefore, the Court should find, as specified in Paragraph 2 of the Settlement Agreement, that (i) the Distributor Plaintiffs have direct purchaser standing; (ii) MedStar and Hebrew Home do not have direct purchaser standing with respect to purchases made from or through distributors; and (iii) only those purchasers who purchased the relevant BD products from BD and were invoiced by BD have direct purchaser standing.

### C.   The Healthcare Plaintiffs Are Not Direct Purchasers

MedStar may argue that because they (or their GPOs) entered into pricing agreements with BD, they are the direct purchasers as they are the ones who negotiated or determined "the price" at which they ultimately acquired BD products. This is, of course, the argument made and rejected in *Delaware Valley* and *C.R. Bard.* The price that is negotiated between the GPOs and BD is the price at which *distributors* purchase the product from BD. Though GPOs represent hospitals, the distributor-price agreements they negotiate with suppliers only confirm that the distributors are the "immediate buyers" and, thus, the direct purchasers.

MedStar likely will invite the Court to explore the economics of BD's sales and the GPO contracts. However the Court analyzes the issue, the outcome will be the same because the discovery record shows that the chain of distribution

24

from BD to the distributors and on to the hospitals is the same whether BD sells its products pursuant to GPO contracts or not.  In either case, distributors buy directly from BD, are invoiced by BD, pay BD, and take possession of the product from BD -- and separately negotiate their prices and terms of sale to hospitals and other downstream customers.  On those facts, the law assigns direct purchaser standing to the distributor.

## CONCLUSION

For the reasons set forth above, BD respectfully submits that the Court should make the findings set forth in Paragraph 2 of the Settlement Agreement and, pursuant to Federal Rule of Civil Procedure 23(e), grant the motion for preliminary approval of the settlement between BD and the Distributor Plaintiffs.

Dated: December 22, 2009

Respectfully submitted,

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

/s/ Robert A. Atkins
Theodore V. Wells, Jr.
(twells@paulweiss.com)
Moses Silverman
(msilverman@paulweiss.com)
Robert A. Atkins
(ratkins@paulweiss.com)
Jacqueline P. Rubin
(jrubin@paulweiss.com)
Steven C. Herzog
(sherzog@paulweiss.com)
1285 Avenue of the Americas
New York, New York  10019-6064
Telephone: (212) 373-3000

Attorneys for Defendant
Becton, Dickinson and Company

26