# EXHIBIT
# I

**JUDGE BRIEANT**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

THE HEBREW HOME FOR THE AGED
AT RIVERDALE,

Plaintiff,

-v-

BECTON, DICKINSON AND
COMPANY,

Defendant.

# 07 CV 2544

CLASS ACTION COMPLAINT

**JURY TRIAL DEMANDED**

The Hebrew Home For The Aged at Riverdale ("Hebrew Home" or "Plaintiff")

brings this class action on behalf of itself and all others similarly situated, and alleges

upon information and belief, as follows:

## NATURE OF THE ACTION

1.      Hebrew Home is one of many healthcare providers, which, at all relevant

times, bought disposable hypodermic products manufactured by Defendant Becton,

Dickinson and Company ("Becton").  Plaintiff brings this civil action for nationwide

equitable relief and damages for violating federal antitrust laws and the various states'

antitrust laws and common law.

2.      The disposable hypodermic products at issue include relevant product

markets for: (a) disposable syringes and associated needles; (b) disposable blood

collection tubes; (c) disposable blood collection tube holders; and (d) intravenous ("IV")

catheter devices and their associated needles.  Collectively, the products in these markets

are referred to herein as "Disposable Hypodermic Products."

3.      Hebrew Home and other healthcare providers face the daily problem of

providing high-quality healthcare at an affordable price.  Becton, a large healthcare-

product manufacturer, for decades has been the dominant manufacturer of syringes and other Disposable Hypodermic Products in the United States. Becton has been able to maintain its monopoly and/or market power in the markets for Disposable Hypodermic Products by unreasonably restraining trade and otherwise foreclosing competition through anticompetitive and illegal actions. As a result of this conduct, Becton has been able to overcharge hospitals and other healthcare providers for its Disposable Hypodermic Products. Hebrew Home and other healthcare providers, dedicated to providing superior medical care, have been left to pay the bill for Becton's abuse of its dominant position.

4. Upon information and belief, Becton's anticompetitive practices were structured to eliminate competition for Disposable Hypodermic Products. Furthermore, Becton: (1) imposed market share purchase requirements on healthcare providers; (2) bundled its goods for exclusionary and predatory purposes; (3) contracted with GPOs to impose exclusionary conditions on Class members; and (4) bundled its goods with other manufacturer's goods for exclusionary purposes.

5. Absent Becton's anticompetitive conduct, Plaintiff and other healthcare providers would have paid less for the Disposable Hypodermic Products purchased during the Class Period (defined below). Prices for these products would have been lower with unfettered competition because: (a) Becton would have been forced to compete with products that were either superior in quality and/or less expensive, thus forcing Becton to lower prices or risk losing significant sales and market share; (b) healthcare providers would have replaced some Disposable Hypodermic Products purchased from Becton with less-expensive Disposable Hypodermic Products sold by

2

Becton's competitors; and (c) Becton's competitors would have been able to achieve economies of scale with sufficient market entry that would have put further downward pressure on Becton's prices for Disposable Hypodermic Products.

6.     Since at least the late 1980s, Becton has used (and continues to use) anticompetitive and illegal practices to achieve and maintain its dominant market position and market power, unreasonably restrain trade, and otherwise foreclose competition in the relevant markets by suppressing and foreclosing competition from existing competitors like Terumo Medical Corporation ("Terumo") and product innovators such as Retractable Technologies, Inc. ("RTI"). This conduct has enabled Becton to charge prices for Disposable Hypodermic Products substantially above competitive levels.

7.     Until July 2, 2004, when Becton settled an antitrust lawsuit brought by RTI for $100 million, Plaintiff and other healthcare providers did not have sufficient reason to investigate Becton's pricing and marketing practices for Disposable Hypodermic Products. Moreover, a very broad protective order existed in that litigation and healthcare providers, including Plaintiff, did not, and could not, gain access to documents related to Becton's business planning, competitive responses, and pricing strategies. Accordingly, Becton's conduct has tolled the statute of limitations from at least 1988 through at least July 2, 2004 for the claims stated herein as well as others that have yet to be discovered.

## JURISDICTION AND VENUE

8.     Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to recover treble damages, equitable relief, costs of suit and reasonable attorneys' fees for Becton's violations of Sections 1 and 2 of the Sherman

Act, 15 U.S.C. §§ 1-2, as well as Section 3 of the Clayton Act, 15 U.S.C. § 14. Subject matter jurisdiction is proper pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. §§ 1331, and 1337, because the action arises under the laws of the United States.

9.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a), as the matter in controversy exceeds the sum or value of $75,000 and is between the citizens of different states.

10.     This Court also has jurisdiction over this class action pursuant to Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), providing for jurisdiction where, as here, "any member of a class of plaintiffs is a citizen of a State different from any defendant" and the aggregated amount in controversy exceeds five million dollars ($5,000,000), exclusive of interests and costs. See 28 U.S.C. §§ 1332(d)(2) and (6).

11.     Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b) and (c) because during the Class Period Becton resided, transacted business, was found, or had agents in this district, and because a substantial part of events giving rise to Plaintiff's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this district.

12.     The Court has personal jurisdiction over Becton pursuant to 28 U.S.C. § 1391 as well as pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.

## THE PARTIES

13.     Hebrew Home is a non-sectarian, not for profit geriatric center that provides care to older people in the Bronx, Manhattan and Westchester County, New

4

York. Founded in 1917 as a shelter for homeless elderly in Harlem, Hebrew Home now includes two long-term care residential facilities, two senior apartment communities, and ElderServe, the Hebrew Home's community services division. Hebrew Home's principal place of business is located at 5901 Palisade Avenue, Riverdale, New York 10471. At all relevant times, Hebrew Home purchased Disposable Hypodermic Products manufactured by Becton for use.

14.    Becton Dickinson & Company is a corporation formed and existing under the laws of the State of New Jersey, with its principal place of business located at 1 Becton Drive, Franklin Lakes, New Jersey 07417. Becton is a manufacturer of Hypodermic Products that regularly transacts in this judicial district.

## CLASS ALLEGATIONS

15.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), on its own behalf and as a representative of the following class of persons and entities (the "Class"):

> All hospitals and healthcare providers in the United States who purchased Disposable Hypodermic Products manufactured by Becton through Becton's authorized distributors, at any time during the period 1988 through the present (the "Class Period"). The Class excludes Becton, Becton's parents, subsidiaries and affiliates, as well as Becton's authorized distributors.

16.    *Alternatively*, or in addition, Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3), on its own behalf and as a representative of the following class of persons and entities ("the Indirect Class"):[1]

---

[1]    The allegations in this Complaint generally apply to all classes. Allegations that only apply to one class are explicitly stated as such.

5

All hospitals and healthcare providers in Alabama, Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin (the "Class Jurisdictions"), who purchased Disposable Hypodermic Products manufactured by Becton through a distributor or wholesaler at any time during the period of 1988 through the present (the "Class Period"). The Class excludes Becton, Becton's parents, subsidiaries and affiliates, and all distributors or wholesalers.

17. Joinder of all Class members is impracticable. While the size of the Class is not yet known with certainty, based on the nature of the trade and commerce involved, Plaintiff reasonably believes that the Class numbers in the thousands. Class members are geographically dispersed throughout the United States. The Class members are readily identifiable from information and records in Becton's possession and in the possession of Becton's authorized distributors and wholesalers.

18. Questions of law and fact are common to the Class, including but not limited to whether:

    A.    Becton's anticompetitive conduct is continuing, thus entitling the Class to injunctive relief to promote unrestrained trade and free and fair competition.

    B.    Becton engaged in agreements, contracts, combinations, and conspiracies, which had the purpose and/or effect of unreasonably restraining competition thereby artificially inflating prices and limiting purchaser access to Disposable Hypodermic Products;

    C.    Becton obtained and maintained monopoly and/or market power in the markets for the Disposable Hypodermic Products in the United States;

    D.    Becton's anticompetitive contracts, combinations, and conspiracies have caused Plaintiff and the other members of the Class to suffer antitrust injury in the nature of overcharges;

E.   Becton's contracts with GPOs, separately, and as part of its market-wide scheme to monopolize, have resulted in unreasonable restraints on trade and competition; and

F.   Becton's unlawful conduct caused Plaintiff and other Class members to pay more for the Disposable Hypodermic Products than they otherwise would have paid without such conduct ever occurring.

19.   Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and other Class members purchased Disposable Hypodermic Products manufactured by Becton and were overcharged as a result of Becton's market-wide and centrally-controlled scheme and thus were injured by the same wrongful conduct. Defendant's antitrust violations, those violations' effects, and the relief sought, are all issues or questions common to Plaintiff and Class members.

20.   As a Class representative, Plaintiff will fairly and adequately protect the Class members' interests and have engaged counsel experienced and competent in antitrust and class litigation.

21.   The questions of law and fact that are common to the members of the Class predominate over any questions affecting only individual Class members. Whatever possible issues may exist in managing the class action are greatly outweighed by the corresponding advantages. Those advantages include, but are not limited to, providing Class members with a method for redress of claims that might otherwise not warrant individual litigation.

22.   Class action treatment is a superior method for fairly and efficiently adjudicating this controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously,

efficiently, and without unnecessarily duplicating evidence, effort and expense that numerous individual actions would engender. A class action enables injured persons or entities to obtain redress on claims that might not be practicable to pursue individually. Class treatment also eliminates the potential for inconsistent adjudications.

## RELEVANT MARKETS AND MARKET POWER

23. Defendant's conduct was specifically intended to eliminate or lessen competition and unlawfully acquire and maintain monopoly and/or market power in the markets for Disposable Hypodermic Products, including Disposable Syringes and their associated needles; Blood Collection Tubes; Blood Collection Tube Holders; and IV Catheters and their associated needles. Such products at issue in this case are classified by the FDA as Non-Exempt Class II devices and are sold within the relevant markets described below. The FDA approval process is a significant barrier to entry that makes it more difficult for manufacturers to successfully enter the markets for Disposable Hypodermic Products.

### Disposable Syringes and their Associated Needles

24. Disposable Syringes consist of a plunger fitted to a plastic tube, called the barrel, and a hypodermic needle used to transfer or extract blood, medication, or other liquids to or from veins or body tissue.

25. Disposable Syringes are available in safety and non-safety forms for use by hospitals and other healthcare providers.

8

26.   Becton manufactures Disposable Syringes and sells them in interstate commerce to hospitals and other healthcare providers throughout the United States, including this judicial district.

27.   A relevant product market exists for the sale of Disposable Syringes and their associated needles and the market segments thereunder. There is no product that can reasonably be substituted for Disposable Syringes and their associated needles to fill this medical need.

28.   The relevant geographic market for Disposable Syringes and their associated needles and the market segments thereunder is the United States.

29.   Becton has monopoly and/or market power in the Disposable Syringe market and the market segments thereunder, with a market share in excess of 70%.

<u>**Blood Collection Devices**</u>

30.   Becton manufacturers Blood Collection Tubes, Blood Collection Tube Holders, and needles (all three elements of a blood collection device) and sells them in interstate commerce to hospitals and other healthcare providers throughout the United States, including this judicial district. Blood Collection Tubes, Blood Collection Tube Holders, and their associated needles are separate products and are sold separately.

A.   <u>**Blood Collection Tubes**</u>

31.   Blood Collection Tubes are used as part of a blood collection device which consists of a disposable needle, a blood collection tube, and a blood collection tube holder. Blood collection devices are used to extract and collect blood from patients' veins.

9

32.     A relevant product market exists for the sale of Blood Collection Tubes and the market segments thereunder.   There is no product that can reasonably be substituted for Blood Collection Tubes to fill this medical need.

33.     The relevant geographic market for the sale of Blood Collection Tubes and the market segments thereunder is the United States.

34.     Becton has monopoly and/or market power in the Blood Collection Tube market and the market segments thereunder, with a market share of more than 70%.

## B.     Blood Collection Tube Holders

35.     Blood Collection Tube Holders are used as part of the blood collection device.

36.     Blood Collection Tube Holders are available in safety and non-safety forms for use by hospitals and other healthcare providers.

37.     A relevant product market exists for the sale of Blood Collection Tube Holders and the market segments thereunder.   There is no product that can reasonably be substituted for Blood Collection Tube Holders to fill this medical need.

38.     The relevant geographic market for the sale of Blood Collection Tube Holders and the market segments thereunder is the United States.

39.     Becton has monopoly and/or market power in the Blood Collection Tube Holder market and the market segments thereunder, with a market share of more than 70%.

10

### IV Catheters and their Associated Needles

40.    IV Catheters consists of a disposable need initially used to puncture the patient's skin to insert the catheter. The needle is then withdrawn leaving the catheter in place for a direct hook-up to a bottle of fluid to be delivered or to be capped for later use. The catheter is designed to deliver fluids directly into the patient's vein.

41.    Becton manufacturers IV Catheters (including Winged IV Catheters), and sells them in interstate commerce to hospitals and other healthcare providers throughout the United States, including this judicial district.

42.    A relevant product market exists for the sale of IV Catheters and their associated needles and the market segments thereunder. There is no product that can reasonably be substituted for IV Catheters and their associated needles to fill this medical need.

43.    The relevant geographic market for the sale of IV Catheters and their associated needles and the market segments thereunder is the United States.

44.    Becton has market power in the market for IV Catheters and their associated needles and the market segments thereunder, with a market share of more than 50%.

### FACTUAL ALLEGATIONS

### The Monopolist: Becton

45.    Becton was founded in 1897; its first product was an all-glass syringe. By the 1950s, Becton had become the leading U.S. hypodermic syringe manufacturer. Its product line also included blood collection products and IV catheters.

11

46.   Since the early to mid 1980s, Becton has faced numerous threats to its monopoly and market power in the Disposable Hypodermic Product markets from rival competitors.  As set out below, Becton has repeatedly been able to eliminate or impede competition from these rivals through the various anticompetitive actions alleged herein and those yet to be discovered.  Furthermore, by erecting artificial barriers to entry through the exclusionary and predatory conduct alleged herein, Becton discouraged potential rivals from even attempting to invest the resources necessary to challenge Becton's dominance in the markets for Disposable Hypodermic Products.

47.   Disposable Hypodermic Products come in both safety and non-safety forms.  By the mid 1980s, significant demand was developing for hypodermic products that would reduce the risk of needlestick injuries to medical personnel.  Each year 600,000 to 800,000 needlestick injuries occur in the United States exposing healthcare workers to diseases like HIV, Hepatitis B, and Hepatitis C.  In late 2000, Congress passed the Needlestick Safety and Prevention Act ("NSPA"), which requires healthcare providers to use the safest products available.  Although many healthcare providers continue to use standard non-safety hypodermic products, a large and growing percentage of the market for Disposable Hypodermic Products now comprises safety devices.

### Background: The Role of Authorized Distributors in Becton's Sale of Disposable Hypodermic Products to Class Members

48.   At all relevant times, Class members, including hospitals and other healthcare providers, purchased Disposable Hypodermic Products from Becton through authorized distributors who do not independently set prices for those products.

49.    Upon information and belief, Becton sells is Disposable Hypodermic Products through a distribution process that works as follows:

    A.    A Class member negotiates a price for Disposable Hypodermic Products with Becton, either directly or through a GPO.

    B.    An authorized distributor takes possession of Becton's products, holds them in inventory until they are needed, and then delivers them to the Class member.

    C.    The Class member pays the authorized distributor the price the Class member negotiated with Becton.  The Class member also pays the authorized distributor a delivery or administrative fee, which typically is a fixed percentage of the total sale amount.

    D.    The authorized distributor then pays Becton the amount collected from the Class Member, i.e. the amount already agreed to between Becton and the Class Member under applicable GPO agreements or otherwise directly with Becton.

    E.    As a result of this purchasing process, there is effectively only one sale: the Class Member purchases Becton Disposable Hypodermic Products at prices negotiated with Becton and then receives these Products from authorized distributors.

50.    As these authorized distributors have no independent control over pricing for Becton's products, they act solely as a distribution agent, temporarily holding inventory and then delivering the product purchased by the Class Member.  The only price that the authorized distributors negotiate with Becton and/or the Class members is the price for services related to transporting and distributing purchased products.  The fixed percentage the authorized distributor charges for distribution services is the same no matter the price the Class Member negotiates and then pays Becton, and the price a Class Member pays for Becton Disposable Hypodermic Products will be the same from all authorized distributors.

51.    To that end, Becton has described its authorized distributors' role in the purchase of Becton's Disposable Hypodermic Products in the following way:

> [T]he economic role of authorized distributors under the GPO contracts...is not that of a direct purchaser at all. Rather, these distributors basically deliver Becton's products to hospitals at prices negotiated directly between Becton and the hospital's agent (the GPO). The distributors acquire Becton's products at a predetermined price dictated by the hospital's GPO contract, which is then covered by the hospital in full.

(Becton Request for Downstream Discovery, *Louisiana Wholesale Drug Co. v. Becton & Co.*, Civ. A. No. 05-CV-1602, D.N.J., filed Aug. 24, 2005.)

52.    Likewise, the authorized distributors report that they "buy the product directly from Becton and sell it [to] whomever Becton has a contract with, and [they] sell it at the price that Becton negotiates with that contractor. (September 27, 2005, Transcript of Discovery Motion in *Louisiana Wholesale Drug*, before The Honorable Ronald J. Hedges at p. 12.)

53.    Upon information and belief, an authorized distributor who sells Disposable Hypodermic Products to a Class member at a price below the price set by Becton risks losing the rebate from Becton.

54.    Upon information and belief, Becton also sells some portion of its Disposable Hypodermic Products to wholesalers who then resell these products to Indirect Class members.

14

## The GPOs' Role in this Procurement and Distribution Scheme

55.    The GPOs act as negotiating agents for tens of thousands of hospitals and other healthcare providers. It is variously estimated that between 68% and 98% of the nation's hospitals currently belong to at least one GPO.

56.    GPOs were originally conceived as a way for hospitals to save money by pooling purchasing power to negotiate lower prices for various medical products and other goods. In 1986, the GPOs convinced Congress that the manufacturers and suppliers should be allowed to pay fees to support the GPOs. Prior to 1986, any payments that a manufacturer made to a GPO would be considered an illegal "kickback" violating the Social Security Act's "anti-kickback" provisions. To allow manufacturers (rather than the hospitals) to pay the GPOs, Congress amended the Social Security Act's "anti-kickback" provisions to create an exception for amounts paid by vendors to a GPO as long as: (a) the fees were kept at 3% or lower of the purchase price; and (b) the GPO fully disclosed, in writing, to each member, all fees received from each vendor with respect to purchases made by, or on behalf of, the member.

57.    In addition to millions of dollars in cash payments, Becton's payment of GPO administrative fees has also taken the form of equity positions. A February 1997 article reported:

58.    In furtherance of Becton's scheme to exclude competition from rival Disposable Hypodermic Product manufacturers, Becton used "commitment contracts." Commitment contracts essentially required GPO members to deal exclusively with Becton for its Hypodermic Product needs. For example, in or around 1998 Premier awarded Becton a 7.5 year sole-source contract. In or around 1999, Becton provided

another GPO, Novation, a $1 million payment (in addition to the 3% administrative fees that is pays Novation) for a 4-year sole-source contract under which Becton would be the only vendor approved by Novation to sell Disposable Hypodermic Products to Novation members.

59.    These commitment or sole-source contracts were designed to prevent Class members from buying Disposable Hypodermic Products made by other manufacturers. If a Class member desired to purchase Disposable Hypodermic Products from a manufacturer that was not the chosen sole-source contractor for the GPO, the Class member risked losing numerous financial incentives.

60.    Becton's sole-source contracts with Novation, Premier, and possibly other GPOs, worked to significantly impede and prevent competing Disposable Hypodermic Product manufacturers from selling significant (if any) Disposable Hypodermic Products to healthcare providers that used those GPOs. As one of Novation's attorneys stated in a paper submitted to the Federal Trade Commission:

> Given that GPO contracts account for seventy-two percent of hospital purchases, failure to win one or more GPO contracts may result in a significant loss of business to the losing vendor depending on the percentage of the total market for the product(s) represented by the purchases of a particular GPO.

Bloch, *"An Analysis of Group Purchasing Organizations' Contracting Practices Under the Antitrust Laws: Myth and Reality"* at 15.

61.    By unlawfully excluding and impairing competition, Becton's conduct has caused Plaintiff and the other Class members to pay more for Disposable Hypodermic Products than they otherwise would have paid absent Becton's illegal, exclusionary conduct.

## Becton's Use of Exclusionary Bundling Contracts

62.    Throughout the Class Period Becton used, and continues to use, predatory and exclusionary conduct to frustrate, impair, and substantially foreclose competition from Terumo, RTI, and other actual or potential Disposable Hypodermic Products manufacturers.

63.    A key element of Becton's conduct has been to bundle together for sale different types of products to protect and exploit its market power. For example, Becton has responded to bid requests from GPOs and individual hospitals and other customers by offering "bundled" proposals to sell its Disposable Hypodermic Products, either together or with other unrelated products. Becton's bundled terms include the offer of substantial financial incentives to hospitals and other customers that agree to purchase the vast majority of their needs for the products included in the bundle.

64.    Becton offers substantial financial incentives to purchasers who agree to buy all or substantially all of the products offered as part of the bundle only from Becton. Under certain purchasing programs, Class members who purchased less than Becton's suggested "compliance" levels of their Disposable Hypodermic Products needs from Becton were penalized by: (a) having to pay higher prices for the Disposable Hypodermic Products that it buys from Becton; (b) losing post-purchase rebates for all or most of the Becton Disposable Hypodermic Products it bought; and, in some cases (c) having to re-pay past rebates received from Becton. Furthermore, the financial incentives offered through these bundled contracts have induced GPOs to enter into sole-source supply agreements for Disposable Hypodermic Products with Becton and have caused individual

17

hospitals and other customers to buy all or virtually all of the products included in the bundle only from Becton and to the exclusion of Becton's competitors.

65.    As an additional incentive to accept the bundle, Becton offered certain Class members "conversion" bonuses and rebates that required even further commitment to purchase multiple Becton products.  For instance, under one such program, a Class member could only purchase Becton products at premium discounts if it agreed to utilize a "minimum of three of four Becton Dickinson safety product categories that include needles and syringes, IV catheters, surgical blades and blood collection."  Pursuant to another conversion program, Becton offered to give Class members on free month's worth of hypodermic products as an inducement to choose Becton as their "primary" Disposable Hypodermic Product supplier.

66.    Many of Becton's competitors in the Disposable Hypodermic Product markets are smaller, specialized companies that sell fewer products, and in some instances, only a single product.  As a result, these competitors cannot profitably match Becton's structured offers across product lines (because the combined discounts on all of the products in Becton's bundle is in many cases greater than the entire price of a single product made by another manufacturer).  In certain cases, even if the competitor offered substantial discounts on Disposable Hypodermic Products (or indeed gave them away for free), it could not "replace" all the discounts and rebates that the buyer would "lose" as a penalty for rejecting Becton's bundle.

67.    As a result of the deliberately designed and structured choices Becton offered, competition from other manufacturers of Disposable Hypodermic Products was unlawfully reduced by, among other things, Becton's threat to Class members of losing

18

financial incentives, or the exclusionary sole source contracts entered into by GPOs. Accordingly, a substantial portion of the markets for Disposable Hypodermic Products have been foreclosed. The purpose of Becton's conduct has been to permit Becton to maintain its monopoly and/or market power, otherwise restrain trade by means other than full and fair competition, and to allow Becton to continue charging supra-competitive prices to Class members.

68. Contrary to Becton's representations that hospitals and other customers who purchased Becton's bundle would receive a financial benefit, in reality Becton's customers have actually paid more than they would have paid in the absence of Becton's unlawful conduct. The aggregated and combined market effect of the inducements described above has resulted in foreclosed competition, and correspondingly, higher prices for all purchasers. Because that market foreclosure has resulted from the collective effect of many individual purchasing decisions, no single customer or Class Member's response to the structured purchase options made available by Becton could have caused or prevented such foreclosure.

69. There are no significant offsetting, pro-competitive efficiencies created through Becton's use of predatory and exclusionary conduct. The rebates and pricing terms are not structured based solely upon the volume that a customer purchases, but rather upon the extent to which a hospital or other customer agrees not to purchase products from Becton's competitors.

19

## Becton's Use of Exclusionary Contracts to Restrain
## Trade from Competing Manufacturers

70.     Becton has used the exclusionary and predatory practices described above, including, on information and belief, bundled pricing and the offer of other similar financial incentives, to unfairly restrain and limit competition from competing manufacturers of Disposable Hypodermic Products.   Beginning in the 1970s and continuing into the mid-1980s, Becton began facing competition from Terumo, a Japanese company, which manufacturers certain disposable medical products, including disposable syringes and associated needles.  By 1988 Terumo had gained approximately 12% of the U.S. market for various Hypodermic Products, largely by selling its hypodermic products at prices that were approximately 20% to 40% below Becton's then-current prices.

71.     In response to the growing threat to its monopoly position posed by Terumo's price reductions, Becton undertook a program called "Block Terumo" which entailed the use of an aggressive strategy that included the bundled pricing and contracting strategies described above and other similar exclusionary and predatory sales tactics.  Following Becton's implementation of the "Block Terumo" strategy, Terumo's market share in the United States for the Disposable Hypodermic Products went from approximately 12% to approximately 1%.  In or about 1992, Terumo announced that it would no longer focus on selling hypodermic products to hospitals in the United States.

72.     Another competitive threat to Becton arose in the mid to late 1990s, following substantial growth in the demand for hypodermic products that would not pose a significant risk of needlestick injuries to medical personnel (i.e. safety hypodermic products).  One such company was Retractable Technologies.  RTI developed a syringe

20

with a retractable needle that was specifically designed to prevent needlestick injuries. RTI's devices represented a breakthrough in safety for healthcare providers and have been recognized as superior to other disposable syringe options (including syringes made by Becton) in clinical studies and by the Emergency Care Research Institute ("ECRI"), a respected, independent research organization.

73.     Concerned about the competitive threat posed by RTI's superior products, and the growing demand among hospitals and other healthcare providers for such products, Becton was faced with the choice of competing fairly with RTI on price and quality or to use anticompetitive tactics to maintain and extend its monopoly and market power in the markets for Disposable Hypodermic Products.   Becton chose the later of course, utilizing the bundled pricing and contracting strategies described above and other similar exclusionary and predatory sales tactics to foreclose competition from RTI. Becton's unlawful practices have had their desired effect of limiting competition from RTI by effectively preventing healthcare providers from in many cases even considering the purchase of RTI's products.

## DAMAGES

74.     During the relevant period, Plaintiff and the other Class members purchased Disposable Hypodermic Products from Becton in substantial amounts.  As a result of Becton's alleged illegal conduct, Class members were compelled to pay, and did pay, unlawfully inflated prices for Disposable Hypodermic Products they purchased.

75.     Plaintiff and the Class members would have been able to, *inter alia,* purchase less-expensive Disposable Hypodermic Products had competitors been able to enter the market without unlawful interference.  In addition, prices would have fallen by

21

an even greater amount had these competitors then been able to achieve economies of scale.

76.    The prices Plaintiff and the other Class members paid for Disposable Hypodermic Products during the Class Period were substantially greater than the prices Plaintiff and the Class members would have paid absent the illegal conduct alleged herein because: (1) the prices of all Disposable Hypodermic Products were artificially inflated by Becton's illegal conduct; (2) Class members were deprived of the opportunity to purchase competing Disposable Hypodermic Products, other than Becton's Disposable Hypodermic Products, and to purchase those competing products at substantially lower prices.   Paying these overcharges caused the Class members substantial losses and damage to their business and property.   The full amount, form and components of such damages will be determined after discovery and upon proof at trial.

77.    Becton's anticompetitive scheme also has had a negative effect on product innovation.   The unlawful barriers Becton created have diminished competitors' motivation to develop better, safer and less expensive products.   With little chance to successfully compete with Becton, there is little reason for a competitor to invest substantially in improving upon current technology.   Similarly, Becton has little reason to invest in innovation due to the competition it has foreclosed.   Accordingly, those who purchased Disposable Hypodermic Products, such as the hospitals and other healthcare providers that make up the Class, have been damaged by paying higher quality-adjusted prices for such products.

22

## CAUSES OF ACTION

### COUNT I

**Violations of Section 1 of the Sherman Act and Section 3 of the Clayton Act**

**Unreasonable Restraint of Trade**

78.    Plaintiff re-alleges paragraphs 1-77 as set forth above.

79.    Becton has market power in the markets for Disposable Syringes, Blood Collection Tubes, Blood Collection Tube Holders and IV Catheters.

80.    Becton has entered into agreements with GPOs, individual hospitals and other customers of these products where such contracts include terms providing for bundled financial incentives, exclusive dealing commitments, and other provisions that collectively or individually constitute unreasonable restraints of trade.

81.    These unreasonable restraints of trade have resulted in substantial harm to competition in the United States for Disposable Syringes, and Blood Collection Tube Holders, Blood Collection Tubes and IV Catheters.

82.    There are no legitimate business justifications for Becton's exclusionary and predatory conduct.  To the extent that there are any legitimate business reasons for Becton's restraints of trade, they are not the least restrictive means of achieving those business purposes.  Any claimed pro-competitive business reasons for Becton's restraints of trade are outweighed by the competitive harm that they have caused to competition in the relevant markets.

83.    As a result, Plaintiff and members of the Class were injured in their business or property by Defendant's restraint of trade in the relevant markets.  Plaintiff and the other members of the Class have been forced to pay higher prices for Disposable

Hypodermic Products in the relevant markets than they would have paid in the absence of Defendant's unlawful conduct.

**COUNT II**

Violation of Section 2 of the Sherman Act

Monopoly Maintenance

84.    Plaintiff re-alleges paragraphs 1-83 as set forth above.

85.    Becton possesses monopoly power in the Disposable Syringe and Blood Collection Tube and Blood Collection Tube Holder markets in the United States.

86.    Becton's conduct in maintaining and extending its monopoly power in the relevant U.S. markets constitutes unlawful monopolization in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

87.    Becton has willfully and unlawfully used exclusionary and predatory conduct, including, but not limited to, bundled pricing with the intent to foreclose competition, and exclusionary agreements, to maintain and preserve its monopoly power in the markets for Disposable Syringes, Blood Collection Tubes and Blood Collection Tube Holders.

88.    Becton has engaged in the alleged conduct for the specific anticompetitive purposes of foreclosing a substantial share of the Disposable Syringe and Blood Collection Tube and Blood Collection Tube Holder markets in the U.S., and maintaining its monopoly power in the Disposable Syringe, Blood Collection Tube and Blood Collection Tube Holder markets in the U.S.

89.    Becton has not maintained its monopoly power in the Disposable Syringe, Blood Collection Tube and Blood Collection Tube Holder markets as a consequence of

24

superior product offerings, good faith business acumen, or historical accident. Rather, Becton has employed a pattern of predatory and economically coercive practices to force customers to make purchasing decisions in a less than fully competitive market.

90.     There are no legitimate business justifications for Becton's exclusionary and predatory conduct. To the extent that Becton has sought to achieve any legitimate business purposes through its conduct, it has not used the least restrictive means of doing so. Moreover, any claimed pro-competitive benefit is outweighed by the anti-competitive harm.

91.     As a result, Plaintiff and other Class members were injured in their business or property by Defendant's monopolization of the relevant markets. Plaintiff and the other members of the Class have been forced to pay higher prices for Disposable Hypodermic Products in the relevant markets than they would have in the absence of Defendant's unlawful conduct.

### COUNT III

### Violation of Section 2 of the Sherman Act

### Attempted Monopolization

92.     Plaintiff re-alleges paragraphs 1-91 as set forth above.

93.     In the alternative, to the extent that Becton does not possess monopoly power in the Disposable Syringe, Blood Collection Tube and/or Blood Collection Tube Holder markets in the United States, it has unlawfully attempted to monopolize the markets for Disposable Syringes, Blood Collection Tubes and/or Blood Collection Tube Holders.

25

94.    Becton has willfully and unlawfully used exclusionary and predatory conduct, including, but not limited to, bundled pricing with the intent to foreclose competition, and exclusionary agreements, in an attempt to obtain monopoly power in the markets for Disposable Syringes, Blood Collection Tubes and/or Blood Collection Tube Holders.

95.    Becton had the specific intent to achieve its goal of obtaining monopoly power in the markets for Disposable Syringes, Blood Collection Tubes and/or Blood Collection Tube Holders, and engaged in the conduct alleged above the specific purpose of achieving those goals.

96.    There is a dangerous probability that if left unchecked, Becton will achieve its goals of obtaining monopoly power in the markets for Disposable Syringes, Blood Collection Tubes and/or Blood Collection Tube Holders.

97.    As a result of Becton's attempt to monopolize, Plaintiff and members of the Class were injured in their business or property by Defendant's attempted monopolization of the relevant markets.  Plaintiff and other Class members have been forced to pay higher prices for Disposable Hypodermic Products in the relevant markets than they would have paid in the absence of Defendant's unlawful conduct.

## COUNT IV

### State Antitrust Law Violations
### (Brought only by the Indirect Class)

98.    Plaintiff re-alleges paragraphs 1-97 as set forth above.

99.    The twenty five states and the District of Columbia that comprise the Class Jurisdictions permit suits by "indirect" purchasers.  These jurisdictions include: Alabama, Alabama, Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas,

Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

100.    Through the exclusionary and predatory conduct set forth above, Becton unreasonably restrained trade, willfully maintained and unlawfully exercised its monopoly power and/or market power, or attempted to acquire monopoly power in the relevant markets of each jurisdiction in violation of each jurisdiction's respective laws, thereby causing injury to indirect purchasers in each respective jurisdiction.

101.    Becton's conduct has and continues to have a substantial effect on commerce within each of these jurisdiction in which Plaintiff brings claims as an indirect purchaser.

102.    There is no legitimate business justification for the actions and conduct through which Becton unreasonably restrained trade, maintained its monopoly and/or market power or attempted to acquire monopoly power in the relevant markets.

103.    The anti-competitive effects of Becton's conduct far outweigh any conceivable pro-competitive benefits or justifications.

104.    Plaintiff and Class members were injured in their business or property by Becton's exclusionary and predatory conduct in the relevant markets. Without limiting the generality of the foregoing, Plaintiff and the Class members have been forced to pay higher prices for Disposable Hypodermic Products in the relevant markets than they would have paid in the absence of Becton's unlawful conduct.

## COUNT V

### Unjust Enrichment
### (Brought by All Classes)

105.    Plaintiff re-alleges paragraphs 1-104 as set forth above.

106.    Becton unreasonably restrained trade, willfully maintained and unlawfully exercised its monopoly power and/or market power, or attempted to acquire monopoly power in the relevant markets in each of the Class Jurisdictions in violation of that state's laws.

107.    As a result of Becton's anticompetitive scheme alleged herein, Plaintiff and the Class members paid too much for Becton Disposable Hypodermic Products. The payment of these "overcharges" represents an unjust benefit Plaintiff and Class members conferred upon Becton. Becton was unjustly enriched by these illegal overcharges and equity requires disgorgement to prevent Becton from benefiting from its illegal acts.

108.    Plaintiff and Class members were injured by Becton's conduct and seek an order directing Becton to return the benefit Becton unjustly procured, received, and retained.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully requests that:

(i)     The Court determine that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23, be given to the Class;

28

(ii)    The acts alleged herein be adjudged and decreed to be unlawful acts in

violation of Sections 1 and 2 of the Sherman Act, Sections 3 and 16 of the

Clayton Act and/or alternatively, the laws of the various states;

(iii)    The Class be granted structural, prospective relief to promote competition,

and any other appropriate relief as may be determined to be just, equitable,

and proper by this Court;

(iv)    Each member of the Class recover three-fold the damages (or the

maximum amount of damages available under applicable law) determined

to have been sustained by each of them, and that judgment be entered

against Defendant in favor of the Class;

(v)    The Class recover its costs of suit, including reasonable attorneys' fees and

costs as provided by law; and

(vi)    The Court determine that Becton has been unjustly enriched by their

illegal, unfair or deceptive acts, unfair competition, and restraint of trade,

and award restitution to Plaintiff and the Class; and

(vii)    The Class be granted any other appropriate relief as may be determined to

be just, equitable, and proper by this Court.

29

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated: March 26, 2007

Respectfully submitted,

**ABBEY SPANIER RODD
ABRAMS & PARADIS, LLP**

By: _____
Arthur N. Abbey
Paul O. Paradis (PP 9335)
Gina M. Tufaro (GT 5419)
212 East 39th Street
New York, New York 10016
Telephone: (212) 889-3700
Facsimile:  (212) 684-5191

Herbert J. Stern
Joel M. Silverstein
**STERN & KILCULLEN, LLC**
75 Livingston Avenue
Roseland, New Jersey
Telephone: (973) 535-1900
Facsimile:  (973) 535-9664

Kenneth Wexler
**WEXLER TORISEVA
WALLACE, LLP**
One North LaSalle Street
Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Joseph P. Guglielmo
**WHATLEY DRAKE &
KALLAS, LLC**
1540 Broadway, 37th Floor
New York, New York 10036
Telephone: (212) 447-7007
Facsimile: (212) 447-7077

30