# EXHIBIT K

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

In re HYPODERMIC PRODUCTS
ANTITRUST LITIGATION

This Document Relates to:

MEDSTAR HEALTH, INC., *et al.*,


                    Plaintiffs,


            v.


BECTON DICKINSON & COMPANY,


                    Defendant.

Civil Action No. 05-CV-1602
(JLL)(CCC)
MDL No. 1730


Civil Action No. 06-CV-03258



ORAL ARGUMENT REQUESTED

MEMORANDUM OF LAW IN SUPPORT OF MEDSTAR'S
MOTION FOR PARTIAL SUMMARY JUDGMENT THAT IT IS A
DIRECT PURCHASER UNDER SECTION 4 OF THE CLAYTON ACT

## TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................1

II.  STATEMENT OF MATERIAL FACTS NOT IN DISPUTE .......................2
     A.   Parties ..........................................................................................2
     B.   The Contracts ...............................................................................4
          1.   Becton's Contracts to Sell its Disposable Hypodermic
               Products.............................................................................6
          2.   Distribution Contracts to Deliver Becton's Disposable
               Hypodermic Products to Becton's Customers Like
               MedStar .............................................................................8

III. THE COURT SHOULD GRANT SUMMARY JUDGMENT
     FINDING THAT MEDSTAR IS A PROPER PARTY TO SEEK
     OVERCHARGE DAMAGES FOR BECTON'S  VIOLATION OF
     THE FEDERAL ANTITRUST LAWS ......................................................10
     A.   The Plain Meaning of the Relevant Contracts Establishes that
          MedStar is a Direct Purchaser of Disposable Hypodermic
          Products from Becton.....................................................................12
     B.   This Court Also Uses an Economic Substance Test to
          Determine Which Party is the Direct Purchaser .................................14
          1.   *Mercedes-Benz* Provides the Legal Framework for
               Examining the Economic Substance of the Transactions
               between MedStar and Becton .................................................17
          2.   MedStar Interacts Directly with Becton to Set the
               Economic Terms for the Purchase of Becton's
               Disposable Hypodermic Products...........................................20
          3.   The Servicing Agent's Role in Delivering Becton's
               Disposable Hypodermic Products to MedStar is
               Subordinate to a Preceding Contract to Purchase Those
               Products Between MedStar and Becton.....................................23

4.    MedStar's Harm is not Derivative Because it Arises
      Directly Out of Its Purchases of Disposable Hypodermic
      Products from Becton ...............................................................25

IV.   CONCLUSION.................................................................................26

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Day v. Taylor*, 400 F.3d 1272 (11th Cir. 2005) ............................................... 14

*Diskin v. Daily Racing Form, Inc.*, No. 92 Civ. 6347, 1993 WL
   149069 (S.D.N.Y. May 4, 1993) ................................................................ 15

*Diskin v. Daily Racing Form, Inc.*, No. 92 Civ. 6347, 1994 WL
   330229 (S.D.N.Y. July 7, 1994) ......................................................... 16, 20

*Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d
   425 (3d Cir. 1993) .................................................................................. 17

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968) ....... 11

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363
   (3d Cir. 2005) .................................................................................... 15, 19

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) .................................. 11, 15

*Kansas v. Utilicorp United, Inc.*, 497 U.S. 199 (1990) ............................... 11

*Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002) ............ 20

*In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d 355 (D.N.J.
   2001) ....................................................................................................... 15

*In re Mercedes-Benz Anti-Trust Litig.*, 364 F. Supp. 2d 468 (D.N.J.
   2005) .................................................................................................passim

*Mid-West Paper Prods. Co. v. Continental Group, Inc.*, 596 F.2d 573
   (3d Cir. 1979) ......................................................................................... 11

*In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493
   (S.D.N.Y. 1996) ...................................................................................... 20

*Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215 (8th Cir. 1987) ...................... 14

iii

*Simpson v. Union Oil Co. of Cal.*, 377 U.S. 13 (1964) ...........................14, 15

*Sitkin Smelting & Ref. Co. v. FMC Corp.*, 575 F.2d 440 (3d Cir. 1978) ......15

*United States v. Gen. Elec. Co.*, 272 U.S. 476 (1926)............................14, 15

## MISCELLANEOUS

Restatement (Second) of Agency § 14J.......................................................16

## I.   **INTRODUCTION**

The Court has invited the parties to file motions regarding their status as direct purchasers able to recover overcharge damages from an antitrust violator under Section 4 of the Clayton Act. Thus, MedStar Health, Inc. ("MedStar") brings this motion for partial summary judgment to establish that MedStar is a direct purchaser of safety and non-safety versions of disposable hypodermic needles and syringes, IV catheters and blood collection devices (collectively "Disposable Hypodermic Products") from Defendant Becton Dickinson & Company ("Becton").

The plain meaning of the contracts under which MedStar buys Becton's Disposable Hypodermic Products shows that MedStar *buys* Disposable Hypodermic Products *directly* from Becton. These "Net Dealer Acquisition" contracts specify the products to be sold and the price at which Becton will sell them to MedStar. They also require both MedStar and Becton to designate a distributor that will serve as a servicing agent and deliver the products. After the servicing agent (distributor) is designated, it accepts MedStar's orders, delivers the product, and invoices MedStar on behalf of Becton. The servicing agent receives a separately negotiated brokerage fee for these services.

In addition to the plain meaning of these contracts, an analysis of the economic substance of MedStar's purchases establishes that MedStar is a direct

purchaser of Becton Disposable Hypodermic Products. Therefore, the Court should grant MedStar's motion for partial summary judgment and enter a finding that MedStar is a proper party to prosecute and collect a claim for overcharge damages under Section 4 of the Clayton Act for its purchases of Disposable Hypodermic Products.

## II.   STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

The following material facts are not in dispute:

### A.   Parties

The vast majority of hospitals in the United States procure Disposable Hypodermic Products under contracts negotiated by Group Purchasing Organizations ("GPOs").[1] GPOs negotiate contracts with healthcare suppliers like Becton on behalf of their member hospitals. While GPOs act as purchasing agents, it is their individual member hospitals who buy products from Becton, which are then delivered by a servicing agent. Thus, four participants are involved in MedStar's purchases of Disposable Hypodermic Products from Becton: (1) the healthcare provider, MedStar,[2] (2) the GPO, Novation, LLC ("Novation"),[3] (3) the

---

[1] Becton defines GPO as a "Group organization that consists of numerous member institutions and is responsible for negotiating pricing agreements for their members." Ex. 4, Contract Management Operating Guide, BDAF-00673235, 474-76, at BDAF-00673475.

[2] MedStar operates a system of acute care hospitals, surgery centers, rehabilitation centers and other healthcare providers serving the Washington-Baltimore metro

2

Disposable Hypodermic Products manufacturer, Becton,[4] and (4) the servicing

agent, Cardinal Health, Inc. and its subsidiary Allegiance Corporation (collectively

"Cardinal").[5]  Each of these parties has contracts governing its respective role in

this distribution scheme.

    MedStar, Novation and Becton enter into agreements for the sale of

Disposable Hypodermic Products by Becton to MedStar.  Further, MedStar,

Novation and Becton also enter into agreements with Cardinal for the delivery of

these products to MedStar.  Although Becton's distribution system includes

different contracts among four participants, its substance is straightforward:

---

area.  MedStar purchased Becton's Disposable Hypodermic Products for use in its
facilities as a Novation member since at least 2001.  *See, e.g.*, Ex. 1-F, Ex. 2-F,
Supplier Agreement between Novation, LLC and Becton, Dickinson and Company
("2000 Becton-Novation contract"), VHA015511-600.

[3] Novation acts as the contracting services company for the members, associates
and affiliates of VHA, Inc. ("VHA") and University HealthSystem Consortium
("UHC") (collectively "Novation members") to help them manage and reduce
supply costs.  Novation Home Page, http://www.novationco.com/about/default.asp.

[4] Becton is a hypodermic product manufacturer.  Its products include various
disposable syringes and needles, blood collection devices, blood collection tubes,
blood collection tube holders, and IV catheters and needles.  (MedStar Second
Amended Complaint ¶¶ 15, 25-46, July 28, 2006.)

[5] Cardinal delivers a broad range of medical and laboratory products to MedStar,
including Becton's Disposable Hypodermic Products.  Becton defines distributors
as "Agents of BD who receive and ship orders to end users." Ex. 4, at BDAF-
00673474.  End-users are defined as "Hospital, Laboratory, University, Group or
other type of medical facility who purchases BD products."  *Id.* at BDAF-
00673475.

MedStar purchases Disposable Hypodermic Products from Becton that are delivered by Cardinal.

## B.    The Contracts

Becton's contracts with Novation for the purchase of Disposable Hypodermic Products are Net Dealer Acquisition contracts[6] and, as reflected in Becton's data, nearly all of MedStar's Disposable Hypodermic Product purchases were made under Net Dealer Acquisition contracts.[7]

Net Dealer Acquisition contracts are rebated agreements.  This means that once a servicing agent delivers a product, the servicing agent sends a rebate request to Becton, which then pays the servicing agent the difference between the price at

---

[6] In a Net Dealer Acquisition contract, the end-user (MedStar) negotiates a contract price with Becton that does not include a brokerage fee for the servicing agent. Upon acceptance of pricing by the end-user, the end-user selects a Becton-authorized servicing agent to service the purchase contract, after which Becton sends that servicing agent a letter informing it of the contract's terms and conditions.  The end-user negotiates with the servicing agent to determine the delivery fee.  Ex. 5, Contracting Pricing and Membership Policy, BDAF-00021017-35, at BDAF-00021028; *see also* Ex. 6, BD Medical Contract Guidelines, BDAF-00333545-642, at BDAF-00333549; Ex. 7, BD Field Guide Pricing and Contracting, BDAF-00739371-400, at BDAF-00739380; Ex. 8, Hospital/Medical Customer Price Agreement, BDAF-00362251-55, at BDAF-00362255; Ex. 9, Contract/Rebate Profile, BDAF-00752194-244, at BDAF-00752197-98.

[7] *See* Ex. 10, Letter from Berit A. Winge to W. Eric Pilsk (Oct. 19, 2006) (enclosing Becton's AS400 and SAP data); Ex. 11, Letter from Jacqueline P. Rubin to Peter Kohn (Dec. 29, 2006) (enclosing CD with Becton's SAP data from Jan. to June 2003); Ex. 12, Letter from Jacqueline P. Rubin to W. Eric Pilsk (Feb. 9, 2007).

which Becton agreed to sell the product to its customer and the *higher price* the servicing agent was invoiced for the Disposable Hypodermic Product.[8]

After signing a Net Dealer Acquisition contract similar to the 2000 Becton-Novation contract,[9] Becton notifies the servicing agent of the individual healthcare facilities (such as MedStar) buying under the contract, the products sold under the contract and the prices of those products.[10] To service a Net Dealer Acquisition contract, a servicing agent keeps Becton Disposable Hypodermic Products in its warehouse.[11] The title of the product, however, passes directly from Becton to the healthcare provider customer once the servicing agent receives an order for the product from the healthcare provider.[12]

---

[8] *See, e.g.*, Ex. 5, at BDAF-00021028. Some servicing agents may self-deduct their rebates "from their payment prior to BD's calculation of the rebate credit due," while others "will not deduct from payment without credit." Ex. 9, at BDAF-00752199.

[9] *See, e.g.*, Ex. 1-F, Ex. 2-F, 2000 Becton-Novation contract, at VHA015511-600.

[10] "Each contract will generally have BD specified Contract Membership Lists, specific products and prices, different pricing tiers, etc. all which must be effectively communicated to the end user and dealer servicing the contract." Ex. 9, at BDAF-00752209.

[11] *See generally* Ex. 1-F, Ex. 2-F, 2000 Becton-Novation contract, ¶ 4(b), at VHA015518 (Product Fill Rates).

### 1.    Becton's Contracts to Sell its Disposable Hypodermic Products

Novation, on behalf of its members, entered into a contract for Disposable Hypodermic Products with Becton in 2000 ("2000 Becton-Novation contract").[13] Novation and Becton signed similar agreements in 2003 and 2006.[14]  MedStar, as a VHA/Novation member since 2001, participates in the contracts negotiated by Novation on its behalf.[15]  Since 2001, MedStar has committed to purchase (i.e., entered into agreements with Becton) Disposable Hypodermic Products at the prices, terms and conditions set forth in the Becton-Novation contracts.[16]

---

[12] See, e.g., Ex. 1-K, Ex. 2-C, BDHS Dealer Notification, BDAF-00522903-04, 12, at BDAF-00522904.

[13] Ex. 1-F, Ex. 2-F, 2000 Becton-Novation contract, at VHA015511-600.

[14] Ex. 1-H, Ex. 2-G, 2003 Supplier Agreement between Novation, LLC and Becton, Dickinson ("2003 Becton-Novation contract"), BDAF-00935240-90; Ex. 13, 2006 Product Supplier Agreement between Novation, LLC and Becton, Dickinson and Company ("2006 Becton-Novation contract"), BDLWD 00043009-29.

[15] Ex. 3, Declaration of Erin Germann ("Germann Decl.") ¶ 6 (Director of Supply Chain Operations at MedStar); Ex. 1-B, MedStar Health/VHA Inc. Agreement, MDSTR001365-70. MedStar renewed its agreement with VHA in 2003. Ex. 1-C, Patronage Agreement, MDSTR001220-23. Prior to becoming a Novation member, MedStar purchased Becton's products under a Premier contract. See Ex. 14, Letter from John P. McDaniel, MedStar CEO, to Richard A. Norling, Premier CEO (Oct. 26, 2000), MDSTR001364.

[16] Ex. 3, Germann Decl. ¶ 6; Ex. 1-D, Letter of Commitment, Acute Care Program, BDAF-00119524-27, at BDAF-00119524 ("This Letter of Commitment provides the undersigned member of VHA or UHC participation in the Tier 2 committed pricing structure, terms and conditions set forth by Novation and Becton

The 2000 Becton-Novation contract designates Becton as the "Supplier" of
Disposable Hypodermic Products to Novation members.[17]  Under the 2000 Becton-
Novation contract, Becton has the following obligations:  (1) notifying the
servicing agents of any changes in product prices,[18] (2) keeping the product prices
competitive,[19] (3) delivering Disposable Hypodermic Products to servicing agents
for purchase by healthcare providers,[20] and (4) accepting returned products.[21]  The
2000 Becton-Novation contract also states that Novation or its members have

---

Dickinson."); Ex. 1-E, Letter of Participation, Becton Dickinson Standard Needles
and Syringes, MDSTR000135-37, at MDSTR000135.

[17] Ex. 1-F, Ex. 2-F, 2000 Becton-Novation contract, ¶ 1(c), at VHA015515
("Supplier.  Supplier is the manufacturer of products listed on Exhibit A, the
provider of installation, training and maintenance services for such products, and
the provider of any other services listed on Exhibit A.").

[18] *Id.* ¶ 2(e), at VHA015516-17 ("Notification of Changes in Pricing Terms.
Supplier will provide not less than sixty (60) days' prior written notice to Novation
and not less than forty-five (45) days' prior written notice to all Authorized
Distributors of any change in pricing terms permitted or required by this
Agreement.").

[19] *Id.* ¶ 2(c), at VHA015516 ("Market Competitive Terms.  Supplier agrees that the
prices, quality, value and technology of all Products purchased under this
Agreement will remain market competitive at all times during the Term . . .
Supplier will lower the Award Prices or increase any discount applicable to the
purchase of the Products as necessary to assure market competitiveness.").

[20] *Id.* ¶ 4(a), at VHA015518, VHA015575 ("Delivery and Invoicing.  Supplier
agrees to deliver Products ordered by the Authorized Distributors on behalf of
Members to the Authorized Distributors, FOB shipping point, and will direct its
invoices to the Authorized Distributors in accordance with this Agreement.").

7

contracted with certain third-party servicing agents that agreed to deliver Becton's
Disposable Hypodermic Products to Novation members.[22]

### 2. Distribution Contracts to Deliver Becton's Disposable Hypodermic Products to Becton's Customers Like MedStar

Novation entered into an umbrella distribution contract with Cardinal in
2000, whereby Cardinal provides delivery services to Novation members,
including MedStar.[23] This contract provides, among other things, that Novation
enters into contracts with individual manufacturers "who agree to sell Contract
Products or Private Label Products *to Members through distributors.*"[24] Under the
terms of the contract, the servicing agents (distributors) cannot substitute contract

---

[21] *Id.* ¶ 4(h), at VHA015519 ("Return of Products. Any Member or Authorized
Distributor . . . will have the right to return Products to Supplier under any of the
following circumstances . . .").

[22] *Id.* ¶ 1(b), at VHA015515 (defining "Authorized Distributors").

[23] Ex. 1-I, Ex. 2-M, Authorized Distributor Agreement between Novation, LLC
and Allegiance Healthcare, VHA051215-314; Ex. 15, Medical-Surgical
Distribution, VHA051126-214.

[24] *Id.* ¶ 1(d), at VHA051220 (emphasis added).

products or private label products without the consent of Novation members.[25]

MedStar chose Cardinal as its servicing agent for Becton-Novation contracts.[26]

After Becton is notified of MedStar's level of commitment and both Becton

and the servicing agent have been notified of MedStar's choice of servicing agent,

Becton sends the servicing agent a "Dealer Notification,"[27] that states in part:

> We offer your firm the opportunity to act as a *servicing agent (Distributor)* for Becton-Dickinson (BD) under that contract. Pursuant to the supply contract, you will deliver from time to time for BD's account (title to pass to BD upon shipment) the goods set out in that contract.[28]

---

[25] *Id.* ¶ 4(i), at VHA051224 ("Product Substitution. Authorized Distributor will have no unilateral right to substitute other products for any of the Contract Products or Private Label Products ordered by Participating Members . . . . Under no circumstances will any substitution for a Contract Product or Private Label Product be permitted without the Participating Member's agreement to the substitution prior to shipment.").

[26] *See* Ex. 1-J, Ex. 2-L, AD Selection Form, Medical Surgical Distribution, MDSTR001013-28, at MDSTR001013; Ex. 16, AD Selection Form, Medical Surgical Distribution, MDSTR000955-58, at MDSTR000955. MedStar also entered into a separate contract with Cardinal for delivery of healthcare supplies. Ex. 1-G, Ex. 2-I, MedStar Health and Cardinal Health Corporate Agreement, MDSTR001050-130.

[27] Becton defines a Dealer Notification as a "form used to notify dealers of contract pricing negotiated with a specific end user or group." Ex. 4, at BDAF-00673474. Becton's customary business practice is to send the servicing agent a Dealer Notification informing the servicing agent of the agreement terms and conditions under which MedStar is making its purchases. *See, e.g.*, Ex. 8, at BDAF-00362255; Ex. 9, at BDAF-00752197-98.

[28] *See, e.g.*, Ex. 1-K, Ex. 2-C, at BDAF-00522903-04, 12 (emphasis added) (Dealer Notification sent to Cardinal for Novation Contract ID No. 500057 listing MedStar affiliate Georgetown University Hospital on the Authorized Contract Membership

The terms of the Dealer Notification control the transactions between Becton and Cardinal for MedStar's purchases.[29]

Once the servicing agent, *i.e.*, Cardinal, is appointed, MedStar then contacts it to order Becton products. Ordering is electronic, and Cardinal loads the agreed-upon product price schedule and product list into its computer system.[30] Next, Cardinal delivers those products at the Becton-provided product price and also charges MedStar a separately negotiated delivery fee.[31]

## III. THE COURT SHOULD GRANT SUMMARY JUDGMENT FINDING THAT MEDSTAR IS A PROPER PARTY TO SEEK OVERCHARGE DAMAGES FOR BECTON'S VIOLATION OF THE FEDERAL ANTITRUST LAWS

MedStar is a proper party under the Clayton Act to seek overcharge damages from Becton and summary judgment on that point is warranted at this time.

Section 4 of the Clayton Act authorizes private parties, such as MedStar, to sue for

---

List). This notification includes the Novation contract identification number so that Cardinal knows what product price to invoice MedStar facilities. *See also* Ex. 17, BD Dealer Notification, BDAF-00523449-50 (Novation Contract ID Nos. 500294, 500295, 500297, and 500451); Ex. 18, BDHS Dealer Notification, BDAF-00527504-05, at BDAF-00527505.

[29] *See, e.g.*, Ex. 19, Letter from Keith Zyla, Becton Distributor Analyst, to Ann Marie Johnson, The Claflin Co. V.P. of Administration, BDAF-00371350 (letter from Becton to distributor stating that the Becton-distributor "relationship is based on the language in the dealer notification form.").

[30] Ex. 3, Germann Decl. ¶ 9.

[31] Ex. 3, Germann Decl. ¶ 10.

treble damages to remedy federal antitrust violations.[32]  Section 4 has been

interpreted to permit only a person who purchases products directly from the

antitrust violator to assert such claims.[33]  In this case, the named Distributor

Plaintiffs and MedStar have both sued Becton to recover overcharge damages

resulting from Becton's alleged violations of the federal antitrust laws.

The undisputed facts, however, establish that both the contracts themselves,

and the economic substance of MedStar's interaction with Becton, make MedStar a

direct purchaser of Disposable Hypodermic Products from Becton.  Moreover,

because Becton's anticompetitive activity that is the focus of this case (*i.e.*,

bundled discounts conditioned on a healthcare provider's commitment to buy

hypodermic products from Becton) was directly aimed at MedStar and other

similarly situated buyers, and not the servicing agents, MedStar, and not the

---

[32] In addition to Section 4 authorizing damages suits, Section 16 of the Clayton Act
authorizes private parties to seek injunctive relief to remedy such violations.  No
dispute exists here that MedStar could obtain injunctive relief under Section 16 of
the Clayton Act even if it were deemed to be an indirect purchaser.  *See Mid-West
Paper Prods. Co. v. Continental Group, Inc.*, 596 F.2d 573, 594 (3d Cir. 1979).

[33] *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 729 (1977) (declining "to abandon the
construction given s 4 in Hanover Shoe that the overcharged direct purchaser, and
not others in the chain of manufacture or distribution" has a claim for federal
damages); *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 494
(1968).  The Supreme Court has observed that indirect purchasers "are not the
immediate buyers from the alleged antitrust violators." *Kansas v. Utilicorp
United, Inc.*, 497 U.S. 199, 207 (1990).

servicing agent, is the appropriate party to recover for any product overcharge that resulted from that anticompetitive conduct.

A.   **The Plain Meaning of the Relevant Contracts Establishes that MedStar is a Direct Purchaser of Disposable Hypodermic Products from Becton**

In the typical case, no dispute exists as to who is the direct purchaser entitled to recover overcharge damages under Section 4 of the Clayton Act.  Given the contracts under which MedStar purchases Becton's Disposable Hypodermic Products, no real dispute should exist here — MedStar is the direct purchaser. MedStar's purchases of Disposable Hypodermic Products are made pursuant to contracts between MedStar, as negotiated by its purchasing agent Novation, and Becton.[34]  The price of the relevant products is governed by these contracts.[35] MedStar and Becton further agree to specific pricing and volume commitments (*i.e.*, selecting Tier 1 or Tier 2 pricing).[36]  The servicing agent is not party to these contracts, but instead is notified of the agreed upon products and prices only after

---

[34] Ex. 1-F, Ex. 2-F, 2000 Becton-Novation contract; Ex. 1-H, Ex. 2-G, 2003 Becton-Novation contract; Ex. 13, 2006 Becton-Novation contract.

[35] Ex. 1-F, Ex. 2-F, 2000 Becton-Novation contract, at VHA015532; Ex. 1-H, Ex. 2-G, 2003 Becton-Novation contract; Ex. XX, 2006 Becton-Novation contract. These agreements contain a "listing of Products and pricing therefore ('Award Prices') attached hereto as Exhibit A."  The price lists specify the exact price at which Novation members such as MedStar may purchase Becton's products.

[36] *See, e.g.*, Ex. 1-D, at BDAF-00119524; Ex. 1-F, Ex. 2-F, 2000 Becton-Novation contract, ¶¶ 2.c. and e., at VHA015516-17.

12

MedStar and Becton's contracting is complete.[37]   MedStar purchases Disposable

Hypodermic Products under these contracts with Becton.[38]   Moreover, the

anticompetitive harm at issue in this case stems from the collective effect of these

types of contracts with Becton.[39]

MedStar's contracts with Becton provide that the product will be delivered

to MedStar by a servicing agent.[40]   The servicing agent accepts orders from

MedStar as if they are orders to purchase from Becton, delivers the product to

MedStar and invoices MedStar on behalf of Becton.[41]   Moreover, MedStar receives

title to the product from Becton.[42]   The servicing agent cannot vary the contract

price paid by MedStar for its purchases of Disposable Hypodermic Products under

the Becton-Novation contracts and cannot substitute other products without

---

[37] Ex. 1-D, at BDAF-00119525-26; *see also* Ex. 1-K, Ex. 2-C, at BDAF-00522903-04.

[38] Ex. 3, Germann Decl. ¶ 6.

[39] The tiered pricing structure is set pursuant to agreements between Novation and Becton, as well as commitment letters between MedStar and Becton, and is enforced by Becton. *See, e.g.*, Ex. 1-D, at BDAF-00119524; Ex. 1-F, Ex. 2-F, 2000 Becton-Novation contract, ¶¶ 2.c and e., at VHA015516-17.

[40] Ex. 1-F, Ex. 2-F, 2000 Becton-Novation contract, ¶ 1.b., at VHA015515.

[41] *See, e.g.*, Ex. 1-K, Ex. 2-C, at BDAF-00522903-04, 12 ("You are to regard orders from the Customer as purchase orders from BD.  Upon your acceptance of the order, you are instructed to ship the designated goods within 3-6 days and invoice the customer on behalf of BD.").

[42] *Id.*

13

MedStar's permission.[43]  Indeed, Becton is responsible for providing current pricing to the servicing agents to ensure that MedStar is charged the price upon which Becton and MedStar have previously agreed.[44]  Although these contracts acknowledge that the Disposable Hypodermic Products purchased by MedStar will be physically delivered by servicing agents, MedStar is the direct purchaser of these products from Becton.[45]

**B.  This Court Also Uses an Economic Substance Test to Determine Which Party is the Direct Purchaser**

Where the identity of the direct purchaser is disputed in good faith by the parties, both this Court and the Third Circuit have held that a court should analyze the "economic substance" of the transactions among the antitrust violator, the

---

[43] *Id.*; Ex. 1-I, Ex. 2-M ¶ 4(i), at VHA051224.

[44] Ex. 1-F, Ex. 2-F, 2000 Becton-Novation contract, ¶ 2.e., at VHA015516-17.

[45] Becton's structuring of an agency relationship with the servicing agents who service its Net Dealer Acquisition and other similar contracts with its customers like MedStar, represents a purposeful attempt to ensure that its distribution method is not *per se* unlawful. *See e.g.*, *United States v. Gen. Elec. Co.*, 272 U.S. 476, 488 (1926); *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005).  This reinforces the conclusion that MedStar is a direct purchaser of Becton's Disposable Hypodermic Products purchased pursuant to Net Dealer Acquisition contracts.  Moreover, the product price at which MedStar buys from Becton has already been set, and the servicing agents have no ability to sell to MedStar at a lower price.  As a result, if the servicing agents were to be deemed direct purchasers for purchases under Net Dealer Acquisition contracts as they apparently claim to be, both the servicing agents and Becton would be liable for resale price maintenance.  *See, e.g.*, *Simpson v. Union Oil Co. of Cal.*, 377 U.S. 13, 21-22 (1964); *Ryko Mfg. Co. v. Eden Servs.*,

plaintiff, and any other parties involved in the distribution of the products at issue to determine which party is the direct purchaser.[46] *See, e.g., Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 373 (3d Cir. 2005); *In re Mercedes-Benz Anti-Trust Litig.*, 364 F. Supp. 2d 468, 481 (D.N.J. 2005).

Under the economic substance test, this Court has recognized that a transaction involving a seller alleged to have violated the antitrust laws, an intermediary and a sale to an end-user may be treated as a single sale transaction between the seller and the end-user.[47] *Mercedes-Benz*, 157 F. Supp. 2d at 366 ("no

---

823 F.2d 1215, 1222 (8th Cir. 1987); *Sitkin Smelting & Ref. Co. v. FMC Corp.*, 575 F.2d 440, 446 (3d Cir. 1978).

[46] Becton agrees that cases such as *Dentsply* and *Mercedes-Benz* "instruct this Court to examine the economic substance of the transactions." Tr. of Status Conference before the Hon. Ronald Hedges, at 38 (Jan. 31, 2007); *see also id.* at 31. Indeed, because the analysis is factual, this and other courts have held that it is appropriate to determine the issue after an opportunity for discovery. *See, e.g., In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d 355, 367 (D.N.J. 2001) (denying defendants' motion to dismiss for lack of direct purchaser standing and noting that "[o]bviously, when the facts are developed and a record exists upon which the Court may rule, defendants may renew their *Illinois Brick* argument"); *Diskin v. Daily Racing Form, Inc.*, No. 92 Civ. 6347, 1993 WL 149069, at *2 (S.D.N.Y. May 4, 1993) ("the 'indirect purchaser' rule is normally appropriate only as the basis of a motion for summary judgment, not a motion to dismiss"); *see also Illinois Brick*, 431 U.S. at 727 (involving a motion for summary judgment).

[47] The conclusion that the economic substance of a transaction facilitated by a third party may be that of one sale directly from the manufacturer to the customer is neither novel nor unique. For over eighty years, courts have addressed the question of whether a distributor is acting merely as an agent facilitating a sale between two other parties. *See, e.g., Simpson*, 377 U.S. 13; *Gen. Elec. Co.*, 272 U.S. 476. Although this issue first arose in resale price maintenance cases, a

15

indirect purchaser problem exists . . . where an [intermediary] does not function as an independent entity in the chain of distribution"). This Court's analysis is consistent with principles of agency law, accounting and economics. Specifically, accountants must determine whether a distributor is acting as an agent or as a principal to determine how to account for revenues received.[48] *Cf.* RESTATEMENT (SECOND) OF AGENCY § 14J. Similarly, economists who study firms, markets and competition analyze the economic substance of market transactions to understand why firms act in certain ways. That analysis includes understanding and making economic sense of contractual relationships between parties in a distribution system.[49]

---

similar analysis has been applied to the *Illinois Brick* direct purchaser issue. *Diskin v. Daily Racing Form, Inc.*, No. 92 Civ. 6347, 1994 WL 330229 (S.D.N.Y. July 7, 1994) (applying resale price maintenance agency analysis to direct purchaser question).

[48] Quentin L. Mimms, an accountant familiar with EITF No. 99-19 (Emerging Issues Task Force ("EITF") Issue No. 99-19, titled *Reporting Revenue Gross as a Principal versus Net as an Agent*), analyzed the contracts related to MedStar's purchases of Becton Disposable Hypodermic Products and concluded that "the role of Distributors in regard to sales of the Disposable Hypodermic Products to MedStar under what Becton describes as a Net Dealer Acquisition Contract represents that of an agent of Becton, and not that of a principal." Ex. 2, Declaration of Quentin L. Mimms ("Mimms Decl.") ¶¶ 9, 35. Courts deciding whether an entity is an agent or buyer rely on many of the same factors listed in the EITF. *See, e.g.*, RESTATEMENT (SECOND) OF AGENCY § 14J.

[49] Analyzing the contracts between Becton, MedStar, Novation and Cardinal using those economic principles, Fiona Scott Morton, a Professor of Economics at the Yale School of Management with experience applying those principles, concluded

16

1.   *Mercedes-Benz* **Provides the Legal Framework for**
     **Examining the Economic Substance of the Transactions**
     **between MedStar and Becton**

The *Mercedes-Benz* court addressed when a customer who deals directly

with the antitrust violator, but who acquires use of the goods through a separate

transaction with a third party, is a direct purchaser from the antitrust violator. 364

F. Supp. 2d at 468. *Mercedes-Benz* involved antitrust claims brought by car

lessees against car dealers. The dealer defendants moved for summary judgment

on the grounds that the cars being leased had been sold by the car dealers to a

leasing company. The dealers argued that the lessees, who leased the cars from the

third-party leasing company, were at best indirect purchasers from the dealers, and

that their direct claims were barred by *Illinois Brick*. *Id.* at 477.

This Court recognized that Third Circuit precedent "require[s] that district

courts look beyond a limited definition of direct purchaser to other facts that are

suggestive of purchaser status." *Mercedes-Benz*, 364 F. Supp. 2d at 481 (citing

*Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425 (3d Cir.

1993)). This Court found that under the lease arrangement, the lessee and dealer

---

that "MedStar performs the economic functions of a buyer of [Disposable
Hypodermic Products] from Becton, and Becton performs the economic functions
of the seller of these products to MedStar." Ex. 1, Declaration of Fiona Scott
Morton ("Scott Morton Decl.") p. 9. Professor Scott Morton further concluded that
"[w]hile Distributors facilitate the supply of hypodermic products to MedStar, they

17

negotiated the terms of the lease and subsequently submitted the lease to a third-party leasing company for acceptance. *Id.* at 472. The leasing company then paid the dealer the purchase price of the vehicle and the lessee paid the leasing company monthly lease payments for the use of the vehicle for a certain term. *Id.* at 471. The lessee plaintiffs argued that they were direct purchasers, and this Court agreed that their claims were not subject to the *Illinois Brick* indirect purchaser bar. *Id.* at 482.[50]

This Court concluded that the lessees were direct purchasers under the economic substance test because "the interaction between the lessees and the dealer defendants closely resembled that which occurs in a sales transaction," because "[t]he lessees and the dealers negotiated the terms of the transaction, including . . . purchase price," and because the lessees "had no interaction with the

---

sell logistics and related services to MedStar, not Becton's hypodermic products." *Id.*

[50] The fact that the lessees merely leased the car and never technically purchased the vehicle was not significant. The court treated the lessees as if they were purchasers (deciding only if they were direct or indirect purchasers) because "[t]here is no substantive difference regarding the negotiation of a price between a customer who wants to finance the purchase of a vehicle and a customer who wants to lease a vehicle." *Mercedes-Benz*, 364 F. Supp. 2d at 474.

18

leasing companies [the parties who the defendants claimed to be the direct purchaser] until after the deal was consummated."[51] *Id.* at 481.

In applying the economic substance test, the *Mercedes-Benz* court looked at the following factors: (1) whether the plaintiffs directly interacted with the antitrust violator regarding the economic terms of the transaction; (2) whether the intermediary's function was dependent on a preceding interaction between the plaintiffs and antitrust violator; and (3) whether the harm suffered by the plaintiffs arose directly out of their interaction with the antitrust violator or instead was derivative of injury first suffered by another party to the transaction.[52] Applying

---

[51] This Court's analysis in *Mercedes-Benz* was validated by the Third Circuit's recent opinion in *Dentsply*, in which the court held that the "economic substance" of the parties' roles in the transaction must be examined to determine which party is the direct purchaser. *Dentsply*, 424 F.3d at 373. The Third Circuit affirmed the district court's analysis of the facts surrounding the transaction, concluding that the "economic substance of the transaction" was that of two separate sale transactions: one sale from the manufacturers to the dealers and a second sale from the dealers to the dental laboratories. *Id.* ("[T]he dealers still make the *sale* to Plaintiffs and Dentsply makes the *sale* to the dealers.") (emphasis added). The Third Circuit also noted that the physical transfer of the products to and from the dealers did not itself alter the economic substance of the transaction. *Id.* ("[T]he fact that some of the teeth are drop shipped directly from Dentsply to Plaintiffs does not affect the economic substance of the transaction.").

[52] This Court also noted that the lessees were direct purchasers under what it called the direct purchaser paradigm, under which "Party A, the antitrust violator, sells to Party B, and then Party C, a down-stream purchaser from B, seeks to recover the implicit overcharges that B passed on to C," because the lessees represented party B since they dealt directly with the dealers (the antitrust violator). In addition, the lessees' harm (the overcharge) immediately resulted from that interaction with the

19

this analysis to the uncontested facts of this case establishes that MedStar is the

direct purchaser for its purchases of Disposable Hypodermic Products from Becton

pursuant to Net Dealer Acquisition contracts.

### 2.    MedStar Interacts Directly with Becton to Set the Economic Terms for the Purchase of Becton's Disposable Hypodermic Products

Recognizing that "there is usually no direct interaction between the antitrust

violator and the indirect purchaser," the *Mercedes-Benz* court's primary focus was

whether direct interaction existed between the plaintiffs and the antitrust violator.

364 F. Supp. 2d at 480; *see also Diskin*, 1994 WL 330229, at *4; *In re NASDAQ*

*Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 506 (S.D.N.Y. 1996). This Court

held the fact that the plaintiffs "negotiated the terms of the transaction, including

. . . the 'agreed value' or purchase price" was "indicative of a purchase-like

transaction." *Mercedes-Benz*, 364 F. Supp. 2d at 480. Moreover, this Court noted

the fact that "[t]he leasing companies do not deal directly with the customers

regarding the lease transaction." *Id.* at 473. Rather, "[w]hen a dealer and a

customer do negotiate the agreed value of the vehicle, the leasing company is not

involved in that negotiation." *Id.* at 474. This Court, finding that these facts

indicated the plaintiff was a direct purchaser, denied the defendants' motion for

---

dealers rather than being passed on from the leasing company. *Mercedes-Benz*,
364 F. Supp. 2d at 480 (citing *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469

summary judgment and entered partial summary judgment in favor of the lessee plaintiffs. *Id.* at 482.

In this case, it cannot be disputed that MedStar interacts directly with Becton to agree upon the price and other economic terms for the purchase of Disposable Hypodermic Products.[53] The Supplier Agreement negotiated by Novation and Becton sets forth the economic terms of sale, including the price of Disposable Hypodermic Products.[54] Moreover, MedStar dealt directly with Becton when it signed the Letter of Commitment to buy under those terms.[55] The servicing agents, however, do not participate in Becton's negotiation of the economic terms of the sale with the hospital or GPO and cannot vary the contract price paid by MedStar. Rather, the servicing agent is specifically identified as an agent authorized to service Becton's contracts with MedStar at prices agreed upon by Becton and

---

(7th Cir. 2002)).

[53] *See supra* Section II, III.A.; *see also* Ex. 1-B, at MDSTR001365; Ex. 1-C, at MDSTR001220.

[54] Ex. 1-F, Ex. 2-F, 2000 Becton-Novation contract; Ex. 1-H, Ex. 2-G, 2003 Becton-Novation contract; Ex. 13, 2006 Becton-Novation contract.

[55] *See* Ex. 1-D, at BDAF-00119524; Ex. 1-E, at MDSTR000135.

MedStar.[56]  The servicing agent's role is thus consistent with its status as an agent
rather than a seller.[57]

Becton's own sales data, internal documents and statements confirm such a
relationship with its customers like MedStar.  Countless Becton manuals and
internal documents define the relevant contractual relationship as "[a]n agreement
between B-D and the end-user" where "[p]ricing is negotiated directly with
account."[58]  As Becton has previously explained to this Court:

> [T]he economic role of authorized distributors under the
> GPO contracts . . . is not that of a direct purchaser at all.
> Rather these distributors basically deliver Becton's
> products to hospitals at prices negotiated directly
> between Becton and the hospital's agent (the GPO).
> The distributors acquire Becton's products at a pre-
> determined price dictated by the hospital's GPO contract,
> which is then covered by the hospital in full.[59]

---

[56] *See, e.g.,* Ex. 1-K, Ex. 2-C, at BDAF-00522903-04 (explicitly stating that the
dealer is "authorized to supply, as [Becton's] agent, under this Contract between
BD and the attached named institution(s)" and that "[f]or the contract included
hereto prices are guaranteed firm"); *see also* Ex. 4, at BDAF-00673474.

[57] Ex. 2, Mimms Decl. ¶¶ 9, 35.

[58] Ex. 6, at BDAF-00333549 (further providing that "Account signs proposal letter.
Account chooses servicing distributor(s)."); *see also* Ex. 9, at BDAF-00752195
(stating that a Net Acquisition "contract is between BD and end-user (hospital,
GPO, etc) where BD determines eligible end-users"); Ex. 5, at BDAF-00021028;
Ex. 4, at BDAF-00673475.

[59] Becton Request for Downstream Discovery, *Louisiana Wholesale Drug Co. v.
Becton & Co.*, Civ. A. No. 05-CV-1602, D.N.J., filed Aug. 24, 2005.

Moreover, from an economic perspective, the relevant contracts and interactions demonstrate that MedStar buys the Disposable Hypodermic Products directly from Becton.[60]  MedStar's direct interaction with Becton undeniably compels the conclusion that MedStar is the direct purchaser of the relevant products *from* Becton.

### 3.   The Servicing Agent's Role in Delivering Becton's Disposable Hypodermic Products to MedStar is Subordinate to a Preceding Contract to Purchase Those Products Between MedStar and Becton

In *Mercedes-Benz*, this Court also considered relevant the timing and extent of an intermediary's involvement in the transaction.  364 F. Supp. 2d at 481.  The undisputed facts of this case show that the servicing agent's involvement occurs *after* the relevant economic terms of the transaction between Becton and MedStar are agreed upon.[61]  Once MedStar elects to participate under the terms of the Supplier Agreement (*i.e.*, the contract negotiated between Becton and MedStar's GPO), MedStar notifies Becton who it has chosen to act as its servicing agent for

---

[60] *See* Ex. 1, Scott Morton Decl. p. 9 ("While Distributors facilitate the supply of hypodermic products to MedStar, they sell logistics and related services to MedStar, not Becton's hypodermic products.  It is misleading to follow the physical path of the hypodermic products and assume that it tracks economic function.").

[61] *See, e.g.*, Ex. 5, at BDAF-00021028 ("Upon acceptance of pricing by the end user, they will select a BDX authorized distribution agent to service the agreement. BDX will send the distribution agent a letter informing them of the agreement terms and conditions.").

its purchases under that contract.[62]  Becton then notifies the servicing agent of the relevant economic terms of the transaction.[63]

The servicing agent's role in MedStar's product purchases from Becton is, therefore, dependent on a preceding purchase contract between Becton and MedStar.[64]  Moreover, when MedStar purchases under its GPO contract with Becton, the servicing agent, in most cases Cardinal, can only distribute specific, agreed upon products to MedStar, and is required to invoice those products on Becton's behalf at the pre-determined contract prices.[65]  The servicing agent, therefore, has no discretion over product selection or pricing.[66]  Thus, analysis of the second *Mercedes-Benz* factor also compels the conclusion that MedStar is a direct purchaser of Disposable Hypodermic Products from Becton.

---

[62] Ex. 1-D, at BDAF-00119524.

[63] *See, e.g.*, Ex. 1-K, Ex. 2-C, at BDAF-00522903-04; *see also* Ex. 9, at BDAF-00752221 (stating that the Dealer Notification includes "product list; brokerage % (if applic.); pricing, etc.; BD Contract Membership List" and is faxed or mailed to the dealer).  Numerous Becton documents confirm this timing. *See, e.g.*, Ex. 8, at, BDAF-00362255.

[64] Ex. 1-K, Ex. 2-C, at BDAF-00522904 ("BD has been awarded a supply contact with the institutions noted in this Dealer Notification Form.  We offer your firm the opportunity to act as a servicing agent (Distributor) for Becton-Dickinson (BD) under that contract.").

[65] *See, e.g.*, Ex. 1-K, Ex. 2-C, at BDAF-00522903-04, 12.

[66] *See, e.g.*, Ex. 1-F, Ex. 2-F, 2000 Becton-Novation contract, ¶¶ 4(a), at VHA015518, VHA015575; Ex. 1-I, Ex. 2-M, ¶ 4(i), at VHA051224.

### 4. MedStar's Harm is not Derivative Because it Arises Directly Out of Its Purchases of Disposable Hypodermic Products from Becton

Finally, the *Mercedes-Benz* court considered whether the plaintiff's harm was separate from, or derivative of, harm first suffered by an intermediary. 364 F. Supp. 2d at 480-81. The court noted that in the direct purchaser paradigm, an indirect purchaser's harm results from the first purchaser passing on an overcharge that the antitrust violator imposed on the initial buyer. *Id.* at 480. In that sense, an indirect purchaser's harm is derivative of harm first suffered by a previous purchaser in the chain of distribution. In *Mercedes-Benz*, this Court found that the car lessees' harm was not derivative because "the prices they paid to lease new Mercedes-Benz vehicles were inflated by the [dealer's] price-fixing scheme." *Id.* at 482.

In this case, two important points establish that MedStar's harm also is not derivative of any other purchaser's harm. First, the distributors are servicing agents in the transactions, not previous purchasers.[67] Second, and more importantly, the prices MedStar (and other healthcare providers) paid for the relevant products are set out in contracts between Becton and MedStar's GPOs, contracts to which the servicing agents are not even a party. In fact, given the way that Becton's rebate system works, the servicing agents are neither overcharged

25

nor "pass on" any harm to MedStar with respect to MedStar's purchases under Net Dealer Acquisition contracts.  Instead, if MedStar has paid an overcharge on Becton's Disposable Hypodermic Products, the servicing agent, *e.g.*, Cardinal, actually *benefits* from receiving a *higher* delivery fee because it would be calculated on the illegally higher price MedStar paid for Becton's products. MedStar's harm, therefore, arises directly from its dealing with Becton, and is not derivative of any harm first suffered by the servicing agent that is subsequently "passed on" to MedStar, as is the case in the classic indirect purchaser situation.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, MedStar respectfully requests that its motion for partial summary judgment be granted and that the Court find that MedStar is a proper party to seek overcharge damages pursuant to Section 4 of the Clayton Act for its purchases of Disposable Hypodermic Products.

---

[67] *See, e.g.*, Ex. 1-K, Ex. 2-C, at BDAF-00522904.

Dated:  April 25, 2007


Respectfully submitted,


_____s/_____
Kenneth A. Wexler
Jennifer Fountain Connolly
**Wexler Toriseva Wallace LLP**
One N. LaSalle Street, Suite 2000
Chicago, IL 60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022
kaw@wtwlaw.us
jfc@wtwlaw.us


_____s/_____
Paul O. Paradis
Gina M. Tufaro
**Abbey Spanier Rodd Abrams &**
**Paradis LLP**
212 E. 39th Street
New York, NY  10016
Telephone: (212) 889-3700
Facsimile: (212) 684-5191
pparadis@abbeyspanier.com
gtufaro@abbeyspanier.com

_____s/_____
R. Laurence Macon
**Akin Gump Strauss Hauer & Feld,**
**LLP**
300 Convent Street, Suite 1500
San Antonio, TX 78205-3732
Telephone: (210) 281-7000
Facsimile: (210) 224-2035
lmacon@akingump.com

AND

Herbert J. Stern
Joel M. Silverstein
**Stern & Kilcullen**
75 Livingston Avenue
Roseland, NJ 07068
Telephone: (973) 535-1900
Facsimile: (973) 535-9664
hstern@sgklaw.com
jsilverstein@sgklaw.com

27

AND

Richard L. Wyatt, Jr.
Perry M. Rosen
Todd M. Stenerson
**Akin Gump Strauss Hauer & Feld,**
**LLP**
Robert S. Strauss Building
1333 New Hampshire Avenue, N.W.
Washington, DC 20036-1564
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
rwyatt@akingump.com
prosen@akingump.com
tstenerson@akingump.com

AND
James V. Bashian
**Law Offices of James V. Bashian,**
**P.C.**
Fairfield Commons
271 Route 46 West, Suite F-207
Fairfield, NJ 07004
Telephone: (973) 227-6330
jbashian@bashianlaw.com

AND

Gordon Ball
**Ball & Scott**
550 W. Main Street, Suite 601
Knoxville, Tennessee 37902
Telephone: (865) 525-7028
Facsimile: (865) 525-4679
gball@ballandscott.com

28