# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| |
|---|
| **In re HYPODERMIC PRODUCTS ANTITRUST LITIGATION** |
| **THIS DOCUMENT RELATES TO: ALL ACTIONS** |

**MDL No. 1730 (JLL)**
**Civ. Action No. 05-CV-1602 (JLL)(CCC)**

### THE HEALTHCARE PLAINTIFFS' OPPOSITION TO THE DISTRIBUTOR PLAINTIFFS' MOTION FOR CERTIFICATION OF THE PROPOSED DIRECT PURCHASER CLASS, PRELIMINARY APPROVAL OF PROPOSED SETTLEMENT, APPROVAL OF THE FORM AND MANNER OF NOTICE TO THE CLASS, AND SETTING OF FINAL SETTLEMENT SCHEDULE AND HEARING

# TABLE OF CONTENTS

**Page**

I.     Introduction ................................................................................. 1

II.    Background .................................................................................. 3

III.   Standards for Preliminary Approval ............................................. 6

IV.    Argument ..................................................................................... 9

A.     The Settlement Is Not Fair, Adequate or Reasonable Because It
Is The Product Of Collusion ................................................... 9

B.     The Settlement is Obviously Deficient ................................... 13

C.     The Settlement Unfairly Favors the Claims of Distributors Over
The Claims of Healthcare Providers and Other Types of Non-
Distributor Entities ................................................................ 18

1.     The Settlement Gives the Healthcare Plaintiffs Virtually
No Consideration .......................................................... 19

2.     The Distributor Plaintiffs are Unfairly Favored Because
Counsel for the Distributor Plaintiffs Negotiated the
Settlement with a Conflict of Interest ........................... 20

D.     The Distributors Cannot Rely on the *Endosurgical* Settlement
as a Model ............................................................................. 22

1.     The Delaware Valley objection ..................................... 23

2.     The *Endosurgical* court's holding ................................ 25

E.     Even if this Court Grants Preliminary Approval, It Must
Require the Settling Parties to Amend Their Notice To Advise
Healthcare Providers of the Deficiencies of the Settlement ...... 30

1.     It is Appropriate to Amend the Notice because Class
Members Cannot Ascertain Whether They are Members
of the Class .................................................................. 32

i

2.   It is Appropriate to Amend the Notice to Explain the Procedural Posture of this Settlement and to Explain that There Exist Substantially Differing Views on Estimates for Potential Recovery .............................................................. 35

V.   Conclusion ................................................................................... 37

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*Berry Petroleum Co. v. Adams & Peck,*
    518 F.2d 402 (2d Cir. 1975)..................................................................9

*Brown v. American Home Prods. Corp.,*
    No. 99-20935, 2003 U.S. Dist. LEXIS 23717 (E.D. Pa. Dec. 3, 2003)..........9

*Cascade Health Solutions v. PeaceHealth,*
    515 F.3d 883 (9th Cir. 2008).........................................................25, 30

*D'Amato v. Deutsche Bank,*
    236 F.3d 78 (2d Cir. 2001)...................................................................7

*Delaware Valley Surgical Supply, Inc. v. Johnson & Johnson,*
    523 F.3d 1116 (9th Cir. 2008)..................................................23, 27, 29

*Fisher Bros v. Phelps Dodge Indus., Inc.,*
    604 F. Supp. 446 (E.D. Pa. 1985).......................................................16

*Fisher Bros. Inc. v. Mueller Brass Co.,*
    630 F. Supp. 493 (E.D. Pa. 1985).......................................................16

*Fry v. Hayt, Hayt & Landau,*
    198 F.R.D. 461 (E.D. Pa. 2000).....................................................32, 35

*G.M. Sign, Inc. v. Franklin Bank,*
    No. 06 C 949, 2007 U.S. Dist. LEXIS 91512 (N.D. Ill. Dec. 13, 2007)......33

*Girsh v. Jepson,*
    521 F.2d 153 (3d Cir. 1975)..............................................................15

*Greenfield v. Villager Indus., Inc.,*
    483 F.2d 824 (3d Cir. 1973)................................................................9

*Greer v. Shapiro & Kreisman,*
    No. 00-4647, 2001 U.S. Dist. LEXIS 21114
    (E.D. Pa. Dec. 18, 2001) ..........................................................15, 17, 19

*Hanlon v. Chrysler Corp.,*
    150 F.3d 1011 (9th Cir. 1998)..............................................................9

iii

*In re Aetna Inc. Sec. Litig.*,
    MDL No. 1219, 2001 U.S. Dist. LEXIS 68 (E.D. Pa. Jan. 4, 2001) ............ 36

*In re Armored Car Antitrust Litig.*,
    472 F. Supp. 1357 (N.D. Ga. 1979) ................................................................ 16

*In re Cendant Corp. Sec. Litig.*,
    404 F.3d 173 (3d Cir. 2005)................................................................... 7, 16

*In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second*
    *Mortgage Loan Litig.*,
    418 F.3d 277 (3d Cir. 2005)................................................................. 12, 15

*In re Diet Drugs Prods. Liab. Litig.*,
    282 F.3d 220 (3d Cir. 2002)...................................................................... 9

*In re Endosurgical Prods. Direct Purchaser Antitrust Litig.*,
    Case No. 05-8809 (C.D. Cal. Aug. 2, 2007).......................................... passim

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995)....................................................................... 8

*In re Ikon Office Solutions, Inc.*,
    194 F.R.D. 166 (E.D. Pa. 2000) ............................................................ 36

*In re Initial Pub. Offering Sec. Litig.*,
    226 F.R.D. 186 (S.D.N.Y. 2005) ....................................................... 6, 16

*In re Ins. Brokerage Antitrust Litig.*,
    MDL No. 1663, Nos. 04-5184 (GEB), 05-1079 (GEB), 2007 U.S.
    Dist. LEXIS 65037  (D.N.J. Sept. 4, 2007) ...................................... 6

*In re Microstrategy, Inc. Sec. Litig.*,
    148 F. Supp. 2d 654 (E.D. Va. 2001) ......................................................... 36

*In re Motor Fuel Temperature Sales Practices Litig.*,
    258 F.R.D. 671 (D. Kan. 2009)................................................................. 7

*In re NASDAQ Market-Makers Antitrust Litig.*,
    176 F.R.D. 99 (S.D.N.Y. 1997) ........................................................ 10, 18

*In re Plastic Tableware Antitrust Litig.*,
    No. 94-3564, 1995 U.S. Dist. LEXIS 17014  (E.D. Pa. Nov. 14, 1995)...... 16

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,*
  148 F.3d 283 (3d Cir. 1998)..................................................................8

*In re Remeron End-Payor Antitrust Litig.,*
  Nos. 02-2007 (FSH) and 04-5126 (FSH), 2005 U.S. Dist. LEXIS
  27011 (D.N.J. Sept. 13, 2005)..................................................15, 17

*Jaffe v. Morgan Stanley & Co.,*
  No. C 06-3903 TEH, 2007 U.S. Dist. LEXIS 96465 (N.D. Cal. Dec.
  12, 2007)..................................................................................18

*Karvaly v. eBay, Inc.,*
  245 F.R.D. 71 (E.D.N.Y. 2007) ..........................................................19

*Kaufman v. Am. Express Travel Related Servs. Co., Inc.,*
  No. 07 C 1707, 2009 U.S. Dist. LEXIS 119397 (N.D. Ill. Dec. 22.
  2009)...............................................................................18, 32

*LePage's Inc. v. 3M,*
  324 F.3d 141 (3d Cir. 2003)..............................................................30

*Lepinske v. Mercedes Homes, Inc.,*
  No. 6:07-cv-915-Orl-31DAB, 2008 U.S. Dist. LEXIS 111166
  (M.D. Fla. July 7, 2008)...................................................................32

*Martin v. FedEx Ground Package Sys., Inc.,*
  No. C 06-6883 VRW, 2008 U.S. Dist. LEXIS 106524 (N.D. Cal. Dec.
  31, 2008)...............................................................................32, 36

*McElhaney v. Eli Lilly & Co.,*
  93 F.R.D. 875 (D.S.D. 1982) ........................................................33, 34

*Mullane v. Cent. Hanover Bank & Trust Co.,*
  339 U.S. 306 (1950) .................................................................32, 35

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.,*
  C.A. No. 05-12024 (PBS) (D. Mass) .....................................................15

*Retractable Techs., Inc. v. Becton Dickinson & Co.,*
  Case No. 01-00036 (DSF) (E.D. Tex.) ...................................................29

*Reynolds v. Beneficial Nat'l Bank,*
  288 F.3d 277 (7th Cir. 2002)...........................................................15

*Smith v. Ajax Magnethermic Corp.*,
  No. 4:02CV0980, 2007 U.S. Dist. LEXIS 85551, at *21 (N.D. Ohio
  Nov. 7, 2007)...................................................................................... 32

*Smith v. First Union Mortgage Co.*,
  No. 98-5360, 1999 U.S. Dist. LEXIS 10747 (E.D. Pa. July 19, 1999) ........ 17

*Smith v. Prof'l Billing & Mgmt. Servs.*,
  No. 06-4453 (JEI), 2007 U.S. Dist. LEXIS 86189 (D.N.J. Nov. 21,
  2007)...................................................................................................... 14

*Vasquez v. Coast Valley Roofing, Inc.*,
  No. 1:07-CV-00227 OWW DLB, 2009 U.S. Dist. LEXIS 106973
  (E.D. Cal. Nov. 16, 2009) .......................................................................... 10

## OTHER AUTHORITIES

Manual for Complex Litigation § 21.222 4th ed. (2004)......................................... 33

Newberg & Conte, *Newberg on Class Actions,* (3d ed. 1992)............................. 9, 20

## RULES

Fed. R. Civ. P. 23(e)........................................................................................ *passim*

The Healthcare Plaintiffs, by their undersigned counsel, respectfully submit this Opposition to the Distributor Plaintiffs' Motion for Certification of the Proposed Direct Purchaser Class, Preliminary Approval of Proposed Settlement, Approval of the Form and Manner of Notice to the Class, and Setting of Final Settlement Schedule and Hearing ("Motion for Preliminary Approval" or "Motion").[1]  For the reasons set forth below, the Court should deny the Distributor Plaintiffs' Motion.

## I.    Introduction

The Healthcare Plaintiffs respectfully submit that the Court need not (and cannot) even consider this motion unless it grants summary judgment to the Distributor Plaintiffs.  Without an express finding that the Distributor Plaintiffs are direct purchasers with respect to 100% of the products at issue in this litigation, the Settlement fails.

The Distributor Plaintiffs seek certification of a settlement ("Settlement") that will, contrary to their prior representations to this Court, release not only the claims of the Distributor Plaintiffs but also the federal claims of the Healthcare Plaintiffs, all similarly-situated healthcare providers such as hospitals and nursing

---

[1] Because Becton's motion for preliminary approval was directed solely at the direct purchaser issue, Plaintiffs respond to that motion in their Opposition to the Direct Purchaser Plaintiffs' Motion to Make Particular Findings Relating to Direct Purchaser Standing or Alternatively, For Partial Summary Judgment.

homes, as well as a host of other persons and entities, whose purchases are recorded in Becton's sales data.   In exchange, those entities will receive consideration that at this time appears to represent less than *one quarter of one percent (.246%)* of relevant product sales during the class period alleged by the Healthcare Plaintiffs and less than one percent of the net present value of pre-trebling damages as estimated by the expert retained by Healthcare Plaintiffs. Sadly, the Distributor Plaintiffs were willing to enter into this Settlement for one reason:  they want the mantle of "Direct Purchasers" at any cost. This Court, as a fiduciary to those whose claims the settling parties seek to extinguish, should not give the Settlement preliminary approval.

The Settlement should not be granted preliminary approval for at least three reasons.   First, the Settlement improperly grants preferential treatment to the Distributor Plaintiffs while valuing the claims of Healthcare Plaintiffs and other similarly situated healthcare providers at virtually nothing.

Second, the Settlement is obviously deficient because it does not come close to falling within the range of reasonableness, and, despite being grossly deficient, gives clear sailing to Class Counsel seeking *33 1/3%* in attorneys' fees[2] *plus* expenses. The Settlement also gives the seven Distributor Plaintiffs themselves *$35,000 each* in "incentive payments," primarily for a limited role in attempting to

---

[2] At times, a 33 1/3% fee request is appropriate.  In this instance, it is not.

defeat Becton's motion to dismiss and the Healthcare Plaintiffs' motions on the direct purchaser issue.  There is no justification for incentive awards of this magnitude where there has been limited merits discovery to date, in which the Distributor Plaintiffs have had little participation.

Third, the Settlement is a product of collusive negotiations whereby counsel for the Distributor Plaintiffs accepted a nuisance value settlement in exchange for Becton's support for their obtaining the Direct Purchaser title – a title not only important to the Distributor Plaintiffs and their counsel in *this* litigation but, most importantly, a title that they and their counsel feel a need to maintain in *other* litigation.  The process was further tainted because counsel for the Distributor Plaintiffs bargained on behalf of plaintiffs they do not and cannot represent.

For all of these reasons, this Court should deny even preliminary approval of the Settlement or, in the alternative, as more fully described below, order the Distributor Plaintiffs to amend the notice to the Class to make these deficiencies clear so that the purported settlement class is fully informed of the facts.

## II.    Background

A large part of the 5-year history of this litigation has been devoted not to the merits of the litigation, but to resolving which plaintiffs are direct purchasers entitled to pursue treble damages under the federal antitrust laws.  As Becton's counsel once represented to this Court, the direct purchaser issue is "a very open,

very rambunctious area of the law." Hearing Tr. (Oct. 3, 2007) at 8:4-14, Ex. A to Declaration of R. Laurence Macon In Opposition To Motion For Preliminary Approval ("Macon Decl."). As such, Becton sided with the Healthcare Plaintiffs in asserting that discovery was necessary to resolve that issue. *See, e.g.*, Hearing Tr. (Oct. 3, 2007), at 6:6-24 ("so there is a lot of law to go around for everybody . . . [i]n every one of the cases cited by all of the parties, there was always discovery of the facts."), Ex. A to Macon Decl.

Becton certainly did not agree with the Distributors' view that they were direct purchasers with respect to both contract and non-contract sales until, of course, the proposed Settlement was reached; indeed, Becton represented that it intended to argue that there were so many types of purchases of its Hypodermic Products that a class could not be certified. *See, e.g.,* Hearing Tr. (June 14, 2006), at 5:18-6:1 ("MR. ATKINS:   ….   And the truth of the matter is, with some humility; or not much, really, we've kind of been talking about this since the case began that not only were we going to have complications about which named plaintiffs had which claims under which laws, but, indeed, could you even certify a class where everybody is standing behind them."), Ex. B to Macon Decl. *See also id.* at 27:22-27:8; 28:11-22. In fact, Becton contended that *it* was the source of the Healthcare Plaintiffs' claim that they were the direct purchasers. *See id.* at 6:19-7:2 ("MR. ATKINS:   What I understand them to be doing is saying, they, as

named plaintiffs, who are – now they have a hospital in Georgetown, a couple of pharmacy companies, or pharmacies, say they're the true direct purchasers under federal law because the distributors these guys represent are just sort of sit-ins, they pass on product from Becton at prices they negotiate. *It sounds kind of familiar because it's what I've been talking about since I showed up here.*") (emphasis added)).

In an effort to set aside their differences on the "direct purchaser issue" so both sets of plaintiffs could focus on prosecuting the case against Becton, counsel for the Healthcare Plaintiffs traveled to New York and met with counsel for the Distributors. *See* Declaration of Kenneth A. Wexler ("Wexler Decl.") ¶ 2. At that meeting, counsel for the Distributor Plaintiffs expressed less interest in successfully prosecuting the underlying litigation than in preserving for their clients the status of "direct purchasers." *Id.* at ¶ 3. Specifically, during that meeting, Bruce Gerstein, lead counsel for the Distributor Plaintiffs, stated that his predominant concern and that of his clients was to have the title of "direct purchaser," for not just this case, but for *future* cases. *Id.*[3]

---

[3] Many of the Distributor Plaintiffs are repeat players in federal antitrust litigation, with Dik Drug Company, Louisiana Wholesale Drug Company Inc., Park Surgical Company Inc., Smith Drug Company and Rochester Drug Co-Operative Inc. collectively appearing as plaintiffs in a score of federal antitrust cases since 1998, in many cases represented by their counsel here. *See* Ex. C to Macon Decl.

After the Healthcare Plaintiffs were unwilling to grant the Distributors the title they wanted on their conditions, it appears that the Distributors approached Becton about settlement.[4]   Not surprisingly, the proposed Settlement Agreement accords the Distributor Plaintiffs the title of Direct Purchaser Plaintiffs.   *See* Settlement Agreement § 2.  Apparently, Becton was willing to grant the Distributor Plaintiffs that title, despite its previous representation to the Court that a distributor was merely a "delivery service."[5]   It is not unreasonable to infer that the accordance of such title may have been part of the consideration (in addition to the relatively small monetary amount) exchanged for the broad releases granted to Becton in the proposed Settlement.

## III.    Standards for Preliminary Approval

"The court owes a duty to class members to ensure that the proposed settlement is 'fair, reasonable and adequate.'"   *In re Initial Pub. Offering Sec. Litig.*, 226 F.R.D. 186, 189 (S.D.N.Y. 2005) (quoting Fed. R. Civ. P. 23(e)); *see also In re Ins. Brokerage Antitrust Litig.*, MDL No. 1663, Nos. 04-5184 (GEB), 05-1079 (GEB), 2007 U.S. Dist. LEXIS 65037, at *40 (D.N.J. Sept. 4, 2007) (preliminary approval of the settlement requires, in part, that the proposed

---

[4] *See* Distributor Plaintiffs' Prelim. Appr. Memo. at 10 (stating first mediation session began in November 2008).

[5] Hearing Tr. (June 9, 2008), Macon Decl. Ex. D at 25:25-26:11 (statement of Becton's counsel).

settlement is "fair, reasonable and adequate to warrant sending notice of the [Settlement Agreement]."). Indeed, the Court is a fiduciary of the absent class. *In re Cendant Corp. Sec. Litig.*, 404 F.3d 173, 188 (3d Cir. 2005). The purpose of Rule 23(e) is to "'protect[] unnamed class members from unjust or unfair settlements affecting their rights when the representatives become fainthearted before the action is adjudicated . . . .'" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997) (citation omitted).

Indeed, an even higher degree of scrutiny is warranted here because approval of the Settlement is being sought prior to the certification of a litigation class. "[A] higher degree of scrutiny applies when determining the fairness of a settlement which is negotiated prior to class certification." *In re Motor Fuel Temperature Sales Practices Litig.*, 258 F.R.D. 671, 676 (D. Kan. 2009) (citing *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001)). The Supreme Court has warned that class certification issues require "undiluted, even heightened, attention in the settlement context. Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Amchem*, 521 U.S. at 620. In addition, the Third Circuit has held that the potential for collusive settlements requires that courts exercise increased scrutiny when examining settlement agreements reached prior to class certification. *In re GMC*

*Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 805 (3d Cir. 1995) ("We affirm the need for courts to be even more scrupulous than usual in approving settlements where no class has yet been formally certified.") (citations omitted).

An additional and not insignificant reason that this Court should employ a heightened degree of scrutiny at the preliminary approval stage is that the settling parties are seeking to carve out the Healthcare Plaintiffs from the Class definition, thereby depriving them of their right to object to the Settlement at the final approval stage. *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 327 (3d Cir. 1998) (Rule 23(e) "is designed to summarize the litigation and the settlement and to apprise *class members* of the right and opportunity to inspect the complete settlement documents, papers and pleadings filed in the litigation." (emphasis added)). The settling parties have carved the Healthcare Plaintiffs out of the class despite repeatedly assuring this Court that the Healthcare Plaintiffs would have the opportunity to object to the Settlement.[6] In addition, as the settling parties surely know, the named Healthcare Plaintiffs cannot

---

[6] *See* Direct Purchaser Plaintiffs' Opp. to Healthcare Plaintiffs' Motion to Issue Injunction Under All Writs Act, Dkt. No. 314, at 15-7; Memo. of Becton, Dickinson & Company in Opposition to Healthcare Plaintiffs' Motion to Issue Injunction Under the All Writs Act, Dkt. No. 315, at 8-9; Distributors' Prelim. Appr. Memo. at 25 n.18 (stating that members of the Class can always opt out).

opt out an entire class.[7]  Under these circumstances, where the named Healthcare

Plaintiffs will be stripped of any right to object to the Settlement, this Court should

scrutinize the settling parties' request for preliminary approval with particular care

now.[8]

## IV.   Argument

### A.   The Settlement Is Not Fair, Adequate or Reasonable Because It Is The Product Of Collusion

Any class action settlement, regardless of whether approval is sought before

or after class certification, requires the Court to "determine whether the settlement

has been influenced by fraud or collusion and whether it is fair, adequate and

reasonable." *Greenfield v. Villager Indus., Inc.*, 483 F.2d 824, 833 (3d Cir. 1973).

To obtain preliminary approval, a settlement must be a "product of serious,

informed, non-collusive negotiations." *In re NASDAQ Market-Makers Antitrust*

---

[7] Courts have routinely held that opt-outs may not be accomplished on a representative basis. *See In re Diet Drugs Prods. Liab. Litig.*, 282 F.3d 220, 241 (3d Cir. 2002) (observing that "opting out is an individual right and it must be exercised individually"); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1024 (9th Cir. 1998) ("The right to participate, or to opt-out, is an individual one and should not be made by the class representative or the class counsel."); *Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 411-12 (2d Cir. 1975), *See also Brown v. American Home Prods. Corp.*, No. 99-20935, 2003 U.S. Dist. LEXIS 23717, at *3 (E.D. Pa. Dec. 3, 2003) (noting that "opt-out right must be exercised individually, and a class member must personally sign the notice, not the class member's attorney"); Newberg & Conte, *Newberg on Class Actions*, §16.16 at 90 (3d ed. 1992) (same).

[8] Under the settling parties' proposed schedule, class members will have only thirty (30) days from the date of mailing of the notice to opt out of the class.  *See* Distributors' Prelim. Appr. Memo. at 36.

*Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997). A proposed settlement is a product of serious negotiation between counsel where, for example, the settlement was reached after counsel performed the extensive investigation and discovery necessary for assessing the "strengths and weaknesses of the case." *Vasquez v. Coast Valley Roofing, Inc.*, No. 1:07-CV-00227 OWW DLB, 2009 U.S. Dist. LEXIS 106973, at *19 (E.D. Cal. Nov. 16, 2009).

Here, although the settling parties claim that the Settlement is the result of negotiations[9] that began after "more than three years of intense litigation" (Distributors' Prelim. Appr. Memo. at 8), since June 2006 the only issue that has been "intensely litigated" is the direct purchaser issue which, conveniently enough, has been resolved by agreement of the settling parties. Furthermore, the Distributor Plaintiffs cite to the "risks" of litigation to justify the settlement amount, when the Court's consideration of the only substantive issues that have arisen in this case certainly do not warrant the conclusion that the case is too

---

[9] The Distributor Plaintiffs have stated that the Settlement was reached "after 6 months of highly-contentious, arm's-length negotiation" (Dkt No. 314, at 8) and that it was reached "after extensive arm's-length negotiations occurring over the course of several months, including two mediation sessions." Distributors' Prelim. App. Memo. at 4. Becton says the Settlement was reached "following a multi-day mediation over the course of several months." Memo. of Becton, Dickinson & Company in Opposition to Healthcare Plaintiffs' Motion to Issue Injunction Under the All Writs Act, Dkt. No. 315, at 2.

risky.[10]   The Distributor Plaintiffs ignore that this Court roundly *denied* Becton's motions to dismiss. *See* Dkt. Nos. 180, 181, 182.   Further, the vast majority of the documents the Distributor Plaintiffs claim to have reviewed are from the underlying litigation with Retractable Technologies, Inc. ("RTI"), litigation that resulted in a $100 million settlement with a Becton competitor.   In view of the RTI settlement and a decision emphatically denying Becton's motion to dismiss, vague references to the "unsettled state of the law" cannot suffice to justify this Settlement.   Distributors' Prelim. Appr. Memo. at 9.   A $100 million competitor settlement demonstrates that plaintiffs have a strong case.

The Distributor Plaintiffs also claim to have reached a conclusion as to the value of their case after "working with experienced economic experts on issues relating to liability and damages." *Id.* at 4.   Yet neither of the settling parties has submitted an expert's declaration regarding the settlement value vis-à-vis potential damages in this case – or even a plain vanilla declaration offering support for the reasonableness of the settlement.   This raises a rather obvious red flag since the Distributor Plaintiffs have touted the particular expertise of their liability expert, Einer Elhauge, who was the plaintiffs' expert in the *RTI* litigation and who has

---

[10] The one thing that did go consistently badly for the Distributor Plaintiffs was their attempt to deny Becton and the Healthcare Plaintiffs discovery regarding the direct purchaser issue. *See* CMO No. 22 (granting Rule 56(f) applications); Order, Dkt. No. 246, (denying appeal of ¶¶ 1-3 of same); CMO No. 25 (granting motions to compel discovery of Distributor Plaintiffs).

written extensively about the economics of bundled discounting. *See* Distributors'
Prelim. Appr. Memo. at 11 n.13.   Indeed, when counsel for the Healthcare
Plaintiffs offered to share *their experts'* analysis of potential damages in this case
with counsel for the Distributor Plaintiffs, counsel for the Distributor Plaintiffs
declined to even look at it. *See* Declaration of Torsten Kracht ¶¶ 2-3. The failure
of the Distributor Plaintiffs to offer *any* expert testimony in support of the
Settlement -- or make any representation about the value of the settlement
whatsoever, and then refuse to examine expert analysis that would call into
question the value of the Settlement -- further confirms that the Settlement in
inadequate.   The Court also should note that the settling parties did not invite
Healthcare Plaintiffs or their attorneys to the settlement negotiations; the only
entities represented at the bargaining table were distributors.

Moreover, one additional indicium of collusion can be a "red-carpet
treatment on fees." *In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee
Second Mortgage Loan Litig.*, 418 F.3d 277, 308 (3d Cir. 2005).   Here, Becton
agreed not to oppose the Distributor Plaintiffs' request for attorneys' fees,
*regardless of amount. See* Settlement Agreement § 12.   The Distributor Plaintiffs
have characterized this as a "weak" case, and yet, despite the fact the Settlement
represents a miniscule fraction of relevant product sales, they will seek 33 1/3% in
fees *plus expenses. See* Notice, Ex. B to Pearlman Decl., § 8 at 8.   Combined with

the factors addressed above, such a generous fee request in the context of what can at best be characterized as a weak result suggests that the claims of the direct purchasers were settled for an unreasonable sum in exchange for a title and for fees.

The incentive awards – $35,000 *each* to seven class representatives – are likewise excessive and suggest collusion.  The proposed notice states that these awards are appropriate because the class representatives assisted Class Counsel by "the production of documents and electronic data, providing written discovery responses, supplying affidavits, and regular communications with counsel." *Id.* § 8 at 7.  However, none of those tasks are unusual for a class representative in an antitrust case and the requested amounts are disproportionate to the class representatives' purported contributions to the case.  Moreover, the Distributors fail to disclose that the discovery responses, affidavits and electronic data provided by the class representatives to date was primarily in connection with the 56(f) discovery conducted on the direct purchaser issue – not in connection with actively litigating substantive claims against Becton, the defendant in this case.

**B.    The Settlement is Obviously Deficient**

This Court should likewise refuse to grant preliminary approval of the Settlement because it is obviously deficient.  In determining whether a proposed settlement is fair, reasonable and adequate, the Court must scrutinize whether the

settlement has any "obvious deficiencies" and falls within the "range of reason." *Smith v. Prof'l Billing & Mgmt. Servs.*, No. 06-4453 (JEI), 2007 U.S. Dist. LEXIS 86189, at *4 (D.N.J. Nov. 21, 2007) (citation omitted).

The $45 million settlement amount does not fall within the range of reason. Indeed, none of the settling parties have made *any* representation about the adequacy of this amount, other than to say that it is adequate in part based on the alleged uncertainty of the law surrounding bundled discounts. *See, e.g.,* Distributors' Prelim. Appr. Memo. at 9. Notably, the $45 million represents less than one quarter of one percent (.246%) of what the Healthcare Plaintiffs consider to be relevant sales of $18.3 billion during the Healthcare Plaintiffs' class period. Declaration of Professor Nicholas Economides, Attachment 1. This is significantly *less* than the 2.2% of sales given final approval in the *Endosurgical* case discussed in detail at Point D. below, which was justified in part by competitors' prior *failed* efforts at trial. The $45 million likewise represents between .49% and 1.25% of pre-trebling damages as calculated by Professor Economides using various inputs into a widely-recognized economic model of competition, and between .38% and .96% of the net present value of pre-trebling damages. *Id.* ¶ 16. Thus, the proposed Settlement is likewise a far cry from the settlement sought by many of the same attorneys for the Distributors less than one month after their preliminary approval papers were filed here seeking preliminary approval here in a related

bundling case. In that case, the settlement presented for approval offered consideration to the Class representing nearly 18% of *damages*. *See* Plaintiffs' Motion for Preliminary Approval of Settlement, Approval of Form of Notice and Setting of Final Settlement Hearing, *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, C.A. No. 05-12024 (PBS) (D. Mass), Ex. E to Macon Decl.[11]

Under applicable authority, the Settlement amount is not within the range of reasonableness. *See, e.g., Greer v. Shapiro & Kreisman*, No. 00-4647, 2001 U.S. Dist. LEXIS 21114, at *10 (E.D. Pa. Dec. 18, 2001) (denying preliminary approval of settlement where plaintiff failed to explain why the class would likely receive nothing were the case to proceed to trial). "In order to evaluate the propriety of an antitrust class action settlement's monetary component, a court should compare the settlement recovery to the estimated single damages." *In re Remeron End-Payor Antitrust Litig.*, Nos. 02-2007 (FSH) and 04-5126 (FSH), 2005 U.S. Dist. LEXIS 27011, at *69 (D.N.J. Sept. 13, 2005) (citation omitted); *see also Girsh v. Jepson*, 521 F.2d 153, 159 (3d Cir. 1975) (remanding the proposed settlement for further

---

[11] These numbers should not be viewed in isolation, where the Settlement smacks of a reverse auction, and where the Distributors were apparently willing to take anything in exchange for the moniker of direct purchasers in this case. These kinds of settlements are routinely disapproved. *See, e.g., Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 282 (7th Cir. 2002) (A reverse auction is said to occur when "the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant." (*quoted in Cmty. Bank of N. Va*, 418 F.3d at 308.

factual development where the district court failed to analyze potential recovery value).   The recovery achieved under the settlement must represent a "material percentage" of the available recovery "in light of all the risks considered under *Girsh*." *In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 235, 263 (D.N.J. 2000).

While other courts have approved antitrust settlements where the settlement amount constitutes a minimal percentage of estimated damages, such cases are based on facts and circumstances not present in this case – such as the insolvency of the defendant, the acquittal of a defendant in a parallel criminal proceeding, or actual negative class certification or liability rulings.[12]   For example, while the

---

[12] *See In re Initial Pub. Offering Sec. Litig.*, No. 21 MC 92 (SAS), 2009 U.S. Dist. LEXIS 93162, at *1-2 (S.D.N.Y. Oct. 6, 2009) (approving settlement of 2% of expected recovery where court of appeals had significantly circumscribed class in major class certification opinion); *In re Plastic Tableware Antitrust Litig.*, No. 94-3564, 1995 U.S. Dist. LEXIS 17014, at *4-5 (E.D. Pa. Nov. 14, 1995) (approving settlement to an antitrust action that represented 3.5% of total sales in part where defendants were involved in a criminal action and a larger settlement against one of the defendants "would have been impracticable in light of its financial situation."); *Fisher Bros. Inc. v. Mueller Brass Co.*, 630 F. Supp. 493 (E.D. Pa. 1985) (approving settlement of a direct purchaser class action that represented .2% of sales because of defendant's "weak financial status," because defendant was the last defendant to settle in the case, and because defendant was an unindicted co-conspirator in the related criminal case such that jury would view liability of defendant with skepticism); *Fisher Bros v. Phelps Dodge Indus., Inc.*, 604 F. Supp. 446 (E.D. Pa. 1985) (approving $2.5 million settlement of direct purchaser class action in price-fixing case where defendant was acquitted in criminal trial, even though settlement amount represented 2.4% of sales during the four years prior to the filing of the complaint); *In re Armored Car Antitrust Litig.*, 472 F. Supp. 1357 (N.D. Ga. 1979) (approving settlement of 3.88% of sales where defendants had pled nolo contendere in the government actions, the Fifth Circuit had recently overturned class certification in a similar private antitrust action, and plaintiffs'

*Endosurgical* court held that "2.2% of Defendants' sales" was "within the range of settlements approved in similar cases when alleged monopolists were sued first by competitors and then by purchasers" (Ex. D. to Pearlman Decl. at 12), the Court so held knowing that one of J&J's primary competitors had lost its jury trial based on the same facts. Here, of course, there was no such negative precedent. In fact, the precedent is a $100 million settlement paid by Becton.

Finally, the Settlement is also deficient because the proposed attorneys' fees are excessive relative to the result. *See, e.g., Greer*, 2001 U.S. Dist. LEXIS 21114, at *7 (indicating that the court evaluates a proposed settlement based in part on obvious deficiencies such as "excessive compensation of attorneys, . . . ."); *see also Smith v. First Union Mortgage Co.*, No. 98-5360, 1999 U.S. Dist. LEXIS 10747, at *3 (E.D. Pa. July 19, 1999) (same). If class counsel intend to seek attorneys' fees based on the deficient Settlement proposed, they should not get attorneys' fees near the top of the range permitted by Courts in this Circuit. *See In re Remeron Direct Purchaser Antitrust Litig.*, Civil No. 03-0085 (FSH), 2005 U.S. Dist. LEXIS 27013 (D.N.J. Nov. 9, 2005) ("Courts within the Third Circuit often award fees of 25% to 33% of the recovery.").

---

damage experts indicated that the $11.8 million settlement was *within the projected damages range of $8.5 million to $16.7 million*, and defendants had limited ability to pay); *In re Anthracite Coal Antitrust Litig.*, 79 F.R.D. 707 (M.D. Pa. 1978) (approving settlement where settlement amount was 3.08% of estimated sales because there was pending federal legislation that would have overruled *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977)).

**C.** **The Settlement Unfairly Favors the Claims of Distributors Over The Claims of Healthcare Providers and Other Types of Non-Distributor Entities**

Finally, this Court should deny preliminary approval because the Settlement unfairly favors the claims of distributors over the claims of healthcare providers and any other entities that are not distributors. It is without question that the Settlement "favors" distributors, as it seeks – wholly unrelated to the real substantive issues – to legitimize their claim to the title of "direct purchasers" in exchange for the extinguishment of healthcare providers' federal claims for the most minimal consideration.

A settlement cannot "improperly grant preferential treatment to class representatives or segments of the class." *NASDAQ*, 176 F.R.D. at 102. Preferential treatment to the named plaintiff or certain segments of the class may occur where the settlement provides a disproportionately large payment to the named plaintiff or certain class members. *See, e.g., Jaffe v. Morgan Stanley & Co.*, No. C 06-3903 TEH, 2007 U.S. Dist. LEXIS 96465, at *12 (N.D. Cal. Dec. 12, 2007); *see also Kaufman v. Am. Express Travel Related Servs. Co., Inc.*, No. 07 C 1707, 2009 U.S. Dist. LEXIS 119397, at *26-27 (N.D. Ill. Dec. 22. 2009) (holding that awards to named plaintiffs are subject to "heightened judicial scrutiny at this stage" and that the court should consider the actions of the named plaintiff to protect the interests of the class, whether the class has benefitted from the named

plaintiff's actions and the amount of time and effort expended in the litigation).[13]
For example, in *Amchem Products*, at 627, the Supreme Court struck down that settlement in part because "[t]he settling parties . . . achieved a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected. Although the named parties alleged a range of complaints, each served generally as representative for the whole, not for a separate constituency."

**1.    The Settlement Gives the Healthcare Plaintiffs Virtually No Consideration**

Here, the Settlement favors distributors over healthcare providers and other types of entities that are not distributors.    While the Distributor Plaintiffs are arguably receiving the title of Direct Purchasers in exchange for extinguishing their federal antitrust claims, the Healthcare Plaintiffs are releasing their claims for no consideration.    The release states that:

> [E]ach member of the Direct Purchaser Class shall release [Becton] . . . from any and all claims, rights, demands, obligations, damages, actions or causes of action, or liabilities whatsoever, known or unknown, fixed or contingent, in law or equity (1) arising under 15 U.S.C. §§ 1, 2 and 14 concerning the sale by BD of BD Hypodermic Products to the Direct Purchaser Class members *for Class Purchases*

---

[13] Courts have also held that a proposed settlement that provides unduly preferential treatment to named plaintiffs or to segments of the class is obviously deficient. *See, e.g., Greer*, 2001 U.S. Dist. LEXIS 21114, at *7; *Karvaly v. eBay, Inc.*, 245 F.R.D. 71, 86 (E.D.N.Y. 2007).    For the reasons set forth above, this Settlement is.

from the beginning of time through the date of this Settlement
Agreement.

*Id.* § 13.[14]  For a certain limited number of transactions, the Healthcare Plaintiffs

do not receive their products through one of Becton's servicing agents and thus

appear in the "bill to" and/or "sold to" columns of Becton's sales data.  Thus, if

this Settlement is approved, thousands of healthcare providers will release *all* of

their federal claims against Becton, not just their federal claims for the purchases

reflected in Becton's sales data.

> ### 2.   The Distributor Plaintiffs are Unfairly Favored Because Counsel for the Distributor Plaintiffs Negotiated the Settlement with a Conflict of Interest

The reason the Healthcare Plaintiffs receive virtually nothing as part of this

Settlement is obvious:   the Settlement was negotiated by counsel for the

*Distributors*, who do not represent and have no right to represent the Healthcare

Plaintiffs or any other persons or entities who are not distributors.  *See* Newberg &

Conte, *Newberg on Class Actions* § 3:22, at 3-126 (3d ed. 1992) (where a conflict

exists, there is no "assurance of vigorous prosecution").  The conflict between

---

[14] The "Class Purchases" language is deceptive.  Although the term appears to release only federal claims related to specific purchases, the term as defined in the Settlement Agreement relates to certain *entities*.  *See id.* § 1 (defining "Class Purchases" as "*[p]ersons or entities* who purchased BD Hypodermic Products in the United States from BD during the Class Period and were invoiced by BD for said purchases are *entities* who appear in the 'bill to' or 'sold to' fields of BD's electronic sales data for those purchases.") (emphasis added).

distributors and healthcare providers, while not discussed at all in the Distributors' papers, is hardly speculative or hypothetical.  The Distributor Plaintiffs initially opposed consolidation of the Distributor Plaintiffs' and the Healthcare Plaintiffs' actions because they were "in direct conflict with each other."  *See* Hearing Tr. (June 14, 2006), at 8:10-18 ("MR. PEARLMAN:  Yeah.  In direct conflict with each other.  That there [*sic*] were asserting competing theories of federal standing. That we are asserting the other is wrong factually and legally."), Ex. B to Macon Decl.[15]  Beyond this clear conflict, as discussed in detail in Medstar's opposition to the Distributor Plaintiffs' motion for findings or alternatively for partial summary judgment, the Distributor Plaintiffs lack injury with respect to the 76% of relevant sales for which they act as a delivery service and thus lack standing – both antitrust and Article III -- to settle claims arising out of those purchases.

Because the Settlement so greatly favors the Distributor Plaintiffs while extinguishing the federal claims of healthcare providers for virtually no consideration, it should not be granted preliminary approval.

---

[15] The Distributors, citing to this Court's September 7, 2006 order denying downstream discovery, claim that this Court has previously held that there is no conflict between members of the direct purchaser class. Prelim. Appr. Memo. at 25, citing Dkt. No. 98, at 11.  However, the Court was referring to the lack of conflicts between distributors, not the "direct purchaser class" as the settling parties have defined it.

## D.   The Distributors Cannot Rely on the *Endosurgical* Settlement as a Model

During their settlement negotiations, Becton and the Distributor Plaintiffs had a model not only well-known to the Distributors, but one which they themselves had vigorously *opposed* in another case – the settlement entered into in *In re Endosurgical Prods. Direct Purchaser Antitrust Litig.* (C.D. Cal.) ("*Endosurgical*") that received final approval in May 2009. In that case, Plaintiffs Niagara Falls Memorial Medical Center ("Niagara"), a direct purchaser, and Bamberg County Memorial Hospital and Nursing Center ("Bamberg"), an indirect purchaser, negotiated a settlement resolving the claims of direct *and* indirect purchasers. The settlement had three primary components: (1) a $13 million cash component, represented by the settling parties to be 1.7% of sales; (2) injunctive relief valued by the plaintiffs' expert at $26.1 million;[16] and (3) the defendant's agreement to pay $500,000 towards notice and administration expenses. Class counsel subsequently sought a $3.5 million fee equal to 26.9% of the *cash* portion of the settlement fund for attorneys' fees and expenses. *See* Final approval order, Ex. D to Declaration of Peter Pearlman ("Pearlman Decl."), at 20-21. They also sought a $10,000 incentive award for each of the two class representatives. *Id.* at 24.

---

[16] *See* Affidavit of Douglas A. Young, *In re Endosurgical Prods. Direct Purchaser Antitrust Litig.*, Dkt. No. 135-36, Ex. F to Macon Decl.

### 1.    The Delaware Valley objection

Plaintiff Delaware Valley Surgical Supply Company, Inc. ("Delaware Valley"), represented by Berger & Montague ("B&M"), counsel for the Distributor Plaintiffs here, filed a scathing objection to the *Endosurgical* settlement supported by a declaration from Eric L. Cramer. *See* Plaintiff Delaware Valley Surgical Supply Co., Inc.'s Opposition to Plaintiff Niagara Falls Memorial Medical Center's and Bamberg County Memorial Hospital and Nursing Center's Motion for Preliminary Approval of "Settlement", Dkt. No. 152 ("*Endosurgical* Objection"), Ex. G to Macon Decl. B&M claimed that the settlement provided "wholly-inadequate monetary relief" and "illusory injunctive relief." *Endosurgical* Objection at 1. It characterized the settlement, which according to B&M represented 0.3% of the defendant's sales during the class period (as opposed to the 1.7% represented by the settling parties), as a "***nuisance settlement***." *Id.* (emphasis added). *See also id.* at 7; 14 ($13 million amounts to settlement of "nuisance value"); and 19 (risks "do not justify a 'nuisance value' settlement such as the one now before this Court").

B&M found the settlement particularly troubling because its expert, who B&M acknowledged had done only a "preliminary" analysis, estimated damages to be between $237 million and $313 million from December 2001 through the end of 2003 alone. *Id.* at 2. In contrast, B&M argued that the settlement was

"uninformed by any analysis whatsoever of the range of recoverable damages." *Id.*
at 14. Importantly, B&M thought the settlement amounted to a *nuisance value
settlement* even though, unlike here -- where Becton paid a single competitor $100
million *before* trial to settle virtually the same claims at issue here -- a competitor
of the corporate defendant had previously tried – and *lost* – the same claims to a
jury. *Id.* at 3. B&M argued, citing to the $316 million settlement in *Spartanburg
Regional Health Care System, Inc. v. Hillenbrand Indus., Inc.*, C.A. No. 7:03-
2141-HFF-BHH (D.S.C.), negotiated by one of the co-lead firms for the Healthcare
Plaintiffs in this case, that the *Endosurgical* settlement amount was "low when
compared to analogous cases involving exclusionary bundling brought by
purchasers seeking recovery of overcharges." *Id.* at 4.

B&M further claimed that the settlement unfairly valued the claims of the
indirect purchaser plaintiffs over the claims of the direct purchaser class. *Id.* at 5.
It also argued that the settlement process was "tainted" because B&M had been
excluded from settlement negotiations. *Id.* at 6. Finally, B&M characterized the
*Endosurgical* settlement as the result of a "reverse auction." *Id.* at 7. Because
B&M believed all those infirmities to exist, it urged the *Endosurgical* court to give
the settlement "close judicial scrutiny," even at preliminary approval. *Id.* at 8.

## 2.   The *Endosurgical* court's holding

Despite B&M's claims, the *Endosurgical* court ultimately granted final approval of the settlement. *See* May 11, 2009 Order, Ex. D to Declaration of Peter Pearlman. First, the court rejected B&M's contention that the settlement amount was low relative to both potential recoverable damages and the merits of the case. *Id.* at 14. The court held that 2.2% of sales, the figure provided by class counsel in the case, was well within the range of settlements approved in similar cases, with "similar cases" defined as cases where alleged monopolists were sued first by competitors and then by purchasers. *Id.* at 12. The court refused to credit B&M's own damages estimate because B&M itself had conceded it was "preliminary" and in need of "further refinement." *Id.* at 15. Second, the court further rejected B&M's reliance on the *Spartanburg* case as an analogous case because in that case the class action followed a *successful* suit brought by a competitor plaintiff, the case was not subject to the Ninth Circuit's "higher standard" articulated in *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008), the defendant in that case had a "total monopoly," and the documents in *Spartanburg* were far more damaging. *Id.*

Third, the court rejected B&M's argument that the settlement provided specialized treatment to indirect purchasers because only they would benefit from the injunctive relief. *Id.* at 16-17. Fourth, the court rejected that the settlement

process was tainted because B&M had been excluded from it. The court noted that such exclusion could be appropriate in circumstances such as those that existed in that case where excluded counsel had such a divergent view of the strength case that their continued participation in settlement discussions would be counter-productive. *Id.* at 17. Fifth, it rejected B&M's argument that the settlement constituted a reverse auction because class counsel in that case could not be fairly characterized as "the most ineffectual class lawyers." *Id.* at 18.

## C.    The *Endosurgical* Defenses Fail Here

Given the lessons the Distributor Plaintiffs learned in *Endosurgical*, the Healthcare Plaintiffs fully expect that the settling parties will use Judge Selna's opinion in that case to justify their actions with regard to this Settlement, turning a loss there into a victory here. Thus, Healthcare Plaintiffs expect the settling parties to argue that the settlement amount is not obviously deficient, that the settlement process was not tainted because Healthcare Plaintiffs were properly excluded based on their allegedly divergent view of the value of the case, and that there was no reverse auction because the attorneys representing the Distributor Plaintiffs are talented antitrust lawyers. But there are multiple reasons why the *Endosurgical* defenses should be rejected here.

First, at the time the *Endosurgical* settlement was announced, the Court had already determined which plaintiffs were direct purchasers. *See* Order on Cross-

Motions for Partial Summary Judgment, Dkt. No. 96, *In re Endosurgical Prods. Direct Purchaser Antitrust Litig.*, Case No. 05-8809 (C.D. Cal. Aug. 2, 2007), Ex. H to Macon Decl., *aff'd*, *Delaware Valley Surgical Supply, Inc. v. Johnson & Johnson*, 523 F.3d 1116 (9th Cir. 2008). The plaintiffs in that case did not use the settlement as a disguised vehicle to obtain by fiat the "direct purchaser" title. Indeed, both direct and indirect purchaser plaintiffs negotiated the settlement – just without counsel for *one* of the direct purchaser plaintiffs.

Moreover, unlike here, there was never any dispute or deception associated with whether the *Endosurgical* settlement sought to release the claims of the direct and indirect purchasers. At the time they moved for preliminary approval, the settling parties made clear that they intended to release all claims,[17] and, in fact, according to the declaration filed by Eric Cramer, at the time the settlement was reached, counsel for the settling plaintiffs in *Endosurgical* candidly admitted that "B&M had been purposely excluded from those negotiations, and [] the proposed settlement would extinguish the claims both of direct and indirect purchasers." *Endosurgical* Obj. at 14 (citing Cramer Decl. ¶¶ 9-10). Here, in contrast, the Distributors first refused to disclose whether Healthcare Plaintiffs' claims had been

---

[17] *See* Memorandum in Support of Plaintiffs' Motion for Preliminary Approval of Settlement, *In re Endosurgical Prods. Direct Purchaser Antitrust Litig.*, Dkt No. 135-2, at 1 ("The settlement is an excellent result for both direct and indirect purchasers."), Ex. I to Macon Decl.

released,[18] and then, in opposing the Healthcare Plaintiffs' All Writs Motion, affirmatively but falsely stated that the Settlement would *not* resolve the claims of the Healthcare Plaintiffs. *See* Direct Purchaser Plaintiffs' Opposition to Healthcare Plaintiffs' Motion To Issue Injunction Under All Writs Act, Dkt. No. 314, at 1-2 ("The Indirects' premise is false: the release in the Settlement Agreement does not cover the Indirects, but pertains only to the Direct Purchaser Plaintiffs . . . and not entities that comprise the Indirects, who buy the relevant products 'through' the distributors.") (footnote and citations omitted); *id.* at 10 ("the proposed settlement would release, if approved, ***only the claims of the Directs.***") (emphasis in original). Such actions are far more indicative of a collusive settlement or reverse auction than the facts that existed in *Endosurgical.*

In addition, as set forth more fully in the Healthcare Plaintiffs' All Writs Act motion [Dkt. No. 313-7], the settling parties sought to exclude Healthcare Plaintiffs from their settlement discussions so that they could hide the true reason why they were no longer interested in pursuing Rule 56(f) discovery. While Becton had previously been interested in an expeditious resolution of the direct purchaser issue, beginning in November 2008, when the settling parties apparently began their secret negotiations, 56(f) discovery pursuant to CMO No. 10 ground to

---

[18] *See* Macon All Writs Act Decl., Dkt. No. 313-2, ¶¶ 5, 6 and Ex. B to same (unanswered letters from Kenneth A. Wexler to Bruce Gerstein).

a halt. *See* Declaration of R. Laurence Macon (May 7, 2009) "Macon All Writs Decl." [Dkt No. 313-2] ¶ 3. This change in course by Becton and the Distributor Plaintiffs makes it further evident that the primary purpose of this Settlement is not to give the Class adequate consideration for their claims, but rather to take the uncertainty and risk away from the direct purchaser issue in exchange for minimal consideration.

Second, one of the primary reasons the *Endosurgical* court believed that settlement to be adequate was because of the *failure of the competitor's lawsuit.*[19] In contrast, here RTI did not lose anything but, to the contrary, settled its case with Becton for *one hundred million dollars in cash. Retractable Techs., Inc. v. Becton Dickinson & Co.,* Case No. 01-00036 (DSF) (E.D. Tex.). Thus, while the *Endosurgical* plaintiffs could point to the adverse jury verdict in the underlying competitor case as a significant reason that their settlement was reasonable, here the Distributor Plaintiffs face the precise opposite: a successful competitor lawsuit resulting in a $100 million cash settlement.

---

[19] In addition, another competitor had filed suit in the United States District Court for the Southern District of New York alleging damages of $1.8 billion but settled for $11 million and another competitor filed suit in the United States District Court for the Eastern District of Texas but settled the case for a confidential sum. *See Endosurgical* Plaintiffs' motion for preliminary approval, at 2, Ex. I to Macon Decl and *Endosurgical* Defendants' Reply to Delaware Valley Surgical Supply Co.'s Opposition to Motion for Preliminary Approval of Settlement, Dkt. No. 162, at 2 (stating "The Settlement Agreement Provides More Value Than Any Other Litigant Has Obtained from J&J on Similar Claims"), Ex. J to Macon Decl.

Distributor Plaintiffs here thus can only argue that the state of the law is "unsettled" and point to allegedly "similar" bundling cases and the acknowledged difficulty of those cases to justify their Settlement. *See* Distributors' Prelim. Appr. Memo. at 9.   Indeed, much like the *Spartanburg* case discussed by the *Endosurgical* court, this case is being prosecuted in the presence of a *successful* competitor lawsuit. Moreover, unlike the *Endosurgical* case, *LePage's Inc. v. 3M*, 324 F.3d 141, 154 (3d Cir. 2003) (*en banc*) controls the standard upon which liability will be determined here and this case is not subject to the Ninth Circuit's "higher standard" articulated in *Cascade Health Solutions*, 515 F.3d 883; and documents squarely supporting plaintiffs' claims against Becton already have been produced. *See* Macon Decl. Ex. K.   These documents are even stronger as to Becton's intent to exclude competition with respect to its bundle pricing practices than the documents produced in *Spartanburg*.

In the end, the Distributor Plaintiffs' anticipated reliance on *Endosurgical* is wholly misplaced.

## E.    Even if this Court Grants Preliminary Approval, It Must Require the Settling Parties to Amend Their Notice To Advise Healthcare Providers of the Deficiencies of the Settlement

Even if this Court is inclined to grant preliminary approval, as a condition of approval it should require the settling parties to amend their notice to (1) describe the direct purchaser controversy in this litigation and state that a term of the

Settlement Agreement is that the Court will enter an order resolving that controversy in favor of the Distributor Plaintiffs; (2) affirmatively state that healthcare providers and other types of entities have isolated and atypical purchases that appear in the "bill to" or "sold to" columns of Becton's sales data and that the presence of those isolated purchases in Becton's sales data will have the effect of including them in the Class and thereby releasing *all* of their federal antitrust claims under the Settlement; and (3) set forth the Healthcare Plaintiffs' evaluation of the value of those claims so that healthcare providers can make an informed decision regarding whether to opt out of the Settlement.[20] If the Court grants this relief, the Healthcare Plaintiffs will promptly submit proposed language for the Court's consideration.

Notice must meet the requirements of the Due Process Clause and Rule 23. The Due Process Clause requires that notice be "reasonably calculated, under all

---

[20] One additional troubling aspect of the Settlement is that the settling parties propose to supplement direct notice by publication notice in *Health Care Distributor*, a publication that by its title is directed to distributors. The proposed order states that this publication (which is not named in the proposed order) is appropriate because "Direct Purchaser Class members . . . are mainly medical device wholesalers and retailers." *Id.* ¶ 8(e). This is most certainly not the case. In contrast, the plaintiffs in the *Endosurgical* settlement, who acknowledged they were resolving the claims of direct and indirect purchaser plaintiffs, published notice in *The Wall Street Journal, AHA News, Surgical Products, Hospital & Health Networks, Modern Healthcare* and *Materials Management in Healthcare.* Notice Program, *In re Endosurgical Prods. Direct Purchaser Antitrust Litig.*, at 7-9, Ex. L to Macon Decl.

the circumstances, to apprise interested parties of the pendency of the action and

afford them an opportunity to present their objections." *Mullane v. Cent. Hanover*

*Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  Courts have directed settling parties

to amend notice provisions to ensure that the proposed notice is the "best notice

practicable under the circumstances," and properly informs class members about

the settlement and their rights under the settlement pursuant to the Due Process

Clause and Rule 23.[21]

1.    **It is Appropriate to Amend the Notice because Class Members Cannot Ascertain Whether They are Members of the Class**

It is appropriate to require the class notice to inform class members that

entities that have isolated and atypical purchases may appear in the "bill to" or

---

[21] *See, e.g., Martin v. FedEx Ground Package Sys., Inc.*, No. C 06-6883 VRW, 2008 U.S. Dist. LEXIS 106524, at *19-22 (N.D. Cal. Dec. 31, 2008) (indicating that notice to the class must be "the best practicable under the circumstances" and evaluating whether parties' revised notice addressed the court's concerns and "adequately apprise[d] class members of their rights under the settlement."); *see also Fry v. Hayt, Hayt & Landau*, 198 F.R.D. 461, 474-75 (E.D. Pa. 2000) (holding that while proposed notice was reasonable under due process and Rule 23, revisions to notice were required to provide additional information to the class); *Smith v. Ajax Magnethermic Corp.*, No. 4:02CV0980, 2007 U.S. Dist. LEXIS 85551, at *21 (N.D. Ohio Nov. 7, 2007) (indicating that plaintiffs submitted revised notice at the court's direction and that the revised notice satisfied requirements under Rule 23); *Kaufman*, 2009 U.S. Dist. LEXIS 119397, at *19-20 (granting leave to file an amended notice consistent with the court's opinion and Rule 23 requirements); *cf. Lepinske v. Mercedes Homes, Inc.*, No. 6:07-cv-915-Orl-31DAB, 2008 U.S. Dist. LEXIS 111166, at *10-11, *14 (M.D. Fla. July 7, 2008) (tentatively approving settlement and requiring parties to file a revised notice incorporating minor edits suggested by the court).

"sold to" columns of Becton's sales data. Without such disclosure, class members may not be able to determine whether they are members of the Class because the Class is defined with reference to whether an entity appears in Becton's sales data, a source to which class members have no access.[22] The Manual for Complex Litigation provides that: "[a]lthough the identity of individual class members need not be ascertained before class certification, the membership of the class must be ascertainable." Manual for Complex Litigation § 21.222 4th ed. (2004). "[A] class must be identifiable as a class before an action can be certified." *G.M. Sign, Inc. v. Franklin Bank*, No. 06 C 949, 2007 U.S. Dist. LEXIS 91512, at *6 (N.D. Ill. Dec. 13, 2007) (citing *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006)); *see also McElhaney v. Eli Lilly & Co.*, 93 F.R.D. 875, 877 (D.S.D. 1982) ("Prior to a consideration of the criteria established by Rule 23, the Court must determine whether a class exists and is capable of legal definition.") (citation omitted).

For example, in *G.M. Sign*, defendant Franklin Bank contracted with an advertising company to fax advertisements regarding defendant's loan programs. *G.M. Sign*, 2007 U.S. Dist. LEXIS 91512, at *2. Plaintiff G.M. Sign brought a

---

[22] The Distributors seem to suggest that because Becton's sales data has been produced *in this litigation*, membership in the Class should be clear (Prelim. Appr. Memo. at 34), but not every member of the Settlement class has access to what has been produced in this case. Indeed, because there are approximately 2,000 members of the Class, very few do.

class action lawsuit against defendant, in part, alleging violations of a state

consumer protection statute and sought to certify a class

> containing all persons who, during the four-year period prior to the
> filing of the action, were sent telephone facsimile messages of
> material advertising the commercial availability of any property,
> goods, or services by or on behalf of Franklin Bank for whom
> Franklin Bank cannot provide evidence of prior express permission or
> invitation for the sending of such messages.

*Id.* at *2-3. The court held that plaintiff's proposed class definition was

"unworkable," *id.* at *5, because it contained components that were *"outside the*

*knowledge of potential class members,* making it impossible for them to ascertain

their membership within the class . . . ." *Id.* at *8 (emphasis added). The court

found that, while a class member could determine whether he or she received the

fax, it would be impossible for a class member to know whether the defendant had

received permission or an invitation for the fax to be sent. *Id.* Due to the defects

in plaintiff's proposed class definition, the court declined to analyze any of

plaintiff's other arguments regarding class certification. *Id. See also McElhaney,*

93 F.R.D. at 877-78 (holding where plaintiff's proposed class consisted of "'all

male and female young people residing in South Dakota who are similarly situated

in that they have been exposed to DES as unborn children'" was deficient because

many members of the class likely had no access to their mothers' medical records

and as a result "a large number of persons . . . will never be able to determine

34

whether they were exposed to DES."). Likewise here, since class members have no access to Becton's claims data, the class is not ascertainable as defined.[23]

### 2. It is Appropriate to Amend the Notice to Explain the Procedural Posture of this Settlement and to Explain that There Exist Substantially Differing Views on Estimates for Potential Recovery

It is further appropriate to amend the notice as Healthcare Plaintiffs have proposed in order to explain that this Settlement seeks to resolve the claims of competing plaintiffs and to convey that one set of plaintiffs places a much higher value on the claims being released. The purpose of notice in the class action context is to explain fully and accurately the basis for a settlement and to give settlement class members the opportunity to accurately assess their options. *See Mullane*, 339 U.S. at 314. The Court may thus direct revisions to the proposed notice of settlement where "[s]uch information is necessary for a putative class member to weigh the pros and cons of accepting the settlement or choosing to opt out of the class." *Fry*, 198 F.R.D. at 475.

In addition, several courts have held that notice requirements were satisfied where the proposed notice included estimates of potential recovery. *See, e.g.,*

---

[23] The notice does state that if a class member has any questions about class membership they can contact Class Counsel [*id.* § 7 at 7], but such a "fix" does not cure the defect in the class definition itself. Moreover, given Distributor Counsel's conflict of interest, it cannot be presumed that, if a Healthcare Provider were to call, complete and accurate disclosure about the consequences of remaining in the case will be made.

*Martin*, 2008 U.S. Dist. LEXIS 106524, at *20-22 (indicating that counsel amended notice to address the court's concerns where notice "did not explain the basis for class counsel's estimate of class damages, state the total damages available if the case went to trial, or give an estimate of a typical class member's recovery under the proposed settlement."); *see also In re Ikon Office Solutions, Inc.*, 194 F.R.D. 166, 175 (E.D. Pa. 2000) (holding notice met due process and Rule 23 requirements where "[i]t contained a detailed explanation of the settlement terms, including estimates of potential recovery if the action were to proceed to trial and counsel's reasons for proposing the settlement."); *cf. In re Microstrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 670 (E.D. Va. 2001) (approving notice that "provided a statement of the parties' disagreement as to the potential damages recoverable in the case"); *In re Aetna Inc. Sec. Litig.*, MDL No. 1219, 2001 U.S. Dist. LEXIS 68, at *18 (E.D. Pa. Jan. 4, 2001) (holding that the proposed notice satisfied due process and Rule 23 where, "[r]ather than estimat[ing] the potential recovery if the action were to proceed to trial, the Notice list[ed] the issues on which the parties disagree with respect to damages.").

* * *

In short, the Healthcare Plaintiffs' proposals to amend the class notice are reasonable. Notably, although resolution of the direct purchaser issue was the *sine qua non* of the Distributors' willingness to enter into the Settlement, the notice

nowhere describes that term of the Settlement. If healthcare providers and entities other than distributors are going to release federal antitrust claims, they should do so only after being fully informed as to what they are giving up.

## V.    Conclusion

For all of the above reasons, this Court should deny preliminary approval of the Settlement or, in the alternative, amend the proposed class notice in the manner proposed by the Healthcare Plaintiffs, and grant all other relief that this Court deems just and appropriate.

DATED:  February 19, 2010                    Respectfully submitted,

By:  /s/ James V. Bashian
Law Offices of James V. Bashian, P.C.
500 Fifth Avenue, Suite 2700
New York, NY  10110
(212) 921-4110 – Telephone
jbashian@bashianlaw.com

R. Laurence Macon
Akin Gump Strauss Hauer & Feld LLP
300 Convent Street, Suite 1500
San Antonio, TX  78205-3732
(210) 281-7000 – Telephone
lmacon@akingump.com

Richard L. Wyatt
Todd M. Stenerson
Torsten M. Kracht
Hunton Williams LLP
1900 K Street, NW
Washington, DC  20006
(202) 955-1500 – Telephone
rwyatt@hunton.com
tstenerson@hunton.com
tkracht@hunton.com

Kenneth A. Wexler
Jennifer Fountain Connolly
Amber M. Nesbitt
Wexler Wallace LLP
55 W. Monroe Street, Suite 3300
Chicago, IL  60603
(312) 346-2222 – Telephone
kaw@wexlerwallace.com
jfc@wexlerwallace.com
amn@wexlerwallace.com

Judith L. Spanier
Karin E. Fisch
Abbey Spanier Rodd & Abrams, LLP
212 E. 39th Street
New York, NY  10016
(212) 889-3700 – Telephone
kfisch@abbeyspanier.com

***Counsel for the Healthcare Plaintiffs***

## CERTIFICATE OF SERVICE

I, Elizabeth A. Vitt, hereby certify that, on the 19th day of February, 2010, copies of the above-captioned Healthcare Provider Plaintiffs' Opposition to Motion for Preliminary Approval of Settlement were served by U.S. mail, postage prepaid, and by electronic mail where addresses are noted, on the parties listed on the attached service list, together with supporting declarations of R. Laurence Macon, Torsten M. Kracht, Kenneth A. Wexler, and exhibits.

Elizabeth A. Vitt

## SERVICE LIST

# ATTORNEYS FOR DEFENDANT   BECTON DICKINSON

LOWENSTEIN SANDLER PC
Gregory B. Reilly
Scott L. Walker
Ellen B. Unger
65 Livingston Avenue
Roseland, NJ 07068
greilly@lowenstein.com
swalker@lowenstein.com
eunger@lowenstein.com

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Theodore V. Wells, Jr.
Moses Silverman
Robert A. Atkins
Steven Herzog
Jacqueline P. Rubin
1285 Avenue of the Americas
New York, NY 10019
twells@paulweiss.com
ratkins@paulweiss.com
msilverman@paulweiss.com
sherzog@paulweiss.com
jrubin@paulweiss.com

(continued on next page)

ATTORNEYS FOR DISTRIBUTOR PLAINTIFFS

BERGER & MONTAGUE, P.C.
Daniel Berger
Eric L. Cramer
1622 Locust Street
Philadelphia, PA  19103
danberger@bm.net
ecramer@bm.net

BERGER SINGERMAN, PA
Mitchell W. Berger
350 East Las Olas Boulevard, Suite 1000
Fort Lauderdale, FL 33301
mberger@bergersingerman.com

COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP
Peter S. Pearlman
Park 80 Plaza West-One
Saddle Brook, NJ 07663
psp@njlawfirm.com

FARUQI & FARUQI, LLP
Peter R. Kohn
2600 Philmont Avenue, Suite 324
Huntingdon Valley, PA 19006
pkohn@faruqilaw.com

GARWIN GERSTEIN & FISHER, LLP
Bruce E. Gerstein
Joseph Opper
Noah Silverman
1501 Broadway,  Suite 1416
New York, NY 10036
bgerstein@garwingerstein.com
jopper@garwingerstein.com
nsilverman@garwingerstein.com
(continued on next page)

41

HAGENS BERMAN SOBOL SHAPIRO LLP
David S. Nalven
Thomas M. Sobol
One Main Street, Fourth Floor
Cambridge, MA 02142
davidn@hbsslaw.com
tom@hbsslaw.com

HANGLEY, ARONCHICK, SEGAL & PUDLIN
Steve D. Shadowen
30 North Third Street, Suite 700
Harrisburg, PA 17101
sshadowen@hangley.com

KAPLAN FOX & KILSHEIMER LLP
Linda P. Nussbaum
Robert N. Kaplan
805 Third Avenue
New York, NY 10022
lnussbaum@kaplanfox.com
rkaplan@kaplanfox.com

KIRBY MCINERNEY LLP
Kenneth G. Walsh
Christopher S. Studebaker
825 Third Avenue, 10th Floor
New York, NY 10022
kwalsh@kmllp.com
cstudebaker@kmllp.com

KOZYAK TROPIN & THROCKMORTON PA
Adam M. Moskowitz
Gail A. McQuilkin
Thomas A. Ronzetti
2525 Ponce de Leon Boulevard, Ninth Floor
Miami, FL 33134
amm@kttlaw.com
gam@kttlaw.com
tr@kttlaw.com
(continued on next page)

LAW OFFICE OF ALFRED G. YATES, JR., PC
Alfred G. Yates, Jr.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
yateslaw@aol.com

LAW OFFICES OF JOSHUA P. DAVIS
Joshua P. Davis
437 Valley Street
San Francisco, CA 94131

LEVIN, FISHBEIN, SEDRAN & BERMAN
Howard J. Sedran
510 Walnut Street, Suite 500
Philadelphia, PA   19106
hsedran@lfsblaw.com

ODOM & DES ROCHES, LLP
Andrew Kelly
Charles F. Zimmer II
John Gregory Odom
Stuart E. Des Roches
650 Poydras Street, Suite 2020
New Orleans, LA 70130
akelly@odrlaw.com
czimmer@odrlaw.com
jodom@odrlaw.com
stuart@odrlaw.com

ROBERTS LAW FIRM, P.A.
Michael L. Roberts
20 Rahling Circle
Little Rock, AK 72223
mikeroberts@aristotle.net

(continued on next page)

RODA & NAST, PC
Dianne M. Nast
801 Estelle Drive
Lancaster, PA 17601
dnast@rodanast.com

SPECTOR ROSEMAN KODROFF & WILLIS, P.C.
Jeffrey L. Kodroff
John A. Macoretta
1818 Market Street, Suite 2500
Philadelphia, PA  19103
jkodroff@srkw-law.com
jmacoretta@srkw-law.com

THE SMITH FOOTE LAW FIRM, LLP
David C. Raphael, Jr.
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309
draphael@smithfoote.com

WALDER HAYDEN & BROGAN
Rebekah R. Conroy
5 Becker Farm Road
Roseland, NJ 07068
rrconroy@whbesqs.com