COHN LIFLAND PEARLMAN
 HERRMANN & KNOPF LLP
Peter S. Pearlman
Park 80 Plaza West-One
Saddle Brook, NJ  07663
Telephone:  (201) 845-9600
Fax:  (201) 845-9423

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

### *"DOCUMENT TO BE FILED ELECTRONICALLY"*

| | | |
|---|---|---|
| In re: HYPODERMIC PRODUCTS DIRECT PURCHASER ANTITRUST LITIGATION | : : : : | Master Docket No. 05-1602 (JLL/CCC) |
| | : | MDL No. 1730 |
| THIS DOCUMENT RELATES TO: The Consolidated Direct Purchaser Class Actions:  Louisiana Wholesale Drug Company, Inc. (05-1602), Rochester Drug Co-Operative, Inc. (05-1602), JM Smith Corporation (05-1602), Dik Drug Company (05-4465), SAJ Distributors, Inc. (05-5891), American Sales Co. Inc. (06-1204), and Park Surgical Co., Inc. (06-1205) | : : : : : : : : : : : | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION OF THE DIRECT PURCHASER PLAINTIFFS THAT THE COURT MAKE PARTICULAR FINDINGS RELATING TO DIRECT PURCHASER STANDING, OR, ALTERNATIVELY, FOR PARTIAL SUMMARY JUDGMENT

## [REDACTED]

# TABLE OF CONTENTS

Table of Authorities.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

UNDISPUTED FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I.    Each of the Direct Purchaser Plaintiffs Has Direct Purchaser
      Standing to Assert Damage Claims Against BD Under Section 4
      of the Clayton Act for All BD Hypodermic Products it Purchased
      from BD.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

II.   Medstar and Hebrew Home Do Not Have Direct Purchaser
      Standing to Assert Damage Claims Against BD Under Section 4 of
      the Clayton Act for Any BD Hypodermic Products Any of Them
      Purchased From or Through a Distributor or Other Intermediary. . . . . . . . 23

III.  Only Those Purchasers of BD Hypodermic Products Who Purchased
      Those Products from BD and Were Invoiced by BD for Those
      Products Have Direct Purchaser Standing to Assert Damage Claims
      Against BD under Section 4 of the Clayton Act with Respect to Class
      Purchases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## TABLE OF AUTHORITIES

### CASES

*Campos v. Ticketmaster Corp.*,
    140 F.3d 1166 (8th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Delaware Valley Surg. Supply, Inc. v. Johnson & Johnson*,
    523 F.3d 1116 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Gulfstream III Assoc., Inc. v. Gulfstream Aerospace Corp.*,
    995 F.2d 425 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 28

*Hanover Shoe, Inc. v. United Machinery Corp.*,
    392 U.S. 481 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 16, 17

*Howard Hess Dental Labs., Inc. v. Dentsply Int'l Inc.*,
    424 F.3d 363 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*In re Brand Name Prescription Drugs Antitrust Litig.*,
    1996 WL 267752 (N.D. Ill. May 17, 1996),
    *aff'd*, 123 F.3d 599 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*In re Microsoft Antitrust Litig.*,
    127 F. Supp.2d 702 (D. Md. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Kansas v. UtiliCorp United, Inc.*,
    497 U.S. 199 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Kloth v. Microsoft Corp.*,
    444 F.3d 312 (4th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 28, 29

*McCarthy v. Recordex Service, Inc.*,
    80 F.3d 842 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*St. Francis Med. Center v. C.R. Bard, Inc.*,
    2009 U.S. Dist. LEXIS 89166 (E.D. Mo. Sept. 28, 2009). . . . . . . . . . *passim*

## **OTHER AUTHORITIES**

Wright & Miller, FEDERAL CIVIL PROCEDURE § 2575. . . . . . . . . . . . . . . . . . . . . . 6

## PRELIMINARY STATEMENT

Contemporaneously with their motion seeking preliminary approval of a proposed $45 million settlement ("Settlement") with defendant Becton, Dickinson and Company ("BD"),[1] the Direct Purchaser Plaintiffs hereby seek a judicial determination, on which consummation of the Settlement depends, that the proposed settlement class of direct purchasers — who are predominantly distributors and other middlemen who purchased Hypodermic Products directly from BD — have standing to seek damages under the Clayton Act.[2]

This motion also seeks a judicial determination, equally necessary to the Settlement, that the self-styled Healthcare Purchaser Plaintiffs[3] — who are

---

[1] *See* "Direct Purchaser Plaintiffs' Motion for Certification of the Proposed Direct Purchaser Class, Preliminary Approval of Proposed Settlement, Approval of the Form and Manner of Notice to the Class, and Setting of Final Settlement Schedule and Hearing," filed contemporaneously herewith.

[2] The consolidated Direct Purchaser Plaintiffs, so denominated by CMO 5 (Doc. #33) and CMO 7 (Doc. #75), but colloquially referred to as the "Distributor Plaintiffs," are Louisiana Wholesale Drug Company, Inc. (05-1602), Rochester Drug Co-Operative, Inc. (05-1602), JM Smith Corporation (05-1602), Dik Drug Company (05-4465), SAJ Distributors, Inc. (05-5891), American Sales Co., Inc. (06-1204), and Park Surgical Co., Inc. (06-1205).

[3] The "Healthcare Purchaser Plaintiffs," who originally described themselves as "Indirect Purchaser Plaintiffs" in Case Management Order 7 (Doc. #75) and elsewhere, are MedStar Health, Inc., MedStar-Georgetown Medical Center, Inc., Washington Hospital Center Corporation, and National Rehabilitation Hospital, Inc. (collectively "MedStar") and Hebrew Home for the Aged at Riverdale ("Hebrew Home").

predominantly hospitals who say they purchased BD Hypodermic Products *from distributors*, and thus *not* directly from BD — lack such standing.

The judicial determinations sought here are simple and straightforward. There is no genuine dispute over the material facts, and the controlling law is clear. For over 40 years, the Supreme Court has held that only purchasers who pay overcharges *directly to the defendant* have been "injured" within the meaning of Section 4 of the Clayton Act. *See Hanover Shoe, Inc. v. United Machinery Corp.*, 392 U.S. 481, 489 (1968) ("*Hanover Shoe*") and *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 724-25 (1977) ("*Illinois Brick*"). By contrast, those who buy through middlemen are *not* direct purchasers and therefore *cannot* recover damages under the Clayton Act. *Id.*

Telling the difference between a direct purchaser and an indirect purchaser involves bright line rules with no applicable exceptions. An indirect purchaser is simply defined as someone who buys through a middleman, such as a dealer or distributor. *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199, 207 (1990) ("*UtiliCorp*"); *McCarthy v. Recordex Service, Inc.*, 80 F.3d 842, 852 n.15 (3d Cir. 1996) ("in order for a consumer to be considered an indirect purchaser of an item . . . it is only necessary that the consumer have purchased the item *through a middleman*") ("*McCarthy*"); *Howard Hess Dental Labs., Inc. v. Dentsply Int'l Inc.*, 424 F.3d 363, 372-73 (3d Cir. 2005) (plaintiff admitted he was an indirect purchaser

where his complaint limited the plaintiff class to those "who purchased . . . *through Dentsply Dealers*") (emphasis in original) ("*Dentsply*"). In circumstances virtually identical to those here — where hospitals like the Healthcare Purchaser Plaintiffs were members of a Group Purchasing Organization ("GPO") — the Ninth Circuit and a district court in the Eighth Circuit recently held that distributors were the direct purchasers from the product manufacturer, and the hospitals that bought through those distributors were indirect purchasers. *See Delaware Valley Surg. Supply, Inc. v. Johnson & Johnson*, 523 F.3d 1116 (9th Cir. 2008) ("*Delaware Valley*"); *St. Francis Med. Center v. C.R. Bard, Inc.*, 2009 U.S. Dist. LEXIS 89166, *90-*95 (E.D. Mo. Sept. 28, 2009) ("*St. Francis*").

The Direct Purchaser Plaintiffs here are clearly "direct purchasers" from BD under *Illinois Brick*. They ordered Hypodermic Products directly from BD, took delivery directly from BD, were invoiced directly BD, and paid BD directly. BD has admitted this in discovery. *See* Direct Purchaser Plaintiffs' Statement of Undisputed Material Facts ("SOF") ¶ 1.

By contrast, the self-described "Healthcare Purchaser Plaintiffs" are obviously indirect purchasers under controlling law, because they bought BD Hypodermic Products **not** directly from BD, but instead **through distributors**. They said so themselves, in their Complaints, just as the disappointed plaintiffs did in *Dentsply*.

-3-

*See* MedStar Amend. Compl. ¶ 50 (Doc. #90) ("[a]t all relevant times, Class members, including hospitals and other healthcare providers, purchased Disposable Hypodermic Products from Becton *through authorized distributors*") (emphasis added); Hebrew Home Compl. ¶ 48 (Doc. # 3-2 at No. 07-2128) (same).

During discovery the Healthcare Purchaser Plaintiffs reiterated that they bought through distributors, and not from BD directly. SOF ¶ 2.[4] BD provided additional confirmation that the BD Hypodermic Products the Healthcare Purchaser Plaintiffs obtained through distributors were first purchased directly from BD *by those distributors, not* by the Healthcare Purchaser Plaintiffs. SOF ¶ 6.

Therefore, the Direct Purchaser Plaintiffs, on behalf of themselves and the proposed Direct Purchaser Class,[5] hereby move that the Court make each of the three

---

[4]For its part, Hebrew Home has refused to participate in discovery on the "direct purchaser" issue.

[5]The Direct Purchaser Class as defined in Paragraph 1 of the Settlement Agreement between BD and the Direct Purchaser Plaintiffs is:

> All persons and entities (and assignees of claims from such persons and entities) who (1) purchased BD Hypodermic Products in the United States from BD at any time during the period of March 23, 2001 through the date of this Settlement Agreement (the "Class Period") and (2) were invoiced by BD for said purchases. The Direct Purchaser Class excludes BD, BD's parents, subsidiaries and affiliates, and United States Government Entities and those
>
> (continued...)

(3) findings contained in Paragraph 3 of the [Proposed] Order Preliminarily Approving Direct Purchaser Class's Proposed Settlement, Authorizing Notice to the Class, and Setting Final Settlement Schedule and Hearing (the "Preliminary Approval Order").[6] The three (3) enumerated findings — on which the Settlement Agreement is expressly conditioned, and absent which the proposed $45 million settlement will become null and void — are as follows:

> 3. The Court finds (i) each of the Direct Purchaser Plaintiffs has Direct Purchaser standing to assert damage claims against BD under Section 4 of the Clayton Act for all BD Hypodermic Products it purchased from BD; (ii) MedStar Health, Inc., MedStar-Georgetown Medical Center, Inc., Washington Hospital Center Corporation, National Rehabilitation Hospital, Inc., and the Hebrew Home for the Aged at Riverdale do not have Direct Purchaser standing to assert damage claims against BD under Section 4 of the Clayton Act for any BD Hypodermic Products any of them purchased from or through a distributor or other intermediary, and (iii) only those purchasers of BD Hypodermic Products who purchased those products from BD and were invoiced by BD for those products have Direct Purchaser standing to assert damage claims against BD under Section 4 of the Clayton Act with

---

[5](...continued)
> persons or entities who are permitted by the Court to opt out of the Direct Purchaser Class.

*See* Declaration of Peter S. Pearlman, Esq. in Support of Direct Purchaser Plaintiffs' Preliminary Approval Motion ("Pearlman Approv. Decl.") Ex. A, ¶ 1.

[6]Pearlman Approv. Decl. Ex. C, ¶ 3.

respect to Class Purchases,[7] as defined in paragraph 4 below.

*See* Preliminary Approval Order (Pearlman Approv. Decl. Ex. C) ¶ 3 (findings); *see also* Settlement Agreement (Pearlman Approv. Decl. Ex. A) ¶ 2 ("[t]his Settlement Agreement is expressly conditioned on these findings being included in the Court's orders granting preliminary and final approval of the settlement").[8] Alternatively, the Direct Purchaser Plaintiffs move that partial summary judgment be entered in their

---

[7]The Direct Purchaser Plaintiffs and BD have used the phrase "Class Purchases" in the proposed class definition and release language to clearly identify and limit the purchases (and purchasers) of BD Hypodermic Products to which the Settlement Agreement and its Releases pertain. "Class Purchases" are limited to those transactions where a Class member is the "bill to" or "sold to" entity in BD's electronic sales data (which was produced to all parties in discovery in this case), and the Direct Purchaser Class and Released Claims are limited to such entities and such purchases. *See* Pearlman Approv. Decl. Ex. A, ¶¶ 1, 13 (Settlement Agreement); *id.* Ex. A at Ex. A ¶ 4 (Preliminary Approval Order); *id.* Ex. A at Ex. C ¶ 3 (Proposed Order and Final Judgment). Only entities that are invoiced by and pay BD directly appear as the "bill to" or "sold to" entity in BD's electronic sales data. SOF ¶ 13. Entities (like the Healthcare Purchaser Plaintiffs) that purchase BD Hypodermic Products through BD's distributors (the class definitions contained in the Healthcare Purchaser Plaintiffs' complaints) do *not* appear as the "bill to" or "sold to" entity in BD's electronic sales data for such purchases. SOF ¶¶ 13-15. Thus, the purchases for which the Healthcare Purchaser Plaintiffs seek to recover as "direct purchasers" are not part of the "Released Claims" under the plain terms of the Settlement Agreement, nor even are the entities on whose behalf the Healthcare Purchaser Plaintiffs seek to recover releasing parties or Class members under that Settlement Agreement.

[8]The making of such findings is permitted under Fed. R. Civ. P. 52. *See* Wright & Miller, Federal Civil Procedure § 2575 (although not mandatory on a motion, "findings are desirable and ought to be made").

favor, and against the Healthcare Purchaser Plaintiffs, on the issue of standing to seek damages under the Clayton Act.

## BACKGROUND

This motion is submitted in connection with the proposed settlement between the proposed Direct Purchaser Class and BD, providing for the immediate payment of $45 million in cash to the Direct Purchaser Class (the "Settlement"). *See* Pearlman Approv. Decl. Ex. A (Settlement Agreement).

The Settlement Agreement makes clear that Direct Purchaser Class members are limited to "entities who appear in the 'bill to' or 'sold to' fields of BD's electronic sales data" (data which was produced by BD to Plaintiffs in the course of discovery), and that the claims of such Class members that are compromised in the Settlement Agreement are limited to such purchases where Class members appear as the "bill to" or "sold to" entities in that data (defined as "Class Purchases"). *See* Pearlman Approv. Decl. Ex. A, ¶ 1.

The Settlement is expressly conditioned on the Court's determination that (i) each of the Direct Purchaser Plaintiffs has direct purchaser standing to assert damages claims against defendant BD under Section 4 of the Clayton Act for all BD

Hypodermic Products[9] it purchased from BD; (ii) Medstar and Hebrew Home are not direct purchasers with standing to assert damages claims against BD under Section 4 of the Clayton Act for any BD Hypodermic Products they purchased from or through a distributor or other intermediary; and (iii) only those purchasers of BD Hypodermic Products who purchased from BD and were invoiced by BD for those purchases have direct purchaser standing to assert damage claims with respect to Class Purchases. *See* Settlement Agreement ¶ 2 (Pearlman Approv. Decl. Ex. A).

The issue of direct purchaser standing has stalled this case for over two years. MedStar initially raised the issue in its opposition to BD's motion to dismiss its complaint, characterizing its claims as relating to "sales in which the prices have been set through contracts between a putative class member and Becton." *See* Doc. # 117 at 26-29, 28 n.26; Mem. in Support of Mot. to Strike the Distributor Pl.'s Self-Styled "Reply," at 2 (MedStar says it and the class it seeks to represent "are the 'direct purchasers' of Becton's products for . . . sales . . . that occur pursuant to contracts executed by Group Purchasing Organizations (GPOs) on behalf of their member

---

[9]"BD Hypodermic Products" are products sold by BD in the following device categories: (a) safety and conventional hypodermic needles and syringes; (b) safety and conventional blood collection devices, inclusive of needles, blood collection tubes and tube holders; (c) safety and conventional IV catheters, including winged IV catheters; and (d) safety and conventional insulin delivery devices. *See* Settlement Agreement ¶ 1 (Pearlman Approv. Decl. Ex. A).

hospitals and healthcare providers") (Doc. #126).  In its complaint, MedStar seeks overcharge damages as a direct purchaser only for such "contract purchases" it made through BD's authorized distributors, something this Court observed in its decision denying BD's motion to dismiss.  *See* Doc. #182, at 9.

Subsequently, several of the Direct Purchaser Plaintiffs served a motion for partial summary judgment, seeking a ruling that they have standing to assert claims against BD under Section 4 of the Clayton Act for overcharge damages on all BD Hypodermic Products they bought from BD and for which they paid BD, regardless whether they subsequently resold those units to a third party (like MedStar or Hebrew Home) that had a GPO contract covering such products.

Medstar served a parallel motion for partial summary judgment seeking a ruling that it (and not its distributors, Cardinal Health, Inc. ("Cardinal") and Owens & Minor, Inc.) had direct purchaser standing for units of BD Hypodermic Products it purchased through those distributors pursuant to "Net Dealer Acquisition"-type GPO contracts.  Thus, the identity of the units of BD Hypodermic Products at issue — which have sometimes been referred to as the "contested units" — has long been clear to the parties:  units of BD Hypodermic Products that a member of the Direct Purchaser Class (*e.g.*, a distributor) first buys from BD, and then subsequently resells to MedStar, Hebrew Home, or another entity in MedStar's proposed class that has a

-9-

GPO contract and who purchases the units "through" that distributor.

Discovery on this issue is now complete, and the issue is ripe for a determination. Therefore, the Direct Purchaser Plaintiffs request that the Court make the findings contained in Paragraph 3 of the Preliminary Approval Order, so they may consummate their Settlement and bring a substantial portion of this litigation to a close. Alternatively, the Direct Purchaser Plaintiffs request that the Court enter partial summary judgment in their favor and against the Healthcare Purchaser Plaintiffs on the issue of standing to seek damages under the Clayton Act.

## UNDISPUTED FACTS

All of the relevant facts have been developed in discovery. There is no genuine dispute about those facts.

### A.    Named Distributor Plaintiffs

Five of the Direct Purchaser Plaintiffs were deposed by counsel for the Healthcare Purchaser Plaintiffs pursuant to Fed. R. Civ. P. 30(b)(6).[10]  Each is a distributor or wholesaler.  Each testified, without qualification, that for each and every Hypodermic Product it received from BD: (1) it placed its order directly with BD, (2) it was invoiced directly by BD, (3) it paid BD directly, and (4) this was true

---

[10] The Healthcare Purchaser Plaintiffs elected not to depose SAJ Distributors, Inc. or American Sales Co., Inc.

even of the BD Hypodermic Products it ultimately resold to a customer (like the Healthcare Purchaser Plaintiffs) that happened to be a member of a GPO that had a contract with BD. SOF ¶ 1. BD confirmed the Direct Purchaser Plaintiffs' testimony. *Id.*

### B.   MedStar

#### 1.   MedStar admits it purchased from distributors like Cardinal

MedStar admitted in discovery that it did ***not*** purchase directly from BD for any relevant transaction. SOF ¶ 2. Instead, MedStar's corporate designee admitted that when MedStar bought BD Hypodermic Products, it did so from a distributor called Cardinal. *Id.* MedStar and Cardinal gave identical testimony: MedStar would order from Cardinal (not BD); Cardinal would pull the products from Cardinal's general inventory; Cardinal (not BD) would invoice MedStar; and MedStar would pay Cardinal directly (not BD). *Id.* Cardinal bore the risk of loss of BD Hypodermic Products until they were delivered to MedStar. SOF ¶ 10. Prior to MedStar's purchasing BD Hypodermic Products from Cardinal, Cardinal had to buy them directly from BD. SOF ¶ 6. MedStar admitted that the final invoice price paid by MedStar to Cardinal was set by Cardinal, not by BD. SOF ¶ 11.

-11-

### 2. The GPO contracts show MedStar purchased from distributors

MedStar was a member of a GPO called Novation, that entered into various agreements with BD. MedStar signed papers indicating that it wished to participate in certain of Novation's agreements with BD, one pertaining to Hypodermic Products. MedStar agrees, however, that none of the papers it signed were contracts of purchase or sale of BD Hypodermic Products. SOF ¶ 7.

Moreover, plain language of the Novation GPO agreements with BD in which MedStar participated — the very agreements that MedStar claims make it a "direct purchaser" from BD — clearly provides that BD Hypodermic products would be made available for purchase *by distributors* in the first instance, and that distributors would thereafter *resell* those products to GPO members like MedStar. SOF ¶ 5. The pertinent language of the GPO agreement upon which MedStar relies states:



-12-

VHA015516, ¶ 2(a) (emphasis added) (Pearlman Standing Decl. Ex. 9).[11]  The plain language of the GPO contract confirms the undisputed testimony.

## C.   **Becton, Dickinson and Company**

BD's testimony during discovery leaves no room to doubt that the Direct Purchaser Plaintiffs are direct purchasers of all of the BD Hypodermic Products they purchased from BD, and that the Healthcare Purchaser Plaintiffs are merely indirect purchasers of BD Hypodermic Products.

BD testified that, while certain end users[12] are direct purchasers from BD because they place their orders with BD, get product delivered directly by BD, are invoiced directly by BD, and pay BD directly, none of the Healthcare Purchaser Plaintiffs fits that description for purchases through distributors.  SOF ¶ 3.  None of the Healthcare Purchaser Plaintiffs had an agreement with BD providing for such a relationship.  SOF ¶ 4.  The types of agreements that the Healthcare Purchaser Plaintiffs had with BD — called "net dealer acquisition" and "Z" contracts — are *not* the types of contracts that BD enters into for purchasing directly from BD.  *Id.*

---

[11]The Declaration of Peter S. Pearlman, Esq. in Support of Direct Purchaser Plaintiffs' Standing Motion ("Pearlman Standing Decl.") is filed contemporaneously herewith.

[12]BD's corporate designee used the term "end users" to refer to hospitals and health care facilities (like MedStar and Hebrew Home).  *See* BD 30(b)(6) Dep. Tr. at 352:25-353:4 (Pearlman Standing Decl. Ex. 1).

-13-

Instead, the Healthcare Purchaser Plaintiffs purchase *indirectly* from BD, *though distributors*. SOF ¶ 3. Indirect-purchasing end users (like the Healthcare Plaintiffs) are those that place their orders with a distributor (not BD), get product delivered by the distributor (not BD), and pay the distributor (not BD). *Id.* For such purchases, it is the *distributor* who is the "immediate buyer" from BD. SOF ¶ 8. The distributor orders from BD, gets product delivered directly by BD, is invoiced by BD, and pays BD directly. SOF ¶ 6. The distributor takes ownership of all such products. SOF ¶ 9.

Thus, BD testified, for every unit of Hypodermic Products that Cardinal obtained directly from BD from March of 2001 through the present — which would include the units that MedStar bought through Cardinal — Cardinal (1) bought those products directly from BD, and (2) was the immediate purchaser from BD of those units, regardless of (a) how or to whom they resold those units, or (b) whether those units were resold to an end user under a contract or not. SOF ¶ 6. For all such units, Cardinal ordered directly from BD, took delivery directly from BD, was invoiced directly by BD, paid BD directly, took ownership from BD, and appears as the "bill to" or "sold to" entity in BD's electronic sales data. *Id.*

In other words, for every unit of BD Hypodermic Products that a distributor delivered to MedStar or Hebrew Home from March of 2001 through the present, BD

-14-

has admitted that the distributor first had to buy those products directly from BD and was the immediate buyer from BD of those products, regardless of whether the products were covered by a contract that MedStar or Hebrew Home's GPO had with BD. *See* BD Rule 30(b)(6) Dep. Tr. at 373:4-374:17 (Pearlman Standing Decl. Ex. 1); SOF ¶¶ 6, 4. And, upon delivery by BD, the distributor would take ownership of those units. SOF ¶ 9.

Distributors (not BD) determine the resale price to MedStar or Hebrew Home for units of BD Hypodermic Products, including for units covered by a contract that a GPO had with BD. SOF ¶ 11. BD's corporate designee testified in deposition, under MedStar's questioning, that the "contract price" — the price set forth in contracts between BD and GPOs — is the net price the ***distributor*** ultimately pays to BD, and is *not* the price a GPO member hospital (like MedStar and Hebrew Home) pays to a distributor. SOF ¶ 12.

\* \* \*

The allegations and evidence, when reviewed in light of controlling law, establish conclusively that:

      (i)     each of the Direct Purchaser Plaintiffs has Direct Purchaser standing to assert damage claims against BD under Section 4 of the Clayton Act for all BD Hypodermic Products it purchased from BD;

      (ii)    MedStar and Hebrew Home do not have Direct Purchaser standing

-15-

to assert damage claims against BD under Section 4 of the Clayton Act for any BD Hypodermic Products any of them purchased from or through a distributor or other intermediary; and

> (iii)   only those purchasers of BD Hypodermic Products who purchased those products from BD and were invoiced by BD for those products have Direct Purchaser standing to assert damage claims against BD under Section 4 of the Clayton Act with respect to Class Purchases.

## ARGUMENT

The "direct purchaser rule" has been a fixture of antitrust law for several decades. *See Hanover Shoe*, 392 U.S. at 489; *Illinois Brick*, 431 U.S. at 724-25. Under the rule, exclusive standing to seek damages under federal antitrust law vests in the "immediate buyers" from the alleged antitrust violator. *See UtiliCorp*, 497 U.S. at 207.

The purpose of the direct purchaser rule is threefold: (1) to protect defendants against multiple exposure, once to middlemen and once to later downstream purchasers suing under federal law, to overcharges on the very same products (*Illinois Brick*, 431 U.S. at 730-31); (2) to protect the judicial system, and antitrust enforcement more generally, from the need to engage in complicated overcharge apportionment calculations between middlemen and later downstream purchasers (*id.* at 737-47); and (3) so that the middleman is motivated to bring private damages actions, to protect the middleman's right to collect the full amount of the overcharge

-16-

it paid to an antitrust defendant (*id.* at 724-25).

The direct purchaser rule of *Illinois Brick* is a "bright line" rule. *McCarthy*, 80 F.3d at 851 n.14.  The Supreme Court has warned that litigation over supposed subtleties or nuances existing particular types of distribution chains should not occupy judicial time or effort. *UtiliCorp*, 497 U.S. at 216 ("ample justification exists for our stated decision not to carve out exceptions to the [direct purchaser] rule for particular types of markets . . . [t]he possibility of allowing an exception, even in rather meritorious circumstances, would undermine the rule") (quotation omitted); *id.* at 217 ("[i]n sum, even assuming that any economic assumptions underlying the *Illinois Brick* rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions.  Having stated the rule in *Hanover Shoe,* and adhered to it in *Illinois Brick,* we stand by our interpretation of § 4").[13]

The Third Circuit, heeding the Supreme Court's warning, has forbidden attempts to litigate around the direct purchaser rule using arguments about

---

[13]There are but two exceptions to the rule of *Illinois Brick*, but the Healthcare Purchaser Plaintiffs have disclaimed meeting either one.  *See* Hearing Transcript of October 3, 2007, at 29:7-11 (Healthcare Purchaser Plaintiffs are not "seeking an exception" to *Illinois Brick*); *id.* at 32:12-15 (same).  Even if they had not, discovery quickly revealed that neither the "cost-plus fixed-quantity" nor the "owned or controlled" exception applies here.

-17-

purportedly "unique" types of purchase transactions. *See Gulfstream III Assoc., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 440 (3d Cir. 1993) ("[d]espite Cessna's arguments concerning the unique nature of the G-III aircraft transaction, we see no circumstances here that could justify disregarding the Supreme Court's clear admonition that 'it would be an unwarranted and counterproductive exercise to litigate a series of exceptions' to the direct purchaser rule") (quoting *UtiliCorp*) ("*Gulfstream*").

The Supreme Court's admonitions are not even implicated in this case, because there is nothing subtle or unique about the Direct Purchaser Plaintiffs' or the Healthcare Purchaser Plaintiffs' purchase of BD Hypodermic Products. The Direct Purchaser Plaintiffs order Hypodermic Products directly from BD, are invoiced directly by BD, and pay BD directly. They are *direct* purchasers from BD. The Healthcare Purchaser Plaintiffs order Hypodermic Products *from distributors*, are invoiced *by distributors*, and pay *distributors*. They are *not* direct purchasers from BD. They are *indirect* purchasers. Neither these facts, nor the legal conclusions that necessarily flow from them, are subject to reasonable dispute.

-18-

I.   **EACH OF THE DIRECT PURCHASER PLAINTIFFS HAS DIRECT PURCHASER STANDING TO ASSERT DAMAGE CLAIMS AGAINST BD UNDER SECTION 4 OF THE CLAYTON ACT FOR ALL BD HYPODERMIC PRODUCTS IT PURCHASED FROM BD**

The Court should find, in accordance with Paragraph 3(i) of the Preliminary Approval Order, that "each of the Direct Purchaser Plaintiffs has Direct Purchaser standing to assert damage claims against BD under Section 4 of the Clayton Act for all BD Hypodermic Products it purchased from BD." Preliminary Approval Order ¶ 3(I) (Pearlman Approv. Decl. Ex. C).

To determine whether the Direct Purchaser Plaintiffs have standing to seek damages for all units of BD Hypodermic Products they purchased from BD, the Court must simply apply the bright line "direct purchaser rule" that has been well settled for several decades. Under that rule, exclusive standing to seek damages under federal antitrust law vests in the "immediate buyers" from the alleged antitrust violator. *See UtiliCorp*, 497 U.S. at 207 (1990) (defining direct purchaser as the immediate buyer from the antitrust violator).

The "immediate buyer" from the alleged antitrust violator is the buyer that pays the antitrust violator. The Ninth Circuit's recent decision in *Delaware Valley* is directly on point. *Delaware Valley*, like this case, was a proposed class action against a medical device supplier for allegedly engaging in a bundled pricing and

-19-

exclusionary contracting scheme.  There, as here, a dispute arose — identical to the dispute between the Direct Purchaser Plaintiffs and the Healthcare Purchaser Plaintiffs here — about whether the distributor or the hospital was the direct purchaser when the hospital was subject to a GPO contract, but where the hospital nevertheless purchased through the distributor.

In *Delaware Valley*, the Ninth Circuit rejected all of the arguments that the Healthcare Purchaser Plaintiffs have made here.  The Ninth Circuit held that the **distributors** were the direct purchasers because they were the "immediate purchaser[s] . . . from J&J." 523 F.3d at 1122.  What made the distributors — and not the hospital — the "immediate purchasers" was the following straightforward proposition:

> [the distributor] paid J&J directly for its inventory and took title in the products before selling them to [the hospital]. [The hospital] directly paid [the distributor], not J&J, for its orders.

*Id.* at 1122.  The court in *St. Francis* utilized identical reasoning in dismissing the claims of hospitals who bought Bard catheters through distributors pursuant to GPO contracts.  2009 U.S. Dist. LEXIS 89166 at *90-*95.

The very same straightforward proposition that controlled the outcome in *Delaware Valley* and *St. Francis* is settled law here in the Third Circuit, as well.

-20-

Entities — like MedStar and Hebrew Home — that buy through distributors by definition are not "immediate buyers." *See Dentsply*, 424 F.3d at 372-73 (where "complaint limited the plaintiff class" to those "who purchased . . . ***through Dentsply Dealers***," plaintiffs, who sought to be deemed direct purchasers, were conclusively indirect purchasers) (emphasis in original) ("*Dentsply*"); *McCarthy v. Recordex Service, Inc.*, 80 F.3d 842, 852 n.16 (3d Cir. 1996) ("to be considered an indirect purchaser of an item . . . it is only necessary that the consumer have purchased the item through a middleman"). *See also Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006) ("[t]hose who purchase indirectly or through intermediaries are barred from recovering for antitrust injuries").

Here, the undisputed facts, as recounted above and in Direct Purchaser Plaintiffs' Statement of Undisputed Material Facts, compel the finding that the distributors — the Direct Purchaser Plaintiffs — are the "immediate buyers" of Hypodermic Products from BD under the definitions provided by controlling law (*Dentsply* and *McCarthy*) and recent on-point decisions (*Delaware Valley* and *St. Francis*). As BD's witness explained, distributors — like the Direct Purchaser Plaintiffs and MedStar's distributor, Cardinal — ***pay BD directly*** for Hypodermic Products. BD 30(b)(6) Dep. Tr. at 358:14-16; *id.* at 371:13-15; *id.* at 375:9-11 (Pearlman Standing Decl. Ex. 1); SOF ¶¶ 1, 6. MedStar's own expert witness said

-21-

this, as well. *See* Fiona M. Scott Morton Dep. Tr. at 76:19-22 ("the wholesaler has to pay for the product or Becton Dickinson will not continue to sell them product, and they can't function as a wholesaler") (Pearlman Standing Decl. Ex. 8). BD and MedStar's expert witness agreed that the distributors like the Direct Purchaser Plaintiffs and Cardinal are *invoiced directly by BD*, as well. BD 30(b)(6) Dep. Tr. at 358:11-13; *id.* at 371:10-12; *id.* at 375:5-8 (Pearlman Standing Decl. Ex. 1); Fiona M. Scott Morton Dep. Tr. at 75:6-76:22 (Pearlman Standing Decl. Ex. 8).

Moreover, BD's witness, Cardinal's witness, and even MedStar's witnesses were unanimous that distributors — like the Direct Purchaser Plaintiffs and MedStar's distributor, Cardinal — all take title in the BD Hypodermic Products that BD delivers to them. SOF ¶ 9; *see also* BD 30(b)(6) Dep. Tr. at 314:17-315:5; *id.* at 358:17-359:3; *id.* at 371:16-372:5; *id.* at 375:19-376:9; *id.* at 382:12-18 (Pearlman Standing Decl. Ex. 1); Cardinal 30(b)(6) Dep. Tr. at 193:12-194:6 ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮") (Pearlman Standing Decl. Ex. 10); Fiona M. Scott Morton Dep. Tr. at 85:7-9 ("from what I can tell – title passes to the distributor") (Pearlman Standing Decl. Ex. 8). For Class Purchases — that is, for purchases where a Class member appears as the "bill to" or "sold to" entity in BD's electronic sales data — neither Direct Purchaser Plaintiffs, Cardinal, nor any other distributor, purchases BD Hypodermic Products through dealers, middlemen, or other

-22-

intermediaries.  BD 30(b)(6) Deposition Tr. at 363:19-366:3 (Pearlman Standing Decl. Ex. 1); SOF ¶¶ 1, 6, 8, 13, 14.

Accordingly, the Court should find, in accordance with Paragraph 3(i) of the Preliminary Approval Order, that "each of the Direct Purchaser Plaintiffs has Direct Purchaser standing to assert damage claims against BD under Section 4 of the Clayton Act for all BD Hypodermic Products it purchased from BD."  Preliminary Approval Order ¶ 3(I) (Pearlman Approv. Decl. Ex. C).

## II.   MEDSTAR AND HEBREW HOME DO NOT HAVE DIRECT PURCHASER STANDING TO ASSERT DAMAGE CLAIMS AGAINST BD UNDER SECTION 4 OF THE CLAYTON ACT FOR ANY BD HYPODERMIC PRODUCTS ANY OF THEM PURCHASED FROM OR THROUGH A DISTRIBUTOR OR OTHER INTERMEDIARY

The Court should find, in accordance with Paragraph 3(ii) of the Preliminary Approval Order, that MedStar and Hebrew Home "do not have Direct Purchaser standing to assert damage claims against BD under Section 4 of the Clayton Act for any BD Hypodermic Products any of them purchased from or through a distributor or other intermediary."  Preliminary Approval Order ¶ 3(ii).

MedStar admitted in discovery that it did not purchase directly from BD for any relevant transaction.  Instead, meeting the definition of "indirect purchaser" set forth by the Third Circuit in *Dentsply* and *McCarthy*, MedStar admitted it purchased ***through distributors***. SOF ¶ 2. MedStar explained that it would order from Cardinal;

MedStar would receive an invoice from Cardinal; and MedStar would pay Cardinal. *Id.*

The Healthcare Purchaser Plaintiffs have been nothing if not steadfast and consistent on this point. Even in their Complaints, they admitted that they purchased "through distributors," just like the plaintiffs adjudged to be indirect purchasers had admitted in *Dentsply*. *See* MedStar Amend. Compl. ¶ 50 (Doc. #90) ("[a]t all relevant times, Class members, including hospitals and other healthcare providers, purchased Disposable Hypodermic Products from Becton through authorized distributors"); Hebrew Home Compl. ¶ 48 (Doc. # 3-2 at No. 07-2128) (same).

Faced with these undeniable facts and their own prior admissions, the Healthcare Purchaser Plaintiffs have argued that controlling Third Circuit law does not apply to them.[14] They have argued they are direct purchasers because their GPOs have contracts with BD. But those contracts set the ***distributor's*** purchase price for BD Hypodermic Products, not that of the Healthcare Purchaser Plaintiffs. SOF ¶ 12. The Healthcare Purchaser Plaintiffs' purchase price is set by the distributor. SOF ¶ 11.

---

[14]The Healthcare Purchaser Plaintiffs have said that they do not read *Dentsply* or *McCarthy* "as standing for the black and white proposition that every plaintiff who alleges that it has purchased products 'through' a distributor must be labeled an 'indirect purchaser.'" Doc. #126 at 9.

Moreover, the Healthcare Purchaser Plaintiffs are wrong as a matter of settled law.  Every court considering it has rejected the argument that a contract or a price negotiation between an antitrust defendant (like BD) and a claimant (like MedStar or Hebrew Home) confers direct purchaser standing upon the claimant in lieu of a middleman (like a distributor) who stands between the defendant and the claimant.

*Delaware Valley* and *St. Francis* are on point.  *Delaware Valley* involved "a hospital that had a contract with J&J setting a list price for the purchase of medical supplies, but that ultimately purchased its J&J products through a separate contract with a third-party distributor" (523 F.3d at 1118), the precise facts alleged by the Healthcare Purchaser Plaintiffs here.  Nevertheless, the hospital was held to "lack[] standing to pursue an antitrust claim under a direct purchaser theory." *Id.* at 1118.  The Ninth Circuit reasoned (1) the hospital "did not pay J&J directly for any goods, and J&J did not ship any goods directly to" the hospital; (2) "the final contract price paid by" the hospital was composed not just of the price negotiated under its GPO's agreement with J&J, but also included the distributor's markup[15]; and (3) the hospital

_____

[15] As a matter of law (and logic), the "price" a hospital pays its distributor for BD Hypodermic Products cannot be separated from the distributor's service fee or markup. *See Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1171-72 (8th Cir. 1998) ("[a]lthough the plaintiffs describe these fees as separate from what they call the actual purchase price of concert tickets, it appears clear that the actual purchase price and the cost of the service fees amount to the single cost of attending the concert, (continued...)

"paid [the distributor] directly for its orders, and [the distributor] delivered the products to" the hospital." *Id.* The court in *St. Francis* utilized identical reasoning in dismissing the hospitals' claims there. 2009 U.S. Dist. LEXIS 89166 at *90-*95.

These are the precise facts here. As reviewed above and in the Statement of Undisputed Facts, the Healthcare Purchaser Plaintiffs paid distributors (not BD) for Hypodermic Products. SOF ¶ 2. And as MedStar admitted during discovery, the price it paid its distributor (Cardinal) was composed not only of the of the price negotiated under its GPO's agreement with BD, but also included the distributor's markup. SOF ¶ 11. Cardinal confirmed this fact. *Id.* BD confirmed it, too. *Id.*

The Ninth Circuit thus rejected the hospital's suggestion that its contract with J&J made it a direct purchaser:

> Appellants argue this situation is distinguishable because [the hospital] and J&J did have an independent contractual relationship. However, Supreme Court jurisprudence has been neither vague nor ambiguous in establishing the direct purchaser rule. The Supreme Court intended to make a bright line rule for identifying the proper plaintiff when an antitrust violation occurs in a multi-tiered distribution system. *See Illinois Brick*, 431 U.S. at 735-36, 97 S. Ct. 2061. The Court has explicitly rejected attempts to create exceptions to that rule, even when the considerations in a particular market may undermine some of the reasoning

---

[15](...continued)
regardless of how that cost is divided into actual purchase price and service fees") (citing *McCarthy*, 80 F.3d at 853 n.18).

used by the *Illinois Brick* Court. *See UtiliCorp*, 497 U.S. at 211, 110 S.Ct. 2807. The undisputed truth is that [the hospital] only indirectly purchased goods from J&J.

* * * Although the price that [the hospital] pays [the distributor] is set, in part, by an agreement negotiated by a GPO on behalf of [the hospital], the hospital contracted separately with [the distributor] for the actual sale and delivery of products. The final price paid by [the hospital] included the list price negotiated by Premier, plus a markup fee charged by [the distributor].

523 F.3d at 1122. The hospital's argument, the Ninth Circuit said, "myopically focus[ed] on the contract between [the hospital] and J&J, without taking into consideration where the hospital actually bought its products." *Id.*[16] The hospital "did not purchase its products directly from J&J. Rather, it was invoiced by, and sent payments directly to [the distributor]," the Court concluded, on facts indistinguishable from those MedStar and Hebrew Home point to here. *Id.* at 1125.

The Third Circuit's decision in *Dentsply* holds similarly. There, the Third Circuit held that only the middlemen (dealers) could sue the defendant (Dentsply), even though the end users (dental labs) negotiated prices directly with Dentsply. The dental labs in *Dentsply*, who, like the Healthcare Purchaser Plaintiffs here, alleged that they bought "through authorized dealers" (424 F.3d at 372-73), theorized, as the

_____

[16]The court additionally observed that the contract between the hospital and J&J was not a contract of sale, in that it did not provide for the "actual sale and delivery of products[.]" *Id.* at 1122. Such is the case here, as well. SOF ¶ 7.

Healthcare Purchaser Plaintiffs do here, that *Illinois Brick* did not apply to them, because "Dentsply negotiates [directly] with the [downstream customer] lab to allow it to buy teeth from the [middleman] dealer at a price below Dentsply's suggested price" (424 F.3d at 367), and the prices the downstream customer labs paid were "controlled by Dentsply" and not by the dealers. *Id.* at 368.

The Third Circuit nevertheless held, in conformity with its prior refusals to find exceptions to the direct purchaser rule,[17] that the end user labs were ***indirect*** purchasers without standing to sue under *Illinois Brick*, since otherwise the defendants could be exposed to multiple damages. *Id.* at 372 (nothing would "prevent the dealers from suing Dentsply, thus creating a risk of duplicative liability for Dentsply and potentially inconsistent judgments").

Yet another example is *Kloth* from the Fourth Circuit. There, the plaintiff end users, like MedStar and Hebrew Home here, argued that the middlemen from whom they purchased should be disregarded, because the end users had a direct contractual relationship with defendant Microsoft. *See Kloth*, 444 F.3d at 320-21. The district court rejected those arguments. *See In re Microsoft Antitrust Litig.*, 127 F. Supp.2d 702, 709 (D. Md. 2001) ("[a]lthough the [contract] may establish a direct relationship

---

[17] *E.g.*, *Gulfstream*, 995 F.2d at 440 (rejecting argument that purportedly unique aspects of transaction justified divesting initial purchaser of standing in favor of later purchasers).

between Microsoft and the consumer, that relationship is not sufficient to make the consumer a 'direct purchaser' within the meaning of *Illinois Brick*"). The district court held that "*Illinois Brick* presumes that the [middlemen] from whom plaintiffs made their purchases" — like the distributors in this case — "likewise paid too much in their transactions with Microsoft." The end users were therefore barred from recovering damages, because "the very purpose of the *Illinois Brick* rule is to prevent indirect purchasers, such as [end users], from recovering any portion of a passed-through overcharge." *Id.* at 712.

The Fourth Circuit agreed, holding that, notwithstanding their contract with Microsoft, it was "apparent that the plaintiffs were indirect purchasers because they did not buy products directly from Microsoft," but instead from intermediaries. *Kloth*, 444 F.3d at 320. To vest the end user with standing would violate *Illinois Brick*, the appeals court concluded. *Id.* at 321. The Fourth Circuit reasoned — just as the Third Circuit did in *Dentsply* — that the middlemen could themselves sue for overcharge damages, thereby creating the very complications *Illinois Brick* prohibits. *Id.* at 322-23 ("the same theory could be advanced by OEMs and intermediary retailers who could sue Microsoft alleging that they had paid too much for the products they had purchased, and the problems of potential multiple recoveries and apportionment of damages would recur").

-29-

Still another example comes from the Seventh Circuit.  In *In re Brand Name Prescription Drugs Antitrust Litig.*, 1996 WL 267752, *1(N.D. Ill. May 17, 1996), the district court had certified for interlocutory review its order finding that plaintiff pharmacies (like MedStar and Hebrew Home here) were direct purchasers under *Illinois Brick*, regardless of whether they purchased through wholesalers.[18]  The Seventh Circuit reversed, holding that the pharmacies who bought through wholesalers were *indirect* purchasers, and wholesalers were necessarily *direct* purchasers not subject to any cognizable exception under *Illinois Brick*. *Brand Name*, 123 F.3d 599, 605-06 (7th Cir. 1997).

The reasoning of these cases yields the inescapable conclusion that the Healthcare Purchaser Plaintiffs are not direct purchasers for units of BD Hypodermic Products they purchased from or through a distributor, notwithstanding their GPO contracts.  BD did not invoice MedStar or Hebrew Home, and MedStar and Hebrew Home did not have a payment obligation to BD.  SOF ¶ 2.  MedStar and Hebrew Home did not remit any payment to BD, but instead paid the distributor. *Id.*  And BD

---

[18]Just as the end-user labs argued in *Dentsply*, the district court in *Brand Name* ruled that if the antitrust defendant "directly negotiate[d]" with the wholesaler's customer regarding the price the wholesaler's customer would pay the wholesaler for the antitrust defendants' products, the wholesaler's customer was the "direct purchaser." *See Brand Name*,1996 WL 167350, *30 (N.D. Ill. Apr. 4, 1996). The results of those pricing negotiations apparently were memorialized, as in this case, in contracts directly between the defendant and the wholesaler's customer. *Id.* at *30.

did not set the final invoice price paid by MedStar or Hebrew Home, which instead was set by their distributor, who could include a fee or markup that BD had no role in determining. SOF ¶ 11.

Moreover, the plain language of the very "Net Dealer Acquisition" contracts that form the basis of MedStar and Hebrew Home's theory that they are direct purchasers does not support that inference at all.  Rather, the plain language of those contracts, reviewed above, says (1) that the *distributor* is the direct purchaser from BD (not the hospital), (2) that the contract price is the purchase price *for the distributor* (not the hospital),[19] and (3) that distributors *resell* to the hospital. SOF ¶ 5.

Accordingly, the Court should find that MedStar and Hebrew Home "do not have Direct Purchaser standing to assert damage claims against BD under Section 4 of the Clayton Act for any BD Hypodermic Products any of them purchased from or through a distributor or other intermediary."  Preliminary Approval Order ¶ 3(ii) (Pearlman Approv. Decl. Ex. C).

---

[19] *See* SOF ¶ 12.

### III. ONLY THOSE PURCHASERS OF BD HYPODERMIC PRODUCTS WHO PURCHASED THOSE PRODUCTS FROM BD AND WERE INVOICED BY BD FOR THOSE PRODUCTS HAVE DIRECT PURCHASER STANDING TO ASSERT DAMAGE CLAIMS AGAINST BD UNDER SECTION 4 OF THE CLAYTON ACT WITH RESPECT TO CLASS PURCHASES

Finally, the Court should find, in accordance with Paragraph 3(iii) of the Preliminary Approval Order, that "only those purchasers of BD Hypodermic Products who purchased those products from BD and were invoiced by BD for those products have Direct Purchaser standing to assert damage claims against BD under Section 4 of the Clayton Act with respect to Class Purchases." Preliminary Approval Order ¶ 3(iii) (Pearlman Approv. Decl. Ex. C).

This finding necessarily follows from the previous two findings that the Direct Purchaser Plaintiffs have, above, requested the Court to make. If the Court agrees with the Direct Purchaser Plaintiffs and BD that, under the facts adduced and the law applicable to this case (i) each of the Direct Purchaser Plaintiffs has Direct Purchaser standing to assert damage claims against BD under Section 4 of the Clayton Act for all BD Hypodermic Products it purchased from BD and (ii) MedStar and Hebrew Home therefore do not have Direct Purchaser standing to assert damage claims against BD under Section 4 of the Clayton Act for any BD Hypodermic Products any of them purchased from or through a distributor or other intermediary, then the Court

-32-

necessarily must conclude that (iii) only those purchasers of BD Hypodermic Products who purchased those products from BD and were invoiced by BD for those products have Direct Purchaser standing to assert damage claims against BD under Section 4 of the Clayton Act with respect to Class Purchases.

This third finding necessarily follows from the first two, because it is premised upon the very same factual and legal bases that support the finding that the Direct Purchaser Plaintiffs have standing under *Illinois Brick* for Class Purchases and MedStar and Hebrew Home do not. That is, because Class Purchases are by definition limited to those purchases of BD Hypodermic Products made by entities who appear in the "bill to" or "sold to" fields in BD's electronic sales data (*see* Settlement Agreement ¶ 1 (Pearlman Approv. Decl. Ex. A)), and because the entities that appear in those fields are entities who, as to such purchases:

- were invoiced by BD (BD 30(b)(6) Dep. Tr. at 365:6-8 (Pearlman Standing Decl. Ex. 1));

- paid BD directly (*id.* at 365:6-8); and

- did not purchase BD Hypodermic Products through distributors, dealers, middlemen, or other intermediaries (*id.* at 365:16-366:3)

it necessarily follows that such entities (primarily distributors) are the only entities who are the "immediate buyers" from BD under the holdings of *UtiliCorp*, *Dentsply*, *McCarthy*, *Delaware Valley*, and *St. Francis*.

-33-

The only other entities at issue do not have direct purchaser standing for Class Purchases. Those other entities (such as MedStar and Hebrew Home) do not appear in the "bill to" or "sold to" fields of BD's electronic sales data for Class Purchases. BD 30(b)(6) Deposition Tr. at 364:7-19 (Pearlman Standing Decl. Ex. 1); SOF ¶ 15. As a consequence, they were not invoiced by BD, did not pay BD, and bought BD Hypodermic Products through a middleman or intermediary, such as a distributor. *Id.* at 366:4-367:5. As is extensively set forth above, those entities:

- purchased through a distributor, not directly from BD, by MedStar and Hebrew Home's own class definition (Doc. #182, at 9);

- were not invoiced by BD and had no payment obligation to BD (SOF ¶ 2);

- did not remit any payment to BD, but instead paid the distributor (SOF ¶ 2); and

- had their final invoice price for BD Hypodermic Products set by their distributor, who could include a fee or markup that BD had no role in determining (SOF ¶ 11) .

Consequently, they are not "immediate buyers" from BD under the holdings of *UtiliCorp*, *Dentsply*, *McCarthy*, and *Delaware Valley*.

Accordingly, the Court should find that "only those purchasers of BD Hypodermic Products who purchased those products from BD and were invoiced by BD for those products have Direct Purchaser standing to assert damage claims against

BD under Section 4 of the Clayton Act with respect to Class Purchases." Preliminary

Approval Order ¶ 3(iii) (Pearlman Approv. Decl. Ex. C).

## CONCLUSION

The Direct Purchaser Plaintiffs request that the Court, pursuant to Fed. R. Civ.

P. 52 and/or 56, make the findings contained in Paragraph 3 of the Preliminary

Approval Order, so they may consummate their Settlement and bring a substantial

portion of this litigation to a close.

Respectfully submitted,


Dated: December 22, 2009                     /s/Peter Pearlman
                                        Peter S. Pearlman
                                        COHN LIFLAND PEARLMAN
                                          HERRMANN & KNOPF LLP
                                        Park 80 Plaza West- One
                                        Saddle Brook, NJ 07663
                                        (201) 845-9600
                                        psp@njlawfirm.com


Bruce E. Gerstein                       Daniel Berger
Noah Silverman                          Eric Cramer
Joseph Opper                            Peter Kohn
Elena K. Chan                           BERGER & MONTAGUE, P.C.
GARWIN GERSTEIN & FISHER, LLP           1622 Locust Street
1501 Broadway, Suite 1416               Philadelphia, PA 19103
New York, NY  10036                     (215) 875-3000
(212) 398-0055


-35-

John Gregory Odom
Stuart Des Roches
Andrew Kelly
ODOM & DES ROCHES, L.L.P.
Suite 2020, Poydras Center
650 Poydras St.
New Orleans, LA 70130
(504) 522-0077

Kendall S. Zylstra
Stephen Connolly
SCHIFFRIN & BARROWAY, LLP
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706

Linda P. Nussbaum
COHEN, MILSTEIN, HAUSFELD &
TOLL, P.L.LC.
150 East 52nd Street - 30th Floor
New York, NY 10019
(212) 836-7797

Alfred G. Yates
Gerald Rutledge
LAW OFFICES OF ALFRED G. YATES,
JR., PC
429 Forbes Avenue
Pittsburgh, PA 15219
(412) 391-5164

David P. Smith
PERCY SMITH & FOOTE, L.L.P.
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309
(318) 445-4480

Adam Moskowitz
Tucker Ronzetti
KOZYAK TROPIN & THROCKMORTON, P.A.
280 Wachovia Financial Center
200 South Biscayne Blvd.
Miami, FL  33131
(305) 372-1800

Joshua P. Davis
LAW OFFICES OF JOSHUA P. DAVIS
437 Valley Street
San Francisco, CA 94131
(415) 422-6223

Mitchell W. Berger, Esq.
BERGER SINGERMAN, P.A.
350 Las Olas, Suite 1000
Fort Lauderdale, FL 33301
Tel: (954) 525-9900
Fax: (954) 523-2872

-36-

Steve D. Shadowen
HANGLEY ARONCHICK SEGAL &
PUDLIN
30 North Third Street, Suite 700
Harrisburg, PA 17101-1701
Tel: (717) 364-1030
Fax: (717) 364-1020

Thomas M. Sobol
HAGENS BERMAN SOBOL SHAPIRO,
LLP
One Main Street, 4th Fl.
Cambridge, MA 02142
Tel: (617) 482-3700

Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO,
LLP
60 West Randolph Street, Suite 200
Chicago, IL 60601
Tel: (312) 762-9237

David Boies, III
STRAUS & BOIES, LLP
4041 University Avenue
Fairfax, VA 22030
Tel: (703) 764-8700
Fax: (703) 764-8704

David Patron
PHELPS DUNBAR, LLP
Canal Place
365 Canal Street, Suite 2000
New Orleans, LA 70130-6534
Tel: (504) 566-1311

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO, LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Tel: (206) 623-7292

Jeffrey Kodroff
John A. Macoretta
SPECTOR, ROSEMAN & KODROFF
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tel: (215) 496-0300

Kenneth G. Walsh
STRAUS & BOIES, LLP
2 Depot Plaza
Bedford Hills, NY 10507
Tel: (914) 244-3200
Fax: (914) 244-3260

-37-

Howard J. Sedran
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street
Philadelphia, PA 19106
Tel: (215) 592-1500
Fax: (215) 592-4663

Dianne M. Nast
Erin C. Burns
Steven L. O'Donnell
RODANAST, P.C.
801 Estelle Drive
Lancaster, PA 17601
Tel: (717) 892-3000
Fax: (717) 892-1200

Michael L. Roberts
ROBERTS LAW FIRM, P.A.
P.O. Box 241790
20 Rahling Circle
Little Rock, AR 72223-1790
Tel: (501) 821-5575
Fax: (501)821-4474

Daniel E. Gustafson
GUSTAFSON GLUECK, PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, MN 55402
Tel: (612) 333-8844
Fax: (612) 339-6622