# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **IN RE: HYPODERMIC PRODUCTS ANTITRUST LITIGATION** | **Case No. 05-CV-1602 (JLL)(CCC) MDL No. 1730** |
| **This document relates to:** | **Judge Jose L. Linares Magistrate Judge Claire C. Cecchi** |
| **THE CONSOLIDATED DISTRIBUTOR PLAINTIFF ACTIONS** | **Case Nos. 05-CV-1602, 05-CV-4465, 05-CV-5891, 06-CV-1204, 06-CV-1205** |
| **MEDSTAR HEALTH, INC.,** *et al.,* **Plaintiffs, v. BECTON DICKINSON & COMPANY, Defendant.** | **Case No. 06-CV-03258** |
| | **ORAL ARGUMENT REQUESTED** |
| | **MOTION DAY: TO BE SET BY THE COURT** |

## MEDSTAR PLAINTIFFS' OPPOSITION TO DISTRIBUTOR PLAINTIFFS' MOTION FOR "PARTICULAR FINDINGS OF FACT RELATING TO DIRECT PURCHASER STANDING, OR, ALTERNATIVELY FOR PARTIAL SUMMARY JUDGMENT"

On the Brief and Of counsel:

James V. Bashian
Law Offices of James V. Bashian, P.C.
70 Adams Street, 4th Floor
Hoboken, NJ 07030
Tel (973) 227-6330

R. Laurence Macon
Akin Gump Strauss Hauer & Feld LLP
300 Convent Street, Suite 1500
San Antonio, TX 78205-3732
Tel. (210) 281-7000

Judith L. Spanier
Karin E. Fisch
Abbey Spanier Rodd & Abrams, LLP
212 E. 39th Street
New York, NY 10016
Tel. (212) 889-3700

Richard L. Wyatt, Jr.
Todd M. Stenerson
Torsten M. Kracht
Hunton Williams LLP
1900 K Street, NW
Washington, DC 20006
Tel. (202) 955-1500

Kenneth A. Wexler
Jennifer Fountain Connolly
Amber M. Nesbitt
Wexler Wallace LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Tel. (312) 346-2222

# TABLE OF CONTENTS

I.    Introduction ........................................................................................... 1

II.   Background and Material Facts ........................................................... 6

  A.  The 26% of Transactions that are Not at Issue ............................... 6

  B.  The 74% of Transactions the Distributors Do Not Fully Address .......... 7

  C.  The Distributor Plaintiffs' Inaccurate Statements of Purportedly
      Undisputed Facts ............................................................................ 14

      (1)  The Distributors Do *Not* Determine the Prices at which the MedStar
           Plaintiffs Buy Becton Products ............................................... 14

      (2)  MedStar Did *Not* Admit in Discovery That it Purchases Directly
           from Distributors for Any Relevant Transaction ......................... 17

      (3)  The GPO Agreements Do *Not* "Show MedStar Purchased from
           Distributors" ......................................................................... 18

  D.  Defendant Becton Has Flip-Flopped on Relevant Facts Since Signing Its
      Settlement Agreement with the Distributors ................................... 20

III.  Relevant Law and Distinguishable Law .......................................... 24

  A.  The Findings the Distributors and Becton Seek are Incompatible with
      Federal Rules of Civil Procedure 56 and 52 ................................... 24

  B.  The Distributors Cannot on Summary Judgment Satisfy Even Their
      Own Interpretation of the Direct Purchaser Rule ........................... 26

  C.  Distributor Plaintiffs Misstate Third Circuit Precedent ................... 33

  D.  Distributor Plaintiffs Rely on Readily Distinguishable Case Law from
      Other Circuits ............................................................................... 36

IV.   Conclusion ......................................................................................... 40

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)............................................................................24, 25

*Acuff-Rose Music, Inc. v. Jostens, Inc.,*
155 F.3d 140 (2d Cir. 1998)...........................................................26

*Am. Littoral Soc. v. EPA,*
199 F. Supp. 2d 217 (D.N.J. 2002) ................................................26

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.,*
974 F.2d 1358 (3d Cir. 1992)..........................................................21

*Blades v. Monsanto Co.,*
400 F.3d 562 (8th Cir. 2005)...........................................................4

*Campos v. Ticketmaster Corp.,*
140 F.3d 1166 (8th Cir. 1998)...................................................38, 39

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986).........................................................................24

*Country Floors, Inc. v. A P'ship Composed of Gepner and Ford,*
930 F.2d 1056 (3d Cir. 1991).....................................................25, 26

*Day v. Taylor,*
400 F.3d 1272 (11th Cir. 2005).......................................................20

*Delaware Valley Surgical Supply, Inc. v. Johnson & Johnson,*
523 F.3d 1116 (9th Cir. 2008)....................................................36, 37

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.,*
424 F.3d 363 (3d Cir. 2005)...........................................26, 28, 33, 34

*Illinois Brick Co. v. Illinois,*
431 U.S. 720 (1977).....................................................................27, 31

*In re Lorazepam & Clorazepate Antitrust Litig.,*
202 F.R.D. 12 (D.D.C. 2001)...................................................4, 39, 40

*In re Lower Lake Erie Iron Ore Antitrust Litig.,*
   998 F.2d 1144 (3d Cir. 1993)................................................................. 4, 31

*In re Mercedes-Benz Antitrust Litig.,*
   364 F. Supp. 2d 468 (D.N.J. 2005) ...................................................... 27, 28

*J.F. Feeser, Inc. v. Serv-A-Portion, Inc.,*
   909 F.2d 1524 (3d Cir. 1990)............................................................... 4, 24

*Kansas v. Utilicorp United, Inc.,*
   497 U.S. 199 (1990)................................................................................ 32

*Kloth v. Microsoft Corp.,*
   444 F.3d 312 (4th Cir. 2006).................................................................. 37

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986) ............................................................................... 24

*McCarthy v. Recordex Service, Inc.,*
   80 F.3d 842 (3d Cir. 1996)........................................................... 31, 33, 34

*St. Francis Medical Center v. C.R. Bard, Inc.,*
   657 F. Supp. 2d 1069(E.D. Mo. 2009)................................................. 36, 37

*United States v. Gen. Elec. Co.,*
   272 U.S. 476, 488 (1926) ....................................................................... 20

*Vadino v. A. Valey Eng'rs,*
   903 F.2d 253 (3d Cir. 1990) ................................................................... 26

**Federal Statutes**

Fed. R. Civ. P. 23 .................................................................................... 40

Fed. R. Civ. P. 52 .............................................................................. passim

Fed. R. Civ. P. 56 .............................................................................. passim

**Other Authority**

9C Charles Alan Wright & Arthur R. Miller, *Federal Practice and
   Procedure* § 2575 (3d ed. 2008) ........................................................... 26

Daniel V. Dooley, *Financial Fraud: Accounting Theory and Practice*, VIII
    Fordham J. of Corp. and Fin. Law S53 (2002) ................................................... 13

Plaintiffs MedStar Health, Inc., *et al.* ("MedStar Plaintiffs") respectfully submit this memorandum of law in opposition to the December 22, 2009 Motion for "Particular Findings of Fact Relating to Direct Purchaser Standing, or, Alternatively for Partial Summary Judgment" served by Plaintiffs Louisiana Wholesale Drug Co., Inc., Rochester Drug Co-Operative, Inc., JM Smith Corp. d/b/a Smith Drug Co., Dik Drug Co., and Park Surgical Co., Inc. (collectively, "Distributor Plaintiffs").

## I.    Introduction

Although only about 26% of Defendant Becton, Dickinson & Co.'s ("Becton") Disposable Hypodermic Products that are shipped by Becton's distributors are actually purchased by those distributors, the Distributor Plaintiffs here are asking the Court to make three express "findings" that would grant them direct purchaser status for 100% of those products. The Distributor Plaintiffs desperately need these three "findings" because their collusive settlement with Becton depends on them.[1]

Becton's distributors *lack* direct purchaser standing for the approximately 74% of Becton's products they ship to Becton's contract customers, who are

_____

[1] The Distributor Plaintiffs are bringing their motion for partial summary judgment on the direct purchaser issue in their *individual* capacities and not as class representatives. But the "findings" they seek could have far-reaching class implications because they are inextricably intertwined with their proposed settlement class definition.

healthcare providers ("Contract Customers" or "Healthcare Providers"), like the MedStar Plaintiffs, who purchase products from Becton pursuant to contracts that Becton negotiates with them and their respective group purchasing organizations ("GPO") without any involvement by Becton's distributors. For Becton's sales to its Contract Customers, Becton's distributors act as Becton's agents; they accept orders *on behalf of* Becton, ship product *on behalf of* Becton, invoice *on behalf of* Becton, and collect payment *on behalf of* Becton, all at prices and on terms previously negotiated between Becton and its Contract Customers, such as the MedStar Plaintiffs.[2] Under Supreme Court precedent and the law of this Circuit, standing to bring federal antitrust claims against Becton for these 74% of purchases belongs to Healthcare Providers such as the MedStar Plaintiffs, not to Distributor Plaintiffs who act as Becton's agents.

The three findings the Distributor Plaintiffs and Becton[3] are asking the Court to make concerning direct purchaser standing would be erroneous under Federal Rules of Civil Procedure 52(a)(1) and 56(d)—the two Rules under which the Distributors are moving—because they would require the Court to make factual

---

[2] *See* MedStar Plaintiffs' Statement of Material Facts in Support of MedStar Plaintiffs' December 22, 2009 Motion for Partial Summary Judgment on Direct Purchaser Standing ("MedStar Pl. SOF"), at ¶¶ 69-73.

[3] Although Becton has not moved for summary judgment on the direct purchaser standing issue, its "Motion for Preliminary Approval of Settlement," ("Becton

2

determinations that: (i) are in *direct conflict* with the plain meaning of relevant documents and therefore incompatible with Rule 56's requirement that all evidence be viewed in the light most favorable to the non-movants, and/or (ii) would require the Court to weigh genuinely disputed issues of material fact in this jury case, something that is not permitted under either Rule 56 or Rule 52.

For example, one of the "findings" the Distributor Plaintiffs seek is apparently designed to exclude Healthcare Providers such as the MedStar Plaintiffs from the definition of "direct purchasers," by carving out entities that were not "invoiced" by Becton. (Becton and the Distributor Plaintiffs are arguing that Becton only invoices its distributors.) In particular, the Distributor Plaintiffs and Becton ask the Court to make a "finding" that:

> only those purchasers of BD Hypodermic Products who purchased those products from BD and were *invoiced* by BD for those products have Direct Purchaser standing to assert damage claims against BD under Section 4 of the Clayton Act with respect to Class Purchases ... .[4]

Not only would such a finding be inconsistent with the law—because whether or not a purchaser receives an invoice from the antitrust violator is not

---

Prelim. Appr. Memo") dated December 22, 2009, is directed almost exclusively at supporting the Distributor Plaintiffs' Motion for Partial Summary Judgment.

[4] *See* Distributor Plaintiffs' December 22, 2009 Motion for Particular Findings of Fact Relating to Direct Purchaser Standing, or, Alternatively for Partial Summary Judgment ("Distr. Pl. MSJ Memo") at pp. 5-6 (emphasis added).

3

dispositive of direct purchaser standing—[5] but it would require the Court to

determine as a matter of fact that Becton did *not* invoice the MedStar Plaintiffs for

Becton's products delivered to the MedStar Plaintiffs by Becton's distributors

under the terms of contracts between Becton and the MedStar Plaintiffs.  That

finding of fact, however, would be *directly contrary* to the plain language of

Becton's "Dealer Notification," which contractually requires the distributors

delivering Becton's products to Becton's Contract Customers, such as the MedStar

Plaintiffs, to invoice those Contract Customers "on behalf of BD" as BD's

"agent."[6]  Neither the Distributors nor Becton discusses the "Dealer Notification"

or related documents in their motion papers.  If anything, the MedStar Plaintiffs are

---

[5] *See, e.g., J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1543 (3d Cir. 1990) (reversing district court's finding on summary judgment that using a sister corporation's billing and shipping system for processing purchases from antitrust violator, among other things, rendered plaintiff an indirect purchaser.); *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1168 (3d Cir. 1993) (paying a third-party does not "foreclose further inquiry as to whether standing existed"); *Blades v. Monsanto Co.*, 400 F.3d 562, 568 (8th Cir. 2005) (a plaintiff being separately invoiced for a technology fee, which was paid by the dealer, was "functionally indistinguishable from a direct purchase"); *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 23 (D.D.C. 2001) (GPO contract customers had direct purchaser standing even though they were not invoiced directly by the manufacturer).

[6] *See* Declaration of R. Laurence Macon in Support of MedStar Plaintiffs' December 22, 2009 Motion for Partial Summary Judgment ("Macon Decl."), Ex. 1-K, BD Dealer Notification, at BDAF-00522904 ("In order to effect these purchases, either BD or the Customer will submit orders directly to you.  You are to regard orders from the Customer as purchase orders from BD.  Upon your

entitled to a finding that Becton's Dealer Notification document means what it says and that the MedStar Plaintiffs *are* invoiced by Becton as spelled out in black and white in Becton's Dealer Notification documents.

In their push to encourage the Court to make what would be clearly erroneous—as a matter of law *and* fact—findings, the Distributors fail to disclose material facts, inaccurately report other facts, overstate factually distinguishable law from outside this Circuit that addresses direct purchaser standing, and ignore Third Circuit precedent that calls for a factual analysis of the substantive economic relationship among the antitrust violator and those claiming direct purchaser standing.

For its part, in angling for approval of the settlement it has brokered with the named Distributor Plaintiffs, Becton does a complete flip-flop on the direct purchaser issue, now taking positions that are directly opposite to those it took before its sweetheart settlement was inked. Becton's latest testimony cannot be trusted, never mind relied on and credited as the basis for unauthorized "findings" under Rule 52 or partial summary judgment under Rule 56.

---

acceptance of the order, you are instructed to ship the designated goods within 3-6 days and invoice the customer on behalf of BD.").

## II.  Background and Material Facts

### A.    The 26% of Transactions that are *Not* at Issue

Of Becton's relevant products that are delivered by Becton's distributors,

only about 26% are actually purchased by those distributors and independently

resold to what the parties here refer to as "non-contract" customers, *i.e.*, entities

that have no pre-existing pricing agreement with Becton.[7]  For these Becton

products, Becton's distributors are direct purchasers.  They owe and pay Becton

the list price or "dealer acquisition cost" at which Becton invoices them, and they

are free to resell those Becton products to whomever they choose, at whatever

prices they choose, and under whatever terms and conditions they choose.[8]

Redacted

There is no contest among the parties that the Distributor Plaintiffs have

direct purchaser standing concerning these 26% of Becton's anticompetitively

---

[7] *See* Declaration of Peter Pearlman in Support of Distributor Plaintiffs' December
22, 2009 Motion for Partial Summary Judgment ("Pearlman Decl."), Ex. 1,
Becton's 30(b)(6) Dep. Tr., at 144:12-145:10
                                    Redacted

                                                    *id.* at 150:20-151:3; *see
also* Supplemental Declaration of R. Laurence Macon in Support of MedStar
Plaintiffs February 19, 2010 Opposition to Distributor Plaintiffs' Motion for Partial
Summary Judgment ("Supp. Macon Decl.") at ¶ 8 (Becton's transactional sales
data shows that approximately 74% of Becton's sales by dollar volume are made to
Becton's Contract Customers and approximately 26% are made to non-contract
customers such as the Distributor Plaintiffs.).

[8]                                     Redacted

[9] Supp. Macon Decl. Ex. 37, Ernst & Young 30(b)(6) Dep. Tr. at 89:15-93:14.

priced products.  And subject to Court approval, they are free to try to settle with Becton their claims—and those of their putative class—related to such purchases.

Despite the lack of any contest on this issue, the Distributor Plaintiffs largely devote their Memorandum of Law to discussing the facts and law related to this 26% minority of transactions.  What is noticeably *absent* from Distributor Plaintiffs' motion for summary judgment, however, is meaningful discussion of the facts and law related to the *remaining* 74% of transactions, which involve Becton's Contract Customers—*i.e.,* Healthcare Providers such as the MedStar Plaintiffs.

**B.    The 74% of Transactions the Distributors Do Not Fully Address**

The Distributor Plaintiffs largely ignore the transactional documents and terms that inform and control the substantive economic relationships of the parties concerning the 74% of Becton's contract sales to Becton's Contract Customers, for which Becton's distributors serve as Becton's servicing agents.  For these 74% of transactions, Becton's own documents are emphatically clear that the distributors act only as Becton's agents, accepting orders on behalf of Becton from Becton's Contract Customers, invoicing Becton's Contract Customers on behalf of Becton, collecting payment from Becton's Contract Customers on behalf of Becton, and then remitting those payments to Becton.[10]  In these instances, Becton's

---

[10]  Macon Decl. Ex. 1-K, BDHS Dealer Notification, BDAF-00522903; Ex. 21, BD Dealer Notification, BDAF-00523449; *id.* Ex. 18, Letter from R. Atkins to Judge Hedges at p. 5, *In re Hypodermic Prods. Antitrust Litig.*, No. 05-1602 (D.N.J. Aug.

distributors are *not* functioning as economic purchasers of Becton's products, they are serving as *agents of Becton*, the seller, for *Becton's* sales to Healthcare Providers such as the MedStar Plaintiffs.

### Redacted

The relationship of Becton's distributors as its agents in these transactions could not be more clear.

### Redacted

---

24, 2005) (Docket No. 22) ("The distributors acquire Becton's products at a pre-determined price dictated by the hospital's GPO contract, *which is then covered by the hospital in full.*") (emphasis added);

### Redacted

[11] Pearlman Decl. Ex. 1, Becton's 30(b)(6) Dep. Tr. at 312:3-330:11.

**Redacted**

Becton's distributors—including the Distributor Plaintiffs here, who are marginal players at best in the 74% of transactions at issue, if they participate in them *at all*—[15] are not party to these contracts, play no role in their negotiation, and only

---

[12]

Redacted

*See* Pearlman Decl. Ex. 2, MedStar 30(b)(6) Dep. Tr. at 136:2-139:24.

[13] Supp. Macon Decl. ¶ 7 (derived by comparing the differences between "contract prices" and "dealer acquisition cost" in the transactional sales data produced by Becton).

[14]

Redacted

[15]

Redacted

9

learn of these contracts and the prices for Becton products agreed upon therein *after* the contracts are finalized.[16]

In fact, Becton's distributors, including the Distributor Plaintiffs here, are expressly *prohibited* from acquiring any Becton products for their own accounts at the lower contract prices.[17]  Moreover, *all* of the provisions in Becton's contracts that are claimed to be anticompetitive are contained in these agreements between Becton and the Healthcare Providers such as the MedStar Plaintiffs, agreements to which Becton's distributors are not even a party.[18]  There is not a single allegedly anticompetitive Becton contract provision to which any Distributor Plaintiff has claimed to be party.

---

[16]

Redacted

*id.* at 257:2-10

.; Macon Decl. Ex. 24, Contracting Pricing and Membership Policy, BDAF-00021017 at 28

Redacted

*see also* MedStar Pl. SOF at ¶¶ 25-30 (describing the roles and interactions between the MedStar Plaintiffs, Becton and _____ in the MedStar Plaintiffs' purchases of Disposable Hypodermic Products from Becton).

[17]

Redacted

[18]

Redacted

# Redacted

---

[19] Pearlman Decl. Ex. 1, Becton's 30(b)(6) Dep. Tr. at 87:16-88:3; 91:15-92:25; and 205:13-15.

[20] *Id.* at 78:20-80:12; 90:19-91:14; 92:7-8; and 346:12-16.

# Redacted

---

[21] *Id.* at 343:15-344:24

Redacted

: *id.* at 346:12-20

Redacted

; *id.* at 347:7-25

[22] *Id.* at 118:15-119:7

Redacted          ; *id.* at 310:4-5

[23] *Id.* at 337:10-15

; *see also id.* at 311:15-19; 340:2-4; 310:4-5; and 311:5-11.

# Redacted

The Distributor Plaintiffs' motion fails to discuss these facts.  Yet, these facts are material to understanding why, under the Third Circuit's economic substance test, the Healthcare Providers such as the MedStar Plaintiffs have standing to pursue federal antitrust claims against Becton for the 74% of Becton's

---

[24] *See, e.g.,* Macon Decl. Ex. 18, Letter from R. Atkins to Judge Hedges at p. 5 ("The distributors acquire Becton's products at a pre-determined price dictated by the hospital's GPO contract, which is then covered by the hospital in full.").

products that are shipped from Becton's distributors' to Becton's Contract

Customers, and why Becton's distributors, including the Distributor Plaintiffs here,

who are merely Becton's agents for these transactions, do not.

    **C.**    **The Distributor Plaintiffs' Inaccurate**
                **Statements of Purportedly Undisputed Facts**

        **(1)**    **The Distributors Do *Not* Determine the Prices at which the**
                **MedStar Plaintiffs Buy Becton Products**

    In an attempt to inflate the role of Becton's distributors in the physical

delivery of Becton's products to Becton's Contract Customers such as the MedStar

Plaintiffs, the Distributor Plaintiffs outright misrepresent relevant facts, including

their claim that "Distributors (not BD) determine the resale price to MedStar . . .

for units of BD Hypodermic Products, including for units covered by a contract

that a GPO had with BD."[26] As discussed above, the contract prices that the

MedStar Plaintiffs pay for Becton products are negotiated between Becton and the

MedStar Plaintiffs (including through their GPO contracting agents).

# REDACTED

---

[25] *See generally, e.g.*, Daniel V. Dooley, *Financial Fraud: Accounting Theory and Practice*, VIII Fordham J. of Corp. and Fin. Law S53 (2002).

[26] Distr. Pl. MSJ Memo at p. 15.

[27] MedStar Pl. SOF at ¶¶ 14-15;



Redacted

Distributors engaged

as servicing agents for Becton's contract sales play no role in setting these prices

and are only involved in the transaction *after* the prices are negotiated and set

between Becton and the GPO, acting as the Healthcare Providers' agents.[30]

When the MedStar Plaintiffs receive invoices for Becton products from their

distributor           those invoices include the Becton product price separately

agreed on by Becton and the MedStar Plaintiffs,

REDACTED

---

Redacted                              ; Pearlman Decl. Ex. 2,

MedStar's 30(b)(6) Dep. Tr. at 158:11-14 (

REDACTED

28

29

Redacted

30

31                                                      ; *see*

*also* Pearlman Decl. Ex. 2, MedStar's 30(b)(6) Dep. Tr. at 158:11-14

REDACTED

15

REDACTED                                    [32] Indeed, Becton

confirmed this point, admitting: "under the GPO contracts at issue, the distributors

have no control over price and, instead, function merely as delivery services."[33]

REDACTED                              [34] In other words,                delivery fee

is *disassociated* from the underlying Becton product price that MedStar has

negotiated and contracted for directly with Becton.  And even if             were to

charge its delivery fee by adding a percentage "markup" to the price of Becton

products that MedStar independently agreed to directly with Becton, that would

not equate to             —or any other Becton distributor, including the Distributor

Plaintiffs—"determining the product price" for Becton products any more than the

United States Postal Service determines "product price" when it adds postage to

the final total for a C.O.D. delivery.[35]

---

[32] MedStar Pl. SOF at ¶¶ 23-24; *see also* Pearlman Decl. Ex. 2, MedStar's 30(b)(6) Dep. Tr. at 158:11-14.

[33] Supp. Macon Decl. Ex. 34, Supp. Memo of Becton, Dickinson & Co. in support of its Appeal of Magistrate Judge Ronald J. Hedges' October 24, 2005 Order Denying Its Request for Discovery at pp. 7-8, *In re Hypodermic Prods. Antitrust Litig.*, No. 05-1602 (D.N.J. Aug. 4, 2006) (Docket No. 91) (internal citations omitte[

[34]                              REDACTED

[35] Macon Decl. Ex. 1, Prof. Fiona Scott Morton Decl. at pp. 8-12.

16

**(2)    MedStar Did *Not* Admit in Discovery That it Purchases Directly from Distributors for Any Relevant Transaction**

Without basis, the Distributor Plaintiffs allege that "MedStar admitted in discovery that it did *not* purchase directly from BD for any relevant transaction."[36] The MedStar Plaintiffs, of course, made no such admission, and the testimony on which the Distributor Plaintiffs rely says no such thing.  In the testimony upon which they rely, the MedStar Plaintiffs' corporate representative explained that: (1) MedStar purchases Disposable Hypodermic Products from *Becton* pursuant to the agreement negotiated by their agent (their GPO Novation),[37] (2) Becton's distributors, such as _____ service that agreement,[38] and (3) they do so at the prices negotiated between Becton and the MedStar Plaintiffs', through their GPO Novation.[39]

---

[36] Distr. Pl. MSJ Memo at pp. 11-12.

[37] *See* Pearlman Decl. Ex. 2, MedStar's 30(b)(6) Dep. Tr. at 35:8-37:18.

[38]

REDACTED

[39]

17

**(3)    The GPO Agreements Do *Not* "Show MedStar Purchased from Distributors"**

# Redacted

---

[40] Distr. Pl. MSJ Memo at pp. 12-13.

[41] Macon Decl. Ex. 1-F, 2000 Becton-Novation Contract, VHA015511-600.

[42] *Id.*; Macon Decl. Ex. 22, 2006 Becton-Novation Contract, BDLWD00043009-029.

**Redacted**

For all of Becton's sales to Novation members under the various Becton-Novation contracts in effect during the period of the MedStar Plaintiffs' claims in this case, the mechanism Becton chose to fulfill its pricing obligations to its Contract Customers such as the MedStar Plaintiffs, was *not* to make products available to its distributors for purchase and resale to the Novation members, but rather to appoint its distributors its *agents* pursuant to the terms of its Dealer Notification, so that its products would be sold directly to Novation members like

---

[43] In addition, as noted by Prof. Fiona Scott Morton, even if practiced, this contract provision would be a "limitation on distributor activities," providing further support that distributors sell logistical services to MedStar, not Becton's Disposable Hypodermic Products.  Macon Decl. Ex. 1, F., Prof. Fiona Scott Morton Decl. at p. 9.
[44]

**Redacted**

_____

*See* Macon Decl. Ex. 22, 2006 Becton-Novation Contract, ¶ 2(a) at BDLWD00043011; *see also* MedStar Pl. SOF at ¶¶ 54-60, 67-70.

the MedStar Plaintiffs.[45]  Becton's and the Distributor Plaintiffs' own documents say so as plain as day.[46]

Pursuant to the terms of Becton's Dealer Notification sent to Becton's distributors that were servicing Contract Customers such as the Novation members purchasing under the 2000 Becton-Novation contract, Becton's distributors acted as its agents to (1) accept orders from Novation members on Becton's behalf, (2) ship product to Novation's members on Becton's behalf, (3) invoice those members on Becton's behalf, and (4) remit payment from those members to Becton.[47]

**D.    Becton Has Flip-Flopped on Relevant Facts Since Signing Its Settlement Agreement with the Distributors**

Although Becton has not itself moved for summary judgment on the direct purchaser issue, it has filed a brief in support of the preliminary approval of its settlement with the Distributor Plaintiffs that is devoted to arguing direct purchaser

---

[45] *See supra* fn. 6, 10, and 16.

[46] *See, e.g.,* Macon Decl. Ex. 1-K, BDHS Dealer Notification, BDAF-00522903-904; *id.* Ex. 1-Q, BDHS Dealer Notification, PS_BD00098-110.

[47] *Id.* If Becton had *not* appointed the Distributors its agents for these sales, Becton would not have been able to guarantee its products to Novation's members at the prices to which it had agreed, without running the risk of violating resale price maintenance laws by dictating to its distributors the prices at which they must "resell" to Becton's Contract Customers. *See, e.g., United States v. Gen. Elec. Co.,* 272 U.S. 476, 488 (1926); *Day v. Taylor,* 400 F.3d 1272, 1276 (11th Cir. 2005). Becton's decision to appoint its distributors as its agents for its sales to its Contract Customers was plainly motivated by a desire to avoid resale price maintenance liability.  Becton should not now be permitted to run away from this fact for the

20

standing.[48] Becton plainly wants the Distributor Plaintiffs to succeed on their motion because it would get Becton one step closer to securing a very cheap settlement of valuable antitrust claims. In blind pursuit of this goal, Becton has submitted to this Court factual assertions and arguments that *directly contradict* numerous admissions Becton made during discovery and that its counsel made to this Court. Becton's sudden and dramatic about-face on material facts, at best, highlights that there are issues of fact for a jury to weigh and make credibility determinations about.

Before entering into its settlement with the Distributor Plaintiffs, Becton made the following admissions, which plainly support a finding that Becton's Contract Customers such as the MedStar Plaintiffs are the immediate purchasers of Becton's products sold pursuant to those contracts:

• 

**Redacted**

---

convenience of trying to avoid direct purchaser liability in this case. MedStar Pl. SOF ¶¶ 33-40.

[48] Becton's motion, although captioned as a request for approval of a settlement, actually seeks summary judgment on the direct purchaser standing issue. As such, all "facts" on which the motion relies should be viewed in the light most favorable to the non-movant. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied*, 507 U.S. 912 (1993) (citations omitted) (all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true").

[49] Macon Decl. Ex. 26, Becton's RFA Responses (March 27, 2008) at No. 6.

21

Redacted

- "[T]he economic role of authorized distributors under the GPO contracts at the heart of this case is not that of a direct purchaser at all. Rather, these distributors basically deliver Becton's products to hospitals at prices negotiated directly between Becton and the hospital's agent (the GPO)."[51]

- "When Becton first briefed the [downstream discovery] issue ..., we argued that one reason for ordering downstream discovery is that some of the so-called 'direct purchasers' involved in the 'direct action' do not have standing or antitrust injury. We explained that under the GPO contracts being challenged in this case, certain 'authorized distributors' who buy products from Becton for resale to hospitals and doctors have no standing to sue or to recover damages from Becton."[52]

- "[The Healthcare Providers'] basis for claiming that they, and not the distributors, have federal standing is the very same basis as Becton had asserted for obtaining downstream discovery: under the GPO contracts at issue, the distributors have no control over price and, instead, function merely as delivery services."[53]

- Mr. Atkins: "[I]t is our intention to show that it is that very distinction between sales they claim to make that are noncontract, where presumably prices can vary as they alleged in their motion; and sales that are done under Becton contracts where they cannot [vary] because the purchase

---

[50] *Id.* at No. 52.

[51] Macon Decl. Ex. 18, Letter from R. Atkins to Judge Hedges (August 24, 2005) at p. 5.

[52] Supp. Macon Decl. Ex. 34, Supp. Memo of Becton, Dickinson & Co. in support of its Appeal of Magistrate Judge Ronald J. Hedges' October 24, 2005 Order Denying Its Request for Discovery at p. 6 (Aug. 4, 2006) (internal citations omitted).

[53] *Id.* at pp. 7-8 (internal citations omitted).

22

price is negotiated between Becton and the end user, and the distributor is merely a delivery service."[54]

Again, all of the foregoing are *Becton's* prior statements in this case, not the MedStar Plaintiffs'. Once Becton entered into a settlement agreement with the Distributor Plaintiffs—parties that Becton once asserted had no antitrust injury and therefore no standing—Becton's story changed dramatically, and it adopted a conveniently opposite version of the facts, that directly contradicts its prior admissions. For example, Becton now asserts that:

- "The commercial and legal bottom line is the same whether there is a GPO contract or not: distributors are 'direct purchasers' because they order from BD, buy from BD, are invoiced by BD, and pay BD;"[55]

- "[T]he Distributor Plaintiffs are the parties with standing to seek damages from BD under the federal antitrust laws...;"[56] and

- There is no difference between contract and non-contract sales.[57]

The Court should disregard Becton's newfound and self-serving statements. In the alternative, Becton's new statements, when contrasted with their prior admissions, inherently create issues of material fact about the economic role of Distributor Plaintiffs, sufficient to deny the summary judgment relief requested in

---

[54] Supp. Macon Decl. Ex. 35, Hrg. Tr. (June 9, 2008) at 25:25-26:6 (statement of Becton's counsel).

[55] Becton's Prelim. Appr. Memo at p. 13.

[56] *Id.* at p. 4.

[57] *Id.* at p. 13.

23

the Distributor Plaintiffs' instant motion.  Becton's admissions also call into question the validity of Becton's proposed settlement, as the settlement was negotiated with parties Becton has previously admitted have no standing to bring certain direct claims, let alone settle them.

## III.   Relevant Law and Distinguishable Law

### A.   The Findings the Distributors and Becton Seek are Incompatible with Federal Rules of Civil Procedure 56 and 52

The Distributor Plaintiffs are moving under Federal Rules of Civil Procedure Rules 56 and 52.[58]  Neither Rule, however, permits the "findings" they seek.

Under Rule 56, summary judgment can be granted only when no genuine issues of material fact remain for resolution at trial.[59]  All facts material to the Distributor Plaintiffs' motion must be viewed in the light most favorable to the MedStar Plaintiffs.[60]  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[61]  Weighing evidence and making findings of disputed facts that otherwise contradict the plain language of

---

[58] Distr. Pl. MSJ Memo at p. 35.

[59] *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986), and *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

[60] *Feeser*, 909 F.2d at 1531.

the operative documents and Becton's own prior unequivocal statements is *exactly* what the Distributor Plaintiffs are asking the Court to do here.[62]  Based on the record, the MedStar Plaintiffs should be granted partial summary judgment on the direct purchaser issue because of the plain language of the relevant documents discussed in the MedStar Plaintiffs' December 22, 2009, Motion for Partial Summary Judgment.  But in no event are the Distributor Plaintiffs so entitled, because their motion requires the Court to disregard the plain language of those documents and make other findings of contested fact.

Federal Rule of Civil Procedure 52, which the Distributor Plaintiffs also invoke as a procedural basis for the "findings" they are asking the Court to make, is inapplicable and inappropriate here.[63]   Rule 52, on its face, applies to cases in

---

[61] *Anderson*, 477 U.S. at 249; *Feeser*, 909 F.2d at 1531 (citing *Anderson*); *Country Floors, Inc. v. A P'ship Composed of Gepner and Ford*, 930 F.2d 1056, 1062 (3d Cir. 1991).

[62] The MedStar Plaintiffs also include with this filing a separate point-by-point written response to the Distributor Plaintiffs' statement of purportedly uncontested facts.

[63] The likely motivation of Distributor Plaintiffs for moving under Rule 52 in the alternative is to improperly invoke the protections of the clearly erroneous standard of review on appeal were the Court to make the "findings" they seek.  *Compare* Fed. R. Civ. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.") *with* 9C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2575 (3d ed. 2008) ("[i]f findings are made on a summary judgment motion … they are not entitled to the protection of the clearly erroneous rule on review.").

which facts will *not* be tried to a jury.[64] But this is a jury case, and the MedStar

Plaintiffs are not waiving their right to a trial of facts by the jury and do not

consent to the "findings" requested by the Distributor Plaintiffs.[65]

**B.    The Distributors Cannot on Summary Judgment Satisfy Even
Their Own Incorrect Interpretation of the Direct Purchaser Rule**

As discussed in the MedStar Plaintiffs' December 22, 2009 Motion for

Partial Summary Judgment, to determine direct purchaser standing, courts in this

Circuit must examine the economic substance of a purported direct purchaser's

role in a sale/purchase transaction.[66] The examination looks to whether: (1) the

putative direct purchaser directly interacted with the antitrust violator regarding the

---

[64] *See* Fed. R. Civ. P. 52(a)(1); *see also Am. Littoral Soc. v. EPA*, 199 F. Supp. 2d 217, 226, (D.N.J. 2002) quoting *Acuff-Rose Music, Inc. v. Jostens, Inc.*, 155 F.3d 140, 142 (2d Cir. 1998) ("Rule 52(a) allows a court to decide, with the consent of the parties, a case without a formal jury trial based on the record compiled in summary judgment proceedings.") (internal quotations omitted).

[65] *See Vadino v. A. Valey Eng'rs*, 903 F.2d 253, 258-59 (3d Cir. 1990) (discussing Rule 52)("findings of fact and conclusions of law thereon are not necessary in ruling on motions under Rules 12 and 56 because resolution of such motions entails a legal determination based on the undisputed facts on the record before the court and the applicable precedent or statute. If there is a genuine issue of material fact, summary judgment would be improper."); *see also Country Floors*, 930 F.2d at 1062 ("In sum, on a motion for summary judgment the responsibility of the district court is to determine if there are triable issues, rather than to try those issues and make findings based on the affidavits or other materials accompanying the motion.").

[66] MedStar Plaintiffs' Dec. 22, 2009 Motion for Partial Summary Judgment ("MedStar Pl. MSJ Memo") at 13-25; *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 373 (3d Cir. 2005); *In re Mercedes-Benz Antitrust Litig.*, 364 F. Supp. 2d 468, 481 (D.N.J. 2005).

economic terms of the transaction, (2) the intermediary's function was dependent on a preceding interaction between the putative direct purchaser and antitrust violator, and (3) whether the harm plaintiff suffered arose directly out of its interaction with the antitrust violator or instead was derivative of injury first suffered by another party to the transaction.[67] Here, the answers to these questions all weigh in favor of the Healthcare Providers having direct purchaser standing.

The Distributor Plaintiffs do not even acknowledge the economic substance test—much less the economic substance of the transactions— in their papers, but instead rely on a proclaimed and over-simplified "bright line" interpretation of the direct purchaser rule set out in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).[68]

The Distributor Plaintiffs claim that the following four "facts" alone satisfy the direct purchaser inquiry under *Illinois Brick*: (1) The [Distributor] Plaintiffs order Hypodermic Products directly from Becton, (2) are invoiced directly by Becton, (3) take delivery directly from Becton, and (4) pay Becton directly.[69] Even if their "bright line" test were appropriate (it is not), the Distributor Plaintiffs'

---

[67] *Mercedes-Benz*, 364 F. Supp. 2d at 481.

[68] Distr. Pl. MSJ Memo at pp. 17-18.

[69] Distr. Pl. MSJ Memo at p. 3.

instant motion must fail because, because the material facts on which they rely to satisfy their test are disputed, creating genuine issues for trial. [70]

Putting aside for the moment that these facts are genuinely contested for the 74% of Becton products purchased pursuant to contracts for which Becton's distributors, including the Distributor Plaintiffs, merely act as Becton's servicing agents, this Court and the Third Circuit have rejected a mechanical reliance on the flow of products through the distribution system. This Court and the Third Circuit analyze the economic role of parties before reaching a decision of who is the direct purchaser. [71] None of the Third Circuit cases Distributor Plaintiffs cited states otherwise.

Application of the *Mercedes-Benz* economic substance factors favors summary judgment for the MedStar Plaintiffs. As discussed in the MedStar Plaintiffs' December 22, 2009 Motion for Partial Summary Judgment, there is no

---

[70] As discussed above in Section II(C)(1), pursuant to the terms of Becton's Dealer Notification, when one of Becton's distributors collects payment for a Becton product from a contract customer such as MedStar, it is doing so as Becton's agent. It is not "paying" Becton for any product that the distributor bought, it is simply remitting to Becton, as Becton's agent, monies that it has collected on Becton's behalf from one of Becton's Contract Customers. Distr. Pl. MSJ Memo at pp. 10-11.

Redacted

[71] *See, e.g., Dentsply*, 424 F.3d at 373; *Mercedes-Benz*, 364 F. Supp. 2d at 481.

28

genuine issue of material fact that Healthcare Providers like MedStar Plaintiffs meet the economic substance test and are direct purchasers for the contested 74% of Becton's products.  First, the MedStar Plaintiffs and other Healthcare Providers like it negotiate with Becton through their GPO agents to set the economic terms for purchasing products (negotiations in which the Distributor Plaintiffs play no role).[72]  Second, Distributor Plaintiffs' role, as servicing agents, in delivering Becton's Disposable Hypodermic Products to MedStar, is subordinate to a preceding pricing contract between the MedStar Plaintiffs and Becton.[73]  And finally, the MedStar Plaintiffs' harm, *i.e.*, the overcharge, is not derivative of any harm suffered by the Distributor Plaintiffs, because it arises directly out of their overpayment to Becton for the products they purchased from Becton pursuant to

---

[72] MedStar Pl. MSJ Memo § III(C)(2); *see also* Macon Decl. Ex. 1, Prof. Fiona Scott Morton Decl. at p. 8 ("MedStar's prices for Becton hypodermic products are determined by its interaction with Becton."), and Ex. 2, Q. Mimms Decl. at ¶ 27 ("In determining which party is the primary obligor, several documents indicate that Becton establishes itself as the primary obligor to its Contract Customers, in this instance, MedStar.").

[73] *Id.* at § III(C)(3); *see also* Macon Decl. Ex. 1, Prof. Fiona Scott Morton Decl. at p. 9 ("Distributors do perform the economic function of a seller, but for contract sales the economic value of their sales activity accrues from their selling of logistical services to MedStar hospitals, not Becton's hypodermic products."), and Ex. 2, Q. Mimms Decl. at ¶ 37 ("the role of the Distributors in regard to sales of the Disposable Hypodermic Products to MedStar under what Becton describes as Net Dealer Acquisition Contract represents that of an agent of Becton, and not that of principal.").

the contracts they negotiated with Becton.[74]  In fact, as Becton itself has

represented to this Court,[75] Becton's distributors, including the Distributor

Plaintiffs, suffer no overcharge injury for the 74% of contested Becton products,

because for Becton's contract sales, the distributor is only remitting to Becton the

amount it is collecting from Becton's contract customer.[76]  Becton said:

> The distributors acquire Becton's products at a pre-
> determined price dictated by the hospital's GPO contract,
> which is then covered by the hospital in full.  These
> distributors suffer no economic injury.[77]

In short, the distributor has no economic "skin in the game" concerning product

price when it is acting as Becton's servicing agent for Becton's contract sales.[78]

     Not only is the Distributor Plaintiffs' over-simplified application of *Illinois*

*Brick* at odds with the Third Circuit's economic substance test, but it also is

---

[74] *Id.* at §III(C)(4); *see also* Macon Decl. Ex. 1, Prof. Fiona Scott Morton Decl. at p. 8 ("the effects of Becton hypodermic product price changes impact MedStar directly."), and Ex. 2, Q. Mimms Decl. at ¶ 32 ("Regarding product pricing, Becton sets product pricing directly with Novation.").

[75] Macon Decl. Ex. 18, Letter from R. Atkins to Judge Hedges (Aug. 24, 2005) at p. 5 ("The distributors acquire Becton's products at a pre-determined price dictated by the hospital's GPO contract, *which is then covered by the hospital in full*.") (emphasis added).

[76] *See supra* fn. 21.

[77] Macon Decl. Ex. 18, Letter from R. Atkins to Judge Hedges (Aug. 24, 2005) at p. 5.

[78] If anything, to the extent Becton's distributors charge a delivery fee to Becton's Contract Customers that is calculated as a percentage of product price, those

inconsistent with Supreme Court precedent for two reasons. First, the Supreme Court's reasons in *Illinois Brick* for crafting the "direct purchaser rule" in the first place are not at play here. The direct purchaser rule was designed to (1) avoid potential double recovery from a defendant for the *same type of injury* (e.g., overcharge) by successive purchasers, (2) avoid the difficulties associated with trying to apportion damages for the *same type of injury* (e.g., overcharge) among successive purchasers, and (3) ensure that plaintiffs remain sufficiently motivated to pursue damages claims against antitrust violators.[79]

Here, the Distributor Plaintiffs have suffered no overcharge injury as a result of Becton's anticompetitive conduct and the Healthcare Providers, who are the true direct purchasers of 74% of Becton's products that are shipped by Becton's distributors, are plainly motivated to pursue their antitrust claims against Becton. Although the Distributor Plaintiffs may have an antitrust claim for *lost profits* from these 74% of contested units (damages which they have disclaimed to avoid having

_____

distributors actually *benefit* from Becton's overcharge, because Becton's illegal overcharge in turn increases the respective distributor's delivery charge.

[79] *Illinois Brick*, 431 U.S. at 730-31; *see McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 851 (3d Cir. 1996) ("In *Lower Lake Erie*, we found that the plaintiffs' claims did not involve "the particular kind of double recovery [of overcharge injury] *Illinois Brick* sought to prevent.") (internal citation omitted); *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1169 (3d Cir. 1993) ("In *Illinois Brick* the concern was that overlapping parties would compete for the same pool of illegal profits garnered from the antitrust activity … Here, different parties allege different injuries … ").

to produce down-stream discovery), they suffer no overcharge injury related to them. There is only *one* overcharged party here, the MedStar Plaintiffs.

Second, the Distributor Plaintiffs' proposed mechanistic application of *Illinois Brick* is inappropriate here because, as this Court noted in its September 7, 2006 Opinion and Order concerning downstream discovery, the Supreme Court's own guidance in *Kansas v. Utilicorp United, Inc.* provides that even if the Court were inclined to label the MedStar plaintiffs "indirect purchasers"— which it should not for reasons discussed throughout this memorandum—then *Illinois Brick* still "might allow indirect purchasers to sue only when, by hypothesis, the direct purchaser will bear no portion of the overcharge and otherwise suffer no injury."[80]

Here, Becton's distributors, including the Distributor Plaintiffs, suffer no overcharge for the Becton products they deliver to the Healthcare Providers as Becton's servicing agent, and the Distributors have not claimed any other injury concerning those sales.[81]

---

[80] Opinion and Order at p. 22, *In re Hypodermic Prods. Antitrust Litig.*, No. 05-1602 (D.N.J. Sept. 7, 2006) (Docket No. 98), quoting *Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 217-19 (1990).

[81] Indeed, to avoid downstream discovery, they have specifically disclaimed any lost profits injury related to those Becton products. Supp. Macon Decl. Ex. 38, Distributor Plaintiffs' Memo of Law in Opp. to Defendant's Obj. to the Downstream Disc. Order at p. 1, *In re Hypodermic Prods. Antitrust Litig.*, No. 05-1602 (D.N.J. Dec. 5, 2005) (Docket No. 50-1) ("Plaintiffs seek damages in the nature of overcharges.").

## C.    Distributor Plaintiffs Misstate Third Circuit Precedent

Similar to their oversimplification and misapplication of the direct purchaser inquiry under *Illinois Brick*, the Distributor Plaintiffs oversimplify the Third Circuit's holdings in *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363 (3d Cir. 2005) and *McCarthy v. Recordex Service, Inc.*, 80 F.3d 842 (3d Cir. 1996), claiming they stand for the "black and white proposition that every plaintiff who alleges that it has purchased products 'through' a distributor must be labeled an 'indirect purchaser.'" Distr. Pl. MSJ Memo at p. 24, n. 14. Neither *Dentsply* nor *Recordex* stands for such a mindless and mechanical determination of direct purchaser standing.

In both *Dentsply* and *Recordex*, the allegations that the plaintiffs purchased "through" some entity other than the antitrust violator was one that was evaluated in the context of the facts concerning the substantive economic roles of the parties to the purchase transactions at issue, and, in both cases, the evaluation of those facts led to reasoned conclusions about which entities were or were not direct purchasers. *Dentsply*, 424 F.3d at 373; *Recordex*, 80 F.3d at 852-53. Neither *Dentsply* nor *Recordex* counsels against a fulsome factual analysis of the economic substance of a purported direct purchaser's transactions with the antitrust defendant to determine direct purchaser standing.

33

In fact, in *Denstply*, the Third Circuit looked at the economic role of each party and focused on the fact that "Plaintiffs pay the dealers their usual price, the dealers take their profit, and then the dealers pay Dentsply." *Dentsply*, 424 F.3d at 373. Only after analyzing the economic role of the parties did the court conclude that the transaction was comprised of two separate sales and that the dental laboratories were indirect purchasers. *Id.* at 373 (noting that "the dealers still make the sale to Plaintiffs and Dentsply makes the sale to the dealers").

Similarly, the Third Circuit in *Recordex* looked at the economic role of plaintiffs in a medical malpractice suit, and the attorneys representing them, before rejecting plaintiffs' claims that they were direct purchasers of photocopies of their respective hospital records being purchased by their attorneys. The Court rejected plaintiffs' claims that they were direct purchasers because "none of the plaintiffs retained their lawyers to act *as mere purchasing agents* whose sole objective and function was to buy photocopies for the clients." *Recordex*, 80 F.3d at 852 (emphasis added). The attorneys were the "real parties in interest" because they bought those records for their own use as part of representing the plaintiffs in malpractice suits. *See Recordex*, 80 F.3d at 852 n.16 and 854 n.19.[82]

---

[82] The court explained: "Plaintiffs are no more direct purchasers of the hospital record photocopies at issue here than a passenger in a taxicab would be considered a direct purchaser of the gasoline used by the taxicab to carry the passenger to his destination." *Id.* at 853 n.18.

Neither *Dentsply* nor *Recordex* supports the Distributor Plaintiffs' argument that, by defining their putative class as those who directly purchase Becton products "through" one of Becton's authorized distributors, the MedStar Plaintiffs have somehow conceded that they are not direct purchasers.   Distr. Pl. MSJ Memo at pp. 3 and 24.  The use of the word "through" in the putative class definition simply reflects the reality that because the Distributor Plaintiffs act as Becton's servicing agents for Becton's contract sales, they are the ones to receive orders on Becton's behalf, ship product on Becton's behalf, and invoice and collect on Becton's behalf.                        Redacted

As a result of Becton's distributors' role as Becton's servicing agents, it is accurate and consistent with a direct purchaser allegation for the MedStar Plaintiffs to describe themselves as purchasing directly from Becton "through" Becton's distributors.[84]  Moreover, even if the distributors were *not* acting as Becton's servicing agents, the MedStar Plaintiffs' description of purchasing Becton's products "through" distributors is entirely consistent with the MedStar Plaintiffs

---

[83] *See, e.g.*, Macon Decl. 1-K, BDHS Dealer Notification, at BDAF-00522903-04;
                                   Redacted

[84] The Distributor Plaintiffs' feigned confusion by the word "through" in the putative class definition in the MedStar Plaintiffs' Complaint, is also belied by the plain language of paragraph 51 of the MedStar Plaintiffs' Complaint, which explains that, "there is effectively only one sale" under which the *class member, i.e., MedStar—not the distributor*, "purchases Becton Disposable Hypodermic

having direct purchaser standing under the economic substance test this Circuit applies. The simple fact remains that the Distributor Plaintiffs have *no* ability to affect the product price and other material terms (including the claimed anticompetitive provisions challenged in this case) agreed to directly between the MedStar Plaintiffs and Becton, without any input or participation by Becton's distributors.

### D.   Distributor Plaintiffs Rely on Readily Distinguishable Case Law from Other Circuits

The Distributor Plaintiffs argue that "every court" that has considered the "precise facts here" has rejected the argument that a claimant like MedStar has standing to pursue damages as a direct purchaser. Distr. Pl. MSJ Memo at pp. 25-26. Not so. None of the non-binding cases identified by the Distributor Plaintiffs is relevant here because each is missing a critical fact that is present in this case.

As explained in MedStar Plaintiffs' December 22, 2009 Motion for Partial Summary Judgment, neither *Delaware Valley Surgical Supply, Inc. v. Johnson & Johnson*, 523 F.3d 1116 (9th Cir. 2008) ("Endosurgical") nor *St. Francis Medical Center v. C.R. Bard, Inc.*, 657 F. Supp. 2d 1069 (E.D. Mo. 2009) ("Bard") were

---

Products and then receives these Products from authorized distributors." MedStar Complaint, ¶ 51(e).

decided in the Third Circuit or examined the economic substance of the relevant transactions.[85]

Further, unlike this case, in which Becton's distributors, including the Distributor Plaintiffs, acted as Becton's *agents* in Becton's sales transactions with its Contract Customers such as the MedStar Plaintiffs, *neither* of the cases cited by the Distributor Plaintiffs included evidence indicating that the distributors in those cases were acting as the antitrust violator's agents. And, each court specifically relied on the *lack* of facts supporting agency in reaching its respective decision. *Endosurgical*, 523 F.3d at 1122 ("O&M is not an agent or subsidiary of J&J"); *Bard*, 657 F. Supp. 2d at 1105 (noting that the lack of an agency relationship was a key factor in *Endosurgical*, and relying on opinion).

Distributor Plaintiffs' reliance on *Kloth v. Microsoft Corp.*, 444 F.3d 312 (4th Cir. 2006) is similarly misplaced. In *Kloth*, the court held that the end-user software license included with software that the plaintiffs purchased from retailers did not create a direct purchaser relationship with Microsoft for purposes of standing to bring antitrust claims; it was an agreement that only arose *after* the plaintiffs had already purchased the software from somebody other than Microsoft. *Id.* at 322 ("While the licenses [plaintiffs] purchased from OEMs and retailers gave

---

[85] MedStar Pl. MSJ Memo at p. 27.

them financial rights against Microsoft, the economic transaction for this license was consummated with the intermediaries at prices fixed by the intermediaries.").

Here, by contrast, Becton's distributors' role in the MedStar Plaintiffs' purchases from Becton is dependent on a preceding contract between Becton and MedStar's GPO that establishes the price of Disposable Hypodermic Products and of the terms and conditions of sale.[86]  If anything, *Kloth* supports the proposition that Becton's distributors *lack* direct purchaser standing for the 74% of products they ship to Becton's Healthcare Provider Contract Customers, because those Healthcare Provider Contract Customers agreements with Becton *precede* any involvement by the distributors in the those transactions.

Similarly, Distributor Plaintiffs' reliance on *Campos v. Ticketmaster Corp.*, 140 F.3d 1166 (8th Cir. 1998) is misguided and relies on language quoted out of context.  If *Campos* finds any application here, it too is to support a finding that Healthcare Providers such as the MedStar Plaintiffs are direct purchasers of Becton's products, not the Distributor Plaintiffs.  In *Campos*, ticket buyers sued Ticketmaster for price fixing with various concert venues and promoters, and for monopolization or attempting to monopolize the market for ticket distribution services. *Id*. at 1168.  The Eighth Circuit decided that ticket buyers were indirect purchasers and did not have standing to sue for damages. *Id*. at 1171.

---

[86] MedStar Pl. SOF at ¶¶ 25-30.

To reach its conclusion, the court looked at the relationship among Ticketmaster, the concert venue, and ticket buyers and found that ticket buyers only buy Ticketmaster's services after the concert venues have first contracted with Ticketmaster. *Campos*, 140 F.3d at 1171. Here, the Healthcare Providers like the MedStar Plaintiffs, through their GPOs, contract directly with Becton, and Becton's distributors do not get involved in those transactions until *after* the contracts between Becton and the Healthcare Providers (or their GPOs) are already in place.

Finally, although Distributor Plaintiffs claim "every court" has rejected healthcare providers' standing claims, they conspicuously fail to even mention *In re Lorazepam & Clorazepate Antitrust Litigation*, 202 F.R.D. 12 (D.D.C. 2001), *aff'd*, 289 F.3d 98 (D.C. Cir. 2002), an antitrust case involving both hospitals and distributors, including Dik Drug, a named Distributor Plaintiff here.[87]  In that case, distributors acquired products from the supplier for distribution to either (1) entities purchasing under contracts negotiated directly between GPOs and Mylan, the antitrust violator, or (2) entities purchasing directly from one of Mylan's

---

[87] The Distributor Plaintiffs' representations and failure to cite *Lorazepam* are particularly troubling given the many times they and Becton argued to this Court over the production of documents related to that case, in which the Distributor Plaintiff, Dik Drug was a named plaintiff. *See, e.g., In re Lorazepam & Clorazepate Antitrust Litig.*, No. 1:99-mc-00276 (Docket).  Also notable is Becton's failure to cite *Lorazepam*.  Becton's counsel here was also defendants' counsel in that case. *Id.*

distributors.  The district court certified a class of direct purchasers that included

hospitals purchasing under contracts negotiated between GPOs and Mylan.

Specifically, the court held that "'contract' customers by their nature are persons

who purchased clorazepate or lorazepam pursuant to their contracts with Mylan,'

and therefore are members of the class 'to the extent that they purchased

clorazepate or lorazepam directly from Mylan.'" *Id.* at 23.  The court also

recognized that distributors, referred to as "invoice purchasers," may be direct

purchasers where they "purchased directly from Mylan for their own account."

*Id.*[88] As in *Lorazepam*, Becton's distributors, including the Distributor Plaintiffs,

may be direct purchasers when they purchase from Becton for their own account,

but they are *not* direct purchasers for the 74% of transactions pursuant to which the

Healthcare Providers such as the MedStar Plaintiffs purchase directly from Becton

under GPO contracts.

## IV.  Conclusion

For the foregoing reasons, the MedStar Plaintiffs respectfully requests that

the Distributor's motion must be denied.[89]

---

[88] D.C. Circuit, reviewing the decision under Fed. R. Civ. P. 23(f), found that there
was no "manifest error in the district court's determination that the class
representatives have standing under *Illinois Brick* or in finding of facts underlying
that conclusion." *In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d at 109.

[89] Plaintiff The Hebrew Home at Riverdale has not moved for summary judgment
on the direct purchaser issue.

Dated: February 19, 2010

Respectfully submitted,

_R. Laurence Macon_

_____
R. Laurence Macon
**Akin Gump Strauss Hauer & Feld LLP**
300 Convent Street, Suite 1500
San Antonio, TX 78205
Telephone: (210) 281-7000
Facsimile: (210) 224-2035
lmacon@akingump.com


AND


Judith L. Spanier
Karin E. Fisch
**Abbey Spanier Rodd & Abrams, LLP**
212 East 39th Street

New York, NY 10016
Telephone: (212) 889-3700
Facsimile: (212) 684-5191
jspanier@abbeyspanier.com
kfisch@abbeyspanier.com


AND


Gordon Ball
**Ball & Scott**
550 Main Avenue, Suite 750
Knoxville, TN 37902
Telephone: (865) 525-7028
Facsimile: (865) 525-4679
gball@ballandscott.com


Richard L. Wyatt
Todd M. Stenerson
Torsten M. Kracht
**Hunton & Williams LLP**
1900 K Street NW
Washington, DC 20006
Telephone: (202) 955-1500
Facsimile: (202) 778-2201
rwyatt@hunton.com
tstenerson@hunton.com
tkracht@hunton.com


AND


Kenneth A. Wexler
Jennifer Fountain Connolly
**Wexler Wallace LLP**
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022
kaw@wexlerwallace.com
jfc@wexlerwallace.com


AND


James V. Bashian
**The Law Offices of James V. Bashian, P.C.**
70 Adams Street, Fourth Floor
Hoboken, NJ 07030
Telephone: (973) 227-6330
Facsimile: (201) 488-3330
jbashian@bashianlaw.com

41

## CERTIFICATE OF SERVICE

I, Elizabeth Vitt, hereby certify that, on the 19th day of February, 2010, copies of the above-captioned Plaintiffs MedStar Health, Inc.'s Opposition to Distributor Plaintiffs' Motion for "Particular Findings of Fact Relating to Direct Purchaser Standing, or, Alternatively for Partial Summary Judgment," were served by U.S. mail, postage prepaid, and by electronic mail where addresses are noted, on the parties listed on the attached service list, together with the MedStar Plaintiffs' Responsive Statement of Disputed Facts, the Supplemental Declaration of R. Laurence Macon, with exhibits, and the Healthcare Provider Plaintiffs' Opposition to Motion for Preliminary Approval of Settlement.

Elizabeth Vitt

42

## <u>SERVICE LIST</u>

**ATTORNEYS FOR DEFENDANT BECTON DICKINSON**

LOWENSTEIN SANDLER PC
Gregory B. Reilly
Scott L. Walker
Ellen B. Unger
65 Livingston Avenue
Roseland, NJ 07068
greilly@lowenstein.com
swalker@lowenstein.com
eunger@lowenstein.com

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Theodore V. Wells, Jr.
Moses Silverman
Robert A. Atkins
Steven Herzog
Jacqueline P. Rubin
1285 Avenue of the Americas
New York, NY 10019
twells@paulweiss.com
ratkins@paulweiss.com
msilverman@paulweiss.com
sherzog@paulweiss.com
jrubin@paulweiss.com

(continued on next page)

1

**ATTORNEYS FOR DISTRIBUTOR PLAINTIFFS**

BERGER & MONTAGUE, P.C.
Daniel Berger
Eric L. Cramer
1622 Locust Street
Philadelphia, PA 19103
danberger@bm.net
ecramer@bm.net

BERGER SINGERMAN, PA
Mitchell W. Berger
350 East Las Olas Boulevard, Suite 1000
Fort Lauderdale, FL 33301
mberger@bergersingerman.com

COHN LIFLAND PEARLMAN HERRMANN & KNOPF LLP
Peter S. Pearlman
Park 80 Plaza West-One
Saddle Brook, NJ 07663
psp@njlawfirm.com

FARUQI & FARUQI, LLP
Peter R. Kohn
2600 Philmont Avenue, Suite 324
Huntingdon Valley, PA 19006
pkohn@faruqilaw.com

GARWIN GERSTEIN & FISHER, LLP
Bruce E. Gerstein
Joseph Opper
Noah Silverman
1501 Broadway, Suite 1416
New York, NY 10036
bgerstein@garwingerstein.com
jopper@garwingerstein.com
nsilverman@garwingerstein.com
(continued on next page)

2

**HAGENS BERMAN SOBOL SHAPIRO LLP**
David S. Nalven
Thomas M. Sobol
One Main Street, Fourth Floor
Cambridge, MA 02142
davidn@hbsslaw.com
tom@hbsslaw.com

**HANGLEY, ARONCHICK, SEGAL & PUDLIN**
Steve D. Shadowen
30 North Third Street, Suite 700
Harrisburg, PA 17101
sshadowen@hangley.com

**KAPLAN FOX & KILSHEIMER LLP**
Linda P. Nussbaum
Robert N. Kaplan
805 Third Avenue
New York, NY 10022
lnussbaum@kaplanfox.com
rkaplan@kaplanfox.com

**KIRBY MCINERNEY LLP**
Kenneth G. Walsh
Christopher S. Studebaker
825 Third Avenue, 10th Floor
New York, NY 10022
kwalsh@kmllp.com
cstudebaker@kmllp.com

**KOZYAK TROPIN & THROCKMORTON PA**
Adam M. Moskowitz
Gail A. McQuilkin
Thomas A. Ronzetti
2525 Ponce de Leon Boulevard, Ninth Floor
Miami, FL 33134
amm@kttlaw.com
gam@kttlaw.com
tr@kttlaw.com
(continued on next page)

3

LAW OFFICE OF ALFRED G. YATES, JR., PC
Alfred G. Yates, Jr.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
yateslaw@aol.com

LAW OFFICES OF JOSHUA P. DAVIS
Joshua P. Davis
437 Valley Street
San Francisco, CA 94131

LEVIN, FISHBEIN, SEDRAN & BERMAN
Howard J. Sedran
510 Walnut Street, Suite 500
Philadelphia, PA 19106
hsedran@lfsblaw.com

ODOM & DES ROCHES, LLP
Andrew Kelly
Charles F. Zimmer II
John Gregory Odom
Stuart E. Des Roches
650 Poydras Street, Suite 2020
New Orleans, LA 70130
akelly@odrlaw.com
czimmer@odrlaw.com
jodom@odrlaw.com
stuart@odrlaw.com

ROBERTS LAW FIRM, P.A.
Michael L. Roberts
20 Rahling Circle
Little Rock, AK 72223
mikeroberts@aristotle.net

(continued on next page)

RODA & NAST, PC
Dianne M. Nast
801 Estelle Drive
Lancaster, PA 17601
dnast@rodanast.com

SPECTOR ROSEMAN KODROFF & WILLIS, P.C.
Jeffrey L. Kodroff
John A. Macoretta
1818 Market Street, Suite 2500
Philadelphia, PA 19103
jkodroff@srkw-law.com
jmacoretta@srkw-law.com

THE SMITH FOOTE LAW FIRM, LLP
David C. Raphael, Jr.
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309
draphael@smithfoote.com

WALDER HAYDEN & BROGAN
Rebekah R. Conroy
5 Becker Farm Road
Roseland, NJ 07068
rrconroy@whbesqs.com