IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: HYPODERMIC PRODUCTS ANTITRUST LITIGATION | Case No. 05-CV-1602 (JLL)(CCC) MDL No. 1730 <br><br> Judge Jose L. Linares <br> Magistrate Judge Claire C. Cecchi |
| MEDSTAR HEALTH, INC., et al., Plaintiffs, <br> v. <br> BECTON DICKINSON & COMPANY, Defendant. | Case No. 06-CV-03258 <br><br> ORAL ARGUMENT REQUESTED <br><br> MOTION DAY: TO BE SET BY THE COURT |

MEMORANDUM OF LAW
IN SUPPORT OF MEDSTAR PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON DIRECT PURCHASER STANDING UNDER
SECTION 4 OF THE CLAYTON ACT

On the Brief and Of counsel:

James V. Bashian
Law Offices of James V. Bashian, P.C.
70 Adams Street, 4th Floor
Hoboken, NJ 07030
Tel (973) 227-6330

R. Laurence Macon
Akin Gump Strauss Hauer & Feld LLP
300 Convent Street, Suite 1500
San Antonio, TX 78205-3732
Tel. (210) 281-7000

Judith L. Spanier
Karin E. Fisch
Abbey Spanier Rodd & Abrams, LLP
212 E. 39th Street
New York, NY 10016
Tel. (212) 889-3700

Richard L. Wyatt, Jr.
Todd M. Stenerson
Torsten M. Kracht
Hunton Williams LLP
1900 K Street, NW
Washington, DC 20006
Tel. (202) 955-1500

Kenneth A. Wexler
Jennifer Fountain Connolly
Amber M. Nesbitt
Wexler Wallace LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Tel. (312) 346-2222

## TABLE OF CONTENTS

I.   INTRODUCTION ...........................................................................1

II.  BRIEF SUMMARY OF RELEVANT FACTS ...............................................3

III. ANALYSIS....................................................................................6

    A.   Legal Standard for Summary Judgment................................................6

    B.   A Plain Reading of the Relevant Transactional Documents
        Supports Finding that  the MedStar Plaintiffs are Direct
        Purchasers...............................................................................7

    C.   The Third Circuit's Economic Substance Test Reinforces that
        the MedStar Plaintiffs Have Federal Antitrust Standing ...................13

        1.   *Mercedes-Benz* provides the legal framework for
            examining the economic substance of the transactions
            between MedStar and Becton. .................................14

        2.   MedStar negotiates with Becton to set the economic
            terms for purchasing Becton's Disposable Hypodermic
            Products, and the Distributors Plaintiffs play *no* role in
            these negotiations...................................................18

        3.   The servicing agent's role in delivering Becton's
            Disposable Hypodermic Products to MedStar is
            subordinate to a preceding contract to purchase those
            products between MedStar and Becton. ...................21

        4.   MedStar's harm is not derivative because it arises
            directly out of its purchases of disposable hypodermic
            products from Becton...............................................22

        5.   The Third Circuit's economic substance test and this
            Court's application of it in *Mercedes-Benz* is consistent
            with principles of economics and accounting, which also
            support the conclusion that MedStar is a direct purchaser. .......25

    D.   Nonbinding Precedent Does Not Dictate a Contrary Result...............27

IV.  CONCLUSION............................................................................28

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*") ........................................... 7, 23

*Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005) .................................. 12

*Blue Shield of Virginia v. McCready*, 457 U.S. 465 (1982) ........................... 7

*Delaware Valley Surgical Supply, Inc. v. Johnson & Johnson*, 523 F.3d 1116 (9th Cir. 2008) ("Endosurgical") ...................................... 27, 28

*Diskin v. Daily Racing Form, Inc.*, No. 92 Civ. 6347, 1994 WL 330229 (S.D.N.Y. July 7, 1994) ......................................................... 11, 18

*Doe v. Arizona Hosp. and Healthcare Ass'n*, No. CV 07-1292, 2009 WL 1423378 (Mar. 19, 2009 D. Ariz.) ..................................................... 18

*Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425 (3d Cir. 1993) .................................................................. 15

*Hersh v. Allen Prods. Co.*, 789 F.2d 230 (3d Cir. 1986) ................................ 6

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363 (3d Cir. 2005) ("*Dentsply*") ..................................................... 8, 14, 16, 17

*Illinois Brick v. Illinois*, 431 U.S. 720 (1977) ("*Illinois Brick*") ................. 7, 8

*Jersey Cent. Power & Light Co. v. Township of Lacey*, 772 F.2d 1103 (3d Cir. 1985) ........................................................................... 7

*Kansas v. Utilicorp United, Inc.*, 497 U.S. 199 (1990) ................................. 24

*Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002) ............. 18

*In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144 (3d Cir. 1993) ............................................................................. 8, 23

*McCarthy v. Recordex Servs., Inc.*, 80 F.3d 842 (3d Cir. 1996) .........8, 12, 23

*McIntosh v. Monsanto Co.*, 462 F. Supp. 2d 1025 (E.D. Mo. 2006) ............12

*In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355 (D.N.J. 2001) ..................................................................................................14

*In re Mercedes-Benz Antitrust Litig.*, 364 F. Supp. 2d 468 (D.N.J. 2005) .............................................................. 8, 14-19, 21, 22

*In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493 (S.D.N.Y. 1996) ..................................................................................18

*Sample v. Monsanto*, 283 F. Supp. 2d 1088 (E.D. Mo. 2003) ...............11, 12

*St. Francis Med. Center v. C.R. Bard, Inc.*, --- F. Supp. 2d -- 2009 WL 3088814 (E.D. Mo. 2009) .........................................................27, 28

*United States v. Gen. Elec. Co.*, 272 U.S. 476 (1926).............................. 10-11

## DOCKETED CASES

*Louisiana Wholesale Drug Co. v. Becton & Co.*, Civ. A. No. 05-CV-1602 ..........................................................................................20

## FEDERAL STATUTES

Fed. R. Civ. P. 56(c) .......................................................................................6

Fed. R. Civ. P. 56(e) .......................................................................................7

## MISCELLANEOUS

Restatement (Second) of Agency § 14J.......................................................27

1

## I.    INTRODUCTION

In this motion for partial summary judgment, MedStar Healthcare, Inc., *et al.* (collectively "MedStar Plaintiffs") ask the Court to hold that they have standing to pursue their federal antitrust claims against Defendant Becton, Dickinson & Co. ("Becton"). The record is ripe for the Court to do so. A plain reading of the transactional documents shows that MedStar purchases Disposable Hypodermic Products directly from the antitrust violator, Becton. MedStar does so pursuant to contracts negotiated directly between Novation, its Group Purchasing Organization, and Becton, which include essential terms such as product price and the bundling provisions challenged in this case as anticompetitive.

The Distributor Plaintiffs—who also claim to have federal antitrust standing for MedStar's purchases of Becton's products—are merely Becton's servicing agents for purchases made by healthcare providers like MedStar. They simply deliver, invoice and collect on Becton's behalf. They do not participate in negotiating Becton's contracts with healthcare providers, and can neither determine nor alter key terms such as product price or the anticompetitive bundling provisions at issue in this case. They are not even parties to those contracts.

As the accompanying Local Rule 56.1(a)[1] Statement demonstrates, there are no *genuine* disputes concerning these fundamental facts; they emerge in black and white from the parties' relevant transactional documents.  The Court may thus find as a matter of law that the MedStar Plaintiffs have direct-purchaser standing under Section 4 of the Clayton Act and the relevant Supreme Court and Third Circuit precedent discussed herein.

If a plain reading of the transactional documents were to leave any question about whether MedStar has federal antitrust standing in this case—and it should not—that question would be resolved by applying the Third Circuit's economic-substance test.  This test requires the Court to evaluate who, among the MedStar Plaintiffs and Distributor Plaintiffs, plays an economically substantive role in the purchase of products from Becton.  Applying that test to the undisputed facts shows that healthcare providers like MedStar have a substantive economic relationship with Becton, so they are the proper parties to pursue federal antitrust claims against Becton for their purchases of Becton's products.  The Distributor Plaintiffs, on the other hand, play no substantive economic role in the transactions at issue; they are just Becton's delivery agents.

---

[1] Citations in this memorandum to the statement of facts are abbreviated "SOF." Referenced exhibits are attached to the accompanying Declaration of R. Laurence Macon ("Macon Decl.").

## II.   BRIEF SUMMARY OF RELEVANT FACTS

This case is about the anticompetitive contracting that Becton has employed in selling Disposable Hypodermic Products in the United States.  The majority of Becton's Disposable Hypodermic Products sold in the U.S. are sold under direct, written supply contracts between Becton and healthcare providers, such as the MedStar Plaintiffs.  (SOF ¶ 13).  The healthcare providers negotiate these contracts with Becton through one or more group purchasing organizations ("GPOs") that act as the healthcare providers' respective agents.  (*Id.* ¶¶ 7, 10).



(*Id.* ¶¶ 13-14).  The parties call healthcare providers who have a direct written supply contract with Becton "contract customers."  Becton's sales to contract customers are called "contract sales."  The MedStar Plaintiffs are contract customers of Becton.  (*Id.* ¶¶ 31-40).

(*Id.* ¶¶ 56, 67).  Becton then defines precisely the contours of its relationship with the designated distributor(s) through the following contract terms it imposes on its distributors who service its contracts with healthcare providers:

3

## IMPORTANT CONTRACT INFORMATION

We offer your firm the opportunity to act as a servicing agent (Distributor) for Becton, Dickinson and Company (BD) under this contract. Pursuant to the supply contract, you will deliver from time to time for BD's account (title to pass to BD upon shipment) the goods set out in that contract.

NOT FOR RESALE: Distributors are expected to assist BD in enforcing the provision in its contract with the institution that its products are not for resale by any institution sold to under a contract with BD. The provisions of this contract would be breached if the distributor knew or had reason to know that such products were not for the customer's own use.

ORDERS AND TERMS OF SALE TO THE CUSTOMER: In order to effect these purchases, either BD or the Customer will submit orders directly to you. You are to regard orders from the Customer as purchase orders from BD. Upon your acceptance of the order, you are instructed to ship the designated goods within 3-5 days and invoice the customer on behalf of BD. Customary terms of state including shipping and payment terms will prevail with the distributor's policies.

CUSTOMER BILLING: To assure accurate billing to the institutions you service, please be sure to maintain current contract data as presented to you by BD. Membership lists and contract data issued to you by anyone other than BD, Franklin Lakes, New Jersey may exclude the servicing distributor from participating in the rebate process.

REBATE REQUESTS: Distributors are required to formally support their rebate requests using our form BD2128 Z CREDIT ADJUSTMENT REQUEST. The instructions for preparing that form are noted on its reverse side. An authorized dealer representative must sign the form as noted before it will be processed.

REBATE REQUEST TIME LIMIT: Rebate request must be received by BD within 45 days of the end of month of the shipment of merchandise by the distributor to the institution. Requests exceeding this time limit will not be honored.

FRAUDULENT REBATE REQUESTS: If you knowingly file a rebate claim containing false or misleading information or apply for a rebate for products which were not purchased directly from BD, except when authorized through the "Transfer of Merchandise" procedures with BD's knowledge and approval, such rebate request will not be honored and you may be removed as an agent to service this and other BD contracts. Such conduct may also result in your removal as a BD distributor and any other legal recourse that may be required. If a rebate is honored and later disclosed to be fraudulent or in error, an adjustment will be issued to your account and, if necessary, the remedies noted above will be implemented.

AUDITS: BD reserves the right to conduct reasonable audits of the agency (dealer) records pertaining to this contract. This may require that we review your sales invoices, shipping and/or freight carrier documents, institution purchase orders and receipts relating thereto. Our audits will be based on sampling techniques, which may be subject to expanded testing if BD deems it necessary. BD may contact institutions to verify the quantities of product delivered to the institution by the distributor as agent.

CONTRACT DROP SHIPMENTS: Drop shipment will be accepted in order to ensure uninterrupted customer service. Contract drop shipments will be billed at the appropriate dealer cost. Orders of $1,000.00 or less will be charged a $50.00 service charge. Orders over $1,000.00 will be charged a 5% service charge. Freight will be prepaid to the end customer. Routine surface shipments (via UPS or LTL) will be on a "no charge" basis. BD will invoice distributors for all air freight or special handling requirements. Normal ordering rules on minimum quantities (75 cases) will apply for pricing shipment orders that are at the request of, or driven by distributor demand. Distributor must submit for contract credit adjustment as stated in the Directions For Submitting A "Z" Credit Adjustment Request.

PRICING AND TERM OF INSTITUTION'S CONTRACT: For the contract included herein prices are guaranteed firm for the period indicated and are exclusive of Federal, State and Local taxes. As Servicing Distributor, and when required by state law, you agree to invoice and collect state sales taxes from the institutions you service, unless they provide you with fully completed and properly signed exemption certificates under the laws of their state. In the event of an audit by state authorities, you agree to assist BD in the collection of delinquent sales taxes from those institutions cited in such state audits.

CARGO CLAIMS, LOSSES, and DAMAGES: All institutions' complaints of loss or damage should be forwarded to the Distributor. BD will not be responsible for loss or damage of goods due to the negligence of the servicing distributor or freight carrier.

PRODUCT INSPECTION: BD reserves the right that at any given reasonable time, which is mutually agreed upon by the distributor, to have access to physically inspect the lot numbers and case packaging on sterile BD merchandise.

BDHS 1094 Rev. 12/00

Effective 12/15/00                                                                 Page 2 of 2

Confidential                                                          BDAF-00523450

*See* SOF ¶70.

4

5

Becton imposes these contract terms on its authorized distributors who service Becton's contract customers like MedStar, and these terms make plain that the distributors play no independent role in the transactions.   Instead, the distributors function only as Becton's agents.  (*Id.* ¶ 17).  When they accept orders, ship goods, and invoice Becton's contract customers, they do so on Becton's behalf.  (*Id.* ¶ 76).  Further, title to Becton's  Disposable Hypodermic Products passes directly from Becton to the contract customer.  (*Id.* ¶ 53).  ███████████

████████████████████████████████████████

████████████████████ *Id.* ¶¶ 67-69).  At that point, the distributors negotiate their delivery service fees, either with Becton or Becton's customer, to compensate them for delivering Becton's products to Becton's customers.  (*Id.* ¶ 78).

The minority of Becton's Disposable Hypodermic Product sales are so-called "non-contract sales."  (*Id.* ¶ 20).  For these sales, Becton sells the products to a distributor at prices that are *above* the prices charged to contract customers for the same products, and the distributor then sets its own prices and resells the products to "non-contract customers" who, unlike contract customers, have no preexisting contract relationship with Becton.  (*Id.* ¶ 41).  Non-contract customers include individual retail drug stores and similarly situated entities.  (*Id.* ¶ 13).

There is no dispute among the parties that the Distributor Plaintiffs are direct purchasers of Becton's products for non-contract sales.

In this case, however, the Distributor Plaintiffs are trying to bootstrap their direct-purchaser standing for a minority of Becton's sales into direct-purchaser standing for *all* of Becton's sales, by trying to exploit the fact that they are interposed between Becton and its contract customers like MedStar in the physical flow of Becton's products. But their role as Becton's servicing agent, and their failure to affect the economic substance of the transactions at issue, defeats their attempt to usurp the direct purchaser standing of MedStar and other healthcare providers.

## III.  ANALYSIS

### A.    Legal Standard for Summary Judgment

Summary judgment is appropriate when the record shows that no genuine issue exists as to any material fact and that the moving party is entitled to a judgment as a matter of law.[2]  Although the burden of proof rests initially with the party moving for summary judgment, when a motion is made and supported, the

---

[2] Fed. R. Civ. P. 56(c); *see also Hersh v. Allen Prods. Co.*, 789 F.2d 230, 232 (3d Cir. 1986).

6

non-moving party must then produce *specific* facts showing that a genuine issue

exists for trial, and cannot rest on allegations or the assertions in the pleadings.[3]

> **B.    A Plain Reading of the Relevant Transactional Documents Supports Finding that  the MedStar Plaintiffs are Direct Purchasers**

MedStar asserts that Becton imposed anticompetitive terms in its contracts

with MedStar and MedStar's GPO-agent.  Specifically, MedStar challenges the

contracts' offering discounts on Disposable Hypodermic Products only if the

healthcare provider promises not to buy Disposable Hypodermic Products from

Becton's competitors.  MedStar Pls.' Am. Compl. at ¶¶ 60-63.  Section 4 of the

Clayton Act authorizes private parties, such as MedStar, to sue for treble damages

to remedy federal antitrust violations.  Precedent requires the court to examine the

relationship between antitrust defendant and plaintiff to determine whether the

relationship and anticompetitive harm alleged is sufficiently immediate or direct to

warrant standing.[4]  In this case, both the named Distributor Plaintiffs and MedStar

---

[3] Fed. R. Civ. P. 56(e); *see also Jersey Cent. Power & Light Co. v. Township of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).

[4] *See Illinois Brick Co. v. Illinois,* 431 U.S. 720, 735 (1977) ("*Illinois Brick*") (limiting standing to bring federal antitrust claims to avoid duplicative recoveries and overburdening federal courts with complex pass-through damages issues); *Blue Shield of Virginia v. McCready,* 457 U.S. 465 (1982) (employee had standing under Section 4 of Clayton Act in antitrust claim against health plan subscribed to through her employer); *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 537-38, 544-46 (1983) ("*AGC*") (citing *Illinois Brick* with approval and outlining multi-factor inquiry to determine standing to bring

Plaintiffs have sued Becton to recover damages resulting from *the same* contractual provisions contained in the contracts between MedStar and Becton.

In the typical case, no dispute exists over who is the direct purchaser entitled to recover overcharge damages under Section 4 of the Clayton Act. Given the plain language of the operative transactional documents in this case, no real dispute should exist here, either—the documents support a finding that MedStar is the direct purchaser.

MedStar buys Disposable Hypodermic Products under contracts that its purchasing agent (its GPO Novation, for example) has negotiated with Becton.[5] These contracts govern the relevant products' prices and contain other important contract terms such as the anticompetitive bundling provisions at issue.[6] ██████

---

federal antitrust claim); *In re Lower Lake Erie Iron Ore Antitrust Litig.,* 998 F. 2d 1144, 1164-71 (3d Cir. 1993) (applying *Illinois Brick* and *AGC* to determine direct purchaser standing); *McCarthy v. Recordex Services, Inc.,* 80 F.3d 842, 850-51 (3d Cir. 1996) (explaining Third Circuit's *Iron Ore* decision as applying *AGC* factors where double recovery concerns of *Illinois Brick* were not implicated); *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.,* 424 F.3d 363, 373 (3d Cir. 2005) ("*Dentsply*") (examining "economic substance" of transaction to determine antitrust standing under Section 4 of Clayton Act); *see also In re Mercedes-Benz Anti-Trust Litig.,* 364 F. Supp. 2d 468, 481 (D.N.J. 2005) (applying economic substance test to evaluate whether lessees are direct purchasers for purpose of federal antitrust claims against defendant car manufacturer, despite intervening purchase of car by independent leasing company).

[5] SOF ¶¶ 10, 58.

[6] SOF ¶¶ 14, 58. ██████████████████████

8

████████████████████████████████████████████████

██████████████████████████████████ MedStar purchases

Disposable Hypodermic Products pursuant to these contracts with Becton.[8]

Moreover, MedStar's injury and the anticompetitive harm at issue in this case

arises exclusively from the terms in those contracts.[9]

      While MedStar's contracts with Becton provide that one or more of Becton's

servicing agents will physically deliver Becton's products to MedStar,[10] the

servicing agent plays no role in negotiating the MedStar-Becton contracts' terms,

and is not party to these contracts.[11] █████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

---

[7] SOF ¶¶ 57(a), 61.

[8] Ex. 3, ██████ Decl. ¶ 6.

[9] ████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████ SOF ¶¶ 57(a), 57(b), 61.

[10] SOF ¶ 56.

[11] SOF ¶¶ 33-37.

[2] Title in the Disposable Hypodermic Products reverts to Becton upon shipment, so MedStar receives title to the product directly from Becton.[13]

Analyzing whether a distributor is an agent of the manufacturer for purposes of determining standing is neither novel nor unique.  In *United States v. General*

---

[12] *See, e.g.*, SOF ¶¶ 37, 69, 71.

[13] *Id.*

[14] *Id.*; SOF ¶ 66.

[15] SOF ¶ 57(a).

*Electric Co.*, 272 U.S. 476, 484-85 (1926), for example, the Supreme Court analyzed whether GE's distributors were acting independently or on behalf of GE as their principal for purposes of resale price maintenance violations, and noted that "[w]e find nothing in his agreement to pay the expense of storage, cartage, transportation (except the freight on the original consignment), handling and the sale and distribution of the lamps, inconsistent with his relation as agent." *See also Diskin v. Daily Racing Form, Inc.*, No. 92 Civ. 6347, 1994 WL 330229, at *4-6 (S.D.N.Y. July 7, 1994) (applying resale price maintenance agency analysis to direct purchaser question).

    A recent antitrust class action against Monsanto is illustrative on the point that an agent is not a direct purchaser of the products it is delivering on behalf of its principal. In *Sample v. Monsanto*, a group of plaintiffs alleged that Monsanto's "technology fee," which it assessed to purchasers of certain soybean seeds, was anticompetitive. Monsanto moved for summary judgment against one plaintiff, CK Farms, arguing that CK Farms was not a direct purchaser because it obtained its seed from two independent farmer-dealers.[16] The court denied the defendants' motion for summary judgment, because material facts remained unresolved concerning plaintiff's allegation that "the farmer-dealers who sell the soybean seed

---

[16] *Sample v. Monsanto*, 283 F. Supp. 2d 1088, 1091 (E.D. Mo. 2003).

and collect the technology fee *act as agents of Monsanto*."[17]  The Eighth Circuit

affirmed the lower court's ruling,[18] and the case returned to the district court.

Because Monsanto never produced sufficient evidence to contradict the plaintiffs'

allegation that the farmer-distributors' were Monsanto's agents, the district court

held that the CK Farms had direct-purchaser standing to pursue its antitrust

claims.[19]

In *Recordex*,[20] the Third Circuit conducted a similar analysis when it looked

at the economic role of plaintiffs in a malpractice suit, and the attorneys

representing them, to determine who were the direct purchasers for copying

services of the plaintiffs' hospital records.  The Court rejected plaintiffs' claims

that they were direct purchasers because "none of the plaintiffs retained their

lawyers to act *as mere purchasing agents* whose sole objective and function was to

buy photocopies for the clients."  *Id.* at 852 (emphasis added).  The attorneys were

the "real parties in interest" because they bought those records for their own use as

part of representing the plaintiffs in malpractice suits.[21]  Applying the Third

---

[17]  *Id.* at 1094 (emphasis added).

[18]  *Blades v. Monsanto Co.*, 400 F.3d 562, 568 n. 4 (8th Cir. 2005).

[19]  *McIntosh v. Monsanto*, 462 F. Supp. 2d 1025, 1031 (E.D. Mo. 2006).

[20]  80 F.3d at 852-53.

[21]  *Id.* at 852. The court explained: "Plaintiffs here are no more direct purchasers of
the hospital record photocopies at issue here than a passenger in a taxicab would be

Circuit's analysis to this case supports the conclusion that distributors, as mere servicing agents for Becton, are not the direct purchasers of Becton's products sold by Becton to its contract customers such as Medstar.

Although the distributors here perform certain limited activities for contract sales, including, *e.g.,* bar coding, customized pallet design, customized packing slips and invoices, and quarterly business reviews, these logistical services do not detract from a finding that they are merely Becton's servicing agents for the sale of Disposable Hypodermic Products by Becton to its contract customers like MedStar.[22]

### C.   The Third Circuit's Economic Substance Test Reinforces that the MedStar Plaintiffs Have Federal Antitrust Standing

A plain reading of the transactional documents in the record shows that the MedStar Plaintiffs are immediate purchasers of Becton's Disposable Hypodermic Products. Further, applying the Supreme Court's and Third Circuit's multi-factor tests, which analyze the relationships of the parties and anticompetitive harm for purposes of standing, supports and reinforces the same conclusion.

---

considered a direct purchaser of the gasoline used by the taxicab to carry the passenger to his destination." *Id.* at 853 n. 18.
[22] "While Distributors facilitate the supply of hypodermic products to MedStar, they sell logistics and related services to MedStar, not Becton's hypodermic products. It is misleading to follow the path of the hypodermic products and assume it tracks economic function." Ex. 1, Scott Morton Decl. pp. 11-12.

To determine direct purchaser standing to bring federal antitrust claims, the Third Circuit requires courts to evaluate the transactions among the various parties in the distribution chain to determine the "economic substance" of their respective roles.[23] *See, e.g., Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 373 (3d Cir. 2005); *In re Mercedes-Benz Antitrust Litig.*, 364 F. Supp. 2d 468, 481 (D.N.J. 2005).

Under the economic-substance test, this Court has recognized that a third party interposed between an alleged antitrust violator and a product's end-user does not necessarily undermine the end-user's direct-purchaser standing. Instead, a transaction running through that third party may be treated as a single sale between the seller and the end-user when the third party "does not function as an independent entity in the chain of distribution." *In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355, 366 (D.N.J. 2001).

1.    ***Mercedes-Benz* provides the legal framework for examining the economic substance of the transactions between MedStar and Becton.**

The *Mercedes-Benz* court addressed a scenario in which a customer negotiated the terms of sale, including price, with the antitrust violator, but

---

[23] Becton agrees that cases such as *Dentsply* and *Mercedes-Benz* "instruct this Court to examine the economic substance of the transactions." Tr. of Status Conference before the Hon. Ronald Hedges, at 38 (Jan. 31, 2007); *see also id.* at 31.

14

acquired use of the goods through a separate transaction with a third party. 364 F.

Supp. 2d at 468. *Mercedes-Benz* involved car lessees' antitrust claims against car

dealers. The dealer defendants moved for summary judgment, arguing that they

sold the cars to a leasing company, which in turn leased the cars to the lessees.

Based on this fact, the dealers argued that the lessees did not purchase their cars

directly from the dealers, so their claims were barred by *Illinois Brick*. *Id.* at 477.

This Court rejected that argument, recognizing that Third Circuit precedent

"require[s] that district courts look beyond a limited definition of direct purchaser

to other facts that are suggestive of purchaser status." *Mercedes-Benz*, 364 F.

Supp. 2d at 481 (citing *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*,

995 F.2d 425 (3d Cir. 1993)). Examining the transaction's economic substance,

the Court found that the lessee and dealer negotiated the terms of the lease, and the

dealer subsequently submitted the lease to a third-party leasing company for

acceptance. *Id.* at 472. The leasing company then paid the dealer the vehicle's

purchase price, and the lessee made monthly lease payments to the lease company.

*Id.* at 471. The lessee plaintiffs argued that they were direct purchasers, and this

Court agreed that their claims were not subject to the *Illinois Brick* indirect-

purchaser bar. *Id.* at 482.

That the lessees merely leased the car and never technically purchased the

vehicle was not significant. The court treated the lessees as if they were purchasers

(deciding only whether they were direct or indirect purchasers) because "[t]here is no substantive difference regarding the negotiation of a price between a customer who wants to finance the purchase of a vehicle and a customer who wants to lease a vehicle." *Mercedes-Benz*, 364 F. Supp. 2d at 474.

This Court concluded that the lessees were direct purchasers under the economic-substance test for three reasons. First, it held that "the interaction between the lessees and the dealer defendants closely resembled that which occurs in a sales transaction." *Id.* at 481. Second, "[t]he lessees and the dealers negotiated the terms of the transaction, including . . . purchase price." *Id.* And third, the lessees "had no interaction with the leasing companies [the parties who the defendants claimed to be the direct purchaser] until after the deal was consummated." *Id.*

The Third Circuit's subsequent opinion in *Dentsply* validated this Court's analysis in *Mercedez-Benz*. There the court held that the "economic substance" of the parties' roles in the transaction must be examined to determine which party is the direct purchaser. *Dentsply*, 424 F.3d at 373. The Third Circuit affirmed the district court's analysis of the facts surrounding the transaction, concluding that the "economic substance of the transaction" was that of two separate sale transactions: one sale from the manufacturers to the dealers and a second sale from the dealers to the dental laboratories. *Id.* ("[T]he dealers still make the *sale* to Plaintiffs and

16

Dentsply makes the *sale* to the dealers." (emphasis added)). The Third Circuit also

noted that the physical transfer of the products to and from the dealers did not itself

alter the economic substance of the transaction. *Id.* ("[T]he fact that some of the

teeth are drop shipped directly from Dentsply to Plaintiffs does not affect the

economic substance of the transaction.").

In applying the economic-substance test, the *Mercedes-Benz* court

considered the following factors: (a) whether the plaintiffs directly interacted with

the antitrust violator regarding the economic terms of the transaction; (b) whether

the intermediary's function was dependent on a preceding interaction between the

plaintiffs and antitrust violator; and (c) whether the harm suffered by the plaintiffs

arose directly out of their interaction with the antitrust violator or instead was

derivative of injury first suffered by another party to the transaction.

This Court also noted that the lessees were direct purchasers under what it

called the "direct purchaser paradigm," under which "Party A, the antitrust

violator, sells to Party B, and then Party C, a down-stream purchaser from B, seeks

to recover the implicit overcharges that B passed on to C." The lessees represented

party B since they dealt directly with the dealers (the antitrust violator). In

addition, the lessees' harm (the overcharge) immediately resulted from that

interaction with the dealers rather than being passed on from the leasing company.

17

*Mercedes-Benz*, 364 F. Supp. 2d at 480 (citing *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469 (7th Cir. 2002)).

As explained below, applying these factors to the uncontested facts of this case squarely supports the conclusion that MedStar purchases directly from Becton.

> ### 2. MedStar negotiates with Becton to set the economic terms for purchasing Becton's Disposable Hypodermic Products, and the Distributors Plaintiffs play *no* role in these negotiations.

Recognizing that "there is usually no direct interaction between the antitrust violator and the indirect purchaser," the *Mercedes-Benz* court's primary focus was whether the plaintiffs negotiated with the alleged antitrust violator, or with the intermediary. 364 F. Supp. 2d at 480; *see also Diskin*, 1994 WL 330229, at *4; *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 506 (S.D.N.Y. 1996); *Doe v. Arizona Hospital and Healthcare Ass'n*, No. 07-1292, 2009 WL 1423378 (Mar. 19, 2009 D. Ariz.). This Court held that the fact that the plaintiffs "negotiated the terms of the transaction, including . . . the 'agreed value' or purchase price" was "indicative of a purchase-like transaction." *Mercedes-Benz*, 364 F. Supp. 2d at 480. Moreover, this Court emphasized that "[t]he leasing companies do not deal directly with the customers regarding the lease transaction." *Id.* at 473. Rather, "[w]hen a dealer and a customer do negotiate the agreed value of the vehicle, the leasing company is not involved in that negotiation." *Id.* at 474.

18

This Court concluded that these facts indicated that the plaintiff was a direct purchaser, denied the defendants' motion for summary judgment, and entered partial summary judgment for the lessee plaintiffs. *Id.* at 482.

In this case, there is no dispute among the parties that MedStar (through its GPO) negotiated with Becton to establish the price and other economic terms for purchasing the Disposable Hypodermic Products at issue.[24]  The resulting Supplier Agreement sets forth the terms of sale, including product price.[25] ███████████

████████████████████████████████

████████████████████████████████

████████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████[26]  The servicing agent's limited role thus shows that it is an agent, not a seller.[27]

Becton's own sales data, internal documents, and statements confirm that it sells Disposable Hypodermic Products directly to customers like MedStar.

---

[24] *See supra* Section II, III.A.; *see also* SOF ¶ 4.

[25] SOF ¶¶ 5, 14, 58.

[26] *See, e.g.*, SOF ¶¶ 17, 21, 28.

[27] Ex. 2, Mimms Decl. ¶¶ 9, 35.

Becton's own manuals and internal documents define the relevant contractual

relationship as ███████████████████████████████████████████████████████

███████████████████████████[28] As Becton has previously explained to this

Court:

> [T]he economic role of authorized distributors under the
> GPO contracts . . . is not that of a direct purchaser at all.
> Rather these distributors basically deliver Becton's
> products to hospitals at prices negotiated directly
> between Becton and the hospital's agent (the GPO).
> The distributors acquire Becton's products at a pre-
> determined price dictated by the hospital's GPO contract,
> which is then covered by the hospital in full.[29]

Moreover, from an economic perspective, the relevant contracts and interactions

demonstrate that MedStar buys the Disposable Hypodermic Products directly from

Becton.[30] MedStar's interaction with Becton compels the conclusion that MedStar

purchases the relevant products directly *from* Becton.

---

[28] SOF ¶¶ 22, 34, 36-38.

[29] Becton Request for Downstream Discovery, *Louisiana Wholesale Drug Co. v. Becton & Co.*, Civ. A. No. 05-CV-1602, D.N.J., filed Aug. 24, 2005.

[30] *See* Ex. 1, Scott Morton Decl. p. 9 ("While Distributors facilitate the supply of hypodermic products to MedStar, they sell logistics and related services to MedStar, not Becton's hypodermic products. It is misleading to follow the physical path of the hypodermic products and assume that it tracks economic function.").

**3.    The servicing agent's role in delivering Becton's Disposable Hypodermic Products to MedStar is subordinate to a preceding contract to purchase those products between MedStar and Becton.**

In *Mercedes-Benz*, this Court also considered relevant the timing and extent of an intermediary's involvement in the transaction. 364 F. Supp. 2d at 481. Here, the undisputed facts show that the servicing agent is not involved until *after* Becton and MedStar agree upon the transaction's relevant economic terms.[31] ███

███████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████████

███████████████████████    ███████████████

███████████████████████████

Thus, Becton's servicing agent plays no independent role in MedStar's product purchases from Becton.[34]  Instead, its role is dependent on a preceding

---

[31] *See, e.g.*, SOF ¶¶ 33-37.

[32] SOF ¶ 36.

[33] *See, e.g.*, SOF ¶ 37.

[34] Ex. 1, Scott Morton Decl. p. 9 ("Distributors do perform the economic function of a seller, but for contract sales the economic value of their sales activity accrues

purchase contract between Becton and MedStar.[35]  Thus, the

second *Mercedes-Benz* factor also compels the conclusion that MedStar directly

purchases disposable hypodermic products from Becton.

> **4.    MedStar's harm is not derivative because it arises directly out of its purchases of disposable hypodermic products from Becton.**

Finally, the *Mercedes-Benz* court considered whether the plaintiff's harm

was separate from, or derivative of, harm first suffered by an intermediary.

364 F. Supp. 2d at 480-81.  The court noted indirect purchasers suffer harm only

when the direct purchaser passes on an overcharge that it paid to the antitrust

violator.  *Id.* at 480 (citing *Loeb Indus., Inc. v. Sumitomo*, 306 F.3d 469, 482 (7th

Cir. 2002).  In that sense, an indirect purchaser's harm is derivative of harm first

suffered by a previous purchaser in the chain of distribution.  In *Mercedes-Benz*,

---

from their selling of logistical services to MedStar hospitals, not Becton's
hypodermic products.").

[35] SOF ¶¶ 68-70.

[36] *See, e.g.*, SOF ¶ 66.

[37] *See, e.g.*, SOF ¶¶ 57(c), 66.

this Court found that the car lessees' harm was not derivative because "the prices they paid to lease new Mercedes-Benz vehicles were inflated by the [dealer's] price-fixing scheme." *Id.* at 481-82.

In this case, two important points establish that MedStar's harm does not derive from any harm initially suffered by any other purchaser. First, in contract sales, the distributors are servicing agents, not previous purchasers in the sense present in any relevant precedent.[38] █████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████[39] Instead, the servicing agent actually *benefits* from such overcharges because overcharges raise the product's price, which increases the service agent's percentage-based delivery fee. MedStar's harm, therefore, arises directly from its relationship with Becton,

---

[38] *See, e.g.*, SOF ¶ 70.

[39] The antitrust injury alleged by the MedStar Plaintiffs (overcharge) is different from the *only* type of antitrust injury the distributor plaintiffs could have suffered on contract sales (lost profits); therefore, the "double recovery" issues that concerned the Supreme Court in *Illinois Brick* are not present in this case. *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d at 1169-70; *Associated Gen. Contractors*, 459 U.S. at 550-51; *Recordex*, 80 F.3d at 851.

and cannot derive from any preceding harm.  MedStar, accordingly, cannot be an indirect purchaser.

*Kansas v. Utilicorp United, Inc.*, 497 U.S. 199 (1990), is not to the contrary. In that case, Kansas and Missouri sued on behalf of their citizens, who they acknowledged did not purchase natural gas directly from the antitrust violator—a pipeline company.  Instead, all parties acknowledged that the citizens bought natural gas from a utility, which in turn bought it from the pipeline company.  For this reason, the state plaintiffs did not argue that they were direct purchasers in the first instance.  Rather, and unlike the MedStar Plaintiffs, they asked the Court to recognize a new *exception* to the direct-purchaser rule.  *Id.* at 207-08.  The Court rejected this plea because, *inter alia*, such an exception would create apportionment problems.  *Id.* at 209-11.  Specifically, the Court noted that even if the utility eventually raised its rates to pass on the overcharge, it would have lower earnings (*i.e.,* it would suffer harm) in the interim.  *Id.* at 211.  Further, the Court noted that the utility would likely have to pass on (in the form of lower rates) to its customers any antitrust damages it collected from the suit.  *Id.* at 212.

Here, no such apportionment problems could possibly exist. ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████ And just the

same, the distributors would have no obligation to pass on to healthcare

organizations like MedStar (in the form of lower distribution fees) any antitrust-

damages recovery.

For each of these reasons, this case fits squarely within the *Mercedes-Benz*

paradigm.  Becton's decision to interpose servicing agents between it and its

contract customers cannot alter the conclusion that the customers are direct

purchasers for the purpose of pursuing their antitrust claims for overcharge

damages.

> **5.     The Third Circuit's economic substance test and this Court's
> application of it in *Mercedes-Benz* is consistent with
> principles of economics and accounting, which also support
> the conclusion that MedStar is a direct purchaser.**
>
> **a)     Economics**

Economists who study firms, markets, and competition analyze the

economic substance of market transactions to understand why firms act in certain

ways.  That analysis includes understanding and making economic sense of

contractual relationships between parties in a distribution system.

Analyzing the contracts between Becton, MedStar, Novation (MedStar's

GPO) and ██████ Becton's servicing agent for MedStar's purchases of Becton

products) using those economic principles, Fiona Scott Morton, a Professor of Economics at the Yale School of Management with experience applying those principles, concluded that "MedStar performs the economic functions of a buyer of [Disposable Hypodermic Products] from Becton, and that Becton performs the economic functions of the seller of these products to MedStar." Ex. 1, Declaration of Fiona Scott Morton ("Scott Morton Decl.") p. 8. Professor Scott Morton further concluded that "[w]hile Distributors facilitate the supply of hypodermic products to MedStar, they sell logistics and related services to MedStar, not Becton's hypodermic products." *Id.* at 11-12.

    **b)**  Accounting

  Accountants must sometimes determine whether a distributor is acting as an agent or as a principal to determine how to account for revenue. Quentin L. Mimms, an accountant knowledgeable with an accounting standard devoted to this very issue (Emerging Issues Task Force Issue No. 99-19, titled *Reporting Revenue Gross as a Principal versus Net as an Agent*), analyzed the contracts related to MedStar's purchases of Becton Disposable Hypodermic Products and concluded that "the role of Distributors in regard to sales of the Disposable Hypodermic Products to MedStar under what Becton describes as a Net Dealer Acquisition Contract represents that of an agent of Becton, and not that of a principal." Ex. 2, Declaration of Quentin L. Mimms ("Mimms Decl.") ¶¶ 9, 35. Courts deciding

26

whether an entity is an agent or buyer rely on many of the same factors. *See, e.g.*,

RESTATEMENT (SECOND) OF AGENCY § 14J.

**D.     Nonbinding Precedent Does Not Dictate a Contrary Result**

Nonbinding authority on which MedStar anticipates the Distributor Plaintiffs

will rely, such as *Delaware Valley Surgical Supply, Inc. v. Johnson & Johnson*,

523 F. 3d 1116 (9th Cir. 2008) ("Endosurgical")and *St. Francis Medical Center v.*

*C.R. Bard, Inc.*, --- F. Supp. 2d ----, 2009 WL 3088814 (E.D. Mo. 2009) ("Bard"),

do not change the analysis or the outcome of this case.  Neither of those opinions

was decided under the controlling precedent in this Circuit, or presented any

analysis of this District's *Mercedes-Benz* decision.  Neither examined the

economic substance of the relevant transactions.  Further, the relevant facts are

different.  Here, unlike those cases, the manufacturer—*i.e.*, Becton—has plainly

designated the distributors as its agents.  That fact was absent in those cases, and

the courts' analyses relied on that absence. *Endosurgical*, 523 F.3d at 1122 ("O &

M is not an agent or subsidiary of J & J"); *Bard*, 2009 WL 3088814, at *27 (noting

that the lack of an agency relationship was a key factor in *Endosurgical*, and

relying on that opinion).

Becton agrees that *Delaware Valley* is inapposite.  Indeed, it has already told

the Court as much: "That the distributors rather than the hospitals were found to

have standing in [Endosurgical I] does not dictate the outcome under the law in the

27

Third Circuit, or the material facts in this case. . . . .". Ex. 32, Letter from R. Atkins

to Hon. C.C. Cecchi (Aug. 24, 2007); *see also* Ex. 33, Letter from R. Atkins to

Hon. C.C. Cecchi (May 16, 2008) ("The Ninth Circuit decision [*Endosurgical II*]

does not change the case law in the Third Circuit..."). If Becton is consistent in its

position, then it will also agree that the *Bard* case is inapposite for similar reasons.


## IV.  CONCLUSION

For the foregoing reasons, the MedStar Plaintiffs respectfully request that its

motion for partial summary judgment be granted and that the Court find that

MedStar is a proper party to seek overcharge damages pursuant to Section 4 of the

Clayton Act for its purchases of Disposable Hypodermic Products.

Dated: December 22, 2009

Respectfully submitted,

*R. Laurence Macon*
_____
R. Laurence Macon
**Akin Gump Strauss Hauer & Feld LLP**
300 Convent Street, Suite 1500
San Antonio, TX 78205
Telephone:  (210) 281-7000
Facsimile:  (210) 224-2035
lmacon@akingump.com

Richard L. Wyatt
Todd M. Stenerson
Torsten M. Kracht
**Hunton & Williams LLP**
1900 K Street NW
Washington, DC 20006
Telephone:  (202) 955-1500
Facsimile:  (202) 778-2201
rwyatt@hunton.com
tstenerson@hunton.com
tkracht@hunton.com

AND

Judith L. Spanier
Karin E. Fisch
**Abbey Spanier Rodd & Abrams, LLP**
212 East 39th Street
New York, NY 10016
Telephone: (212) 889-3700
Facsimile: (212) 684-5191
jspanier@abbeyspanier.com
kfisch@abbeyspanier.com

AND

Gordon Ball
**Ball & Scott**
550 Main Avenue, Suite 750
Knoxville, TN 37902
Telephone: (865) 525-7028
Facsimile: (865) 525-4679
gball@ballandscott.com

AND

Kenneth A. Wexler
Jennifer Fountain Connolly
**Wexler Wallace LLP**
55 West Monroe Street, Suite 3300
Chicago, IL 60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022
kaw@wexlerwallace.com
jfc@wexlerwallace.com

AND

James V. Bashian
**The Law Offices of James V. Bashian, P.C.**
70 Adams Street, Fourth Floor
Hoboken, NJ 07030
Telephone: (973) 227-6330
Fasimile: (201) 488-3330
jbashian@bashianlaw.com

29