NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re HYPODERMIC PRODUCTS ANTITRUST LITIGATION, | Master Docket No.: 05-1602 (JLL) |
| | MDL No. 1730 |
| This Document Relates To: *Louisiana Wholesale Drug Co., Inc. v. Becton Dickinson & Co.*, Civil Action No.: 05-CV-1602; *Dik Drug Co. v. Becton Dickinson & Co.*, Civil Action No.: 05-CV-4465, *American Sales Co., Inc. v. Becton Dickinson & Co.*, Civil Action No.: 06-CV-1204, *Park Surgical Co. Inc. v. Becton Dickinson & Co.*, Civil Action No.: 06-CV-1205, and *SAJ Distributors, Inc. v. Becton Dickinson & Co.*, Civil Action No.: 05-CV-5891. | OPINION |

**LINARES**, District Judge.

This matter comes before the Court by way of a motion for the entry of an order granting final approval of the direct purchaser class settlement by Louisiana Wholesale Drug Company, Inc., Rochester Drug Co-Operative, Inc., JM Smith Corporation d/b/a Smith Drug Company, American Sales Company, Inc., SAJ Distributors, Inc., Dik Drug Company, and Park Surgical Co., Inc. ("Direct Purchaser Plaintiffs," "Direct Purchasers," or "Distributor Plaintiffs") on behalf of the certified Class of Direct Purchasers (the "Class"). (CM/ECF No. 453). A single objection was filed on January 14, 2013, by MedStar Health, Inc. ("MedStar") and MedStar-Georgetown Medical Center, Inc. ("MedStar-Georgetown") (collectively "Objectors," "MedStar," or "Healthcare Provider

1

Plaintiffs"). (CM/ECF No. 451). Defendant Becton Dickinson does not object to the Proposed Order and Final Judgment Approving the Direct Purchaser Class Settlement. Also pending is a motion for an award of attorneys' fees, expenses, and incentive awards for class representatives to which no opposition or objection has been filed. (CM/ECF No. 447). On March 8, 2013, the Court held a final fairness hearing in connection with the instant matter.

The Court notes at the outset that the Direct Purchasers contend, and the Court agrees, that the Objectors are not members of the Class as defined by the Settlement and do not have standing to object accordingly. In addition, the overwhelming majority of the Class supports the Settlement, including the four largest purchasers of the products at issue. Even if the Objectors did have standing, they represent an extremely small minority of that Class. In any event, having considered the arguments made by the Objectors, the Court finds that the Settlement is fair and reasonable. Accordingly, for the reasons set forth below, the Court GRANTS both motions.

## I. BACKGROUND

The Court will assume a familiarity with the underlying facts and parties, and will not set forth same in detail except as necessary. This case involves alleged monopoly power in certain markets for certain hypodermic products made by Becton Dickinson ("BD Hypodermic Products")[1] through an exclusionary contracting and bundling pricing

---

[1] For purposes of the Settlement, BD Hypodermic Products include products in the following device categories: (a) safety and conventional hypodermic needles and syringes; (b) safety and conventional blood collection devices; (c) safety and conventional IV catheters, including winged IV catheters; and (d) safety and conventional insulin delivery devices. (DP Mot. 6, n. 8).

2

scheme which allegedly caused members of the Class to pay higher prices than they would have otherwise paid absent the alleged conduct. (Direct Purchaser Motion for Final Approval, 6 ("DP Mot"); December 31, 2012 Declaration of Lead Class Counsel Bruce E. Gerstein, CM/ECF No. 447-2, at ¶ 28 ("Gerstein Decl.")). Defendant denies each of the allegations and has asserted a number of defenses. (DP Mot. 6; Gerstein Decl. at ¶ 7). In 2005, the Judicial Panel on Multidistrict Litigation ("MDL Panel") consolidated a number of cases involving alleged violations of Sections 1 and 2 of the Sherman Antitrust Act (15 U.S.C. §§ 1 and 2) and Section 4 of the Clayton Act (15 U.S.C. § 15) in the District of New Jersey. In 2006, MedStar and several other complainants filed a class action against Defendant Becton, Dickinson and Company ("BD" or "Becton"), alleging the same underlying conduct, which the MDL Panel consolidated with the cases here.

After multiple sessions before a private mediator, Distributor Plaintiffs and Becton agreed to settle the Consolidated Direct Purchaser Class Actions contingent upon this Court's determination of standing to pursue antitrust claims under Section 4 of the Clayton Act. Under the conditional settlement, Becton would make a $45 million cash payment to the proposed class of Distributors in exchange for dismissal with prejudice and certain releases ("Settlement"). In accordance with the conditional settlement, Distributor Plaintiffs filed motions seeking (1) certification of the proposed class and preliminary approval of the proposed settlement, and (2) partial summary judgment on the issue of direct-purchaser standing. Defendant Becton moved for preliminary approval of the proposed settlement. Healthcare Providers opposed the motions and filed a cross motion for partial summary judgment on the issue of direct-purchaser standing.

3

On September 30, 2010, the Court denied the Distributor Plaintiff's standing motion and denied the preliminary approval motion as moot. Focusing on the "economic substance" of the hypodermic products' supply chain, this Court granted the Healthcare Provider Plaintiffs' motion for partial summary judgment on the issue of direct-purchaser standing. In that regard, the Court held that the Healthchare Provider Plaintiffs, not Distributor Plaintiffs, were direct purchasers of Becton's hypodermic products through contract sales and could therefore pursue federal claims related to those sales of Becton's hypodermic products.[2] (CM/ECF Nos. 392 and 393). Distributor Plaintiffs filed a motion to certify for interlocutory appeal under 28 U.S.C. § 1292(b) (CM/ECF No. 395), which the Court granted on November 23, 2010. (CM/ECF No. 405). The Third Circuit granted Distributor Plaintiffs' petition for permission to appeal on July 22, 2011. (CM/ECF No. 413).

On June 5, 2012, the Third Circuit reversed in light of <u>Warren General Hospital v. Amgen Inc.</u>, 643 F.3d 77 (3d Cir. 2011), issued after this Court's decision. The Court of Appeals held that for purposes of standing under the Clayton Act,[3] Distributor Plaintiffs are direct purchasers and the Healthcare Provider Plaintiffs are indirect purchasers for

---

[2] For the sake of completeness, the Court notes that in addition to granting the Healthcare Provider Plaintiffs' Motion for Partial Summary Judgment, the Court denied the following motions: (1) Distributor Plaintiffs' Motion for Partial Summary Judgment; (2) Distributor Plaintiffs' Motion for Certification; (3) Becton's Motion for Preliminary Approval of Proposed Settlement; and (4) Healthcare Provider Plaintiffs' Motion in Limine. <u>See</u> CM/ECF No. 393.

[3] Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). The scope of § 4 is limited by the direct-purchaser rule, which states that only the immediate buyer of a product has standing to maintain a federal antitrust action. <u>In Re: Hypodermic Products Antitrust Litigation</u>, 484 F. App'x. 669, 674 (3d Cir. 2012).

contract sales. (CM/ECF Nos. 431-32, 14-15). The Healthcare Plaintiffs' motion for panel and *en banc* rehearing was denied. In re: Hypodermic Prods. Antitrust Litig., No. 11-3122, Doc. No. 003110990867 (3d Cir. Aug. 17, 2012).

On September 10, 2012, Distributor Plaintiffs moved for preliminary approval of the proposed direct purchaser class settlement, approval of the form and manner of notice to the class, and to set a final settlement schedule. Despite the Healthcare Providers' Opposition, Distributor Plaintiffs' motion was granted on November 16, 2012, and the following class was certified:

> All persons and entities (and assignees of claims from such persons and entities) who (1) purchased BD Hypodermic Products in the United States from BD at any time during the period of March 23, 2001 through April 27, 2009 (the "Class Period") **and** (2) were invoiced by BD for said purchases. The Direct Purchaser Class excludes BD, BD's parents, subsidiaries and affiliates, and United States Government Entities and those persons or entities who are permitted by the Court to opt out of the Direct Purchaser Class.

(CM/ECF No. 444 at ¶ 44) (emphasis added).

Only one entity, VWR International, LLC, f/k/a VWR International, Inc. f/k/a VWR Scientific Products Corporation, f/k/a VWR Corporation, f/k/a VWR Scientific Inc., timely requested exclusion from the Class. Direct Purchaser Class Counsel submits that they received no objections to the Settlement from a Class member. In addition, four of the largest Class members who collectively comprise about half of the total Class purchases have written to the Court to affirmatively support the Settlement.[4] However, as noted above, MedStar filed an objection.

---

[4] Direct Purchasers point to the following letters: Cardinal Health, dated November 27, 2012, and March 8 (CM/ECF Nos. 447-3, 447-4); McKesson, dated December 12, 2012, and March 3, 2010 (CM/ECF Nos. 447-5, 447-6); AmerisourceBergen, dated November

5

## II. STANDARD

Under Federal Rule of Civil Procedure 23, a Court may approve a proposed settlement which would bind class members "only after a hearing and finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Generally, "Rule 23(e) imposes on the trial judge the duty of protecting absentees, which is executed by the court's assuring that the settlement represents adequate compensation for the release of the class claims." In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab Litig., 55 F.3d 768, 805 (3d Cir. 1995). A presumption of fairness "exists where a settlement has been negotiated at arm's length, discovery was sufficient, the settlement proponents are experienced in similar matters, and there are few objectors." Hall v. AT&T Mobility, LLC, Civ. No. 07-5325, 2010 U.S. Dist. LEXIS 109355, at *25-26 (D.N.J. Oct. 13, 2010) (Linares, J.) (citing In re Warfarin Antitrust Litig., 391 F.3d 516, 535 (3d Cir. 2004)). The presence of an independent mediator "virtually insures that negotiations were conducted at arm's length and without collusion between the parties. Id. at 26.

In the Third Circuit, a court should consider the factors set forth in Girsh v. Jepson, 521 F.2d 153 (3d Cir. 1975), to determine whether a proposed settlement is fair, adequate, and reasonable. In re General Motors, 55 F.3d at 805. Those factors are as follows: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the

---

27, 2012, and March 2, 2010 (CM/ECF Nos. 447-7, 447-8); Medline, dated December 10, 2012, and March 5, 2010 (CM/ECF Nos. 447-9. 447-10).

settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. Girsh v. Jepson, 521 F.2d at 157.

In addition to the Girsh factors, the Third Circuit has indicated that, where appropriate, consideration of the following additional factors, often termed the Prudential factors, may be useful:

> [T]he maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions, 148 F.3d 283, 323 (3d Cir. 1998). However, a court need only consider the Prudential factors that are relevant to the litigation before it. In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 350 (3d Cir. 2010).

## III. DISCUSSION

At the outset, the Court notes that no entity that falls squarely within the Class definition objected to the settlement, despite adequate notice. As explained above, the Settlement Class is limited to entities that were actually invoiced and therefore appear in the "bill to" or "sold to" columns in Becton Dickinson's electronic sales data. (CM/ECF

No. 444 at ¶¶ 1, 13) (emphasis added). The parties do not dispute that MedStar and MedStar-Georgetown do not appear in those columns. Nor do the parties dispute that the Indirect Purchasers/Healthcare Provider Plaintiffs do not have standing under Section 4 of the Clayton Act to pursue damages.

The purported basis for MedStar's inclusion in the Class is as follows: "On multiple dates from 2003-2007, MedStar entities purchased BD Hypodermic Products directly from Defendant, were invoiced for these purchases by Defendant, and appear in the 'sold to' column in MedStar's own data. For example, a MedStar entity purchased $203.80 of products on September 5, 2003, and another MedStar entity purchased $189.15 in products on March 8, 2007." (CM/ECF No. 454, 1). Direct Purchasers argue that the entity to which the Objectors point is actually Washington Hospital Center Corporation, which is a separate legal entity with a separate ability to sue and be sued. (CM/ECF No. 456, n. 1).

In the context of arguing that the Class overwhelmingly supports the Settlement, the Direct Purchaser's motion for final approval argues that MedStar lacks standing to object to the DP Class Settlement. (DP Mot. 16). In this regard, they argue as follows:

> MedStar and MedStar-Georgetown are two of five Healthcare Plaintiffs, which filed a complaint in this matter asserting *indirect purchaser claims*, relating exclusively to purchases of products "through [BD's] authorized distributors." Doc. No. 90 at ¶¶15, 16, 50. Significantly, the one named Healthcare Plaintiff, Washington Hospital Center ("WHC"), which is a member of the DP Class because it made a tiny amount of direct purchases from BD during the Class period and appears in the "bill to" or "sold to" fields of BD's electronic sales data and was sent the Notice via first-class mail, has neither objected to the DP Class Settlement nor asked to be excluded from the Class. Contrary to MedStar and MedStar-Georgetown's claim that they are "members of the Direct Purchaser Class certified by the Court on November 15, 2012," Doc. No. 451, neither entity falls within the certified Class as defined in this Court's Order. Doc. No. 444 at ¶44. That is, neither entity (1)

> purchased BD Hypodermic Products in the United States from BD at any time during the period of March 23, 2001 through April 27, 2009 and (2) was invoiced by BD for said purchases, and therefore appears in the "bill to" or "sold to" fields of BD's electronic sales data for those purchases. See id. at ¶¶ 21, 44, 63(d).

(DP Mot. 16-17) (emphasis in original).[5]

During the final fairness hearing, counsel for MedStar explained as follows: "MedStar Health, Inc. is the parent company, and it has under it a series of hospitals. Those hospitals bought, I believe it's seven or eight purchases directly from Becton, and that fact has been out in this case for a long time, and it's never really been contested." (Tr. 22:20-24). Counsel conceded, however, that the amount of MedStar purchases is a "definitely a very small amount" as compared to the other purchasers. (Tr. 23:3-7). Importantly, MedStar does not contest that those entities are separate legal entities, which have an independent ability to sue or be sued. It is also apparent that none of those entities objected to the Settlement in their own right. Similarly, those entities could have opted out of the Settlement and pursued claims individually, but chose not to do so.

However, MedStar argues that the Settlement releases the injunctive claims of certain entities in the corporate family that purchased products both directly from Becton and indirectly through distributors. On the other hand, the Direct Purchasers argue that those indirect claims are not released. (Tr. 28:13-18). Rather, the Direct Purchasers

---

[5] The Direct Purchasers additionally point to the Healthcare Provider's June 1, 2009, Reply Brief submitted in support of their then-pending Motion for an Injunction Under the All Writs Act (CM/ECF No. 317). Healthcare Providers specifically argued: "[B]ecause the class definition in the Settlement Agreement defines 'direct purchaser' with regard to whether a customer is in the 'bill to' field in Becton's electronic sales data, the settling parties are attempting to release Healthcare Plaintiffs' claims. Becton and the Distributors plan to extinguish the powerful direct purchaser claims of the Healthcare Plaintiffs yet, because the Healthcare Plaintiffs are not members of the settlement class a [sic] currently defined, they will receive no consideration for the release of these valuable claims." (CM/ECF No. 317, 13).

maintain that "[t]he Settlement is explicitly limited and narrowly tailored to release *only* claims based on the direct purchases of BD Hypodermic Products from BD – *i.e.*, those purchases where customers were invoiced by BD and therefore appear in the 'bill to' or 'sold to' columns in BD's electronic sales data. As the Settlement expressly carves out all claims asserted by the Healthcare Plaintiffs, it neither covers nor releases any claims asserted by them in this case." (DP Mot. 7) (citing Settlement ¶ 15)[6] (emphasis in original). Thus, the Court finds that MedStar does not have standing to object to the Settlement.

Further, assuming *arguendo* that the relevant provision was ambiguous and those indirect claims were actually released, MedStar would release no more than $2,000 in direct purchases, but would be able to pursue injunctive relief in connection with the vast majority of purchases, which were indirect purchases. (Tr. 29:4-16). Finally, the indirect purchasers' claims for injunctive relief go beyond the Class period, as defined in the Settlement. (Tr. 31:19-22). Accordingly, MedStar would not lose its ability to pursue its indirect purchaser claims.

Notwithstanding that the Healthcare Provider Plaintiffs do not have standing to object to the instant motions, the Court will address the arguments asserted by the MedStar. The Objection specifically provided, in relevant part, as follows:

> MedStar hereby objects to the proposed Direct Purchaser Settlement as neither fair, reasonable, nor adequate, and requests that final approval of the Settlement be denied. *See* Fed. R. Civ. P. 23(e)(2). The proposed Direct Purchaser Settlement is overbroad to the extent it would improperly

---

[6] The cited language of paragraph 15 of the Settlement is as follows: "[T]he parties do not intend by this Settlement Agreement to settle and release indirect claims the Direct Purchaser Class members may have relating to purchases of BD Hypodermic Products from parties other than BD (and invoiced by persons or entities other than BD) and asserted under laws other than the federal antitrust laws (i.e., indirect claims)."

10

> release not only the federal antitrust claims of Becton's distributors, but also the federal antitrust claims of MedStar, other Healthcare Provider Plaintiffs, and all other non-distributor direct purchasers of Becton products whose interests have been adverse to those of the Distributors throughout this litigation.

(MedStar Obj. 1-2). The Objection also indicated that MedStar would primarily rely on the arguments set forth in its Opposition to the previous motion for preliminary approval.

The Healthcare Provider Plaintiffs made three primary arguments in opposition to the motion for preliminary approval: (1) the Settlement undervalues the direct purchasers' claims and is the product of collusive negotiations; (2) the Settlement favors the claims of Distributor Plaintiffs over the claims of the Healthcare Provider Plaintiffs and other non-distributors because it releases their broader federal claims without any additional compensation, and allows the Distributor Plaintiffs to participate in 100% of the settlement proceeds even though they suffered no economic injury for 74% of their purchases; and (3) the proposed class notice does not advise healthcare providers of the Settlement's deficiencies. (MedStar Opp'n.). As the Court has already determined that the Healthcare Provider Plaintiffs are not members of the Direct Purchaser Class and that their claims are not released by the Settlement, the Court need not address the second and third arguments.[7]

The Objectors primarily take issue with the Settlement as it relates to the eighth and ninth Girsh factors, arguing that the settlement is collusive and the result of a reverse auction. MedStar submits that the Settlement amount does not sufficiently correlate to the available recovery because "[t]he recovery achieved under the settlement must

---

[7] MedStar also urges the Court to require that the Notice make clear that the Settlement resolves the claims of competing plaintiffs. However, in light of the Third Circuit's decision, that is not the case. In any event, MedStar points to no binding authority in support of that position.

11

represent a 'material percentage' of the available recovery 'in light of all the risks considered under Girsh.'" (MedStar Opp'n. 9) (quoting In re Cendant Corp. Sec. Litig., 109 F. Supp. 2d 235, 263 (D.N.J. 2000). MedStar also argues that "[w]hile other courts have approved antitrust settlements where the settlement amount constitutes a minimal percentage of estimated damages, such cases are based on facts and circumstances not present in this case - such as the insolvency of the defendant, the acquittal of a defendant in a parallel criminal proceeding, or actual negative class certification or liability rulings." (MedStar Opp'n. 9).

The Direct Purchasers explain that the possible recovery in this case "ranged from $0 in BD's view to over $2 billion (before trebling) in the DPs' view, assuming the DPs were able to prevail on every element of this complex case." (DP Mot. 28). In addition, they argue that "in light of the complex questions of law and fact present in this litigation, the value of the proposed Settlement substantially outweighs the mere possibility of future relief." (DP Mot. 29). This is particularly the case because there has been no final adjudication as to the validity of their claims and Becton "has continued to deny all liability and allegations of wrongdoing and would have undoubtedly contested class certification, liability, and damages but for the Settlement." (DP Mot. 29).

Direct Purchasers point to five "analogous cases—brought at or about the *same time* on behalf of basically the *same class* of direct purchasers of medical devices making very similar antitrust claims—the $45 million Settlement here is the largest by a substantial margin." (DP Mot. 29) (emphasis in original). Therefore, they argue, that the Settlement represents a good value for a strong case, particularly in light of the attendant uncertainties and risks. (DP Mot. 30).

In a recent letter submitted to the Court, the Direct Purchasers write, in relevant part: "MedStar's sole argument is that $45 million is a small percentage of its view of potential damages. MedStar's argument fails to consider the numerous risk factors that these significant stakeholders took into account when they affirmatively endorsed the Settlement. Moreover, several analogous lawsuits have resulted in the entry of judgment *against* the plaintiffs, and still others have settled for far lower amounts. The settlement is one of the best results of its kind." (Feb. 26, 2013 DP Letter, 2) (emphasis in original). Having considered the associated risks of attempting to proceed to trial and obtaining a favorable result, in addition to other similar cases, the Court finds that the Settlement falls within the range of reasonableness.

Although not contested, Direct Purchasers also argue that the ratio of class members (1,657) to the low number of objectors (Med-Star and MedStar Georgetown) and opt-outs (only 1) demonstrates the overwhelming support for the Settlement. (DP Mot. 14). As Direct Purchasers explain, "the four largest Class members, who together purchased almost half of the challenged purchases have weighed in advising the Court that they strongly support the Settlement and [Direct Purchaser] Plaintiff's Counsel's application for attorneys' fees, reimbursement of expenses, and incentive awards for the named Class Representatives." (DP Mot., 1). Accordingly, the Direct Purchasers urge that "the opinion of the Class members with the greatest financial stake in this litigation should be given considerable weight." (DP Mot. 2). This is particularly the case because "the Class is comprised of sophisticated business entities that can be expected to oppose any settlement they find unreasonable" and many Class members have been members of

certified classes in other medical device and pharmaceutical antitrust actions. (DP Mot. 20-21).

Importantly, the Direct Purchasers assert that BD sales data indicates that the purchases by Washington Hospital Center amount to only 0.0000294% of the total Class purchases. (DP Mot. 16, n.11). Accordingly, even assuming that the Objectors did have standing by way of their association with Washington Hospital Center or other MedStar entities, the Objection is *de minimis*. See Varacallo v. Mass. Mutual Life Ins. Co., 226 F.R.D. 207, 237-38 (D.N.J. 2005) (Linares, J.) (results were "extremely low" and favored approval of the settlement where .003% of the class raised objections). Therefore, in light of the overwhelming support of Class members, the *de minimis* value of purported purchases by the Objectors, the procedural posture of the case and attendant risks associated with achieving a more favorable outcome through the adversarial process, and results obtained in similar cases, the Court finds that the Settlement is fair and reasonable.

## IV. CONCLUSION

Having considered the submissions of the parties and arguments made during the final fairness hearing in this matter, the Court finds that MedStar does not have standing to object to the Settlement. Even assuming that MedStar did have standing, its purchases were *de minimis*. Particularly in light of the robust support from the Class members with the most at stake, the Settlement is fair and reasonable under applicable Third Circuit

14

law. Accordingly, the Court GRANTS both motions and enters the proposed order submitted therewith.

DATED: 4-10-13

Jose L. Linares
United States District Judge